No. 2015-1108

# In the
# United States Court of Appeals
# for the Federal Circuit

---

OPENWAVE SYSTEMS, INC., NKA UNWIRED PLANET, INC.,
*Plaintiff-Appellant,*

v.

APPLE INC., RESEARCH IN MOTION, LTD., RESEARCH IN MOTION CORP.,
*Defendants-Appellees.*

---

Appeal from the United States District Court for the District of Delaware in No.
1:11-cv-00765-RGA, Judge Richard G. Andrews

---

**OPENING BRIEF FOR PLAINTIFF-APPELLANT UNWIRED PLANET,
INC. (F/K/A/ OPENWAVE SYSTEMS, INC.)**

---

Theodore Stevenson, III
  *Principal Attorney*
Daniel L. Geyser
Jared M. Hoggan
Nicholas Mathews
Meredith Elkins
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201
Tel.:  (214) 978-4000
Fax:  (214) 978-4044
*tstevenson@mckoolsmith.com*
*dgeyser@mckoolsmith.com*
*jhoggan@mckoolsmith.com*
*nmathews@mckoolsmith.com*
*melkins@mckoolsmith.com*

*Counsel for Plaintiff-Appellant*

No. 2015-1108

# In the
# United States Court of Appeals
# for the Federal Circuit

---

OPENWAVE SYSTEMS, INC., NKA UNWIRED PLANET, INC.,
*Plaintiff-Appellant*,

v.

APPLE INC., RESEARCH IN MOTION, LTD., RESEARCH IN MOTION CORP.,
*Defendants-Appellees*.

---

Appeal from the United States District Court for the District of Delaware in No. 1:11-cv-00765-RGA, Judge Richard G. Andrews

---

## CERTIFICATE OF INTEREST

---

Counsel for Plaintiff-Appellant Unwired Planet, Inc. (f/k/a/ Openwave Systems, Inc.) certifies the following:

1.      The full name of every party or amicus represented by me is:

Unwired Planet, Inc. (f/k/a Openwave Systems, Inc.)

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Unwired Planet, Inc. (f/k/a Openwave Systems, Inc.) is a publicly held corporation; it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

MCKOOL SMITH, P.C.:  Theodore Stevenson, III; Benjamin Levi; Daniel L. Geyser; Nicholas Mathews; Jared Hoggan; Meredith Elkins; and John Shumaker (formerly associated with firm; participated in trial court only)

MORRIS, NICHOLS, ARSHT & TUNNELL LLP:  Jack B. Blumenfeld; and Rodger D. Smith, II

ALSTON & BIRD LLP:  Scott J. Pivnick

Respectfully submitted.

/s/ *Daniel L. Geyser*
Theodore Stevenson, III
    *Principal Attorney*
Daniel L. Geyser
Jared M. Hoggan
Nicholas Mathews
Meredith Elkins
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201
Tel.:  (214) 978-4000
Fax:  (214) 978-4044
*tstevenson@mckoolsmith.com*
*dgeyser@mckoolsmith.com*
*jhoggan@mckoolsmith.com*
*nmathews@mckoolsmith.com*
*melkins@mckoolsmith.com*

*Counsel for Plaintiff-Appellant Unwired Planet, Inc. (f/k/a/ Openwave Systems, Inc.)*

February 27, 2015

ii

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...............................................................i

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT .........................................................4

STATEMENT OF THE ISSUE................................................................4

STATEMENT OF THE CASE.................................................................5

SUMMARY OF ARGUMENT ..............................................................13

STANDARD OF REVIEW ....................................................................18

ARGUMENT .........................................................................................19

I.    THE DISTRICT COURT'S "DISAVOWAL" FINDING IS AT ODDS WITH CONTROLLING LAW AND INCOMPATIBLE WITH THE PATENTS' PLAIN LANGUAGE..................................19

    A.    The Standard For Establishing Disavowal Is "Exacting," And The Court's Holding Is Inconsistent With That Standard .................................................................................19

        1.    There Is No Clear And Unambiguous Evidence Of A Textual Disclaimer......................................................20

        2.    As The Patents' Unqualified Language And Ordinary Operation Confirms, This Invention Applies With Full Force To *All* Devices, Including Those With "Computer Modules".................................23

    B.    The District Court Misread The Specification And Misapplied The Controlling Standard.......................................29

    C.    If Any Disclaimer Is Appropriate, It Should Be Limited To Disclaiming Devices With A Separate Computer Module ...................................................................................38

## TABLE OF CONTENTS
### (continued)

**Page**

II.   THE DISTRICT COURT'S "DISAVOWAL" FINDING WAS
REVERSIBLE ERROR ....................................................................39

CONCLUSION .........................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363 (Fed. Cir. 2003) ............................18

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361 (Fed. Cir. 2012) ..................................................................................... 32, 34

*Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366 (Fed. Cir. 2008)........................................................................................................33

*Datascope Corp. v. SMEC, Inc.*, 776 F.2d 320 (Fed. Cir. 1985)............................38

*Dealertrack, Inc. v. Huber*, 674 F.3d 1315 (Fed. Cir. 2012)................ 19, 20, 25, 30

*GE Lighting Solutions, LLC v. Agilight, Inc.*, 750 F.3d 1304 (Fed. Cir. 2014)........................................................................................................34

*Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367 (Fed. Cir. 2014) .......... 19, 30

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) .....................19

*Papst Licensing Digital Camera Patent Litig., In re*, No. 14-1110, 2015 U.S. App. LEXIS 1597 (Fed. Cir. Feb. 2, 2015) .......................................... 18, 25

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................22

*Resonate Inc. v. Alteon Websyss., Inc.*, 338 F.3d 1360 (Fed. Cir. 2003).................33

*Retractable Techs. Inc. v. Becton Dickinson & Co.*, 653 F.3d 1296 (Fed. Cir. 2011) ............................................................................................ 19, 34, 35

*Sandisk Corp. v. Memorex Prods.*, 415 F.3d 1278 (Fed. Cir. 2005) .......................19

*Scimed Life Syss., Inc. v. Advanced Cardiovascular Syss., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001) ...................................................................................35

*SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107 (Fed. Cir. 1985) (en banc) ...................................................................................................37

*SuperGuide Corp. v. DirecTV Enters.*, 358 F.3d 870 (Fed. Cir. 2005)...................37

*Teva Pharm. U.S.A. Inc. v. Sandoz, Inc.*, 135 S. Ct. 831 (2015) ............................19

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362 (Fed. Cir. 2012)................................................................................................ 19, 30, 32

*WI-Lan, Inc. v. Acer, Inc.,* 712 F. Supp. 2d 549 (E.D. Tex. 2010).........................25

## <u>Statutes</u>

28 U.S.C. § 1295(a) ................................................................................4

28 U.S.C. § 1331 ....................................................................................4

28 U.S.C. § 1338 ....................................................................................4

28 U.S.C. § 2107(a) ...............................................................................4

35 U.S.C. § 112(a) ................................................................................28

## <u>Rules</u>

Fed. R. App. P. 4(a) ...............................................................................4

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, Plaintiff-Appellant Unwired Planet, Inc. respectfully submits that:

(a) there have been no other previous appeals in this case; and

(b) there are no cases pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

# INTRODUCTION

Alain Rossman, a founder of Unwired Planet, is one of the pioneers of mobile internet technology, and his innovations with Unwired Planet have been used and installed on over 1 billion mobile devices. In its decision below, the district court eviscerated a core set of Rossman's patents.

1. This appeal presents a straightforward, but critical, question of alleged specification disclaimer. In 1995, Unwired Planet devised a multifaceted invention for mobile devices to effectively harness the Internet. The specification was rich and described in detail the workings of mobile devices, the architecture of network servers, and the interaction between those servers and mobile devices.

A number of patents—eight total—issued from this single specification. Three are at issue in this case.[1] One of the patents, the '409, claims the basic concept for implementing an HTML parser on a mobile device for displaying web pages. Another patent, the '447, teaches how to cache pages linked to the page being currently viewed to speed up browsing over mobile connections. The third patent, the '037, discloses how to notify a mobile device that application updates are available on a remote server.

---

[1] *See* U.S. Patent No. 6,405,037 ("'037 patent"); U.S. Patent No. 6,430,409 ("'409 patent"); U.S. Patent No. 6,625,447 ("'447 patent").

Before Rossman's invention, manufacturers struggled to develop a "computer module" with sufficient power to run all applications directly on the device. This left mobile devices too big in size, too expensive to produce, and too difficult (if not impossible) to update without hardwired modifications. These problems left those devices unfit for widespread marketing, and the inability to update those devices without physical changes left the devices inordinately static and inflexible.

This all changed with Rossman's invention. Rather than focus exclusively on a device's computing power, this invention devised ways to divide the computing power between a device and its remote server. By delegating critical functionality to the remote server, the device itself could operate with exceedingly little computing power. New applications and updates could be seamlessly transferred to the device from the remote server, eliminating the need to update the device's physical hardware. Any device capable of accepting and processing directives from the remote server could now take advantage of that server's processing capacity. This fundamental bifurcation of computing power—between devices and servers—eliminated the need for devices to employ full computing capacity on their own. While any device with minimal capacity could practice the invention (and realize its benefits), the invention operated identically on "intelligent" devices with excess processing power. This innovation simply made excess power no longer "*required*" for the device itself.

2. The district court, however, construed the specification to exclude a whole category of devices from the patents. Even though the claims' language was broad, and even though the "plain and ordinary" meaning of that language reached all devices, the court held that the specification implicitly "disavowed" the use of any device containing a "computer module," leaving the patents confined to devices with basic-level "microcontrollers." The court found that the specification "disparaged" the use of "intelligent" devices, and thus intended to exclude them from the claims' scope. Under the court's holding, that exempt class could still practice and benefit from the invention, but they had been disavowed from its natural coverage.

This case does not approach the high threshold for specification disclaimer. The district court went astray when it read these hardware limitations into the claims. The features claimed in these patents have nothing to do with the hardware capabilities of mobile devices. Parsing HTML, caching linked pages, and notifying devices of application updates are novel and useful inventions regardless of whether a mobile device has robust or minimal computing power. The district court erroneously fixated on the specification's discussion of the *minimum* computing requirements: it read language saying a microcontroller was *sufficient* to practice the invention to say it was *necessary* to practice the invention, a clear logical error. It misread multiple aspects of the specification, and it narrowed the claims with features from non-exclusive embodiments, all in direct conflict with this Court's deci-

sions. And it invoked a wholly arbitrary, random disclaimer without any basis for presuming the inventor intended to cripple his own patents.

These patents textually cover any device with the basic capacity to practice the claims. A device's excess processing capacity has no effect on the invention's functionality or critical aspects of its chief benefits. The Court should reverse the district court's ruling and remand for further proceedings.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338, and this Court has jurisdiction under 28 U.S.C. § 1295(a). The notice of appeal was filed on October 27, 2014, after final judgment was entered on October 14, 2014. Under 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a), Unwired Planet's appeal is timely.

## STATEMENT OF THE ISSUE

Whether the district court erred in finding that the patents unmistakably disavow "mobile devices containing computer modules," despite the lack of any explicit textual disclaimer, the ability of those devices to practice and benefit from the invention, the lack of any articulable reason for the patentee to disavow those devices, and the direct conflict between the court's implied disclaimer and the claims' undisputed "plain and ordinary meaning."

# STATEMENT OF THE CASE

In two separate tribunals, Unwired Planet sued Apple and Blackberry for infringing a series of claims in its groundbreaking patents. Unwired Planet first sued Defendants in federal court on August 31, 2011 (A1000), and immediately followed that suit by initiating an ITC action on October 7, 2011 (A1282). The district-court litigation was stayed for the ITC proceeding. That proceeding was ultimately dismissed after the ITC construed the patents—admittedly against their "plain and ordinary meaning"—to "disavow" the use of "computer modules" in practicing the invention. A11518-A11529. The district court followed suit, adopting the same construction. The parties subsequently stipulated to a judgment of non-infringement (A11, A13, A17), and this appeal followed.

## Unwired Planet's Technological Breakthrough

1. Alain Rossmann founded Unwired Planet in 1994 to revolutionize the wireless communication industry, providing powerful end-to-end solutions for mobile internet access and web browsing. A3344. His efforts were a success: Unwired Planet's mobile browser has been installed on over 1 billion mobile devices, and its patented technology has shaped the way mobile devices operate in a modern world. A3345, A4213-A4215.

Rossmann crafted the mobile ecosystem disclosed in the patents-in-suit after major players in the industry struggled for years to produce an effective handheld

wireless device. A56 (1:44-60). The prior art focused on grouping hardware, operating systems, and applications software together into single units. A61 (11:10-16). These products suffered multiple problems that prevented widespread commercial success. A device capable of performing all the necessary functions on its own was "too large and too heavy to fit in a user's pocket," failing a "key requirement of the mobile communication market." A56 (2:1-4). These devices were also too expensive—approximately $1000—given the high prevailing cost of producing computer modules and communications modules. A56 (2:5-8). Contemporary research indicated that the market for such devices was priced at approximately $300, and that "[e]ven with a 20% compound cost decline, it would take five years for the combination units to meet today's customers' price requirements." A56 (2:10-12). Finally, and critically here, these early "intelligent" devices were dependent on ROM to store and run applications. Devices were typically limited to the small number of applications burned into each device at the factory. A56 (2:33-36). Users could not update those applications without returning to the store to have ROM reburned or installing a new memory card in the device. A58 (5:62-6:3), A60 (9:65-10:6). These limitations often left devices at risk of quickly becoming obsolete. A56 (2:33-36), A58 (5:42-45).

2. The three patents-in-suit generally relate to software for mobile internet access and web browsing. A3344. They are continuations from an original parent

application, filed December 11, 1995, and share a common specification with the original application. Nearly one dozen issued patents share that specification. A3345. These patents are three of the eight patents claiming priority to that parent application, which was issued as U.S. Patent No. 5,808,415. A3347.[2]

These patents address specific aspects of the mobile ecosystem, including accessing applications from an "app store" and wirelessly accessing information on a remote server. The '037 patent, for example, creates access to updated applications without the need to reburn ROM or replace memory cards. The '409 patent permits software on a wireless phone to interact with software on a server to transmit content to the user. The '447 patent allows a mobile device to receive several pages of data or information together, so the user can navigate through multiple pages without asking the mobile device to reach back across the network for additional pages, cutting down on wireless data traffic.

---

[2] Besides the asserted '037, '409, and '447 patents, five other patents issues from, and claim priority to, the parent application. Each of these five patents claim different features and concern different embodiments of the mobile ecosystem disclosed in the specification. Importantly, not all of the features described in the parent application are claimed in every patent that issued from that application. When the applicant, for example, chose to limit its claims to a mobile device having limited computing resources, it did so expressly. *See* U.S. Patent No. 5,808,415, A4511 (102:56-57) (the claimed "client module" executes on a "microcontroller of the two-way data communication device"); U.S. Patent No. 7,003,284, A4636 (19:51), A4637 (21:41-42) (reciting a "thin-client mobile device").

Rossmann's inventions accomplished these goals by reconceptualizing the mobile device's core operation—and dividing the computing power between a device and its remote servers. Those servers could "be accessed by any two-way data communication device that can communicate with that server computer." A59 (8:30-34). Users would transmit requests from the device to the server for specific applications using a resource locator, which in turn would execute the application and respond to the device with a user interface. A57 (4:40-57). That message would then be interpreted by a client module on the device, which would generate the user interface (*e.g.*, a data-input option or display). *Ibid.*

Using this innovation, each application on a remote server can generate its own interface for the mobile device, creating endless possibilities: "the user interfaces and possible interactions available to the user are determined only by the applications that developers make available." A58 (5:29-35). By splitting the computing power between the device and the remote server, devices were no longer limited to the programs found in their internal memory, and remote servers could perform much of the work that the prior art struggled to undertake on the device itself. A60 (9:9-15). This permitted (but did not require) a streamlined client module with less processing power, less memory, lower cost, and longer battery life than preexisting devices. A60 (9:16-25), A63 (16:24-36).

Because of the invention's "lightweight" capabilities, it could operate using the processing power already present on most cellular telephones, a clear advantage over prior-art devices. Because the cost of constructing minimal processing power was a "fraction" of adding a separate computer module (A61 (11:31-35)), the patents declared that "the prior art limitations of combining a computer module with a wireless communication module have been overcome" (A57 (3:38-40)).

In addition to reducing hardware and processing requirements, the invention liberated mobile devices from the bounds of closed operating systems and ROM-based applications. A60 (9:29-43). By housing applications on a remote server, developers could create new and updated applications without physically modifying the device itself. A60 (9:44-50). This freed applications from the limitations of specific operating systems and left applications "independent of the particular type of two-way data communication device that is used"—"an application can be accessed by any two-way data communication device that can communicate with that server computer." A59 (8:31-37). This stood in marked contrast to prior-art devices, including those with computer modules: by not dividing functions between devices and remote servers, closed-operating systems lacked reliable means for easy updates. Those devices, without Rossman's invention, could "neither adapt nor be adapted to the fast changing requirements of the market place." A60 (10:2-6).

**Procedural History**

Unwired Planet sued Apple and Blackberry on August 31, 2011, alleging in-fringement of the patents-in-suit (A1000), and subsequently initiated a second ac-tion in the ITC on October 7, 2011 (A1282). The district-court action was stayed pending the ITC's determination.

1. During the *Markman* stage of the ITC investigation, three terms from the patents-in-suit were grouped and construed together as the "mobile device" terms: "mobile device" in the '037 patent, "wireless mobile telephone" in the '409 patent, and "two-way communication device" in the '447 patent.[3] Although Unwired Planet urged that the terms be accorded their plain and ordinary meaning, the ITC's Administrative Law Judge ("ALJ") construed those terms to exclude all products containing any type of computer module. A11518. It found that the speci-fication disavowed those devices from the claims' scope by disparaging the prior art and discussing embodiments where devices explicitly lacked a computer mod-ule.

The ALJ also rejected Unwired Planet's argument that a microcontroller is itself a computer module falling outside any alleged disclaimer. A11529. The ALJ

---

[3] The parties agreed that the ITC and the district court should analyze and construe the "mobile device" terms together. A3350. The district court suggested that the term "two-way communication device" also appears in the claims of the '409 pa-tent (A3-4), but it does not.

refused to further clarify or qualify the "computer module" disclaimer, leaving the boundary between a "computer module" and a basic-level "microcontroller" undefined. A11619. Following the ALJ's *Markman* order, and the ALJ's refusal to enter a stipulated determination of non-infringement based on its claim construction, Unwired Planet dismissed its ITC investigation. A3350. All parties to this case agreed that the *Markman* ruling would have no preclusive effect on the district court, but could be considered for its persuasive value, if any. A3276.

2. After the ITC investigation was dismissed, litigation resumed in district court. A1289. Unwired Planet proposed a streamlined case management procedure that would tee up the dispositive claim construction of the "mobile device" terms before anything else. Unwired Planet stipulated that if the district court adopted a construction of the "mobile device" terms that matched the ALJ's construction "in all material respects," it would terminate the case "while preserving the parties' rights to appeal the claim construction." A3272.

Unwired Planet, Apple, and Blackberry exchanged claim-construction briefs and participated in oral argument focused solely on deciding the proper construction of "mobile device." On February 19, 2014, the district court issued a *Markman* Order that largely agreed with the ITC's claim construction, but featured two distinctions that Unwired Planet viewed as material: (i) the court found that a microcontroller may be a type of computer module; and (ii) the court explicitly noted

that mobile devices containing microcontrollers are not excluded from the scope of the claims. A7. Unwired Planet believed that these differences raised a genuine issue of material fact because, in Unwired Planet's view, Apple's and Blackberry's products contain microcontrollers (which are also computer modules).

Following this *Markman* order, Defendants—with Unwired Planet's consent—moved for an early summary judgment of non-infringement on the ground that the court's construction was identical to the ALJ's and thus dispositive. Unwired Planet offered a two-pronged response: (i) if the court did not intend to materially depart from the ALJ's holding—despite including microcontrollers in the claims' scope—then Unwired Planet would consent to entry of summary judgment; but (ii) if the court's construction was indeed different from the ALJ's, a fact issue would preclude summary judgment. Unwired Planet announced this concession in the first paragraph of the first page of its summary-judgment response: "although [it] disagrees with [Defendants'] interpretation of the Court's *Markman* opinion, Unwired Planet concedes in full candor that the accused devices do not infringe if Defendants are correct. This is because each of the accused mobile devices contains an application processor that is a computer module (and also a microcontroller)." A11196.

On September 9, 2014, the district court denied Defendants' motion for summary judgment on the ground that it was unclear from the record whether the

accused products fell within the computer-module disclaimer. A9-A10. The court, however, provided further guidance on its claim construction: "it is clear to me that the question of infringement is whether the accused products contain a computer module that is not solely a microcontroller." *Ibid.* The court also confirmed that its construction of "mobile device" was materially indistinguishable from the ALJ's. Accordingly, based on the disputed claim construction, Unwired Planet agreed to a stipulated judgment of non-infringement. A11324. The district court entered final judgment on October 14, 2014. A17.

This appeal followed.

## SUMMARY OF ARGUMENT

Contrary to the operative finding below, these patents do not disavow "computer modules" from the claims' natural scope. This invention marked a ground-breaking innovation for wireless internet applications. By dividing computing functions between a mobile device and a remote server, it eliminated the need to do everything on the device itself. Unlike the prior art, for example, new and updated applications could now be used without any hardware or software changes, a major benefit for *any* device. While advanced "computer modules" were no longer "*required*" under the invention, nothing in the patents turned on a device's specific hardware: any device with basic processing abilities could practice the invention and substantially benefit from its operation.

The district court gutted the core of this invention. Despite the lack of any explicit disavowal, the court found that the patents disclaimed any device exceeding some undefined level of minimum processing ability. That holding was mistaken. Nothing in the specification approaches the high threshold for a disclaimer, and the district court's contrary finding distorts the patents' natural scope, misreads the specification, and fails under this Court's governing precedent. Its judgment should be reversed.

1. The standard for finding disavowal is exacting, and the district court failed to satisfy that standard here. A disavowal must be unmistakable. Yet here there was no explicit textual disclaimer, and no other evidence of any intent to dispatch "computer modules" from the invention. Even the district court admitted that disavowal was incompatible with the claims' "plain and ordinary" meaning. Yet the court still declared that devices with "computer modules" were excluded from the claims' broad scope.

That holding is directly at odds with each patent's teachings and its ordinary operation. These patents function exactly as intended when a device has a "computer module." The invention's core concept was dividing processing power between devices and their remote servers. That insight eliminates the *need* for a phone to use advanced computing power, but it does not disavow any particular processors (including "computer modules") from the claim's scope. Any phone

14

with a basic-level processor can benefit by leveraging the computing power on a remote server. The fact that certain phones employ advanced processors is irrelevant to each claim's functionality: the invention can still be fully practiced (with its intended effects) by any device as long as *minimal* capacity exists. While bulking up a phone may diminish some of the claim's *commercial* benefits, it has nothing to do with the claims themselves (or their natural operation).

The specification focuses directly on *sufficient* capacity because that is precisely what the patent is trying to teach. The point of a written disclosure is to *disclose* the invention. This invention "requires only lightweight resources." A58 (6:36). There was no need to show how devices with excess computing power (or other irrelevant features) would function. The purpose was not showing that such excess power was *forbidden*, but that it was *unnecessary—i.e.*, "not *required*," in the words of the specification's consistent, conspicuous refrain. That taught *all* devices (including those with "computer modules") how to practice the invention.

2. The district court's contrary conclusion suffers from a series of legal and logical errors. It first read snippets from the specification out of context, chiefly describing (without acknowledging it) *figures* in the specification. While those *examples*—textually confirmed as merely "one embodiment," "one application," etc.—did not use "computer modules," that hardly means that *no* embodiment can use computer modules. The invention eliminated the need to process everything on

the device itself. If any device uses a remote server in the manner described in the claims, it is covered—and nothing in the claims or specification suggests otherwise. There was no basis to restrict the invention to features found in its non-exclusive embodiments.

Second, it is assuredly true that the specification disparaged (repeatedly) devices with "computer modules," but those devices were disparaged as *commercially* deficient, not *technically* deficient. The specification recognized that the prior art had failed to introduce an "intelligent" device supporting widespread "*market*" success, because those devices were "too bulky, too expensive, and too inflexible." A56 (1:66). It never said those devices were incapable of practicing the invention. Indeed, those devices could directly *benefit* from the invention, by increasing flexibility, harnessing the power of remote servers, and updating applications without hardwired changes. Those "intelligent" devices were hobbled by trying to house all processing functions on the device itself. While the patents disavowed *that* inflexible strategy, the patents did not grant those devices a free pass when they deploy the patented technology.

Third, the court's ruling fights common sense. There is no plausible, rational explanation for why any inventor would artificially restrict the patents' scope in this fashion. The purported disclaimer utterly cripples the invention for a whole swath of devices, yet does so *gratuitously*. There was no issue of (i) avoiding de-

vices that were incompatible with the invention, or (ii) avoiding prior art that would preempt the invention. This invention works perfectly with any device having *minimum* capacity; a computer module's excess processing power is irrelevant. Nor was it necessary to disavow "computer modules" to avoid prior art: the innovation here was dividing processing power between a device and its remote server; a device's hardware capabilities were irrelevant. There is no reason to think those "intelligent" devices were randomly carved out of the invention.

Finally, the court's disavowal cannot be squared with other aspects of the specification. These patents were disclosed in exhaustive detail. The specification shows how the invention benefits *any* phone with *any* processing ability, so long as minimal capacity exists. If the patents nonetheless wished to excuse an entire set of devices, one would expect to see an explicit statement to that effect, coupled with *some* attempt to define the critical line between "computer modules" and "microcontrollers." Yet this specification says—nothing. Such a statement is found nowhere in the specification, no one below had any idea how to define either term in concrete fashion, and the district court threw up its hands after grappling with the issue. The stark contrast between this insoluble imprecision and the specification's meticulous work elsewhere (on all *material* issues) suggests this was not the subject of any surrender.

The contrary presumption is also at odds with the specification's technological predictions for the near term: rational parties do not silently disavow the very devices they foresee shortly overtaking the subject-matter of their field. If one intended something so unusual, one would (again) indicate that intent expressly. The court should have identified far stronger evidence before presuming the patents wished to disavow claim scope in such a bizarre, haphazard fashion.

This invention's basic, profound insight was splitting the processing functionality between mobile devices and remote servers, opening a universe of flexibility and eliminating the *need* to process everything on the device itself. That does not give devices a free pass simply because they happen to use sophisticated processors *while practicing and benefitting from the invention*. There is no clear and unmistakable disclaimer, and the district court's contrary finding should be reversed.

## STANDARD OF REVIEW

When parties stipulate to a non-infringement judgment after a dispositive claim construction, this Court "need only address" the correctness of the claim construction. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1368 (Fed. Cir. 2003). Because the construction below was based entirely on "intrinsic evidence," this Court reviews the issue de novo. *In re Papst Licensing Digital Camera Patent Litig.*, No. 14-1110, 2015 U.S. App. LEXIS 1597, at *10 (Fed. Cir. Feb. 2, 2015)

(citing *Teva Pharm. U.S.A. Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 840-42 (2015)); *see also Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) (reviewing claim construction, including findings of disavowal, de novo).

## ARGUMENT

### I.   THE DISTRICT COURT'S "DISAVOWAL" FINDING IS AT ODDS WITH CONTROLLING LAW AND INCOMPATIBLE WITH THE PATENTS' PLAIN LANGUAGE

#### A.   The Standard For Establishing Disavowal Is "Exacting," And The Court's Holding Is Inconsistent With That Standard

The district court erred in finding that the patents disavowed the use of "computer modules." The standard for disavowal is "exacting." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012). It must be premised on clear and unambiguous language: the waiver must be "'both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer.'" *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1322 (Fed. Cir. 2012) (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003)). If the language is "subject to more than one reasonable interpretation," it must be construed *against* disavowing a claim's natural scope. *See, e.g.*, *Sandisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005).

These principles doom the district court's holding. The claims' plain terms lack any "expression[] of manifest exclusion," *Retractable Techs. Inc. v. Becton Dickinson & Co.*, 653 F.3d 1296, 1306 (Fed. Cir. 2011) (internal quotation marks

omitted), and those claims mean what they say: any device—even those with "computer modules"—can benefit directly from the invention, and the specification nowhere disavowed those devices from its broad sweep. The judgment should be reversed.

### 1. There Is No Clear And Unambiguous Evidence Of A Textual Disclaimer

A proper analysis starts with the patents' text, and this text lacks the required "clear," "unambiguous," "deliberate[]," "unmistakable" disclaimer. *Dealertrack*, 674 F.3d at 1322. A quick glance at each patent is telling.

Claim 12 of the '409 patent, which covers HTML parsing, is representative (A148 (49:12-35)):

> A method for a *wireless mobile telephone*, said wireless mobile telephone having a display and an input interface, the method comprising:
>
> > creating, in a client module executing on a processor in said wireless mobile telephone, a request to a server in a data network, said request specifying a resource locator identifying a resource associated with said server, said server communicating with said wireless mobile telephone over a wireless network, said creating comprising
> >
> > > retrieving said resource locator from a memory in said wireless mobile telephone,
> > >
> > > generating said request using said resource locator and identification information, and
> > >
> > > displaying on said display information relating to said request;

20

transmitting said request over said wireless network to said server;

receiving from said server a response over said wireless network; and

processing said response in said client module, to cause information in said response to be displayed on said display.

Claim 13 of the '447 patent, which covers caching linked pages to speed browsing over low-bandwidth connections, is representative (A218 (60:41-57)):

A *wireless two-way communication device* for communicating across a wireless network, said wireless two-way communication device comprising:

a display to display information;

a wireless network interface to communicate across said wireless network; and

a client module running on a processor, said client module to send a request for access to a resource on a data network using a resource locator identifying said resource, said client module receiving a response from said server, said response including a plurality of linked pages, said client module displaying information on said display according to at least one of the pages, said client module allowing a user of the wireless two-way communication device to move among said pages using a user input interface without sending an additional request.

Claim 1 of the '037 patent, which covers providing a device access to updated applications without modifying the device, is representative (A84 (58:27-40)):

A method for making available a newer version of an application to a *mobile device* with no changes in the mobile device, the method comprising:

> receiving a message over a wireless network from a first server, the message pertaining to the newer version of the application offered from a second server;
>
> displaying, on a screen of the mobile device, a graphic user interface in response to the message;
>
> generating a response message in response to an interaction by a user with the graphic user interface; and
>
> providing access to the newer version of the application from the second server after the response message is successfully transported by the first server to the second server.

Defendants face a high bar to establish disclaimer on these facts. Unlike the usual situation, it is undisputed that these claims lack an explicit textual disclaimer. Their language is clear and categorical, and it applies to *any* "mobile telephone," "two-way data communication device," or "wireless device." There is no hardware limitation in these claims, and any restriction would have nothing to do with the core invention or any of its claimed features. Indeed, even the district court recognized that its disavowal was at odds with the claims' "plain and ordinary" meaning (A4), which presumptively controls (*Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc)). There is no textual support for grafting a "computer module" disclaimer onto the claims' unambiguous scope, and the court's contrary ruling was mistaken.

It is likewise undisputed that the specification lacks an explicit textual disclaimer. It never disavows the use of "computer modules" or demands that devices use *only* "microcontrollers." On the contrary, it describes the "[f]ield of the

[i]nvention" as covering, categorically, "two-way data communication devices," without any hint of hardware processing limitations (A56 (1:36-39)); and it underscores the invention's "functionality" as "limited only by the applications available on a server computer," without any restriction for devices containing computer modules (A57 (3:63-67)). The operative language is not limiting, but broad and inclusive.

Without an explicit textual disclaimer, the court had to unmistakably identify some unstated intent to disavow claim scope. But as explained below, the controlling evidence points in the opposite direction.

> ### 2. As The Patents' Unqualified Language And Ordinary Operation Confirms, This Invention Applies With Full Force To *All* Devices, Including Those With "Computer Modules"

These patents captured all mobile devices by design, and the intrinsic evidence is inconsistent with the district court's disavowal.

a. A computer module has no effect on the proper functioning of the claimed invention, particularly for the features (HTML parsing, caching linked pages, and application-update notifications) that are the subject of the relevant claims. It is absolutely true that the specification "disparaged" the use of computer modules, but *not* for purposes of practicing the invention. Such devices suffered flaws as they operated in the prior art. Those included flaws in commercial marketability (*e.g.*, the devices were too expensive) and flaws in operation (*e.g.*, the devices could not

23

load new applications without hardware or software modifications). A56 (1:61-2:4), A60 (9:44-10:24). But those flaws hardly prevent any device from practicing the invention. This invention opens a new universe by dividing computing power between mobile devices and remote servers. That *requires* minimal processing ability, but it is not *limited* to minimal processing ability. An "intelligent" device may have excess power and invoke the invention in exactly the same fashion as a "lightweight" phone. It may not take full advantage of the claimed invention—*e.g.*, the device may still be "too bulky" or "too expensive" (A56 (1:66))—but it would derive material, tangible benefits from using the patented technology. *See, e.g.*, A60 (9:44-10:24) (describing advantages of updating applications "without the user having to add anything or make any modification to the two-way data communication device").

This is why the specification repeatedly explains that the invention "*requires only*" minimal processing capacity. *See, e.g.*, A58 (6:34-36) ("The client module of this invention is lightweight, and thus *requires only* lightweight resources in a two-way data communication device.") (emphasis added); A63 (15:67-16:2) ("cellular telephone 100 utilizes only a microcontroller found in telephone 100 and *does not require[]* a separate computer module as in the prior art") (emphasis added); A65 (20:56-58) ("[a]gain, note that this invention *does not require* a separate processor and instead *can utilize*"—not *must* utilize—"the processing power that already ex-

ists in cellular telephone 600") (emphases added). If the patents wished to *limit* the invention to devices with minimal capacity, they could have easily done it. They could have explained why the "computer module" somehow interfered with the invention's operation (it does not) or included language of *exclusion* (focusing on what devices must *not* have), rather than its *minimum* requirements. But it is a mistake to read "the 'not required' language in the specification" as directing what is "'omitted' or 'excluded.'" *WI-Lan, Inc. v. Acer, Inc.,* 712 F. Supp. 2d 549, 561 (E.D. Tex. 2010); *see also, e.g.*, *In re Papst Licensing*, 2015 U.S. App. LEXIS 1597, at *35 ("The written description's discussion of real-time input files shows that a virtual file *may* be constructed from data residing on the data device. But nothing in the written description limits virtual files to that arrangement.") (emphasis in original); *Dealertrack*, 674 F.3d at 1322.

The patents' lack of exclusionary language was deliberate. As repeated throughout the patent, the relevant distinction focuses on where the computing occurs—on the mobile device or remote server. *See, e.g.*, A57 (3:58-63) ("Using the two-way communication device that includes the client module, a user can provide information to the server computer, retrieve information from the server computer, provide data to an application on the server computer which uses the data and provides information to the two-way communication device, or sends the information to another location."). The invention was satisfied so long as (i) a device met the

25

minimal processing requirements; and (ii) the relevant functions were performed on the remote server, not undertaken exclusively on the device itself. Thus, for example, "[a]n application on HTTP server 749[, a remote server,] can communicate with *any* two-way data communication device that includes the appropriate client and a module to transmit and receive data over the two-way data communication network." A68 (25:11-15) (emphasis added); *see also, e.g.*, A57 (4:1-7, 4:28-49), A58 (6:34-39). The existence of a robust "computer module" does not frustrate the claims' functionality.

Contrary to Defendants' contention, if an "intelligent" phone takes advantage of the patented technology and practices the invention, there is no reason an infringer should avoid liability simply because a device happens to have *excess* processing power. That unused power is not relevant when the phone is delegating tasks to the remote server as instructed by the claims. If a defendant wishes not to infringe, all it has to do is perform all processing tasks directly on the device itself, without a remote server. But the patents nowhere suggest (much less *unambiguously*) that the patents granted infringers immunity so long as a device happens to use a "computer module."

b. The fact that all devices could directly benefit from the claimed invention further undermines the district court's disavowal finding.

The specification, again, claimed a distinct benefit in the ability to load new and updated applications without physically altering the mobile device (or requiring a data port to input new software). *See* A60 (9:44-10:24). Because applications under the invention are *server*-based, not *device*-based, they can push updates to any device without reburning applications into ROM (A56 (2:33-36)) or modifying the device's hardware (A57 (4:20-23)). This core functionality is available on any unit by installing and operating the invention's "lightweight" claim module (A58 (6:34-39)); the fact that certain "intelligent" devices could (in theory) perform certain processing functions on their own (rather than leverage a remote server) is beside the point. If such a device leverages the remote server anyway, it is benefiting from the invention and infringing the claims.

And these devices predictably *will* employ the patented technology. "This invention allows for the first time two-way communications devices * * * to become open application platforms which in turn empowers software developers to deliver value-added applications and services to *any* two-way communication device that incorporates the principles of this invention." A57 (4:1-7) (emphasis added); A60 (9:26-37). This permits devices, "[y]ears after purchase," to "run all the applications which were [since] developed," without "add[ing] anything or mak[ing] any modification to the two-way communication device." A57 (4:16-22); *see also* A58 (5:64-67) ("to update an application requires only changes on the

server computer"). Even "intelligent" devices benefit by avoiding the prior art's "closed systems" and "fixed functionality." A60 (9:66-10:6); *see also* A57 (4:9-10). Without the invention, those devices would still struggle to "adapt []or be adapted to the fast changing requirements of the market place." A60 (10:4-5).

Any device invoking the claimed features to access this groundbreaking flexibility is covered by the patents. These advantages were disclosed as distinct benefits in the specification, and these advantages redound equally to all devices, even those with "intelligent" computer modules. *See, e.g.*, A58 (5:26-6:3). There is no reason, unmistakable or otherwise, that such devices alone were excluded from the invention.

c. Nor does the specification's focus on *minimal* processing power cut the other way. The entire point of a specification is to *disclose and teach the invention*. 35 U.S.C. § 112(a). Patentees are required to show how an invention works, not how a device's *irrelevant* features (including *unused* processing power) might exist in the background. This, for example, is why the specification explains how the invention "can use existing resources" on basic phones and operate without "add[ing] to the cost of the two-way data communication device." A58 (6:37-39); A60 (9:16-24) (showing how the invention functions without "adversely affect[ing]" mobile devices). The specification, in short, must teach how to practice the claimed operations.

28

That objective is not achieved by focusing on a device with *excess* computing power. That excess power (just like any other unnecessary feature) has nothing to do with teaching how the invention works. The specification was not required to explain how *unused* capacity would *remain unused* during the invention's operation—just as it was not required to explain (for example) how a mobile device with a camera might take pictures wholly apart from the patent's operation. One has nothing to do with the other, and the statutory purpose of disclosure is satisfied when the specification teaches how the invention works. The specification's focus on what matters (and its lack of focus on what does not) constitutes no genuine evidence of disclaimer.

### B. The District Court Misread The Specification And Misapplied The Controlling Standard

According to the district court, the specification reflects a "clear" disavowal of "mobile devices containing computer modules." A6-A7. But these patents did not surrender any claim scope, and the court's contrary view is mistaken.

1. As its "most telling[]" evidence, the court said the "patent itself" twice confirmed that computer modules were disclaimed: "'cellular telephone 100 is not a combination of a computer module and a wireless communication module as in prior art attempts to create an intelligent telephone,'" and "'cellular telephone 100 utilizes only a microcontroller found in telephone 100 and does not require[] a separate computer module as in the prior art.'" A6-A7.

The court demonstrably misread the specification's plain text. On its face, this language describes a *single embodiment*, not every device practicing the invention. This is why the language says "cellular telephone *100*" (emphasis added)—a reference to the specification's Figure 1, explicitly labeled "one embodiment." A59 (7:15-17). These embodiments are *not* exclusive, and the district court errs in suggesting otherwise:

> Various embodiments of a novel interactive two-way data communication system, a two-way data communication device, an airnet network architecture, and a predictive text entry system have been described herein. *These embodiments are illustrative only of the principles of the invention and are not intended to limit the invention to the specific embodiments described.* In view of this disclosure, those skilled in the art will be able to use the principles of this invention in a wide variety of applications to obtain the advantages of this invention, as described above.

A79 (48:9-19) (emphasis added). Under settled law, the district court cannot properly limit the claims' scope to the details found in a single embodiment. *E.g.*, *Hill-Rom Servs.*, 755 F.3d at 1373; *Dealertrack*, 674 F.3d at 1322; *Thorner*, 669 F.3d at 1366-67.

Moreover, according to their own terms, these "telling[]" statements do not disavow any devices. Consistent with the specification's purpose, these examples teach how minimal capacity is *sufficient* to enable the invention: "the processes of this invention * * * permit cellular telephone 100 to effectively utilize an application on server computer 121 on network 120 even though cellular telephone 100

utilizes only a microcontroller * * * and *does not require[]* a separate computer module as in the prior art." A63 (15:58-16:2). The fact that it is *sufficient* to use a microcontroller does not mean it is *necessary* to use a microcontroller. The "embodiment" may "*preferably* utilize[] the memory and processing power that currently exists in the cellular telephone 100," but the specification does not say it *must* use those things. A61 (11:12-16); *see also, e.g.*, A58 (6:34-39) (because the "client module * * * requires only lightweight resources," it "*can* use"—not *must* use—"existing resources in [a two-way communication] device") (emphasis added), quoted at A6.

What is truly "telling[]" is what the specification does *not* say. If the specification truly wished to abandon "intelligent" devices—despite disclosing benefits that squarely improve their functionality—one would expect to find at least *some* direct language to that effect. Yet despite multiple rounds of briefing, Defendants identified nothing. There is not a single direct statement disavowing the use of "computer modules" or insisting that advanced devices are excluded from the claims' scope. These "telling[]" examples were the best evidence the court below could muster, and each example supports *Unwired Planet*, not Defendants. There is no unambiguous evidence of any disclaimer.

2. The district court also declared that the specification "clear[ly] disparage[d]" the prior art, proving that computer modules were "disfavored":

> "Fundamental design and cost problems arising directly from the approach taken by the designers of these intelligent communication devices have limited widespread market acceptance of these devices. The combination of a wireless communication module with a computing module leads to a device that is too bulky, too expensive, and too inflexible to address the market requirements."

A6 (quoting A124 (1:52-60)). According to the court, "[s]uch 'repeated derogatory statements * * * reasonably may be viewed as a disavowal of that subject matter from the scope of the [p]atent's claims.'" A6 (quoting *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1372 (Fed. Cir. 2012)).

The court misunderstood these statements. While the specification does indeed disparage the prior art, it never once "disparaged" the use of computer modules in the *patent's operation*. The core point was that computer modules were *commercially* infeasible, not *technically* infeasible. Any "intelligent" device with a computer module could readily practice the invention, obtaining multiple benefits described directly in the specification itself. *See, e.g.*, A60 (9:66-10:24). Indeed, some of the "disparagement" was focused directly on problems (like being "too inflexible") that the invention would cure. *See* Part I.A.2, *supra*; *see also, e.g.*, A60 (10:7-15). Those "intelligent" devices were not excused from the patents' scope because they might retain other flaws unrelated to the claims' novel and useful features. *See, e.g.*, *Thorner*, 669 F.3d at 1366 ("Mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal.").

32

The court likewise misunderstood the patents' statements "tout[ing] the advantages of the invention." A6. As described above, these advantages chiefly flow from the optimal use of the invention. It made it possible to use "existing resources" without "add[ing] to the [device's] cost" (A126 (6:27-33))—thus overcoming market obstacles—but it nowhere required some unspecified basic-level processor. The language conspicuously set the floor, not the ceiling: the invention can "*require[] only*" a microcontroller without *excluding* "intelligent" devices. A6 (quoting A128 (9:9-18)) (emphasis added). While not every device would obtain market success, a device need not take advantage of every disclosed benefit to practice the invention. *See Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008); *Resonate Inc. v. Alteon Websyss., Inc.*, 338 F.3d 1360, 1367 (Fed. Cir. 2003).

At best, Defendants muster a rough inference based on a demonstrable misreading of the specification—its description of the invention's advantages, its explanation that the invention *can* (but not *must*) operate on limited processing power, and its depiction of non-exclusive embodiments, none of which say anything about excluding computer modules. Under a proper reading, these patents merely disavow the *need* to use a computer module, nothing more. Even if any of these

passages could be read consistent with disclaimer—and they cannot—the district court still fell far short of the mandatory "clear and unambiguous" showing.[4]

3. The district court's decision suffers another flaw: it attributes an utterly implausible desire to the patentee. If the court's holding is allowed to stand, this case would mark the exceedingly rare example of a wholly gratuitous disclaimer.

There was absolutely no reason to carve out "intelligent" devices from the patents' scope. Those devices did not interfere with the claims' proper operation: A computer module's excess processing ability assuredly meets each claim's minimal requirements, and each claimed feature (HTML parsing, caching linked pages, and application-update notifications) works perfectly with any device. *Contrast GE Lighting Solutions, LLC v. Agilight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (describing examples where "for 'successful manufacture' a particular step was

---

[4] Nor does *Chicago Board* cut the other way. Unlike here, the claim's language in *Chicago Board* was consistent with disclaimer, there was "no other way" to interpret the specification, and the "repeated derogatory statements" went "well beyond expressing the patentee's preference[s]." 677 F.3d at 1371-72. Here, by contrast, the claims' "plain and ordinary" meaning is incompatible with disclaimer, there are multiple (and more convincing) ways to interpret the specification, and the patentee criticized only certain aspects of the prior art, while explaining how the invention would still benefit all devices. Disparagement is not always evidence of disclaimer, and it was not evidence of disclaimer here. *See, e.g.*, *Retractable Techs.*, 653 F.3d at 1306 ("In general, statements about the difficulties and failures in the prior art, without more, do not act to disclaim claim scope.").

'require[d]'"). Those devices would benefit from the invention, and no one suggested any functional reason to exclude them. *See, e.g.*, A60 (9:66-10:24).

Nor was there any need to disavow "intelligent" devices to avoid prior art. *Contrast Scimed Life Syss., Inc. v. Advanced Cardiovascular Syss., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001). The invention's genius was rooted in splitting the processing functionality between a device and its remote server. The novel and useful applications arising from that insight were not anticipated by "intelligent" devices designed for closed systems. *See, e.g.*, A57 (4:1-39).

No one in district court identified a single reason the patents would have rationally disavowed devices with computer modules. While those devices might not maximize the invention's market benefits, the patents gained nothing by excusing those devices alone from the patents' coverage.

Yet the district court's holding eviscerates the patents for this entire category of devices. This flunks the core mission of construing the claims and specification to determine the intended meaning and breadth of the patents. *See, e.g.*, *Retractable Techs.*, 653 F.3d at 1305 ("In reviewing the intrinsic record to construe the claims, we strive to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention."). Without

compelling evidence to the contrary, there is little basis to adopt a reading that presumes a wholly arbitrary disavowal of claim scope.

4. The district court's finding is incompatible with other aspects of the specification.

*First*, it is perplexing to presume that the specification placed dispositive weight on a distinction that it never attempted to define. This specification was meticulous and precise; it exhaustively described the patented inventions and even included a detailed appendix to round out the disclosure. Yet it never specified a concrete difference between "computer modules" and "microcontrollers." Those terms are left undefined in the specification, despite Defendants' insistence that this dividing line marked the outer boundary of this critical invention.

Nor is this missing definition otherwise readily discernible. The district court openly struggled with the issue, admitting that "the distinction between the two, which may be obvious to a POSITA, is not obvious to me." A10. Defendants' very able counsel likewise could not identify any "clear fine line" between the concepts, resting on the imprecision that computer modules are "much more muscular" than microcontrollers. A11429.

This is not the way a patentee claims one concept while disavowing the other. Under a proper reading, it did not matter what *maximum* power a device possessed; all that mattered was its *minimum* power. The examples in the specification

36

focus on the minimum requirements in order to teach the invention. *E.g.*, A60 (9:16-20). There was no need to highlight an "intelligent" device's irrelevant features (excess capacity), even if that device was fully capable of practicing the invention (and indeed was covered by the invention). Unlike the district court's theory, this explains exactly why the specification never articulates any line between "microcontrollers" and "computer modules." The haziness of the line separating these concepts suggests this was not the subject of any disclaimer.

*Second*, the court's holding is in tension with the specification's discussion of upcoming technological developments. The specification directly predicts that devices with computer modules would become available in the near term. A56 (2:10-40), A57 (4:28-39). It is implausible that the patents contemplated this development, recognized that such devices would benefit from the invention—and then disavowed those devices to cripple the patents' coverage without reason or explanation.

Absent express language to the contrary, courts refuse to limit a claim's scope to the current state of technology. *See SuperGuide Corp. v. DirecTV Enters.*, 358 F.3d 870, 876-79 (Fed. Cir. 2005); *see also SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc) (applicants are not required to "describe in [their] specification every conceivable and possible future embodiment of [their] invention"); *Datascope Corp. v. SMEC, Inc.*, 776 F.2d 320, 322-26

(Fed. Cir. 1985) ("'an embellishment' made possible by technological advances may not permit an accused device to escape 'the web of infringement'"). The court's disavowal finding—effectively limiting the patents to the old technological state—is further inconsistent with this rule.

### C.    If Any Disclaimer Is Appropriate, It Should Be Limited To Disclaiming Devices With A Separate Computer Module

At most, the patents would disclaim only a *separate* computer module, not a single processor that functions as both a traditional "microcontroller" and an advanced "computer module." *See, e.g.*, A11529 (isolating "'memory and processing power' separate and in addition to the limited 'memory and processing power' already found in a cellular phone, pager, or telephone").

Even under the court's cramped reading, the specification says that the client module is able to run on the computing hardware that is already being used for other functions in the mobile device (*e.g.*, making and receiving calls, menu navigation, accepting keyboard inputs, displaying a user interface, etc.)—and the invention does not "require[] a separate computer module" for any of those functions. *See, e.g.*, A63 (15:7-16:2) ("cellular telephone 100 utilizes only a microcontroller found in telephone 100 and does not require[] a separate computer module as in the prior art"); A65 (20:56-60) ("this invention does not require a separate processor and instead can utilize the processing power that already exists in cellular telephone 600, because as described above, the client process of this invention

is so lightweight"). Under this alternative construction, the accused products would infringe and the stipulated judgment should be reversed.

## II. THE DISTRICT COURT'S "DISAVOWAL" FINDING WAS REVERSIBLE ERROR

The parties stipulated to a judgment of non-infringement because all sides agreed that the accused devices contained a "computer module." A13-A15. That alone undercut Unwired Planet's infringement theory, and that alone was the basis for the stipulated judgment. *Ibid.* The court's disavowal finding was thus dispositive below. *See* A11-A15.

It is also undisputed, however, that Defendants' phones have the basic processing capacity required under the patents. Without the disavowal finding, the claims should be construed (and, on the current record, *must* be construed) according to their plain and ordinary meaning: the patents do not ask what *excess* capacity (or other irrelevant elements) exist on a device; they ask only that the device and remote server contain the bare functionality required to practice the claims.

Because the court erred in construing the patents to disavow devices that otherwise satisfy the claims' elements, the judgment of non-infringement should be reversed.

## CONCLUSION

In light of the district court's incorrect finding of specification disclaimer, the judgment of non-infringement should be reversed, and the case should be remanded for further proceedings.

Respectfully submitted.

/s/ *Theodore Stevenson, III*

Theodore Stevenson, III
  *Principal Attorney*
Daniel L. Geyser
Jared M. Hoggan
Nicholas Mathews
Meredith Elkins
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201
Tel.:  (214) 978-4000
Fax:  (214) 978-4044
*tstevenson@mckoolsmith.com*
*dgeyser@mckoolsmith.com*
*jhoggan@mckoolsmith.com*
*nmathews@mckoolsmith.com*
*melkins@mckoolsmith.com*

*Counsel for Plaintiff-Appellant Unwired Planet, Inc. (f/k/a/ Openwave Systems, Inc.)*

February 27, 2015

# ADDENDUM

# INDEX TO ADDENDUM

Mem. Op. Regarding Claim Construction, A1-A7 (Feb. 19, 2014) .................Add. 1

Mem. Order Denying Mot. For Summ. J., A8-A10 (Sept. 9, 2014).................Add. 2

Mem. On Stip. & Order Regarding J. Of Non-Infringement,
    A11-A12 (Oct. 2, 2014) ...........................................................................Add. 3

Stip. & Order Regarding J. Of Non-Infringement,
    A13-A16 (Oct. 3, 2014) ..........................................................................Add. 4

Final Judgment, A17 (Oct. 14, 2014) .............................................................Add. 5

U.S. Patent No. 6,405,037, A18-A85 ..............................................................Add. 6

U.S. Patent No. 6,430,409, A86-A150 ............................................................Add. 7

U.S. Patent No. 6,625,447, A151-219 .............................................................Add. 8

# ADDENDUM 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **Openwave Systems, Inc.,** | |
| Plaintiff, | |
| v. | Civil Action No. 11-765-RGA |
| **Apple Inc., Research In Motion Ltd. and Research In Motion Corp.,** | |
| Defendants. | |

MEMORANDUM OPINION

Rodger D. Smith, II, Esq., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Theodore Stevenson, III, Esq. (argued), McKool Smith, P.C., Dallas, TX; John Shumaker, Esq., McKool Smith, P.C., Austin, TX, attorneys for Plaintiff.

Mary Matterer, Esq., Morris James LLP, Wilmington, DE; Y. Ernest Hsin, Esq. (argued), Gibson, Dunn & Crutcher, Palo Alto, CA; Stuart M. Rosenberg, Esq., Gibson, Dunn & Crutcher, Palo Alto, CA, attorneys for Defendant Apple Inc.

David E. Moore, Esq., Potter, Anderson & Corroon LLP, Wilmington, DE; Morgan Chu, Esq. (argued), Irell & Manella LLP, Los Angeles, CA; Alan J. Heinrich, Esq., Irell & Manella LLP, Los Angeles, CA, attorneys for Defendants Research in Motion Ltd. and Research in Motion Corp.

February 1?, 2014



ANDREWS, U.S. District Judge:

Pending before this Court is the issue of claim construction of three disputed terms found in U.S. Patent No. 6,405,037, U.S. Patent No. 6,430,409, and U.S. Patent No. 6,625,447.

## I. BACKGROUND

On August 31, 2011, Openwave Systems, Inc, now known as Unwired Planet ("Plaintiff"), filed a patent infringement action (No. 11-765 D.I. 1) against Apple Inc., Research in Motion Ltd., and Research in Motion Corp. ("Defendants"). The Court has considered the Parties' Claim Construction Briefs (D.I. 36, 44, 56, 58) and heard oral argument on November 25, 2013. (D.I. 61).

## II. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195 (D. Del. Sept. 4, 2013) (quoting *Phillips*, 415 F.3d at 1324). When construing patent claims, a matter of law, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotations and citations omitted).

Furthermore, "the words of a claim are generally given their ordinary and customary

1

A0002

meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e. as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314 (internal citations omitted).

A court may consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises," in order to assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art and how the invention works. *Id.* at 1317-19 (internal quotation marks and citations omitted). However, extrinsic evidence is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

Finally, "[a] claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (internal quotation marks and citation omitted).

## III. CONSTRUCTION OF DISPUTED TERMS

There are three terms at issue here, "mobile device" in the '037 patent, "wireless mobile

2

telephone" in the '409 patent, and "two way communication device" in the '409 and '447 patents. The parties agree that these terms should be construed as a group, and for convenience will be referred to as "mobile device." (D.I. 36 at 7). There is only one issue, whether the terms are to be given their plain and ordinary meaning, as Plaintiff urges, or whether the patents disclaim mobile devices containing "computer modules," as Defendants contend. I note that the construction of these terms has been previously litigated in the International Trade Commission ("ITC"). There, the Administrative Law Judge ("ALJ") sided with Defendants, construing "mobile device" as a "portable wireless two-way communication device that does not contain a computer module." (D.I. 38-5 at 54). While not binding, I find the ALJ's reasoning persuasive, and I construe the terms in the same fashion.

The patents at issue are all continuations of U.S. Patent No. 5,808,415, which was filed on December 11, 1995.[1] Generally, the patents teach a mobile ecosystem in which remote servers deliver applications to wireless mobile devices. At the time period in which the patents were filed, mobile devices could only run the applications which were burned into their ROMs at the factory or which were present in a ROM card. ('409 patent 2:25-30). In order to run different applications, the ROM would need to be re-burned or a new memory card installed. The patents teach using a client module to communicate with a server in order to allow mobile devices to access more applications. ('409 patent 3:60-67). This results in an open platform, because applications are not tied to particular devices or features of the network. ('409 patent 3:60-4:33). Essentially, this is a server side solution which allows mobile devices to leverage the greater processing power present on servers. In fact, the goal of the invention was to overcome the limitations present in prior art devices which combined a computer module with a wireless

---

[1] The patents share a common specification. (D.I. 36 at 11).

3

communication module. ('409 patent 3:30-33).

The present issue is whether the claims cover mobile devices which contain a computer module, or whether the specification disclaimed embodiments containing a computer module. As an initial matter, Plaintiff objects to the ALJ's claim construction because it reads out a preferred embodiment, namely a mobile device containing a microcontroller. (D.I. 36 at 9). This argument is without merit. The patents themselves distinguish between a microcontroller and a computer module. For instance, the '409 patent describes a cellular telephone which "utilizes only a microcontroller...and does not require[] a separate computer module as in the prior art." ('409 patent at 15:60-63). While a microcontroller may indeed be a type of computer module, as pointed out by Plaintiff, *see* D.I. 36 at 10, the specification distinguishes between the two. The ALJ's construction, when read in light of the specification, makes clear that only computer modules, not including microcontrollers, are outside the scope of the claims. The ALJ's construction therefore does not read out the preferred embodiment of the invention.

Plaintiff's main argument is that the specification does not disclaim mobile devices having a computer module because the statements in the specification are not clear nor unambiguous. *See Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1306 (Fed. Cir. 2011) ("[T]o disavow claim scope, the specification must contain expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.") (internal citation and quotation marks omitted). Again, this argument fails to carry the day. "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,

4

242 F.3d 1337, 1341 (Fed. Cir. 2001).

Here, the specification makes clear that the invention does not encompass mobile devices

containing computer modules. The following excerpts exemplify that such combinations are

disfavored:

> Fundamental design and cost problems arising directly from the approach taken by the designers of these intelligent communication devices have limited widespread market acceptance of these devices. The combination of a wireless communication module with a computing module leads to a device that is too bulky, too expensive, and too inflexible to address the market requirements. ('409 patent at 1:52-60).

> According to the principles of this invention, the prior art limitations of combining a computer module with a wireless communication module have been overcome. In particular, a two-way data communication device of this invention, such as a cellular telephone, two-way pager, or telephone includes a client module that communicates with a server computer over a two-way data communication network. ('409 patent at 3:30-37).

> The client module of this invention is lightweight, and thus requires only lightweight resources in a two-way data communication device. Consequently, the client module can use existing resources in such a device and therefore does not add to the cost of the two-way data communication device. ('409 patent at 6:27-33).

> The client module is small…and requires only low processing power congruent with the memory chips and built-in microcontrollers in two-way data communication devices…Thus, unlike the prior art attempts at an intelligent telephone, the cost, size, and battery life of either cellular telephones, two-way pagers, or telephones that incorporate this invention are not adversely affected. ('409 patent at 9:9-18).

While Plaintiff maintains that these excerpts merely tout the advantages of the invention, the

Court interprets these statements as clear disparagement of the prior art. Such "repeated

derogatory statements…reasonably may be viewed as a disavowal of that subject matter from the

scope of the [p]atent's claims." *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677

F.3d 1361, 1372 (Fed. Cir. 2012) (citing *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312,

1319 (Fed. Cir. 2006)). Lastly, and most tellingly, the patent itself specifies that, "cellular

telephone **100** is not a combination of a computer module and a wireless communication module

5

as in prior art attempts to create an intelligent telephone" ('409 patent at 14:45-50), and that,

"cellular telephone **100** utilizes only a microcontroller found in telephone **100** and does not

require[] a separate computer module as in the prior art." ('409 patent at 15:60-63).

Lastly, Plaintiff argues that if the Court finds a surrender of subject matter, the following

construction should be adopted: "a portable wireless two-way communication device that does

not require a separate computer module but uses the available circuitry and software resources of

said two-way communication device for voice and data operations." (D.I. 56 at 5). It appears that

this construction is an attempt to include devices where the computer module is integrated with

the wireless communication module. The fact that now, almost 15 years later, circuit design has

advanced to the point where computer modules may be integrated with wireless communication

modules is irrelevant. The patents disclaim mobile devices containing computer modules. I

construe the term "mobile device"[2] as a "portable wireless two-way communication device that

does not contain a computer module."[3]

## IV.   CONCLUSION

Within five days the parties should submit a proposed order, consistent with this opinion,

suitable for submission to the jury.

---

[2] As well as the other "mobile device" terms.
[3] I make clear that this construction does not read out embodiments including microcontrollers.

6

# ADDENDUM 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**Openwave Systems, Inc.,**

Plaintiff,

v.

Civil Action No. 11-765-RGA

**Apple Inc., Research In Motion Ltd. and Research In Motion Corp.,**

Defendants.

MEMORANDUM ORDER

Presently before the Court is Defendants' Motion for Summary Judgment of Non-Infringement (D.I. 73) and related briefing. (D.I. 74, 92, 98). This motion is unexpected. Plaintiff previously stated, "In the event the Court adopts a construction [of the disputed claim terms] that matches the ALJ's construction of these terms in all material respects, the parties will meet and confer to present a motion or stipulation to the Court terminating this case." (D.I. 33 at 2). The ALJ construed these terms as a "portable wireless two-way communication device that does not contain a computer module." (D.I. 38-5 at 54). I construed these terms as a "portable wireless two-way communication device that does not contain a computer module." (D.I. 62 at 7). The only difference was that I added a footnote that read, "I make clear that this construction does not read out embodiments including microcontrollers." (D.I. 62 at 7 n.3). Plaintiff argues that this is a material difference because the ALJ refused to provide clarification regarding microcontrollers. (D.I. 92 at p. 6). I do not believe that this is a material difference. Nevertheless, I am not going to further consider at this time the consequences of Plaintiff's unfulfilled representations.

1

In the claim construction opinion, I recognized that "the patents themselves distinguish between a microcontroller and a computer module." (D.I. 62 at 5). I stated:

> While a microcontroller may indeed be a type of computer module, as pointed out by Plaintiff, *see* D.I. 36 at 10, the specification distinguishes between the two. The ALJ's construction, when read in light of the specification, makes clear that only computer modules, not including microcontrollers, are outside the scope of the claims. The ALJ's construction therefore does not read out the preferred embodiment of the invention.

(D.I. 62 at 5). In making this comment, I did not materially alter the ALJ's claim construction. I merely clarified it in light of the intrinsic evidence.

Plaintiff's briefing attempts to persuade the Court that there is genuine issue of material fact because "each of the accused mobile devices contains an application processor that is a computer module (and also a microcontroller)." (D.I. 92 at p. 1). Plaintiff has submitted an expert declaration stating that various processors in Defendants' products are "microcontrollers." (D.I. 93). Plaintiff's expert does not anywhere state, at least so far as I can see, that the Defendants' products do not contain "computer modules." Plaintiff previously conceded that the accused products contain computer modules, although it is not clear to me what was meant by that.

The patents disclaimed mobile devices containing computer modules. The difficulty here is that I have construed the disputed terms by reference to the term "computer module" and further by reference to the term "microcontroller." Those are terms that appear in the patent, but they are not explicitly defined in the patent. Nor were they explicitly construed by me. Since a microcontroller can be considered a computer module, saying that something is a computer module does not necessarily mean that it is anything different than a microcontroller.

The patents do not contemplate that a microcontroller by itself is a computer module within the meaning of the patent, which I tried to make clear. That those microcontrollers might

2

**A0009**

also be referred to as computer modules in other contexts is not controlling. Here the patentee

distinguished computer modules from microcontrollers, but the distinction between the two,

which may be obvious to a POSITA, is not obvious to me. Therefore, while it is clear to me that

the question of infringement is whether the accused products contain a computer module that is

not solely a microcontroller, the answer is not clear based on the record before me.

Thus, it is with some frustration (which I expect I will be able to revisit when the

question of sanctions or exceptional case arises) that I cannot grant summary judgment. While

there are clues that the Defendants' products do not infringe the patents, the briefing and record

do not make that clear to me. Thus, Defendants' Motion for Summary Judgment of Non-

Infringement (D.I. 73) is **DENIED**.

Entered this 9th day of September, 2014.

Richard G. Andrews

United States District Judge

3

**A0010**

**ADDENDUM 3**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OPENWAVE SYSTEMS INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 11-765-RGA |
| | : | |
| APPLE INC., et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

I have before me the "Stipulation and Order Regarding Judgment of Noninfringement for all Accused Products under the Court's Claim Construction Order." (D.I. 101).

I originally was told that if I construed the disputed claim terms a certain way, Plaintiff would stipulate to a judgment of non-infringement so that it could appeal the claim construction. Thereafter, I construed the disputed claim terms that way. Plaintiff would not stipulate to non-infringement, and I was presented with summary judgment briefing. I explained why I could not grant summary judgment on the record before me. (D.I. 100). While I continued to think the claim construction was right, I was not sure how it would apply to the facts presented in the summary judgment briefing.

I now have the judgment of non-infringement that I expected to get earlier. I am going to sign it, but I do so being somewhat uncertain as to whether the Federal Circuit will think that the record is sufficient to decide the issue of claim construction. I think the parties probably have similar thoughts. (*See* D.I. 101 ¶8). I do note that the parties agree that a Federal Circuit decision at this stage would be the most efficient way to proceed. (*Id.*). I think they are right on

that point. Further, I think, in this case, it is appropriate for me to defer to their judgment as to the best way to proceed.

October 2, 2014

Richard G. Andrews
United States District Judge

# ADDENDUM 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| OPENWAVE SYSTEMS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 11-765 (RGA) |
| | ) |
| APPLE INC., RESEARCH IN MOTION LTD. ) | |
| and RESEARCH IN MOTION CORP., | ) |
| | ) |
| Defendants. | ) |

## STIPULATION AND ORDER REGARDING
## JUDGMENT OF NONINFRINGEMENT FOR ALL ACCUSED PRODUCTS
## UNDER THE COURT'S CLAIM CONSTRUCTION ORDER

WHEREAS, Plaintiff Unwired Planet, Inc. ("Unwired Planet") and Defendants

Blackberry Ltd. (f/k/a Research in Motion Ltd.) and Blackberry Corp. (f/k/a Research in Motion

Corp.) (collectively, "Blackberry"), and Apple Inc. ("Apple") stipulate and move for entry of

judgment of noninfringement under all claims of all asserted patents as to all Accused Products

under the Court's claim construction order as set forth below; and

WHEREAS, entering judgment of noninfringement now will allow the parties to

forego further litigation in this Court, while preserving Unwired Planet's right to appeal the

Court's claim construction order;

IT IS HEREBY STIPULATED AND AGREED by the parties, subject to the

approval of the Court, as follows:

1. This is a patent infringement action brought by Unwired Planet against

Apple and Blackberry. The patents-in-suit in this action include United States Patent

Nos. 6,405,037 ("the '037 Patent"), 6,430,409 ("the '409 Patent"), and 6,625,447 ("the '447

Patent") (collectively, the "Asserted Patents").

2. Unwired Planet has accused certain electronic devices, namely Defendants' products including, but not limited to, Apple's iPhone 3G, 3GS, 4, 4S, and 5, iPod Touch, and iPad 1, 2, and 3, and Blackberry's Curve, Bold, Torch, and Playbook models of devices for mobile data communication (the "Accused Products").

3. This stipulation applies to three terms in the asserted patents: (a) "mobile device" in all claims of the '037 Patent; (b) "wireless mobile telephone" in all claims of the '409 Patent; and (c) "two way communication device" in all claims of the '409 and '447 Patents, which terms have been construed as a group and referred to collectively as "mobile device" (D.I. 62 at 2-3). The **"mobile device"** terms appear as a limitation in all claims of the '037, '409 and '447 patents.

4. On February 19, 2014, the Court issued a Memorandum Opinion and Order construing the disputed claim terms collectively referred to as "mobile device" (D.I. 62) (the "Court's Claim Construction"). The Court's Claim Construction defines the term "mobile device" as a "portable wireless two-way communication device that does not contain a computer module." In a footnote, the Court stated that it was making "clear that this construction does not read out embodiments including microcontrollers." *Id.*

5. On April 29, 2014, Defendants filed a Motion for Summary Judgment of Non-Infringement based on the Court's construction of the "mobile device" terms (D.I. 73). The parties agreed to delay discovery and other events in the case to conserve resources while the Court considered the Defendants' motion.

6. On September 9, 2014, the Court denied the Defendants' Motion for Summary Judgment (D.I. 100).

2

A0014

7. The parties now stipulate that Unwired Planet cannot prove infringement of the Accused Products based on the Court's construction of the "mobile device" terms as set forth in the Court's Claim Construction Order and Summary Judgment Order (D.I. 62 and 100). Unwired Planet concedes that the Accused Products contain a computer module. Under the Court's construction of the "mobile device" terms, Unwired Planet cannot prove that Defendants make, use, sell, or offer to sell Accused Products that meet the limitation of being a "mobile device" as construed by the Court.

8. The parties respectfully request that the Court enter judgment of non-infringement as to all asserted patents to conserve judicial resources and to avoid the time and expense of further discovery and motion practice. Upon entry of such judgment and upon entry of final judgment in this case, Unwired Planet intends to file a notice of appeal as to the Court's final judgment of non-infringement. In the event that the Federal Circuit dismisses Unwired Planet's appeal as premature, Unwired Planet reserves the right (which Defendants do not contest) to undertake further proceedings in this Court on remand to complete the record for appeal.

9. The parties further stipulate and agree that Defendants' unadjudicated affirmative defenses and counterclaims are dismissed without prejudice to being reasserted in the event of remand or other assertions by Unwired Planet of the Asserted Patents.

3

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

---

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

*Attorneys for Plaintiff Unwired Planet, Inc.,
f/k/a Openwave Systems Inc.*

MORRIS JAMES LLP

*/s/ Mary B. Matterer*

---

Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
Kenneth L. Dorsney (#3726)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
rherrmann@morrisjames.com
mmatterer@morrisjames.com
kdorsney@morrisjames.com

*Attorneys for Defendant Apple Inc.*

POTTER ANDERSON & CORROON LLP

*/s/ Richard L. Horwitz*

---

Richard L. Horwitz (#2246)
David E. Moore (#3983)
1313 North Market Street, 6th Floor
Wilmington, DE 19899
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants Research in Motion
Ltd. and Research in Motion Corp.*

October 2, 2014
8568033.1

SO ORDERED this 3rd day of _____, 2014.

The Honorable Richard G. Andrews

4

# ADDENDUM 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OPENWAVE SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 11-765 (RGA) |
| | ) | |
| APPLE INC., RESEARCH IN MOTION LTD. | ) | |
| and RESEARCH IN MOTION CORP., | ) | |
| | ) | |
| Defendants. | ) | |

## FINAL JUDGMENT OF NONINFRINGEMENT FOR ALL ACCUSED PRODUCTS UNDER THE COURT'S CLAIM CONSTRUCTION ORDER

For the reasons set forth in the Stipulation And Order Regarding Judgment Of Non-Infringement For All Accused Products Under The Court's Claim Construction Order (D.I. 101), final judgment of non-infringement as to all asserted patents is hereby entered in favor of Apple Inc., BlackBerry Ltd. (f/k/a Research In Motion Ltd.), and BlackBerry Corp. (f/k/a Research In Motion Corp.) (collectively "Defendants"). In addition, Defendants' unadjudicated affirmative defenses and counterclaims are dismissed without prejudice consistent with the terms of the Stipulation and Order (D.I. 101, ¶ 9).

October 14, 2014

_Richard G. Andrews_

The Honorable Richard G. Andrews

# ADDENDUM 6



US006405037B1

(12) **United States Patent**                    (10) **Patent No.:**        **US 6,405,037 B1**

Rossmann                                          (45) **Date of Patent:**        **Jun. 11, 2002**

(54) **METHOD AND ARCHITECTURE FOR AN INTERACTIVE TWO-WAY DATA COMMUNICATION NETWORK**

(75) Inventor: **Alain Rossmann**, Menlo Park, CA (US)

(73) Assignee: **Openwave Systems Inc.**, Redwood City, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/199,121**

(22) Filed: **Nov. 24, 1998**

**Related U.S. Application Data**

(63) Continuation of application No. 08/978,701, filed on Nov. 26, 1997, and a continuation of application No. 08/570,210, filed on Dec. 11, 1995, now Pat. No. 5,809,415.

(51) **Int. Cl.**[7] .................................................. **H04Q 7/20**

(52) **U.S. Cl.** ...................... **455/426**; 455/422; 455/550; 455/552; 455/424; 455/412

(58) **Field of Search** ................................. 455/403, 411, 455/412, 422, 426, 445, 528, 550, 517, 413, 414, 552, 466, 418, 419, 557, 556, 566, 424

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,787,028 A | 11/1988 | Finfrock et al. | |
| 4,812,843 A | 3/1989 | Champion, III et al. | |
| 5,008,925 A | 4/1991 | Pireh | |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0 646 856 A2 | 4/1995 | |
| EP | 0 646 856 A3 | 12/1996 | |
| EP | 0812120 A3 | 12/1997 | |
| EP | 0812120 A2 | 12/1997 | |
| FI | 100137 | 9/1997 | .......... G07F/19/00 |
| FI | 102020 | 9/1998 | .......... G07F/19/00 |
| JP | 5-233191 | 9/1993 | |

| | | | |
|---|---|---|---|
| JP | 6-110637 | 4/1994 | |
| JP | 6-175764 | 6/1994 | |
| JP | 7-13671 | 1/1995 | |
| JP | 7-263187 | 10/1995 | |
| JP | 59-41047 | 3/1997 | |
| JP | 5-35421 | 2/1999 | |
| WO | WO 93/16550 | 8/1993 | .......... H04M/11/00 |
| WO | WO 96/13814 | 5/1996 | ............ G07F/7/08 |
| WO | WO-97-14244 | 4/1997 | |
| WO | WO 97/41654 | 11/1997 | |

OTHER PUBLICATIONS

HDTP Specification, Version 1.1–Draft, pp. 1–40, Redwood Shores, CA, Unwired Planet, Inc., Jul. 15, 1997.

(List continued on next page.)

*Primary Examiner*—William Trost
*Assistant Examiner*—Keith Ferguson
(74) *Attorney, Agent, or Firm*—Blakely, Sokoloff, Taylor & Zafman LLP

(57) **ABSTRACT**

A two-way data communication device such as a data ready cellular telephone, a two-way pager, or a telephone communicates via a two-way data communication network with a server computer on a computer network that has an interface to the two-way data communication network, i.e, is coupled to the two-way data communication network. For example, the computer network can be a corporate wide area network, a corporate local area network, the Internet, or any combination of computer networks. The two-way data communication device utilizes a client module to transmit message including a resource selector chosen by the user to a server on a server computer on the computer network. The server processes the message and transmits a response over the two-way data communication network to the client module. The client module interprets the response and presents the response to the user via a structured user interface. Alternatively, the user transmits a request that directs the server to transmit the response to the request to another location or to another user.

**28 Claims, 36 Drawing Sheets**

Microfiche Appendix Included
(6 Microfiche, 369 Pages)



# US 6,405,037 B1

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,128,672 | A | 7/1992 | Kaehler ........................ 341/23 |
| 5,335,276 | A | 8/1994 | Thompson et al. |
| 5,465,401 | A | 11/1995 | Thompson |
| 5,491,605 | A | 2/1996 | Roeder ........................ 455/422 |
| 5,491,745 | A | 2/1996 | Roeder |
| 5,548,636 | A | 8/1996 | Bannister et al. |
| 5,555,446 | A | 9/1996 | Jasinski |
| 5,560,008 | A | 9/1996 | Johnson et al. |
| 5,577,100 | A | 11/1996 | McGregor et al. |
| 5,577,103 | A | 11/1996 | Foti |
| 5,577,209 | A | 11/1996 | Boyle et al. |
| 5,579,535 | A | 11/1996 | Orlen et al. |
| 5,581,595 | A | 12/1996 | Iwashita et al. ............ 455/566 |
| 5,606,786 | A | 3/1997 | Gordon ........................ 379/100 |
| 5,608,786 | A | 3/1997 | Gordon |
| 5,623,605 | A | 4/1997 | Keshav et al. |
| 5,625,605 | A | 4/1997 | Keshav et al. .............. 370/392 |
| 5,671,354 | A | 9/1997 | Ito et al. |
| 5,675,507 | A | 10/1997 | Bobo, II ................. 364/514 R |
| 5,708,828 | A | 1/1998 | Coleman |
| 5,727,159 | A | 3/1998 | Kikinis |
| 5,740,252 | A | * | 4/1998 | Minor et al. ................ 455/422 |
| 5,742,668 | A | 4/1998 | Pepe et al. |
| 5,745,706 | A | 4/1998 | Wolfberg et al. |
| 5,751,798 | A | 5/1998 | Mumick et al. |
| 5,854,936 | A | 12/1998 | Pickett |
| 5,867,153 | A | 2/1999 | Grandcolas et al. |
| 5,884,284 | A | 3/1999 | Peters et al. |
| 5,909,485 | A | 6/1999 | Martin et al. |
| 5,918,013 | A | 6/1999 | Mighdoll et al. |
| 5,940,589 | A | 8/1999 | Donovan et al. |
| 5,958,006 | A | 9/1999 | Eggleston et al. |
| 6,049,711 | A | 4/2000 | Ben-Yehezkel et al. |
| 6,085,105 | A | 7/2000 | Becher |
| 6,119,137 | A | 9/2000 | Smith et al. |
| 6,122,403 | A | 9/2000 | Rhoads |
| 6,157,823 | A | 12/2000 | Fougnies et al. |
| 6,167,253 | A | * | 12/2000 | Farris et al. ................ 455/412 |
| 6,185,184 | B1 | 2/2001 | Mattaway et al. |

## OTHER PUBLICATIONS

HDML 2.0 Language Reference, Version 2.0, pp. 1–56, Redwood Shores, CA, Unwired Planet, Inc., Jul. 1997.

M. Liljeberg et al.: "Optimizing World–Wide Web for Weakly Connected Mobile Workstations: An Indirect Approach" International Workshop on Sercvices in Distributed and Networked Environments, Jun. 5, 1995. pp. 132–139, XP000764774.

M. F. Kaashoek et al.: "Dynamic Documents: Mobile Wireless Access to the WWW" Proceedings, Workshop on Mobile Computing Systems and Applications, Dec. 8, 1994, pp. 179–184, XP0002016896.

S. Gessler et al.: "PDAs as mobile WWW browsers"Computer Networks and ISDN Systems, vol. 28, No. 1, Dec. 1, 1995, pp. 53–59, XP004001210.

G. M. Voelker et al.: "Mobisaic: An Information System for a Mobile Wireless Computing Environment" Proceedings, Workshop on Mobile computing Systems and Application, vol. 5, No.10, Jan. 1, 1995, pp. 185–190, XP002062595.

Bekre et al.; Institute of Electrical and Electronics Engineers, Inc.; "Distributed Computing Systems"; May 30—Jun. 2, 1995; pp. 136–143; *IEEE Computer Society.*

Japanese Publication; "Netscape Navigator for Windows"; Chapters 1–3; Jul. 31, 1995.

Japanese Publication; "Nifty Serve"; p. 61; Oct. 5, 1992.

Japanese Article; "Mosaic"; *Unix Magazine*; pp. 36–44; Mar. 1994.

Japanese Publication; "Introduction to HTML–WWW Publishing"; pp. 9,14,15, 20, 32–34, 163, 269, 286, 287 and 270; Jun. 30, 1995.

Japanese Publication; Larry Aronson; "Introduction to HTML"; Jul. 1, 1995.

*Nikkei Multimedia Magazine*; pp. 109–111; Nov. 1995.

"Introduction to HTML (3)"; *Unix Magazine*; Dec. 1994; pp. 49–52.

"NCSA HTTP Defined and Introduction to HTML"; *Unix Magazine*; Oct. 1994; pp. 52–60.

*ASCII Magazine*, vol. 19, No.7; Jul. 1995; pp. 331–353.

*Mac Power Magazine*; Jun. 1995; pp. 105 and 268.

Patent application EP 95935472.1–2207.

Behruz Vazvan: "Real Time Tele–payment System" Distributed in an EU's organized international seminar "Race Mobile Summit," Cascais–Portugal, 22–24.11.1995.

* cited by examiner



FIG. 1

Case: 15-1108    Document: 44    Page: 78    Filed: 02/27/2015

**FIG. 2A**



**FIG. 2B**



**FIG. 2C**



**FIG. 2D**



**FIG. 2E**



**FIG. 2F**



**FIG. 2G**



**FIG. 2H**







**FIG. 4E**

**FIG. 4F**

**FIG. 4G**

**FIG. 4H**

**FIG. 4I**

**FIG. 4A**

**FIG. 4B**

**FIG. 4C**

**FIG. 4D**



FIG. 5



Fig. 6



*FIG. 7*

FIG. 8A



*FIG. 8B*



*FIG. 8C*



*FIG. 9*



*FIG. 8D*

| "_ _" | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| "a | a" | q | a | d | g | j | m | r | t | w |
| "a | b" | q | a | e | i | l | o | r | u | w |
| "a | c" | q | c | e | h | k | m | r | t | w |
| "a | d" | q | a | d | i | j | m | s | v | y |
| "a | e" | q | a | d | g | j | m | p | t | w |
| "a | f" | q | a | f | g | j | m | r | t | w |
| "a | g" | q | a | e | i | j | o | r | t | w |
| "a | h" | q | a | e | g | j | m | p | u | w |
| "a | i" | q | c | d | g | l | n | r | t | w |
| "a | j" | q | a | d | g | j | o | p | t | w |
| "a | k" | q | a | e | i | j | m | s | t | w |
| "a | l" | q | a | e | i | l | o | s | t | w |
| "a | m" | q | a | e | i | l | o | p | u | w |
| "a | n" | q | c | d | g | k | n | s | t | y |
| "a | o" | q | a | d | g | j | m | p | t | w |
| "a | p" | q | a | e | h | l | o | p | t | w |
| "a | q" | q | a | d | g | j | m | s | t | w |
| "a | r" | q | c | e | g | k | o | r | t | y |
| "a | s" | q | c | e | i | k | o | s | t | y |
| "a | t" | q | a | e | i | l | o | s | t | w |
| "a | u" | q | c | d | g | l | m | s | t | w |
| "a | v" | q | a | e | i | j | o | p | t | w |
| "a | w" | q | a | d | g | k | m | p | t | w |
| "a | x" | q | a | e | i | l | m | s | t | w |
| "a | y" | q | b | e | i | j | m | s | t | w |
| "a | z" | q | a | d | i | j | m | p | t | w |
| "a | " | q | a | d | g | j | m | p | t | w |
| "b | a" | q | c | d | g | k | n | s | t | y |
| "b | b" | q | a | d | i | j | m | s | t | y |
| "b | c" | q | a | d | g | j | o | r | t | w |
| "b | d" | q | a | d | g | j | m | s | t | w |
| "b | e" | q | c | e | g | l | n | s | t | x |
| "b | f" | q | a | d | g | j | m | p | t | w |
| "b | g" | q | a | d | g | j | m | p | t | w |
| "b | h" | q | a | d | g | j | m | p | t | w |
| "b | i" | q | c | d | g | l | n | s | t | w |
| "b | j" | q | a | e | g | j | m | p | t | w |

**FIG. 10A**

| "-   -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "b   k" | q | a | d | g | j | m | p | t | w |
| "b   l" | q | a | e | i | j | o | p | t | y |
| "b   m" | q | a | d | g | j | m | r | t | w |
| "b   n" | q | a | d | g | j | m | p | t | w |
| "b   o" | q | a | d | i | j | o | s | u | x |
| "b   p" | q | a | d | g | j | m | s | t | w |
| "b   q" | q | a | d | g | j | m | p | t | w |
| "b   r" | q | a | e | i | j | o | p | u | w |
| "b   s" | q | c | d | i | j | o | s | t | w |
| "b   t" | q | a | d | g | j | m | p | t | w |
| "b   u" | q | a | d | i | l | m | s | t | y |
| "b   v" | q | a | d | i | j | m | p | t | w |
| "b   w" | q | a | e | g | j | m | p | t | w |
| "b   x" | q | a | d | g | j | m | p | t | w |
| "b   y" | q | a | d | g | j | m | p | t | w |
| "b   z" | q | a | d | g | j | m | p | t | w |
| "b   " | q | a | d | g | j | m | p | t | w |
| "c   a" | q | b | d | g | l | n | r | t | w |
| "c   b" | q | a | e | g | j | m | p | t | w |
| "c   c" | q | a | e | i | j | o | s | t | w |
| "c   d" | q | a | d | g | j | m | p | t | w |
| "c   e" | q | a | d | i | l | n | s | t | w |
| "c   f" | q | a | d | i | j | m | p | t | w |
| "c   g" | q | a | d | i | j | m | p | t | w |
| "c   h" | q | a | e | i | j | o | r | t | w |
| "c   i" | q | a | f | i | l | n | p | t | w |
| "c   j" | q | a | d | g | j | m | p | t | w |
| "c   k" | q | b | e | i | l | m | s | t | y |
| "c   l" | q | a | e | i | j | o | r | u | w |
| "c   m" | q | c | d | g | j | m | p | t | w |
| "c   n" | q | a | d | g | j | m | p | t | w |
| "c   o" | q | a | d | g | l | m | r | u | w |
| "c   p" | q | a | d | g | j | m | p | t | w |
| "c   q" | q | a | d | g | j | m | p | t | w |
| "c   r" | q | a | e | i | j | o | p | u | y |
| "c   s" | q | a | d | i | l | o | s | t | w |
| "c   t" | q | a | e | i | l | o | r | u | w |

*FIG. 10B*

| "_ _" | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| "c | u" | q | b | e | i | l | m | s | t | w |
| "c | v" | q | a | d | g | j | m | p | t | w |
| "c | w" | q | a | d | g | j | m | p | t | w |
| "c | x" | q | a | d | g | j | m | p | t | w |
| "c | y" | q | c | d | g | j | m | p | t | w |
| "c | z" | q | a | d | g | j | n | p | t | w |
| "c | " | q | a | d | g | j | m | p | t | w |
| "d | a" | q | b | d | g | j | n | r | t | y |
| "d | b" | q | a | d | g | j | m | p | t | w |
| "d | c" | q | a | d | g | j | m | p | t | w |
| "d | d" | q | a | e | i | l | m | r | t | w |
| "d | e" | q | a | d | g | l | m | r | v | x |
| "d | f" | q | a | d | i | j | m | p | t | w |
| "d | g" | q | a | e | g | j | m | p | t | w |
| "d | h" | q | a | e | g | j | m | p | t | w |
| "d | i" | z | a | f | g | l | n | s | t | w |
| "d | j" | q | a | d | g | j | m | p | t | w |
| "d | k" | q | a | d | g | j | m | p | t | w |
| "d | l" | q | a | e | i | j | m | p | t | y |
| "d | m" | q | a | d | i | j | m | s | t | w |
| "d | n" | q | a | e | g | j | m | p | t | w |
| "d | o" | q | c | e | i | j | n | p | t | w |
| "d | p" | q | a | d | g | j | m | p | t | w |
| "d | q" | q | a | d | g | g | m | m | u | w |
| "d | r" | q | a | e | i | j | o | p | t | w |
| "d | s" | q | a | e | i | j | m | p | t | w |
| "d | t" | q | a | d | g | j | m | r | t | w |
| "d | u" | q | c | e | g | l | m | r | t | w |
| "d | v" | q | a | d | i | j | m | p | t | w |
| "d | w" | q | a | d | i | j | o | m | t | w |
| "d | x" | q | a | d | g | j | m | p | t | w |
| "d | y" | q | a | d | g | j | m | p | t | w |
| "d | z" | q | a | d | g | j | m | p | t | w |
| "d | " | q | a | d | g | j | m | p | t | w |
| "e | a" | q | c | d | g | l | n | s | t | w |
| "e | b" | q | c | f | g | j | m | r | t | y |
| "e | c" | q | a | e | h | k | o | s | t | w |

## FIG. 10C

| "-    -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "e    d" | q | b | e | i | l | n | s | u | w |
| "e    e" | z | a | d | i | k | n | r | t | w |
| "e    f" | q | a | e | i | l | o | r | u | y |
| "e    g" | q | a | d | i | j | o | r | u | w |
| "e    h" | q | a | e | i | j | m | p | t | w |
| "e    i" | q | a | d | g | j | n | r | v | w |
| "e    j" | q | a | e | g | j | m | p | t | w |
| "e    k" | q | a | e | i | j | m | s | t | w |
| "e    l" | q | a | e | i | l | o | p | v | y |
| "e    m" | q | a | e | i | j | o | s | u | w |
| "e    n" | q | c | d | g | l | o | s | t | w |
| "e    o" | q | a | f | g | j | n | p | u | w |
| "e    p" | q | a | e | h | l | o | r | t | w |
| "e    q" | q | a | d | g | j | m | p | u | w |
| "e    r" | q | a | e | i | l | n | s | v | y |
| "e    s" | q | c | e | i | k | n | s | t | w |
| "e    t" | z | c | e | i | j | m | s | t | w |
| "e    u" | q | a | d | g | j | m | r | t | w |
| "e    v" | q | a | e | i | j | o | p | t | w |
| "e    w" | q | a | e | h | j | o | s | t | w |
| "e    x" | q | a | e | i | j | m | p | t | w |
| "e    y" | q | a | d | g | j | o | s | t | w |
| "e    z" | q | a | e | g | j | m | s | t | w |
| "e      " | q | a | d | g | j | m | p | t | w |
| "f    a" | q | c | d | i | k | m | s | v | x |
| "f    b" | q | a | d | g | j | m | p | t | w |
| "f    c" | q | c | d | g | j | m | p | t | w |
| "f    d" | q | a | d | g | j | m | p | t | w |
| "f    e" | q | a | e | g | l | m | r | t | w |
| "f    f" | q | a | e | i | j | o | s | t | w |
| "f    g" | q | a | d | g | j | m | p | t | w |
| "f    h" | q | a | d | g | j | m | p | t | w |
| "f    i" | q | c | e | g | l | n | r | t | x |
| "f    j" | q | a | d | g | j | m | p | t | w |
| "f    k" | q | a | d | g | j | m | p | t | w |
| "f    l" | q | a | e | i | j | o | p | t | y |
| "f    m" | q | a | d | g | j | m | p | t | w |

## FIG. 10D

A0035

| "-  -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "f  n" | q | a | d | g | j | m | p | t | w |
| "f  o" | q | c | d | g | l | n | r | u | w |
| "f  p" | q | a | d | g | j | m | p | t | w |
| "f  q" | q | a | d | g | j | m | p | t | w |
| "f  r" | q | a | e | i | j | o | p | t | y |
| "f  s" | q | a | d | g | j | m | p | t | w |
| "f  t" | q | a | e | g | k | m | p | t | w |
| "f  u" | q | a | d | g | l | n | r | t | w |
| "f  v" | q | a | d | g | j | m | p | t | w |
| "f  w" | q | a | d | g | j | m | p | t | w |
| "f  x" | q | a | d | g | j | m | p | t | w |
| "f  y" | q | a | d | i | j | m | p | t | w |
| "f  z" | q | a | d | g | j | m | p | t | w |
| "f   " | q | a | d | g | j | m | p | t | w |
| "g  a" | z | a | d | i | l | n | r | t | w |
| "g  b" | q | a | d | g | j | m | p | t | w |
| "g  c" | q | a | d | g | j | m | s | t | w |
| "g  d" | q | a | d | g | j | o | p | t | w |
| "g  e" | q | a | d | g | l | n | s | t | w |
| "g  f" | q | a | d | g | j | m | p | u | w |
| "g  g" | q | a | e | g | l | m | p | t | w |
| "g  h" | q | a | e | g | j | o | p | t | w |
| "g  i" | q | c | f | g | j | n | s | v | w |
| "g  j" | q | a | d | g | j | m | p | t | w |
| "g  k" | q | a | d | g | j | m | p | t | w |
| "g  l" | q | a | e | i | j | o | p | t | y |
| "g  m" | q | a | d | g | l | m | s | t | w |
| "g  n" | q | a | e | i | j | o | p | t | w |
| "g  o" | q | a | e | i | j | o | p | t | w |
| "g  p" | q | a | d | g | j | m | p | t | w |
| "g  q" | q | a | d | g | j | m | p | t | w |
| "g  r" | q | a | e | g | j | o | p | t | w |
| "g  s" | q | a | d | g | j | m | p | t | w |
| "g  t" | q | a | e | h | j | o | p | t | w |
| "g  u" | q | a | e | i | l | m | r | t | y |
| "g  v" | q | a | d | g | j | m | p | t | w |
| "g  w" | q | a | d | g | j | m | p | t | w |

## FIG. 10E

| "_ _" | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| "g | x" | q | a | d | g | j | m | p | t | w |
| "g | y" | q | a | d | g | j | m | p | t | w |
| "g | z" | q | a | d | g | j | m | p | t | w |
| "g | " | q | a | d | g | j | m | p | t | w |
| "h | a" | q | b | d | i | l | n | s | t | w |
| "h | b" | q | a | d | g | j | m | p | t | w |
| "h | c" | q | a | d | g | j | o | p | t | w |
| "h | d" | q | a | d | g | j | m | r | t | w |
| "h | e" | q | c | d | i | l | n | r | t | y |
| "h | f" | q | a | d | g | j | m | p | t | w |
| "h | g" | q | a | d | g | j | m | p | t | w |
| "h | h" | q | a | d | g | j | m | p | t | w |
| "h | i" | q | c | e | g | l | n | s | t | w |
| "h | j" | q | a | d | g | j | m | p | t | w |
| "h | k" | q | a | d | g | j | m | p | t | w |
| "h | l" | q | a | d | g | j | m | p | t | y |
| "h | m" | q | a | e | g | j | m | p | t | w |
| "h | n" | q | a | d | i | j | o | p | t | w |
| "h | o" | q | b | d | i | l | n | r | u | w |
| "h | p" | q | a | d | g | j | m | p | u | w |
| "h | q" | q | a | d | g | j | m | p | t | w |
| "h | r" | q | a | e | i | j | o | p | t | w |
| "h | s" | q | a | d | g | j | m | p | t | w |
| "h | t" | q | a | d | g | l | m | s | t | w |
| "h | u" | q | a | d | g | l | m | r | t | w |
| "h | v" | q | a | d | g | j | m | p | t | w |
| "h | w" | q | a | d | g | j | m | p | t | w |
| "h | x" | q | a | d | g | j | m | p | t | w |
| "h | y" | q | a | d | g | j | m | p | t | w |
| "h | z" | q | a | d | g | j | m | p | t | w |
| "h | " | q | a | d | g | j | m | p | t | w |
| "i | a" | q | b | d | g | l | n | r | t | w |
| "i | b" | q | a | e | i | l | m | r | u | w |
| "i | c" | q | a | e | h | k | o | r | t | y |
| "i | d" | q | a | e | i | l | n | p | u | w |
| "i | e" | q | c | d | g | l | n | r | v | w |
| "i | f" | q | a | f | i | j | o | p | t | y |

**FIG. 10F**

| "_    _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "i    g" | q | a | e | h | j | n | r | u | w |
| "i    h" | q | a | d | g | j | m | p | t | w |
| "i    i" | q | a | d | g | j | m | p | t | w |
| "i    j" | q | a | d | g | j | o | p | t | w |
| "i    k" | q | a | e | g | k | m | p | t | w |
| "i    l" | q | a | e | i | l | o | s | t | y |
| "i    m" | q | a | e | i | j | m | p | u | w |
| "i    n" | q | c | e | g | k | n | s | t | w |
| "i    o" | q | a | d | g | l | n | r | u | w |
| "i    p" | q | a | d | i | l | m | s | t | w |
| "i    q" | q | a | d | g | j | m | p | u | w |
| "i    r" | q | c | e | i | l | n | s | t | w |
| "i    s" | q | c | e | h | k | n | s | t | w |
| "i    t" | q | a | e | h | l | o | s | t | y |
| "i    u" | q | a | d | g | j | m | p | t | w |
| "i    v" | q | a | e | i | j | m | p | t | w |
| "i    w" | q | a | d | g | j | m | p | t | w |
| "i    x" | q | a | e | g | j | m | p | t | w |
| "i    y" | q | a | d | g | j | m | p | t | w |
| "i    z" | q | a | e | i | j | o | p | t | w |
| "i     " | q | a | d | g | j | m | p | t | w |
| "j    a" | q | c | d | g | j | n | p | t | w |
| "j    b" | q | a | d | g | j | m | p | t | w |
| "j    c" | q | a | d | g | j | m | p | t | w |
| "j    d" | q | a | d | g | j | m | p | t | w |
| "j    e" | q | c | d | g | j | m | r | t | w |
| "j    f" | q | a | d | g | j | m | p | t | w |
| "j    g" | q | a | d | g | j | m | p | t | w |
| "j    h" | q | a | d | g | j | m | p | t | w |
| "j    i" | q | a | d | g | j | m | p | t | w |
| "j    j" | q | a | d | g | j | m | p | t | w |
| "j    k" | q | a | d | g | j | m | p | t | w |
| "j    l" | q | a | d | g | j | m | p | t | w |
| "j    m" | q | a | d | g | j | m | p | t | w |
| "j    n" | q | a | d | g | j | m | p | t | w |
| "j    o" | q | b | e | i | j | m | r | t | w |
| "j    p" | q | a | d | g | j | m | p | t | w |

**FIG. 10G**

A0038

| "- -" | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| "j | q" | q | a | d | g | j | m | p | t | w |
| "j | r" | q | a | d | g | j | m | p | t | w |
| "j | s" | q | a | d | g | j | m | p | t | w |
| "j | t" | q | a | d | g | j | m | p | t | w |
| "j | u" | q | a | d | g | l | m | s | t | w |
| "j | v" | q | a | d | g | j | m | p | t | w |
| "j | w" | q | a | d | g | j | m | p | t | w |
| "j | x" | q | a | d | g | j | m | p | t | w |
| "j | y" | q | a | d | g | j | m | p | t | w |
| "j | z" | q | a | d | g | j | m | p | t | w |
| "j | " | q | a | d | g | j | m | p | t | w |
| "k | a" | q | a | d | g | j | n | s | t | y |
| "k | b" | q | a | d | g | j | o | p | t | w |
| "k | c" | q | a | d | g | j | m | p | t | w |
| "k | d" | q | a | d | g | j | o | p | t | w |
| "k | e" | q | a | d | g | l | n | s | t | y |
| "k | f" | q | a | d | g | j | m | p | t | w |
| "k | g" | q | a | d | g | j | m | r | t | w |
| "k | h" | q | a | d | g | j | m | p | t | w |
| "k | i" | q | a | d | g | l | n | p | t | w |
| "k | j" | q | a | d | g | j | m | p | t | w |
| "k | k" | q | a | d | g | j | o | p | t | w |
| "k | l" | q | a | d | i | j | m | p | t | y |
| "k | m" | q | a | d | g | j | m | p | t | w |
| "k | n" | q | a | d | g | j | o | p | t | w |
| "k | o" | q | a | d | g | l | n | p | t | w |
| "k | p" | q | a | d | g | j | m | p | t | w |
| "k | q" | q | a | d | g | j | m | p | t | w |
| "k | r" | q | a | d | g | j | m | p | t | w |
| "k | s" | q | a | d | g | j | m | p | t | w |
| "k | t" | q | a | d | g | j | m | p | t | w |
| "k | u" | q | a | d | g | j | m | p | t | w |
| "k | v" | q | a | d | g | j | m | p | t | w |
| "k | w" | q | a | d | g | j | m | p | t | w |
| "k | x" | q | a | d | g | j | m | p | t | w |
| "k | y" | q | a | d | g | j | m | p | t | w |
| "k | z" | q | a | d | g | j | m | p | t | w |

*FIG. 10H*

| "_ | _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|----|----|---|---|---|---|---|---|---|---|---|
| "k | " | q | a | d | g | j | m | p | t | w |
| "l | a" | q | b | d | i | j | n | r | t | y |
| "l | b" | q | a | d | g | j | o | p | t | w |
| "l | c" | q | a | d | g | j | o | p | t | w |
| "l | d" | q | a | e | i | j | n | s | t | w |
| "l | e" | q | a | d | g | l | m | s | t | x |
| "l | f" | q | a | d | g | j | m | p | t | w |
| "l | g" | q | a | d | g | j | m | p | t | w |
| "l | h" | q | a | d | g | j | m | p | t | w |
| "l | i" | z | c | e | g | k | n | s | t | w |
| "l | j" | q | a | d | g | j | m | p | t | w |
| "l | k" | q | a | e | i | j | m | s | t | w |
| "l | l" | q | c | e | i | j | o | s | u | y |
| "l | m" | q | a | d | g | j | o | s | t | w |
| "l | n" | q | a | e | g | j | m | p | t | w |
| "l | o" | q | c | d | g | j | o | s | t | w |
| "l | p" | q | a | d | h | j | m | s | t | w |
| "l | q" | q | a | d | g | j | m | p | t | w |
| "l | r" | q | a | e | g | j | m | p | t | w |
| "l | s" | q | a | e | i | j | o | p | t | w |
| "l | t" | q | a | e | i | j | o | s | t | w |
| "l | u" | q | c | d | g | l | o | s | t | w |
| "l | v" | q | a | e | i | j | m | p | t | w |
| "l | w" | q | a | e | g | j | m | p | t | w |
| "l | x" | q | a | d | g | j | m | p | t | w |
| "l | y" | z | a | d | i | j | n | s | t | w |
| "l | z" | q | a | d | g | j | m | p | t | x |
| "l | " | q | a | d | g | j | m | p | t | w |
| "m | a" | q | c | d | i | k | n | r | t | y |
| "m | b" | q | a | e | i | l | m | p | t | y |
| "m | c" | q | c | d | i | j | o | p | t | w |
| "m | d" | q | a | d | g | j | m | p | t | w |
| "m | e" | q | a | e | g | l | n | s | t | w |
| "m | f" | q | a | d | g | j | o | p | t | w |
| "m | g" | q | a | d | g | j | m | p | t | w |
| "m | h" | z | a | d | g | j | m | p | t | w |
| "m | i" | z | c | d | g | l | n | s | t | x |

**FIG. 10I**

| "- -" | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| "m | j" | q | a | d | g | j | m | p | t | w |
| "m | k" | q | a | d | g | j | m | p | t | w |
| "m | l" | q | a | e | g | j | m | p | t | y |
| "m | m" | q | a | e | i | j | o | p | u | w |
| "m | n" | q | a | d | g | j | m | p | t | w |
| "m | o" | q | b | d | i | j | n | r | v | w |
| "m | p" | q | a | e | i | l | o | r | t | w |
| "m | q" | q | a | d | g | j | m | p | t | w |
| "m | r" | q | a | d | g | j | m | p | t | w |
| "m | s" | q | a | e | g | j | m | p | t | w |
| "m | t" | q | a | d | g | j | m | p | t | w |
| "m | u" | q | c | d | g | l | n | s | t | w |
| "m | v" | q | a | d | g | j | m | p | t | w |
| "m | w" | q | a | d | h | j | m | p | t | w |
| "m | x" | q | a | d | g | j | m | p | t | w |
| "m | y" | q | c | d | g | j | m | s | t | w |
| "m | z" | q | a | d | g | j | m | p | t | w |
| "m | " | q | a | d | g | j | m | p | t | w |
| "n | a" | q | b | d | g | l | m | r | t | w |
| "n | b" | q | a | d | g | j | m | p | t | w |
| "n | c" | q | a | e | i | l | o | r | t | y |
| "n | d" | q | a | e | i | l | o | s | t | y |
| "n | e" | q | c | e | i | l | n | s | t | w |
| "n | f" | q | a | e | i | j | o | s | u | w |
| "n | g" | q | a | e | i | l | m | s | u | w |
| "n | h" | q | a | d | g | j | m | p | t | w |
| "n | i" | z | c | e | g | l | n | s | t | x |
| "n | j" | q | a | d | g | j | m | p | u | w |
| "n | k" | q | a | e | i | j | n | s | t | w |
| "n | l" | q | a | e | i | j | o | p | t | y |
| "n | m" | q | a | e | i | j | o | p | t | w |
| "n | n" | q | a | e | i | j | o | p | u | y |
| "n | o" | q | b | d | g | l | n | r | t | w |
| "n | p" | q | a | d | g | j | o | p | u | w |
| "n | q" | q | a | d | g | j | m | p | u | w |
| "n | r" | q | a | d | g | j | m | p | t | w |
| "n | s" | q | a | e | i | l | m | p | t | w |

**FIG. 10J**

| "_ _" | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| "n | t" | q | a | e | i | l | o | s | u | y |
| "n | u" | q | a | f | g | j | m | s | t | x |
| "n | v" | q | a | e | i | j | o | p | t | w |
| "n | w" | q | a | e | g | j | m | p | t | w |
| "n | X" | q | a | d | g | j | m | p | t | w |
| "n | y" | q | b | d | h | j | m | p | t | w |
| "n | z" | q | a | d | g | j | m | p | t | w |
| "n | " | q | a | d | g | j | m | p | t | w |
| "o | a" | q | b | d | g | l | m | s | t | w |
| "o | b" | q | a | e | i | l | o | s | t | w |
| "o | c" | q | a | e | h | k | o | s | u | w |
| "o | d" | q | a | d | i | l | o | s | u | y |
| "o | e" | q | a | d | g | j | m | s | t | w |
| "o | f" | q | a | f | g | j | m | p | t | w |
| "o | g" | q | a | e | i | j | o | r | t | y |
| "o | h" | q | a | d | g | j | n | p | t | w |
| "o | i" | q | c | d | g | l | n | p | t | w |
| "o | j" | q | a | e | g | j | m | p | t | w |
| "o | k" | q | a | e | i | j | m | s | t | w |
| "o | l" | q | b | d | i | l | o | s | u | w |
| "o | m" | q | a | e | i | l | m | s | t | w |
| "o | n" | q | a | e | g | l | n | s | t | y |
| "o | o" | q | a | d | g | k | n | s | t | w |
| "o | p" | q | a | e | h | l | m | p | t | y |
| "o | q" | q | a | d | g | j | m | p | t | w |
| "o | r" | q | a | e | g | k | m | r | t | w |
| "o | s" | q | c | e | i | j | o | s | t | y |
| "o | t" | q | a | e | h | j | o | s | t | y |
| "o | u" | q | c | d | g | l | m | s | t | y |
| "o | v" | q | a | e | i | j | m | p | t | w |
| "o | w" | q | a | e | i | j | n | s | t | w |
| "o | X" | q | a | d | i | j | m | p | t | w |
| "o | y" | q | a | e | g | j | m | s | t | w |
| "o | z" | q | a | d | g | j | m | p | t | w |
| "o | " | q | a | d | g | j | m | p | t | w |
| "p | a" | q | c | d | g | l | n | r | t | y |
| "p | b" | q | a | e | g | j | m | p | t | w |

## FIG. 10K

| "_  _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "p  c" | q | a | d | g | j | m | s | t | w |
| "p  d" | q | a | d | g | j | m | p | t | w |
| "p  e" | q | c | d | g | j | n | r | t | w |
| "p  f" | q | a | d | g | j | m | r | t | w |
| "p  g" | q | a | d | g | j | m | p | t | w |
| "p  h" | q | a | e | i | j | o | s | t | y |
| "p  i" | q | c | d | g | l | n | r | t | x |
| "p  j" | q | a | d | g | j | m | p | t | w |
| "p  k" | q | a | d | g | j | m | p | t | w |
| "p  l" | q | a | e | i | j | o | p | u | y |
| "p  m" | q | a | e | g | j | m | p | t | w |
| "p  n" | q | a | d | g | j | m | p | t | w |
| "p  o" | q | c | d | i | l | n | r | t | w |
| "p  p" | q | a | e | i | l | o | p | t | y |
| "p  q" | q | a | d | g | j | m | p | t | w |
| "p  r" | q | a | e | i | j | o | p | t | y |
| "p  s" | q | a | d | g | j | m | p | t | w |
| "p  t" | q | c | e | i | j | o | s | t | w |
| "p  u" | q | b | d | g | j | m | r | t | w |
| "p  v" | q | a | d | g | j | m | p | t | w |
| "p  w" | q | a | d | g | j | m | p | t | w |
| "p  x" | q | a | d | g | j | m | p | t | w |
| "p  y" | q | a | d | g | j | m | r | t | w |
| "p  z" | q | a | d | g | j | m | p | t | w |
| "p   " | q | a | d | g | j | m | p | t | w |
| "q  a" | q | a | d | g | j | m | p | t | w |
| "q  b" | q | a | d | g | j | m | p | t | w |
| "q  c" | q | a | d | g | j | m | p | t | w |
| "q  d" | q | a | d | g | j | m | p | t | w |
| "q  e" | q | a | d | g | j | m | p | t | w |
| "q  f" | q | a | d | g | j | m | p | t | w |
| "q  g" | q | a | d | g | j | m | p | t | w |
| "q  h" | q | a | d | g | j | m | p | t | w |
| "q  i" | q | a | d | g | j | m | p | t | w |
| "q  j" | q | a | d | g | j | m | p | t | w |
| "q  k" | q | a | d | g | j | m | p | t | w |
| "q  l" | q | a | d | g | j | m | p | t | w |

## FIG. 10L

| "_   _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "q  m" | q | a | d | g | j | m | p | t | w |
| "q  n" | q | a | d | g | j | m | p | t | w |
| "q  o" | q | a | d | g | j | m | p | t | w |
| "q  p" | q | a | d | g | j | m | p | t | w |
| "q  q" | q | a | d | g | j | m | p | t | w |
| "q  r" | q | a | d | g | j | m | p | t | w |
| "q  s" | q | a | d | g | j | m | p | t | w |
| "q  t" | q | a | d | g | j | m | p | t | w |
| "q  u" | q | a | e | i | j | o | p | t | w |
| "q  v" | q | a | d | g | j | m | p | t | w |
| "q  w" | q | a | d | g | j | m | p | t | w |
| "q  x" | q | a | d | g | j | m | p | t | w |
| "q  y" | q | a | d | g | j | m | p | t | w |
| "q  z" | q | a | d | g | j | m | p | t | w |
| "q   " | q | a | d | g | j | m | p | t | w |
| "r  a" | q | c | d | g | l | n | p | t | w |
| "r  b" | q | a | d | g | j | o | p | t | w |
| "r  c" | q | a | e | h | l | m | p | u | w |
| "r  d" | q | a | e | i | j | n | s | v | w |
| "r  e" | q | a | e | g | l | n | s | v | w |
| "r  f" | q | a | e | g | j | o | p | t | w |
| "r  g" | q | a | e | i | l | m | s | u | w |
| "r  h" | q | a | e | i | l | o | p | t | w |
| "r  i" | z | c | e | g | l | n | p | t | w |
| "r  j" | q | a | d | g | j | m | p | t | w |
| "r  k" | q | a | e | i | l | m | s | t | y |
| "r  l" | q | a | d | i | j | o | p | t | y |
| "r  m" | q | a | e | i | j | m | s | t | w |
| "r  n" | q | a | e | i | j | o | s | t | w |
| "r  o" | q | b | d | g | l | m | p | u | w |
| "r  p" | q | a | d | g | j | o | r | t | w |
| "r  q" | q | a | d | g | l | m | p | t | w |
| "r  r" | q | a | e | i | j | o | p | t | y |
| "r  s" | q | a | e | i | j | o | p | t | w |
| "r  t" | z | a | e | h | j | n | s | u | w |
| "r  u" | q | c | e | g | l | n | s | t | w |
| "r  v" | q | a | e | i | j | m | p | t | w |

## FIG. 10M

| "_  _" | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| "r | w" | q | a | d | i | j | o | p | t | w |
| "r | x" | q | a | d | i | j | m | p | t | w |
| "r | y" | q | b | d | i | j | m | p | t | w |
| "r | z" | q | a | d | g | j | m | p | t | w |
| "r | " | q | a | d | g | j | m | p | t | w |
| "s | a" | q | b | d | g | l | m | p | v | y |
| "s | b" | q | a | d | g | j | m | p | t | w |
| "s | c" | q | a | d | h | l | o | r | u | w |
| "s | d" | q | a | d | g | j | n | p | t | w |
| "s | e" | q | c | e | g | l | n | r | t | y |
| "s | f" | q | a | e | g | j | m | p | u | w |
| "s | g" | q | a | d | g | j | m | r | t | w |
| "s | h" | q | a | e | i | l | o | r | t | w |
| "s | i" | z | c | d | g | l | n | s | t | x |
| "s | j" | q | a | d | g | j | m | p | t | w |
| "s | k" | q | a | e | i | j | m | p | t | w |
| "s | l" | q | a | e | i | j | o | p | t | y |
| "s | m" | q | a | e | i | j | o | s | t | w |
| "s | n" | q | a | e | g | j | m | p | t | w |
| "s | o" | q | c | f | g | l | m | r | u | w |
| "s | p" | q | a | e | g | l | o | r | t | w |
| "s | q" | q | a | d | g | l | l | p | u | w |
| "s | r" | q | c | d | g | j | m | p | t | w |
| "s | s" | q | a | e | i | j | o | p | u | w |
| "s | t" | q | a | e | i | l | o | r | u | y |
| "s | u" | q | b | e | g | l | m | p | t | w |
| "s | v" | q | a | d | g | j | m | p | t | w |
| "s | w" | q | a | e | i | j | o | p | t | w |
| "s | x" | q | a | d | g | j | m | p | t | w |
| "s | y" | q | a | d | g | j | m | s | t | w |
| "s | z" | q | a | d | g | j | m | p | t | w |
| "s | " | q | a | d | g | j | m | p | t | w |
| "t | a" | q | c | f | i | l | n | r | t | y |
| "t | b" | q | a | d | g | j | m | p | t | w |
| "t | c" | z | a | d | h | j | o | p | t | w |
| "t | d" | q | a | d | g | j | m | p | t | w |
| "t | e" | q | c | d | g | l | m | r | u | x |

FIG. 10N

| "_ | _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| "t | f" | q | a | d | i | j | o | p | t | w |
| "t | g" | q | a | e | g | j | o | p | t | w |
| "t | h" | q | a | e | i | l | o | r | u | w |
| "t | i" | z | c | e | g | l | o | s | v | w |
| "t | j" | q | a | d | g | j | m | p | t | w |
| "t | k" | q | a | e | g | j | m | p | t | w |
| "t | l" | q | a | e | i | j | m | p | t | y |
| "t | m" | q | a | e | g | l | o | p | t | w |
| "t | n" | q | a | e | g | j | m | p | t | w |
| "t | o" | q | c | d | g | l | m | r | u | w |
| "t | p" | q | c | d | g | j | m | p | u | w |
| "t | q" | q | a | d | g | j | m | p | t | w |
| "t | r" | q | a | e | i | j | o | p | u | y |
| "t | s" | q | c | e | i | j | o | p | u | w |
| "t | t" | q | a | e | i | l | o | p | t | y |
| "t | u" | q | a | f | i | j | n | r | t | w |
| "t | v" | q | a | d | g | j | m | p | t | w |
| "t | w" | q | a | e | i | j | o | p | t | w |
| "t | x" | q | a | d | g | j | m | p | t | w |
| "t | y" | q | a | d | g | l | m | p | t | w |
| "t | z" | q | a | d | g | j | m | p | t | w |
| "t | " | q | a | d | g | j | m | p | t | w |
| "u | a" | q | a | d | g | l | n | r | t | w |
| "u | b" | q | a | e | i | j | m | s | t | w |
| "u | c" | q | c | e | h | k | m | p | t | w |
| "u | d" | q | a | e | i | j | o | p | t | y |
| "u | e" | q | a | d | g | j | n | s | t | w |
| "u | f" | q | a | f | g | j | m | p | t | w |
| "u | g" | q | a | e | h | j | m | s | t | w |
| "u | h" | q | a | d | g | j | m | p | t | w |
| "u | i" | q | c | d | g | l | n | r | t | w |
| "u | j" | q | a | d | g | j | m | p | t | w |
| "u | k" | q | a | d | g | j | m | p | t | w |
| "u | l" | q | a | d | g | l | m | p | t | y |
| "u | m" | q | b | e | i | j | m | p | t | w |
| "u | n" | q | c | d | i | l | n | s | t | w |
| "u | o" | q | a | d | g | j | m | p | t | w |

**FIG. 10O**

| "-    -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "u    p" | q | a | d | i | l | o | p | t | y |
| "u    q" | q | a | d | g | j | m | p | t | w |
| "u    r" | q | c | e | i | l | n | s | t | y |
| "u    s" | q | a | e | i | l | m | s | t | y |
| "u    t" | q | a | e | i | l | o | s | t | w |
| "u    u" | q | c | d | g | j | m | p | t | w |
| "u    v" | q | a | d | g | j | m | p | t | w |
| "u    w" | q | a | d | g | j | m | p | t | w |
| "u    x" | q | a | d | g | j | m | p | t | w |
| "u    y" | q | a | e | g | j | m | s | t | w |
| "u    z" | q | a | d | g | j | m | p | t | w |
| "u     " | q | a | d | g | j | m | p | t | w |
| "v    a" | q | c | d | i | l | n | r | t | w |
| "v    b" | q | a | d | g | j | m | p | t | w |
| "v    c" | q | a | d | g | j | m | s | t | w |
| "v    d" | q | a | d | g | j | m | p | t | w |
| "v    e" | q | a | d | g | l | n | r | t | w |
| "v    f" | q | a | d | g | j | m | p | t | w |
| "v    g" | q | a | d | g | j | m | p | t | w |
| "v    h" | q | a | d | g | j | m | p | t | w |
| "v    i" | q | c | e | g | j | n | s | t | y |
| "v    j" | q | a | d | g | j | m | p | t | w |
| "v    k" | q | a | d | g | j | m | p | t | w |
| "v    l" | q | a | d | g | j | m | s | t | w |
| "v    m" | q | a | d | g | j | m | p | t | w |
| "v    n" | q | a | d | g | j | m | p | t | w |
| "v    o" | q | a | d | i | l | o | r | t | y |
| "v    p" | q | a | d | g | j | m | p | t | w |
| "v    q" | q | a | d | g | j | m | p | t | w |
| "v    r" | q | a | d | g | j | m | p | t | w |
| "v    s" | q | a | d | g | j | m | p | t | w |
| "v    t" | q | a | d | g | j | m | p | t | w |
| "v    u" | q | a | d | g | j | m | p | t | w |
| "v    v" | q | a | d | g | j | m | p | t | w |
| "v    w" | q | a | d | g | j | m | p | t | w |
| "v    x" | q | a | d | g | j | m | p | t | w |
| "v    y" | q | a | d | g | j | m | p | t | w |

## FIG. 10P

| " - " | " - " | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| "v | z" | q | a | d | g | j | m | p | t | w |
| "v | " | q | a | d | g | j | m | p | t | w |
| "w | a" | q | b | d | i | l | n | r | v | y |
| "w | b" | q | a | d | g | j | m | p | t | w |
| "w | c" | q | a | e | g | j | m | p | t | w |
| "w | d" | q | a | f | g | j | m | p | t | w |
| "w | e" | q | b | e | i | l | n | r | v | w |
| "w | f" | q | a | d | g | j | m | p | t | w |
| "w | g" | q | a | d | g | j | m | p | t | w |
| "w | h" | q | a | e | i | j | o | p | t | y |
| "w | i" | q | c | d | g | l | n | s | t | w |
| "w | j" | q | a | d | g | j | m | p | t | w |
| "w | k" | q | a | d | g | j | m | p | t | w |
| "w | l" | q | a | d | g | j | m | p | t | w |
| "w | m" | q | a | d | g | j | m | p | t | w |
| "w | n" | q | a | d | g | l | m | s | t | w |
| "w | o" | q | a | d | g | j | n | r | u | w |
| "w | p" | q | a | d | h | j | m | p | t | w |
| "w | q" | q | a | d | g | j | m | p | t | w |
| "w | r" | q | a | d | i | j | o | p | t | w |
| "w | s" | q | a | e | g | j | m | p | t | w |
| "w | t" | q | a | d | g | j | m | p | t | w |
| "w | u" | q | a | d | g | j | m | p | t | w |
| "w | v" | q | a | d | g | j | m | p | t | w |
| "w | w" | q | a | d | g | j | m | p | t | w |
| "w | x" | q | a | d | g | j | m | p | t | w |
| "w | y" | q | a | d | g | j | m | p | t | w |
| "w | z" | q | a | d | g | j | m | p | t | w |
| "w | " | q | a | d | g | j | m | p | t | w |
| "x | a" | q | c | d | g | j | m | p | t | w |
| "x | b" | q | a | d | g | j | m | p | t | w |
| "x | c" | q | a | e | h | j | m | p | t | w |
| "x | d" | q | a | d | g | j | m | p | t | w |
| "x | e" | q | c | d | g | l | m | s | t | x |
| "x | f" | q | a | d | g | j | m | p | t | w |
| "x | g" | q | a | d | g | j | m | p | t | w |
| "x | h" | q | a | d | g | j | m | p | t | w |

## FIG. 10Q

| "-" | "-" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| "x" | i" | q | c | d | g | j | n | s | t | w |
| "x" | j" | q | a | d | g | j | m | p | t | w |
| "x" | k" | q | a | d | g | j | m | p | t | w |
| "x" | l" | q | a | d | i | j | m | p | t | w |
| "x" | m" | q | a | d | g | j | m | p | t | w |
| "x" | n" | q | a | d | g | j | m | p | t | w |
| "x" | o" | q | a | d | g | j | m | p | t | w |
| "x" | p" | q | a | e | i | l | o | p | t | w |
| "x" | q" | q | a | d | g | j | m | p | t | w |
| "x" | r" | q | a | d | g | j | m | p | t | w |
| "x" | s" | q | a | e | i | j | m | p | t | w |
| "x" | t" | q | a | e | g | j | m | r | u | w |
| "x" | u" | q | a | d | g | j | m | p | t | w |
| "x" | v" | q | a | d | g | j | m | p | t | w |
| "x" | w" | q | a | d | g | j | m | p | t | w |
| "x" | x" | q | a | d | g | j | m | p | t | w |
| "x" | y" | z | a | d | g | j | m | p | t | w |
| "x" | z" | q | a | d | g | j | m | p | t | w |
| "x" | " | q | a | d | g | j | m | p | t | w |
| "y" | a" | q | a | d | g | j | m | p | t | w |
| "y" | b" | q | a | e | i | j | o | p | t | w |
| "y" | c" | q | a | d | g | l | o | p | t | w |
| "y" | d" | q | a | d | g | j | m | p | t | w |
| "y" | e" | q | a | e | g | j | m | s | t | w |
| "y" | f" | q | a | d | g | j | m | p | t | w |
| "y" | g" | q | a | d | g | j | m | p | t | w |
| "y" | h" | q | a | d | g | j | o | p | t | w |
| "y" | i" | q | c | d | g | j | n | p | t | w |
| "y" | j" | q | a | d | g | j | m | p | t | w |
| "y" | k" | q | a | d | g | j | m | p | t | w |
| "y" | l" | q | a | e | g | j | m | p | t | w |
| "y" | m" | q | a | e | g | j | o | p | t | w |
| "y" | n" | q | c | d | g | j | m | p | t | x |
| "y" | o" | q | a | d | g | j | n | r | u | w |
| "y" | p" | q | a | e | i | j | m | p | t | w |
| "y" | q" | q | a | d | g | j | m | p | t | w |
| "y" | r" | q | a | d | i | j | m | p | t | w |

**FIG. 10R**

A0049

| "-" | "-" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| "y | s" | q | c | e | i | j | m | p | t | w |
| "y | t" | q | a | e | h | j | m | p | t | w |
| "y | u" | q | a | d | g | k | m | r | t | w |
| "y | v" | q | a | d | g | j | m | p | t | w |
| "y | w" | q | a | d | h | j | m | p | t | w |
| "y | x" | q | a | d | g | j | m | p | t | w |
| "y | y" | q | a | d | g | j | m | p | t | w |
| "y | z" | q | a | e | g | j | m | p | t | w |
| "y | " | q | a | d | g | j | m | p | t | w |
| "z | a" | q | a | d | g | j | m | p | t | w |
| "z | b" | q | a | d | g | j | m | p | t | w |
| "z | c" | q | a | d | g | j | m | p | t | w |
| "z | d" | q | a | d | g | j | m | p | t | w |
| "z | e" | q | a | d | g | j | n | r | t | w |
| "z | f" | q | a | d | g | j | m | p | t | w |
| "z | g" | q | a | d | g | j | m | p | t | w |
| "z | h" | q | a | d | g | j | m | p | t | w |
| "z | i" | q | a | d | g | j | n | p | t | w |
| "z | j" | q | a | d | g | j | m | p | t | w |
| "z | k" | q | a | d | g | j | m | p | t | w |
| "z | l" | q | a | d | g | j | m | p | t | w |
| "z | m" | q | a | d | g | j | m | p | t | w |
| "z | n" | q | a | e | g | j | m | p | t | w |
| "z | o" | q | a | d | g | j | n | p | t | w |
| "z | p" | q | a | d | g | j | m | p | t | w |
| "z | q" | q | a | d | g | j | m | p | t | w |
| "z | r" | q | a | d | g | j | m | p | t | w |
| "z | s" | q | a | d | g | j | m | p | t | w |
| "z | t" | q | a | d | g | j | m | p | t | w |
| "z | u" | q | a | d | g | j | m | p | t | w |
| "z | v" | q | a | d | g | j | m | p | t | w |
| "z | w" | q | a | d | g | j | m | p | t | w |
| "z | x" | q | a | d | g | j | m | p | t | w |
| "z | y" | q | a | d | g | j | m | p | t | w |
| "z | z" | q | a | d | g | j | m | p | t | w |
| "z | " | q | a | d | g | j | m | p | t | w |
| " | a" | q | c | d | i | l | n | r | t | w |

**FIG. 10S**

| "_ _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| " b" | q | a | e | i | l | o | r | u | y |
| " c" | q | a | e | h | l | o | r | u | y |
| " d" | q | a | e | i | j | o | r | u | w |
| " e" | q | a | d | i | l | n | s | v | x |
| " f" | q | a | e | i | l | o | r | u | w |
| " g" | q | a | e | i | l | o | r | u | w |
| " h" | q | a | e | i | j | o | p | t | w |
| " i" | q | c | f | g | j | n | s | t | w |
| " j" | q | a | e | g | j | o | p | u | w |
| " k" | q | b | e | i | j | n | p | t | w |
| " l" | q | a | e | i | l | o | p | u | y |
| " m" | q | a | e | i | k | o | s | u | y |
| " n" | q | a | e | i | j | o | p | u | w |
| " o" | z | b | f | g | k | n | r | u | w |
| " p" | q | a | e | h | l | o | r | u | w |
| " q" | z | a | d | g | j | m | p | u | w |
| " r" | q | a | e | i | j | o | s | u | w |
| " s" | q | c | e | h | l | o | p | t | y |
| " t" | q | a | e | h | j | o | r | u | w |
| " u" | q | a | d | i | k | n | s | t | w |
| " v" | q | a | e | i | l | o | p | t | w |
| " w" | q | a | e | i | j | o | r | t | w |
| " x" | q | a | d | g | j | m | p | t | y |
| " y" | q | a | e | i | j | o | p | u | w |
| " z" | q | a | e | i | j | o | p | t | y |
| " " | q | a | f | i | l | o | s | t | w |

**FIG. 10T**



*FIG. 11*



*FIG. 12*

Case: 15-1108    Document: 44    Page: 111    Filed: 02/27/2015



*FIG. 13*

Case: 15-1108    Document: 44    Page: 112    Filed: 02/27/2015



*FIG. 14*

US 6,405,037 B1

1

# METHOD AND ARCHITECTURE FOR AN INTERACTIVE TWO-WAY DATA COMMUNICATION NETWORK

## CROSS REFERENCE TO MICROFICHE APPENDIX

The present application is a continuation application of U.S. patent application ("Parent Application"), Ser. No. 08/978,701, filed on, Nov. 6, 1997, entitled "A Method and Architecture for an Interactive Two-way Data Communication Network," assigned to Openwave Systems Inc., which is also the Assignee of the present application. The Parent Application is a continuation application of U.S. patent application, Ser. No. 08/570,210, filed on, Dec. 11, 1995, now U.S. Pat. No. 5,809,415 entitled "A Method and Architecture for an Interactive Two-way Data Communication Network," also assigned to Openwave Systems Inc.

Appendix A, which is a part of the present disclosure, is a microfiche appendix consisting of six sheets of microfiche having a total of 369 frames. Microfiche Appendix A is a listing of one embodiment of the client module of this invention, which is described more completely below, and a server, as described more completely below, to communicate and interact with the client module of this invention.

A portion of the disclosure of this patent document contains material, that includes, but is not limited to, Microfiche Appendix A, Appendix I, Appendix II, and FIGS. **10A** to **10T**, which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure, as it appears in the Patent and Trademark Office patent files or records, but otherwise reserves all copyright rights whatsoever.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates generally to data communications, and in particular to two-way data communication devices including a cellular telephone, a two-way pager, and a telephone that permit a user to interface with and interact with a server on a computer network.

### 2. Description of Related Art

For at least the last five years, the wireless communication industry has tried to merge computing with wireless communications. This industry wide effort has held the promise of bringing software intelligence to telecommunication devices including mobile wireless communications devices such as cellular telephones and two-way pagers as well as standard telephones.

After years of research and development, and hundreds of millions of dollars' investment by some of the largest companies in the field such as Motorola, AT&T, Sony, Matsushita, Phillips and IBM, the results have been nothing but disappointing. Typically, the intelligent communication devices resulting from these efforts include both the hardware necessary for a computer module and the hardware for a wireless communications module. Examples of such products are Simon from IBM and Bell South, MagicLink from Sony, and Envoy from Motorola.

Fundamental design and cost problems arising directly from the approach taken by the designers of these intelligent communication devices have limited widespread market acceptance of these devices. The combination of a wireless communication module with a computing module leads to a device that is too bulky, too expensive, and too inflexible to address the market requirements.

2

The combination of the two modules is too large and too heavy to fit in a user's pocket. Pocket size is a key requirement of the mobile communication market which remains unmet by these devices

In addition, the cost of these devices is close to the sum of the cost of the computer module and of the communications module, which is around a one thousand dollar end-user price. Market research indicates that the market for intelligent wireless communications devices is at prices around $300. Even with a 20% compound cost decline, it would take five years for the combination units to meet today's customers' price requirements. It is therefore unlikely that devices designed by combining a computer and a wireless module, no matter how miniaturized and cost reduced, can satisfy the cost requirement of the market during this decade.

To succeed in the market place, intelligent wireless communication devices must be able to support a wide variety of applications specific to each market segment. Typically, these applications must be added to the device by the end-user after purchase. Thus, the device must provide a method for loading the initial application and for subsequent updating of the application.

The price sensitivity for intelligent communication devices and the size limitations means that an intelligent communication device cannot support the amount of core memory (RAM), a hard disk or non-erasable memory, or a traditional floppy disk drive, commonly found on computers. These limitations close the traditional routes for delivering new applications or updates to intelligent communications devices.

As a result, the current crop of intelligent communication devices run only the few applications which were burned into their ROMs at the factory or which are contained in a ROM card plugged into a slot designed for this purpose. This scheme lacks the flexibility needed to run the thousands of applications required to address the fragmented requirements of the market and provides no simple method for updating the applications after the device has been sold.

Two other communication oriented attempts at bringing intelligence to telephones are Short Messaging Service (SMS) and Analog Display Service Interface (ADSI). SMS specifies how messages are delivered to and from a cellular telephone and how the cellular telephone should store the messages. SMS also defines some simple processing which the cellular telephone can perform on the message, such as calling a telephone number embedded in the message.

SMS's architecture is similar to that of paging networks with the difference that devices implementing the SMS architecture operate over the control channel of the cellular telephone network. SMS is deployed primarily in Europe over the GSM network.

SMS messages are not delivered in real time. The time delays can range from 30 seconds up to 10 minutes, which makes SMS unsuitable for real time applications. The main purpose of SMS is the delivery of messages. SMS does not specify an application protocol or cellular telephone application module which further restricts its usefulness in running applications on cellular telephones. After a few years of deployment in Europe, SMS implementations have been limited to notification services such as two-way paging and voice mail notification.

SMS as a medium is unsuited to building applications which allows the retrieval, manipulation, to and storage of information. This is the reason why the industry giants have not turned to SMS in their quest to add intelligence to

US 6,405,037 B1

3

cellular telephones, but have consistently attempted to combine a computer module with a wireless communications module.

ADSI was designed as an extension to Interactive Voice Response Systems. ADSI allows a smart telephone with a small screen to display prompts to assist users in choosing among various options. By using visual prompts instead of cumbersome voice prompts, ADSI is thought to make the use of interactive voice services easier and faster.

ADSI allows data to be sent from the service provider to the telephone in the form of screens. ADSI also allows the telephone to respond through touch tone signaling with a special coding to describe the full alphanumeric character set. With ADSI, a telephone is primarily a passive device services send text screens to the telephone, and the telephone sends back short strings indicating the choices the user made from the text screen.

ADSI makes no provisions for performance of processing in the telephone. As a result, ADSI generates a high traffic load on the telephone network since each user input is sent back to the service for processing. This makes ADSI unsuitable for wireless networks where bandwidth is at a premium and "air efficiency" is one of the most sought after qualities. The lack of processing capability in the telephone and the high bandwidth requirements of ADSI have prevented it from being considered by the industry for implementing intelligent wireless devices.

Up to now, intelligent communication devices have combined a computing module with a wireless communications module. However, to gain widespread acceptance, a two-way data communication device with processing capability and the ability to run a wide variety of differing user applications is needed. In addition, such a device should be comparable in size, cost, and weight to a cellular telephone.

SUMMARY OF THE INVENTION

According to the principles of this invention, the prior art limitations of combining a computer module with a wireless communication module have been overcome. In particular, a two-way data communication device of this invention, such as a cellular telephone, two-way pager, or telephone includes a client module that communicates with a server computer over a two-way data communication network. The principles of this invention can be used with a wide variety of two-way data communication networks. For example, two-way data communication networks for cellular telephones that may be used include a cellular digital packet data network as well as TDMA, CDMA, and GSM circuit switched data networks; and the AMPS analog cellular network with a modem. Similarly, for two-way pagers, two-way data communication networks include PACT, the new AT&T endorsed two way paging standard, or other priority two-way paging networks with data transport capability. The two-way data communication network for a telephone is the public switched telephone network.

Using the two-way communication device that includes the client module, a user can provide information to the server computer, retrieve information from the server computer, provide data to an application on the server computer which uses the data and provides information to the two-way communication device, or sends the information to another location. The functionally provided to the user of the two-way communication device is limited only by the applications available on a server computer that is accessible to the user over the two-way data communication network.

4

This invention allows for the first time two-way communications devices such as cellular telephones, two-way pagers, and telephones to become open application platforms which in turn empowers software developers to deliver value-added applications and services to any two-way communication device that incorporates the principles of this invention. This is a radical shift from the current situation where telephones and two-way pagers are closed, proprietary systems. Consequently, an even playing field is created for the market to invent new uses for two-way communication devices and for two-way communication networks. Any entity from corporations to individuals can make new applications available to the installed base of two-way data communication devices that include this invention without physical modification or addition to the two-way communication device. Years after purchase, a two-way communication device incorporating this invention will run all the applications which were developed since its purchase.

Further, all these applications are available without the end user having to add anything or make any modification to the two-way communication device. Also, the applications are independent of the two-way data communication network. The applications do not depend on any feature of the two-way data communication network. Thus, the applications are unaffected by a change in the two-way data communication network.

Also, the applications on the server computer are independent of the two-way data communication device with which the server computer is interacting. An application on the server computer can communicate with any two-way data communication device that includes the client module of this invention and a network interface module to transmit data over, and receive data from the two-way data communication network. These two features mean that an investment in developing an application is insulated from either advances in two-way data communication devices, or advances in two-way data communication network technology.

As indicated above, the two-way data communication device of this invention utilizes a client module to transmit a message including a resource locator selected by the user over the two-way data communication network to a server on a server computer on the computer network. For example, the computer network can be a corporate wide area network, a corporate local area network, the Internet, or any combination of computer networks.

The server processes the message, i.e, executes the application addressed by the resource locator and transmits a response over the two-way data communication network to the two-way data communication device, which stores the response in a memory. The client module interprets the response and generates a user interface using information in the response. In one embodiment, the user interface includes at least one user data input option that is associated with a resource locator. In another embodiment, the user interface is a display.

The resource locator associated with the at least one user data input option can address any one of a wide variety of objects. In one embodiment, the resource locator associated with the at least one user data input option addresses an object on the server computer that transmitted the response. In another embodiment, the resource locator addresses an object on another server computer coupled to the two-way data communication network. In yet another embodiment the resource locator addresses an object stored in the two-way communication device.

US 6,405,037 B1

| 5 | 6 |

When the user selects the at least one user data input option, the client module interprets the selection and if required, appends any input data to the resource allocator associated with the at least one user data input option. The client module transmits a message including the resource locator with any appended input data to the server computer.

Alternatively, the resource locator with any appended data can be addressed to another server computer, or can address an object stored in the two-way communication device. If the resource locator addresses an object on a server computer, the client module provides the message to the network interface module which in turn transmits the message over the two-way data communication network.

Thus, in this embodiment, the message originally transmitted to the two-way data communication device included all the information necessary for the client module to generate the user interface, to associate the user selection and any data entered with a particular resource locator, and to transmit the appropriate resource locator in a subsequent message. The client module includes an interpreter that processed the information in the message. Since the message included all the information needed by the client module, the server computer that transmitted the message retained no state information concerning the message. Consequently, the server computer is defined as a stateless server computer.

An important aspect of this invention is that the message includes all information necessary for the client module to generate the user interface and a particular user interface can be independent from other user interfaces. Unlike prior art systems that gave the user a predetermined menu from which to select items, or limited the user to an E-mail like format, according to the principles of this invention, the user interfaces and possible interactions available to the user are determined only by the applications that developers make available. The possible interactions and user interfaces for one application can be totally different and independent from the possible interactions and user interfaces of another application. Thus, a cellular telephone, two-way pager, and a telephone all truly become an open platform.

These features of the invention are a significant departure from prior art systems. Typically, in the prior art, use of a particular application on a particular platform required that the application be compatible with the operating system on that platform. Further, each time a new version of the application was released, the user was required to take steps to update the application on the user's platform. Further, if the user of the platform did not modify the operating system as new versions of the operating system were released, at some point in time, the platform would no longer be capable of processing a new version of an application that required a current version of the operating system.

This invention eliminates these problems. As explained above, the client module in the two-way data communication device functions an interpreter. The application on the server computer provides all information necessary for the interpreter to generate a user interface on the two-way data communication device, and in response to user selections or data input using the user interface, to route messages to an appropriate server, i.e, either the server that sent the original information or another server.

Thus, the client module only interprets this information and interacts appropriately with the hardware of the two-way data communication device. Consequently, to update an application requires only changes on the server computer and not changes in each two-way data communication device that communicates with that server computer. This

invention eliminates the usual requirement for distribution of application software, and application software updates to the end user of the two-way data communication device.

In one embodiment, a two-way data communication system for communication between a server computer and a two-way data communication device selected from a group consisting of a cellular telephone, a two-way pager, and a telephone, includes a two-way data communication network, a server computer coupled to the two-way data communication network, and a two-way data communication device coupled to the two-way data communication network. The server computer includes a two-way data communication interface module coupled to the two-way data communication network, and a server coupled to the two-way data communication interface module. The server receives a message including a resource locator from the two-way data communication network. The resource locator includes an address of the server computer and of an application on that server computer. The server processes the message using the resource locator. In this embodiment, the server transmits a response to the message over the two-way data communication network.

The two-way data communication device, selected from the group consisting of a cellular telephone, a two-way pager, and a telephone, includes a network interface module coupled to the two-way data communication network, and a client module coupled to the network interface module. The client module transmitted the message including the resource locator to the server over the two-way data communication network. The client module also processes the response to the message from the server. The response includes information for a user interaction over the two-way data communication network.

The client module of this invention is lightweight, and thus requires only lightweight resources in a two-way data communication device. Consequently, the client module can use existing resources in such a device and therefore does not add to the cost of the two-way data communication device.

In one embodiment, the interpreter within the client module includes a plurality of managers including a user interface manager coupled to a display of the two-way data communication device where the user interface manager handles interactions with the display. The user interface manager also is coupled to a keypad of the two-way data communication device and handle interactions with the keypad. Herein, a keypad can be a telephone keypad, the keys found on a two-way pager, or other data input interface of a two-way communication device.

In one embodiment, the response generated by the server computer includes a plurality of resource locators and at least one of the plurality of resource locators includes an address to another server coupled to the communication network.

According to the principles of this invention, a method for using a two-way data communication device, selected from a group consisting of a cellular telephone, a two-way pager, and a telephone, to communicate with a server computer includes:

generating a message by a client module in response to data entered by the user of a two-way data communication device coupled to a two-way data communication network,

wherein the client module executes on a microcontroller of the two-way data communication device; and

the message includes a re source locator;

US 6,405,037 B1

7

transmitting the message over the two-way data communication network to a server computer wherein the server computer is identified by the resource locator;

executing an application on the server computer identified by the resource locator to generate a response to the message; and

transmitting the response to a location identified by the application.

As indicated above the location can be the two-way communication device, another server computer, or some other device coupled to the server computer.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates one embodiment of the airnet network of this invention that includes the two-way data communication devices of this invention.

FIGS. 2A to 2H are illustrations of a series of screen displays of the two-way data communication device of this invention that illustrate one application of the principles of this invention.

FIGS. 3A to 3F are illustrations of a series of screen displays of the two-way data communication device of this invention that illustrate a second application of the principles of this invention.

FIGS. 4A to 4I are illustrations of a series of screen displays of the two-way data communication device of this invention that illustrate yet another application of the principles of this invention.

FIG. 5 illustrates another embodiment of the airnet network of this invention that includes the two-way data communication devices of this invention and an airnet network translator.

FIG. 6 is a block diagram of a mobile wireless communication device that includes the client and support modules of this invention.

FIG. 7 is a more detailed diagram of the mobile wireless communication device and a server computer within the airnet network architecture of this invention.

FIGS. 8A to 8D are a process flow diagram showing the process performed by the client in the mobile wireless communication device and the server on the server computer of FIG. 7.

FIG. 9 is a diagram of a mobile wireless communication device of this invention that includes a novel predictive text entry system that is a part of this invention.

FIGS. 10A to 10T are one embodiment of a letter frequency table.

FIG. 11 is a process flow diagram for one embodiment of a data entry process that includes the novel predictive data entry process of this invention,

FIG. 12 is a more detailed diagram of the mobile wireless communication device and the airnet network translator within the airnet network architecture of the another embodiment of this is invention.

FIG. 13 is a process flow diagram showing the various processes performed by the airnet network translator of FIG. 12.

FIG. 14 is a diagram illustrating the various module managers included in one embodiment of the client module of this invention.

Herein, objects with the same reference numeral are the same object. Also, the first number of a reference numeral indicates the Figure where the object first appeared.

8

## DETAILED DESCRIPTION

According to the principles of this invention, a novel airnet network 150, i.e., a two-way data communication network, interconnects any one, any combination, or all of two-way data communication devices 100, 101, or 102, that each include this invention, with a wide variety of computer networks 120, 130, and 140, for example. As explained more completely below, each two-way data communication device 100, 101, and 102 can be configured to transmit data to and receive data from any desired combination of computers on computer networks 120, 130, and 140. Airnet network 150 is the two-way data communication path from the two-way data communication device to the particular computer that is accessed by the user of that two-way data communication device.

Each wireless communication device 100 that includes this invention can communicate over airnet network 150 with any server computer 121, 131, and 141 on airnet network 150 that includes at least one application that communicates and interacts with the processes of this invention that are included within device 100. Thus, device 100 can access information on the computer network and provide information to the computer network. Similarly, a two-way pager 101, and a telephone 102 with a modem 103, that each include this invention, can communicate over airnet network 150 with any of server computers 121, 131, and 141 that includes at least one application that communicates and interacts with the processes of this invention that are included within devices 101 and 102.

As explained more completely below, an application on a server computer can be accessed by any two-way data communication device that can communicate with that server computer. The application is independent of the particular type of two-way data communication device that is used to access the application and independent of the particular two-way data communication network used. This means that a user can access an application from anywhere so long as the user has a two-way data communication device that can communicate with the server computer.

In one embodiment, a process on wireless communication device 100 is configured as a client process and the applications on server computers 121, 131 and 141 on airnet network 150, that communicate with the client process, are server processes. This architecture allows some of the processing burden to be moved away from cellular telephone 100, across airnet network 150, to a server module on any computer on airnet network 150.

Specifically, a wireless communication device 100 e.g., a cellular telephone, with a telephone like keypad, communicates via a data capable cellular telephone network 110, e.g., a cellular digital packet data telephone network, with an application on a server computer on a computer network that has an interface to data capable cellular telephone network 110. For example, the computer network can be a corporate wide area network 120, a corporate local area network 130, or perhaps the Internet 140.

Similarly, a two-way pager 101 communicates via a two-way pager network 111 with an application on a server computer on a computer network that has an interface to two-way pager network 111. Again, for example, the computer network can be a corporate wide area network 120, a corporate local area network 130, or perhaps the Internet 140. Finally, a telephone 102 communicates via a modem 103 and public switched telephone network 112 with an application on a server computer on a computer network that has an interface to public switched telephone network 112.

US 6,405,037 B1

9

As with the other two-way data communication devices, the computer network can be, for example, a corporate wide area network 120, a corporate local area network 130, or perhaps the Internet 140.

In each of two-way data communication devices 100, 101, and 102, the client process is stored as a client module in the device and the execution of the client module on a micro-controller in the device is sometimes referred to as the client process. The client process performs important processing functions locally. This allows the communication between the client process, hereinafter sometimes referred to as simply client, and the server process, hereinafter sometimes referred to as server, to be minimized and the server computing requirements to grow slowly as the number of clients, i.e., users, grows.

The client module is small, e.g., under 64 KByte, and requires only low processing power congruent with the memory chips and built-in microcontrollers in two-way data communication devices such as cellular telephone 100, two-way pager 101, and telephone 102. Thus, unlike the prior art attempts at an intelligent telephone, the cost, size, and battery life of either cellular telephones, two-way pagers, or telephones that incorporate this invention are not adversely affected.

While client/server architectures have been used exten-sively in computer networks, a client/sever architecture implements using two-way communication data devices such as cellular telephone 100, two-way pager 101, or telephone 102 yields new and unexpected results. This invention allows for the first time a wide variety of two-way data communication devices including but not limited to cellular telephones, two-way pagers, and telephones to become open application platforms which in turn empowers software developers to deliver value added applications and service to any two-way data communication device which incorporates the principles to invention.

This is a radical shift from the current situation where cellular telephones, two-way pagers, and telephones are closed, proprietary systems. Consequently, an even playing field is created for the market to invent new uses for cellular telephones and two-way pager networks, and for telephones on the public switched network.

Any entity from corporations to individuals can make new applications available to the installed base of data ready cellular telephones, two-way pager, and telephones, that include this invention without physical modification or addition to the devices. Years after purchase, a two-way data communication device with this invention can run all the applications which were developed since its purchase. Further, all these applications are available without the user having to add anything or make any modification to the two-way data communication device. These features of the invention are a significant departure from prior art systems. Typically, in the prior art, use of a particular application on a particular platform requited that the application be com-patible with the operating system on that platform. Further, each time a new version of the application was released, the user was required to take steps to update the application on the user's platform. Further, if the user of the platform did not modify the operating system as new versions of the operating system were released, at some point in time, the platform would no longer be capable of processing a new version of an application that required a current version of the operating system.

Also, small devices, such as cellular telephones or pagers, usually do not have card slots, floppy or hard disk drives, or

10

other means commonly found on computers to add or update applications. This limitation has led prior art attempts at intelligent communication devices to design closed systems with fixed functionality. Such devices can neither adapt nor be adapted to the fast changing requirements of the market place and so have not met with market success.

This invention eliminates these problems. The client process in the two-way data communication device func-tions an interpreter. The application on the server computer provides all information necessary for the interpreter to generate a user interface on the two-way data communica-tion device, and in response to user selections or data input using the user interface, to route messages to an appropriate server, i.e, either the server that sent the original information or another server.

Thus, the client process only interprets this information and interacts appropriately with the hardware of the two-way data communication device. Consequently, to update an application requires only changes on the server computer and not changes in each two-way data communication device that communicates with that server computer. This invention eliminates the usual requirement for distribution of application software, and application software updates to the end user of the two-way data communication device.

For example, if initially, two-way pager 101 receives a response to a message from an application on server com-puter 121 on corporate wide area network 120, the inter-preter in two-way pager 101 generates a user interface on display screen 106 using information in the message. As described more completely below, options presented in the user interface can allow the user to access information, or provide information to any one, any combination of, or all of networks 120, 130, and 140.

Specifically, in the response to the message from two-way pager 101, the application initially accessed on server com-puter 121 included resource locators for applications on each of networks 120, 130, 140, typically common gateway interface programs, accessible to the user of pager 101 as well as information required to generate the user interface. Consequently, when the user makes a particular selection or enters data, the interpreter accesses the appropriate resource locator and appends any necessary data to the resource locator. The client transmits a message including the resource locator to the appropriate server.

As shown by this example, the applications on networks 120, 130, 140 send to the two-way data communication device all information necessary to generate a user interface, and to process all user input. Consequently, only an appli-cation must be changed to update the information provided to the two-way data communication device.

In addition, since all the information needed by the client to generate a user interface and all information necessary for the client process to respond to an input data is included in the message, the computer server does not retain any state information concerning the information transmitted to the client process. Consequently, the computer server is state-less.

Each two-way data communication device 100, 101, and 102 that utilizes airnet network 150, includes a data com-munication capability, a display screen, preferably a multi-line display screen, and storage capability for the processes of this invention in an on-board memory, and for the message being processed. Nearly every data capable cellular telephone, e.g., a telephone that utilizes a cellular digital packet data network, includes excess on-board memory capacity and a multi-line display screen. These hardware

US 6,405,037 B1

11

resources are often available, but unused in a data capable cellular telephone because of the indivisibility of memory chip packages. The inclusion of the processes of this invention in such cellular telephones therefore has very little effect on the cost, size, and power consumption of the cellular telephone. Similarly, the inclusion of the processes of this invention in two-way pagers and telephones, that include a microcontroller and memory, has very little affect on the cost, size, and power consumption of these devices.

Thus, unlike prior art approaches that attempted to combine a computer module and a wireless communication module in a single package, this embodiment of the invention preferably utilizes the memory and processing power that currently exists in the cellular telephone **100**, two-way pager **101**, telephone **102** or other wireless or landline two-way data communication devices. This approach limits the cost of the resulting device and overcomes many of the problems of the prior art devices, e.g., the size and weight of the two-way data communication device is not changed, and, as explained above, locating user applications is removed from cellular telephone **100**, two-way pager **101**, and telephone **102**.

In particular, unlike devices produced by previous industry attempts at combining computing modules and a wireless cellular module, two-way data communication devices which incorporate this invention are size and cost competitive with voice-only telephones and can, for the first time, satisfy the market cost and size requirements for an intelligent cellular telephone, for example.

The incremental cost of supporting interactive applications on cellular telephone **100**, two-way pager **101**, and telephone **102** is reduced to at most a slightly larger screen that is required to display the application to the user. This is a fraction of the cost of adding a complete computer module to a cellular telephone, for example.

The incremental power consumption required to support this invention is also very small, as the incremental memory and screen required are small consumers of power compared to the cellular radio itself. Intelligent two-way data communication devices built according to the principles of this invention are not expected to have a significantly lower battery life than standard cellular telephones, or two-way pagers, for example.

The configuration and processes of the client process in two-way data communication devices **100**, **101**, and **102** are similar when the differences in the devices and the two-way data communication network over which the devices communicate are considered. Consequently, in the following description, the operation of data-ready cellular telephone **100** is considered. The same or similar operations can be performed on two-way data communication devices **101**, and **102**. The main difference is that some device dependent features within the client module must be changed to accommodate the particular hardware used in the two-way communication device. However, the client module is architecture described more completely below limits the number of changes that must be made.

As indicated above, in response to user actions, wireless communication device **100** transmits a message, typically a data request, to a server computer **121** on computer network **120** and receives a response to the message. Alternatively, the user action can result in directions to server computer **121** on computer network **120** to transmit the response to the message to another location or to another user. Also, wireless communication device **100** can receive a message from any one of the computers coupled to airnet network **150**.

12

An important aspect of this invention is that the client module interpreter in wireless communication device **100** generates a user interface by which the user can both initiate and receive messages from a variety of applications. The interactions take place in real-time and are not limited by the client module interpreter. The uses of wireless communication device **100** are limited only by the availability of applications on server computers.

The applications available are determined by application developers. Prior to considering one implementation of the invention in further detail, several illustrative examples of applications that can be implemented according to the principles of this invention are described. These applications are illustrative only and are not intended to limit the invention to the particular applications and features described.

In one use, the user configures cellular telephone **100** to access server computer **121** on XYZ corporate wide area network **120**. In response to the access by the user, server computer **121** transmits a card deck to cellular telephone **100** over data capable cellular telephone network **110**. As explained more completely below, a card deck includes one or more cards, and each card is interpreted by the client module to generate a user interface screen.

In the embodiment illustrated in FIG. 2A, the initial card deck transmitted to cellular telephone **100** includes an introductory display card and a choice card. FIG. 2A is an example of introductory screen display **200** that is generated on display screen **105** by the client process in cellular telephone **100** by interpreting the display card. As used herein, a display screen is the physical display apparatus in a two-way communication device. A screen display is the image presented on the display screen.

In this embodiment, display screen **105** is a pixel display that displays graphics. In another embodiment, display screen **105** displays only text and so the graphics would not appear on display screen **105**. Screen display **200**, and other screen displays described more completely below, include a horizontal arrow, i.e., a multi-card deck indicator, to communicate to the user that the current deck includes another card. The inclusion of screen indicators, such as the multi-card deck indicator, to communicate with the user is optional. The functionality of this invention is independent of such screen indicators.

When the user presses a predetermined key, or key sequence, the client process in cellular telephone **100** interprets the next card in the card deck, i.e., the choice card, and in turn generates a menu **201** (FIG. 2B) of items that can be accessed by the user. In this embodiment, each of the menu items is available on server computer **121** to the user who, in this example, is a representative of XYZ corporation visiting ABC Designs.

As explained more completely below, each of the menu items is associated with a resource locator that includes an address of the particular object associated with that menu item, typically an address to a common gateway interface program on server computer **121**. In general, a resource locator includes an address and may include appended data. The address can be to a local object within the two-way data communication device or to a remote object on a server computer. As is known to those skilled in the art, the common gateway interface is an Internet standard that is used to dynamically generate information, e.g., cards. In view of this disclosure, other techniques to generate dynamic cards could be used.

Initially, the highlighting of the first line of menu **201** is not present. When a key on the keypad of cellular telephone

US 6,405,037 B1

13

100 is pressed, the menu item corresponding to that key is highlighted on screen 105. Thus, menu 201 shows the first item highlighted to indicate that the one key was pressed by the user. However, highlighting a selected item is a feature that is specific to this example, and in general is not required to implement the invention. Other methods can be used to indicate the user's choice on display screen 105 such as an arrow pointing at the choice, if such an indication is desired.

After the one key is pressed, the user presses a predetermined key, e.g., an enter key, to verify the selection. Alternatively, in another embodiment, the verification of the selection is not required. In both embodiments, the resource locator for the selection is transmitted to server computer 121 by the client process in cellular telephone 100 over data capable cellular telephone network 110. In response to the selection, server computer 121 processes the message containing the selection, and in this embodiment, transmits another card deck to cellular telephone 100.

The client process in cellular telephone 100 interprets the first card in the deck received from server computer 121, which is a choice card, and generates a screen display 202, that includes a second menu as illustrated in FIG. 2C, on display screen 105. Initially, none of the items in the second menu are highlighted.

Notice that screen display 202 includes a header, that describes the selection made by the user on screen display 201, in addition to the second menu of choices available to the user. A multi-display screen card indicator 203, e.g., in this embodiment, a hand icon with a finger pointing down, shows that the screen associated with the current choice card includes additional items that are not shown on display screen 105. Herein, a screen can be larger than the number of lines available on display screen 105 and so the user must scroll the screen display to view the complete screen.

Thus, to view the additional items, the user presses a first screen scroll key, e.g., a next key, on cellular telephone 100. In this embodiment, when the first screen scroll key is pressed, each line of the display is rolled up one line. The resulting display has an icon with a finger pointing up (not shown) if the menu requires only two screen displays. If the menu requires more than two screen displays, the second screen display of the menu would have two icons, one with a finger pointing up, and another with a finger pointing down. To scroll between the various lines in the second menu, the user uses the first screen scroll key, and a second screen scroll key.

If the user displays the last line of a card, e.g., the last line in the second menu, and presses the first screen scroll key nothing happens. In this embodiment, the user must make a choice before the next card is available.

Screen display 202 also includes representations of two soft keys, a home key 204, and an info key 205. In this example, these soft keys are defined only for the card used to generate screen display 202. When the user presses a predetermined key sequence, the home key is highlighted to indicate the selection. In this embodiment, when the home key is selected, the user is returned to screen display 200. In another embodiment, the user could be returned, for example, to a home screen display that is displayed each time the user activates cellular telephone 100 for use on airnet network 150.

The home key is associated with a pointer, that in one embodiment is a resource locator, and the card addressed by the pointer is displayed by the client process when the home key is selected by the user.. Specifically, if the pointer is to a card in the current deck, the client process simply displays

14

that card. If the pointer is to other than a card in the current deck, the client process in cellular telephone 100 retrieves the deck containing the card at the location identified by the pointer. The location could be, for example, either a memory in cellular telephone 100, or a memory in computer 121.

Similarly, when the user presses another predetermined key sequence, the info key is highlighted to indicate the selection. In this embodiment, when the info key is selected, a help screen is displayed for the user that describes the possible selections. The particular contents of the help screen are determined by the provider of the service. Specifically, a pointer is associated with the info key and when the info key is depressed by the user, the information stored at the location identified by the pointer is retrieved and interpreted by the client process in cellular telephone 100.

Returning to the menu in FIG. 2C, since the user wants to determine the status of an order, the user pushes the two key on the keypad of cellular telephone 100. In response to the key press, the second choice in the menu is highlighted as shown in FIG. 2C. In response to verification of the key press, e.g., the user presses a predetermined key sequence, cellular telephone 100 transmits a check open order request to computer 121, i.e, the client process transmits a message that includes a resource locator associated with the menu item selected by pressing the two key.

In response to the check open order request, computer 121 transmits yet another card deck to cellular telephone 100. The client process in cellular telephone 100 interprets this deck, that is an entry card, and in turn generates a purchase order number entry screen display 206 (FIG. 2D) on display screen 105. Notice that screen display 206 has a previous soft key 207 and a fax soft key 208. Again, each of these soft keys has an associated pointer and the information stored at the location identified by the pointer is retrieved and interpreted by the client process when the user selects the soft key.

In this example, the user does not select a soft key, but rather the user enters the purchase order number as shown in FIG. 2E using the keypad of cellular telephone 100. The user enters only the various numbers. The client process formats the number and inserts the dashes as shown in FIG. 2E.

After the purchase order is entered, the user presses a predetermined key sequence to indicate to the client process that entry of the purchase order number is complete. Notice that the user is entering data and not simply selecting a menu item. The user is utilizing cellular telephone 100 as if cellular telephone 100 was a computer connected to network 120, but, as explained more completely below, cellular telephone 100 is similar to a standard digital data capable cellular telephone that communicates over data capable cellular telephone network 110. Specifically, cellular telephone 100 is not a combination of a computer module and a wireless communication module as in prior art attempts to create an intelligent telephone.

In addition, the user enters data using only the standard cellular telephone keypad. Thus, cellular telephone 100 eliminates the need for a computer keyboard or for a sophisticated touch screen that recognizes motion of a pointing object. This is important to maintaining the size, weight, and power requirements of cellular telephone 100 similar to those of a voice-only cellular telephone. In one embodiment, to facilitate data entry, as explained more completely below, cellular telephone 100 includes a text prediction process that reduces the number of key strokes required to enter text data. In this embodiment, the text prediction process is turned on or off for each entry card.

US 6,405,037 B1

15

In response to entry of the purchase order number, the client process transmits a request to server computer 121 for the particular purchase order. Specifically, the client process appends the entered data to a resource locator and transmits a message containing the resource locator to server computer 121. Server computer 121, in response to the message, retrieves the appropriate purchase order and transmits the purchase order as a card deck to the client process in cellular telephone 100 over airnet network 150.

The client process interprets the card deck and generates a screen display 209 (FIG. 2F). Initially, fax key 208 is not highlighted in screen display 209.

Notice that screen display 209 includes multi-display screen card indicator 203 to show the user that the purchase order screen contains more information that can be displayed at one time on display screen 105.

After the user reviews the purchase order, the user presses the key sequence for fax key 208 and in response, fax key 208 is highlighted as illustrated in FIG. 2F.

In response to selection of fax key 208, the client process retrieves the card deck at the location identified by the pointer associated with fax key 208. If the location is on server computer 121, the client process transmits a message including a resource locator to server computer 121 and in response to the message, server computer 121 transmits back yet another card deck. If the location is on a server computer other than server computer 121, the client process transmits a message including a resource locator to that server computer and in response to the message, that server computer transmits back yet another card deck. If the location identified by the pointer is within cellular telephone 100, the client process simply retrieves the deck. In either case, fax form 210 (FIG. 2G), that is an entry card, is displayed on display screen 105 by cellular telephone 100. This example demonstrates the information accessed by the client process can be located in any number of locations. The resource locator associated with the fax key identifies the appropriate location.

When fax form 210 is displayed, the user enters the facsimile machine telephone number at ABC Designs, as shown in FIG. 2H, using the cellular telephone keypad. In this embodiment, the telephone number is automatically formatted by the client process. After the telephone number is entered, the client process appends the telephone number to a resource locator and transmits the information to server computer 121.

When server computer 121 receives the information, server computer 121 executes a common gateway interface application (CGI) pointed to by the resource locator. The CGI application grabs the necessary information and transmits the information via e-mail to a fax gateway.

The fax gateway, upon receipt of the e-mail, converts the information to a fax and sends the information to the specified telephone number. Thus, cellular telephone 100 requires neither a printer connection nor a print driver, but yet can print using the facsimile machine at ABC Designs.

As illustrated in this example, cellular telephone 100 transmitted a request for a particular purchase order, and scheduled transmission of data responsive to the request to a local machine capable of printing the data. Thus, the processes of this invention, as described more completely below, in cellular telephone 100 in combination with data capable cellular telephone network 110 and server computer 121 permit cellular telephone 100 to effectively utilize an application on server computer 121 on network 120 even though cellular telephone 100 utilizes only a microcontroller

16

found in telephone 100 and does not required a separate computer module as in the prior art.

In addition, the client process using the information transmitted from server computer 121, i.e, the cards, generates a wide-variety of user interfaces as illustrated in FIGS. 2A to 2H. The particular configuration of the various user interfaces is defined by the cards transmitted in a card deck. Consequently, the user interface is not fixed to one particular format such as an E-mail type format, but rather the format is variable and can be redefined by each card that is interpreted by the client process. Also, in general, the user interface for one application on a server computer is independent from the user interface for another application on that server computer.

Specifically, the application accessed on server computer 121 generates the card deck and so in turn defines each of the various user interfaces. Each user interface permits the user to identify a particular selection. Each particular selection could result in generation of a different user interface with different selections. Thus, the user interfaces are limited only by the applications accessible to the two-way data communication device.

As shown below, a wide variety of applications can be provided on a server computer. Despite the robustness of the client module in interpreting a wide variety of application, typically, the client process is lightweight and thus requires only lightweight resources, e.g., 60 Kbytes of read-only memory (ROM) for the client module, 10 Kbytes of random access memory (RAM), and less than one million instructions per second (MIPS) of processing power. Since the client process needs only these lightweight resources in a two-way data communication device, the client can use existing resources in such a device and therefore does not add to the cost of the two-way data communication device such as data capable cellular telephone 100.

In another embodiment, the user can configure cellular telephone 100 to access server computer 131 on corporate local area network 130. In response to the access by the user, computer 131 transmits a home card (not shown) to cellular telephone 100 which in turn generates a home screen display on display screen 105.

When the user selects personal information on the home screen display or on a subsequent screen display associated with the home card, a message including a resource locator for a personal information deck is transmitted from cellular telephone 100 to computer 131. In response to the message, computer 131 transmits a card deck that includes a display card and a choice card to cellular telephone 100. In these examples, the card deck is described as including one of three cards, a display card, a choice card, and an entry card. However, these examples are illustrative only, and are not intended to limit the invention to those particular embodiments of cards. In view of this disclosure, those skilled in the art will be able to form combinations of these types of cards and define other types of cards, if such cards are appropriate for the particular application.

The client process in cellular telephone 100 interprets the display card that includes image and text data and generates screen display 300 on display screen 105 (FIG. 3A). Screen display 300 includes a home key 301, and an info key 302. When the user selects home key 301, the user is returned to the home screen. Info key 302 functions in a manner similar to that described above for info key 205.

When the user presses a predetermined key, the client process interprets the choice card and a second screen display 304 (FIG. 3B) is driven on display screen 105.

US 6,405,037 B1

17                                          18

Screen display **304** is a menu of the personal information that is stored on server computer **131** for use by the user of cellular telephone **100**. Multi-display screen card indicator **203**, e.g., the hand with a finger pointing down, illustrates to the user that the list has additional items that appear on the next screen display. Screen display **304** also indicates the number of E-mail messages, faxes, and voice messages waiting for the user.

The user scrolls the screen display line by line until screen display **305** is on display screen **105**. Initially, the fourth item in the menu is not highlighted. In this example, the user presses the four key on the keypad of cellular telephone **100** to view the user's schedule. In response to the key press, the client module in cellular telephone **100** transmits a message, including a resource locator associated with the menu item selected by pressing the four key, to server computer **131** using data capable cellular telephone network **110** and corporate local area network **130**.

In response to the message, server computer **131** executes the application identified in the resource locator. Upon completion of the execution, server computer **131** transmits, over corporate local area network **130** and data capable cellular telephone network **110** to cellular telephone **100**, a card deck that includes a choice card that describes the user's schedule for that day.

In this embodiment, when server computer **131** completes the transmission, server computer **131** has completed the response to the message and has transmitted all necessary information to cellular telephone **100**. Therefore, server computer **131** does not retain any state information concerning the transmitted information and so is referred to as a stateless server computer **131**. In this embodiment, the client process can only request a card deck. However, as demonstrated herein, card decks and the two-way interactive data communication system of this invention provide the user with a new level of capability.

When cellular telephone **100** receives the card deck, the client process in cellular telephone **100** interprets the choice card and drives screen display **306** (FIG. 3D) on display screen **105**. Initially, the first item in the menu of screen display **306** is not highlighted. When the user depresses the one key on the keypad of cellular telephone **100**, cellular telephone **100** highlights the first item in the menu. Cellular telephone **100** generates screen display **308** (FIG. 3E) upon the user subsequently depressing a predetermined key. Screen display **308** includes a schedule key **309**, that when selected returns the user to screen display **306** (FIG. 3D). Screen display **308** also includes a more detailed description of the 10:00 a.m. meeting.

While screen display **308** is active, if the user depresses a predetermined key, the user is presented with the options in screen display **310** (FIG. 3F). Initially, item two in screen display **310** is not highlighted.

In this example, the user depresses key two on the keypad of cellular telephone **100** and so cellular telephone **100** sends a message including a resource locator to server computer **131** to send an E-mail message to Bill Smith confirming the meeting at 10:00 a.m. When server computer **131** executes the application addressed by the resource locator, an E-mail message is sent.

In another example, the user of cellular telephone **100** connects to Internet service provider computer **141** on Internet **140** using data capable cellular telephone network **110**. Upon connection of cellular telephone **100**, service provider **141** transmits to cellular telephone **100** a card deck to generate FIGS. 4A to 4C.

The client process in cellular telephone **100** interprets the first card in the card deck from computer **141** and generates screen display **400** (FIG. 4A). When the user presses a predetermined key, cellular telephone **100** displays screen display **401** (FIG. 4B). Screen display **401** provides the user with a series of choices that group services alphabetically.

When the user depresses the seven key on the keypad of cellular telephone **100**, cellular telephone **100** displays a list of the services that have letters P, R, or S as the first letter in the service name. In this embodiment, screen displays **401** and **402** are a single card, e.g., a single screen. Each of the various services associated with a key has an index and when a particular choice is made by the user, the choice defines an index. The client process then displays all of the services with the index that corresponds to the index defined by the user's choice.

In screen display **402**, the user is given a series of choices of services that are available to the user under tab seven. Initially, item three in screen display **402** is not highlighted. In this example, the user depresses the three key on the keypad of cellular telephone **100** to select the stock quotes and item three in screen display **402** is highlighted.

In response to this selection, cellular telephone **100** transmits a request for a stock quote, i.e, a message including a resource locator, over cellular telephone network **100** and internet **140** to service provider **141**. In response to the request, service provider **141** executes the application addressed by the resource locator. The application retrieves a card deck that, in turn is transmitted to cellular telephone **100**. The card deck includes a display card and an entry card.

Upon receiving the card deck, the client process in cellular telephone **100** interprets the display card and generates screen display **403** (FIG. 4D). When the user depresses a predetermined key, entry screen display **406** (FIG. 4E) is generated on display screen **105** of cellular telephone **100**.

Initially, the box with letters SUNW in screen display **406** is empty. The letters SUNW are entered in the box by the user to indicate the ticker symbol of the stock for which the user wants information. After the user has entered the stock ticker symbol, the user presses the predetermined key to indicate that the entry is complete.

In response to the entry by the user, the client module appends the stock ticker symbol to the resource locator and transmits the resource locator to service provider computer **141** which, in turn, executes an application addressed by the resource locator to retrieve the latest stock market information for the stock ticker symbol. Service provider **141** uses the retrieved information to generate a card deck that contains the information and then transmits the card deck to cellular telephone **100**.

The client process in cellular telephone **100** interprets the first card in the deck and generates screen display **409** (FIG. 4F). For convenience, the FIGS. 4F to 4I are grouped together and separated by a dotted line. However, at any given time, in this embodiment, display screen **105** can display any four adjacent lines and so the grouping of lines in FIGS. 4F to 4I is for convenience only to demonstrate the level of information that can be retrieved and displayed by the client process. The use of a four line display screen is illustrative only. The client process of this invention can work with any size display screen, even a one line display screen. However, a multi-line display screen is preferred.

In the Figures discussed above, the display screen is a pixel display and so can display images. In another

US 6,405,037 B1

19                                                                                    20

embodiment, the display screen only displays text and is smaller in size. For such an embodiment, the various entries are abbreviated and only text is displayed, but the general operation is identical to that just described. Also, the various computer networks can be interlinked so that a user with access to one computer network can obtain information on another computer network. Moreover, the embodiments described above are merely illustrative. One important aspect of this invention is that cellular telephone **100** can interact with any type of server application that is configured to communicate with and interact with the client process in cellular telephone **100**. Thus, the user is no longer limited to only a few services offered by a telephone network provider.

In FIG. 1, the cellular telephone user must address, i.e., connect to, each computer of interest to access the different services. Consequently, each computer requires the information necessary to communicate with cellular telephone **100**. In another embodiment, not illustrated, cellular telephone **100** contacts a single central computer over data capable cellular telephone network **110**. This computer is connected to each of the other networks illustrated in FIG. **1**. Consequently, the user of cellular telephone **100** sends a message including a resource locator to the central computer, the central computer processes the message and retrieves the information addressed by the resource locator from the appropriate network shown in FIG. **1**. After the requested information is retrieved, the central computer generates a card deck and transmits the card deck to cellular telephone **100**. In this embodiment, only one computer must be configured to communicate with cellular telephone **100**. However, that same computer must be configured to communicate with all other computer networks that are of interest to the user of cellular telephone **100**.

Hence, according to the principles of this invention, the client process on a two-way data communication device can initiate an interaction with a particular server computer. The server computer transmits (i) information to the client process to generate a user interface, and (ii) a resource locator for each possible selection by the user from the user interface. The resource locators can address applications on the server computer, applications on over server computers, or an application on the server computer that in turn accesses other server computers. Consequently, the user of a two-way data communication device is limited only by the applications provided on the server computers.

Further, the user can be provided new and/or updated capabilities by modifying the applications on the server computers. There is no requirement that the client process be changed for a new or updated application. The client process must only interpret the information received from an application and transmit a message for additional information. These operations are unaffected by a new or updated application. Consequently, as noted above, this invention does not require distribution of application updates or new applications to the end user of the two-way data communication device.

FIG. **5** is an illustration of another embodiment of airnet network **150**. In this embodiment, the messages from a two-way data communication device, e.g., devices **100**, **101**, and **102** are directed to an airnet network translator **500**. Airnet network translator **500** and a particular two-way data communication device, e.g., any one of devices **100**, **101**, and **102** communicate using the protocol for point-to-point communication on the particular network linking airnet network translator **500** and that two-way data communication device. For example, if data capable cellular telephone network **110** is a cellular digital packet data network, either

the transmission control protocol (TCP) or the user datagram protocol (UDP) can be used.

Airnet network translator **500** transfers data between the two-way data communication device and the selected computer network after translator **500** validates the communication path, as explained more completely below, and encrypts the message transferred to the computer network if necessary. In addition, airnet network translator **500** collects transaction and billing information concerning the communication between the two-way data communication device and the designated computer network. Specifically, airnet network translator **500** provides access control for paying services and a logging mechanism for billing. Airnet network translator **500** can also provide a directory service to users.

FIG. **6** is a block diagram of a typical GSM digital cellular telephone. Each of the hardware components in cellular telephone **600** is known to those skilled in the art and so the hardware components are not described in detail herein. The compiled and linked processes of this invention are stored in ROM **601** as a client module **602** and support modules **603**. Upon activation of a predetermined key sequence utilizing the keypad, physical layer processor **610**, that is sometimes referred to herein as a microcontroller, initiates a client process using client module **602** in ROM **601**.

In this embodiment, client module **602** includes a plurality of manager modules, as explained more completely below. The particular manager modules utilized is determined by the characteristics of the particular cellular telephone **100** in which client module **602** is implemented. Client module **602** must include manager modules to interface with modules that control the particular hardware in cellular telephone **100**, a manager module to interface with the particular cellular telephone network protocol used by cellular telephone **100**, and a manager module to interpret the card decks received. Therefore, the particular manager modules described herein are only illustrative of the principles of this invention and are not intended to limit the invention to the specific modules described more completely below.

In this embodiment, the client process controls the operations of a plurality of cellular telephone dependent support processes that are stored in ROM **601** such as a display module, a keypad module, and a network and terminal control module, that were referred to above collectively as support modules **603**. The combination of the client process, display process, keypad process, and network and terminal control process are considered foreground tasks by the microkernel in cellular telephone **600**. Also, herein module and process are used interchangeably, but those skilled in the art will appreciate that the module is the computer software as stored in a memory, preferably, a ROM, of cellular telephone **600** and the corresponding process is the execution of the module by the microcontroller in cellular telephone **600**. Again, note that this invention does not require a separate processor and instead can utilize the processing power that already exists in cellular telephone **600**, because as described above, the client process of this invention is so lightweight.

The user interface for cellular telephone **600** determines the version of the user interface manager module that is stored in ROM **601**. In one embodiment, the parameters used to define the user interface level are the display resolution, the pixel access of the display, and the support of soft keys. One definition of the user interface levels is given in Table 1.

US 6,405,037 B1

21

## TABLE 1

| USER INTERFACE LEVEL DEFINITIONS | |
|---|---|
| Level 1 | Text only; 1 or more lines; 12 to 15 characters per line; and no soft keys. |
| Level 2 | Text only; 4 or more lines; 20 to 25 characters per line; and soft keys. |
| Level 3 | Pixel access; 150 by 75 pixels or larger; and soft keys. |

The user interface manager module presents data to the display module which in turn drives display screen **605**; and captures data entered by the user on display screen **605**. In response to this information, the client process prepares a message for transmission by a network manager module.

To more completely explain the operations performed over airnet network **150**, FIG. 7 is a block diagram that illustrates the various components in one embodiment of this invention of cellular telephone **700**. Those skilled in the art will appreciate that cellular telephone **700** includes circuitry and software similar to that illustrated in cellular telephone **600** for voice and data operations supported by cellular telephone **700** in addition to the modules for operation on airnet network **750**. Similarly, server computer **743** includes other software and hardware that is known to those skilled in the art and so is not illustrated in FIG. 7 for clarity.

In this embodiment, client module **702** in digital cellular telephone **700**, that is executing on the microcontroller of telephone **700**, communicates with server computer **743** over cellular digital packet data (CDPD) network **710**. Cellular digital packet data network **710** is used to illustrate one embodiment of this invention on one two-way data communication network. The principles of this invention can be used with a wide variety of two-way data communication networks. For example other two-way data communication networks for cellular telephones that may be used include TDMA, CDMA, and GSM circuit switched data networks; and the AMPS analog cellular network with a modem. Similarly, for two-way pagers, two-way data communication networks include PACT, or other priority two-way paging networks with data transport capability.

Prior to considering the operation of this configuration of airnet network **750** in more detail,, another aspect of this invention is required. Specifically, a technique is required for conveying instructions from digital cellular telephone **700** to a server application on server computer **743**, and conversely.

A telephone interaction description language (PIDL) is defined for use by service developers. A terminal interaction language (TIL) is a distillation of the telephone interaction description language and describes the same interaction to digital cellular telephone **700** as the telephone interaction description language describes to computer **743**.

With the exceptions described more completely below, a process in the terminal interaction language is a compressed version of the same process written in the telephone interaction description language. The terminal interaction language allows easy parsing on the two-way data communication device, which in turn makes the client smaller than a client for the telephone interaction description language that is readable by humans, but is not optimized for parsing by a machine.

The compression from the telephone interaction description language to the terminal interaction description lan-

22

guage is done typically at run time because some cards are computed cards and so cannot be precompiled. A wide variety of techniques can be used to convert the telephone interaction description language to terminal interaction language. The important aspect is that, if bandwidth across the cellular telephone network is limited, a compressed form of the telephone interaction description language is used.

Preferably, each data type is compressed to facilitate optimal transfer over the two-way data communication network. For example, the verbs in the telephone interaction description language are compressed using a binary tokenization. Graphics are compressed using run length limited compression and text is compressed using any one of the well-known techniques for text compression. While compression of the telephone interaction description language is not required to implement this invention, compression makes the invention more efficient by utilizing the bandwidth of the network more effectively.

Instructions in the telephone interaction description language and in the terminal interaction language are grouped into a deck and a card. Each deck includes one or more cards. A card includes the information, i.e., a set of telephone interaction description language, required to generate a screen. As indicated above, a screen can be larger than the number of lines in a display screen. Other equivalent terms for a card include a page and an atomic interaction. Thus, a card deck is simply a group of screens. The number of cards in a card deck is selected to facilitate efficient use of the resources in the two-way data communication device and in the airnet network.

For simplicity, in this embodiment, each card is a single operation. Herein, an operation is defined as a related set of actions such that the user does not encounter an unanticipated delay in moving from one action to the next, i.e, the user does not have to wait for client module **702** to retrieve another card deck from computer **743**. Also, a deck may include definitions of soft keys that stay in force while the deck is active, i.e, being executed by the cellular telephone microcontroller.

Computer **743** may contain stored static telephone interaction description language decks. Computer **743** also generates telephone interaction description language decks in response to data from, or choices made by, the user of cellular telephone **700**.

In the embodiment shown in FIG. 7, computer **743** converts a telephone interaction description language deck to a terminal interaction language deck, that in turn is transmitted to cellular telephone **700**. The terminal interaction language is designed so that decks can be stored unaltered in memory **716** of cellular telephone **700** and referenced directly with little or no parsing. While telephone interaction description language decks on computer **743** may contain references to images, a terminal interaction language deck contains the images at the end of the deck. Thus, if a particular two-way data communication device does not support display of images, the images are easily stripped from the terminal interaction language deck before the deck is transmitted to that particular two-way data communication device.

As indicated above, each interaction with the user of cellular telephone **700** is described by a deck or a series of decks. Logically, the user retrieves a terminal interaction language deck stored in a memory **716** of cellular telephone **700** after receipt from computer **743** over CDPD network **710**. The user reviews the information displayed by cards in the deck and makes choices and/or enters requested infor-

US 6,405,037 B1

23

mation and then requests another deck, as described above with respect to FIGS. 2A to 2H, for example.

When the user receives a deck, the first card of information is displayed on display screen 705. Typically, as shown above, the first card is text, an image, or a combination of an image and text. After the user has reviewed the first card, the user hits a NEXT key to view the next card in the deck. Similarly, a user can return to a previous card in the deck by using a PREV key. Thus, using the NEXT and PREV keys, the user can navigate back and forth through the deck. Within a card, the user uses a scroll key or keys to move the portion of the card displayed up and down. This description of a particular method used to navigate through a deck and within a card is not intended to limit the invention to this particular method. In view of this disclosure, those skilled in the art will be able to use a wide variety of ways to navigate through a deck and within a card.

Cards, in this embodiment, are one of three types, a display card, a choice card, and an entry card. Independent of the type of card, the card can contain text and images. In addition, the invention is not limited to these three particular types of cards. The definition of the three particular types of cards is used to facilitate a description of the invention and to assist the developer's in organizing applications.

A display card gives information to the user to read. The display content can include any one of, or any combination of text, an image, and a soft key. The soft key is in effect only while the display card is active.

A choice card displays a list of choices for the user. The choices are automatically presented in a format specified on the choice card. See Appendix I, which is a part of the present disclosure and is incorporated herein by reference in its entirety. As explained above, the user makes a choice by depressing the key corresponding to the choice.

An entry card is used to obtain input data from the user. An entry card displays one or more entry lines. Typically, each entry line includes a display followed by an entry line. The entry line, in this embodiment, can be for either numeric or text data.

In this embodiment, choice and entry cards prevent the user from moving to the next card until the user has entered the requested information. When the user reaches the last card in a deck and hits the NEXT key, a request for a new deck is initiated. The deck requested is determined by either the deck that the user has completed, or by the choices made by the user. Also, when the deck is completed, the choices and/or data entered by the user typically are transmitted along with the request for the new deck to computer 743.

Appendix I is one embodiment of a syntax for the telephone interaction description language and the terminal interaction language of this invention. In one embodiment, the telephone interaction description language is described using a subset of the standard generalized markup language. Only a subset of the standard generalized markup language is utilized so that telephone interaction description language parsers also can be written easily using simple tools like lex and yacc.

Returning to operation over airnet network 750, cellular telephone 700 includes a display module 712, a keyboard module 711, a client module 702, and a UDP interface module 714. In this embodiment, module 702 is stored in a non-volatile memory (not shown) of telephone 700 and is executed by the microcontroller (not shown) in telephone 700. Modules 711, 712, and 714 operate under the control of client module 702. Client module 702 includes instructions that direct the microcontroller in cellular telephone 700 to

24

perform the operations described more completely below with respect to FIGS. 8A to 8D. The operations include sending uniform resource locator (URL) requests to Hyper-Text Transfer Protocol (HTTP) server 749, parsing and displaying a TIL deck or decks returned by HTTP server 749, and generating new URLs based on the user's key presses. For a description of HTTP server software and platforms that can run the HTTP server software, see, for example, Ian S. Graham, *The HTML Sourcebook,* John Wiley & Sons, Inc., New York, Chapt. 8, (1995), which is incorporated herein by reference.

User datagram protocol (UDP) interface module 714 couples CDPD network 710 to client module 702, and allows client module 702 to communicate using UDP over CDPD network 710. The user datagram protocol is well known to those skilled in the art and is documented extensively. UDP interface module 714 supports transmission of simple stand-alone messages between the connection partners.

Display module 712 is a display driver that couples client module 702 to display screen 705 and so allows client module 702 to specify the information presented on display screen 705. The user interface manager module within client module 702 converts the display information in a card to instructions for display module 704 which in turn provides signals that drive the hardware that controls the operation of display screen 705. For example, if the TIL deck includes an image, the user interface manager module determines whether the active card calls for display of the image. If the active card directs the user interface manager module to display the image, the user interface manager module passes the image in memory 716 to display module 712, which in turn displays the image on display screen 705.

Keyboard module 705 couples keypad 715 to client module 702, and stores data representing keys pressed by the user on physical keypad 715 in memory 716. Keyboard module 705 notifies client module 702 when the user has pressed a key.

When client module 702 is notified of a key press, the user interface manager module within client module 702 passes information about the key press to display module 712 that in turn displays the appropriate character on display screen 705, if an entry card is active. If the user interface manager module determines that a choice card is active, and the key press corresponds to one of the choices, the user interface manager module sends instructions to display module 712 that result in the choice being identified for the user, e.g., highlighted as described above.

In addition to HTTP server 749, host computer 743 includes a UDP interface module 748, CGI programs 761 stored in a memory 755 of host computer 743, and TIL decks 760 stored in memory 755.

HTTP server 749 uses UDP interface module 748 to send data to and receive data from CDPD network 710. TIL decks 760 are TIL decks that can be accessed by HTTP server 749. Static files containing PIDL decks are converted to TIL decks only once on HTTP server 749. CGI programs 761 are common gateway interface programs that produce PIDL decks that are used by HTTP server 749 to produce TIL decks that in turn are transmitted via UDP interface modules 748 and 714 and cellular telephone network 710 to client module 702. In this embodiment, the services available over airnet network 750 are applications accessible by HTTP server 749 on Internet 140 for which a service developer has written a PIDL deck, or a CGI script that in turn generates a PIDL deck, and is stored on computer 743.

25

The architecture in FIG. 7 demonstrates some important aspects of this invention. First, the applications, the PIDL decks and CGI scripts in this embodiment, are independent of the particular two-way data communication network. For HTTP server 749 to communicate over a different two-way data communication network that does not support UDP, only UDP interface module 748 must be changed. The applications are unaffected by such a change.

Second, the applications on HTTP server 749 are independent of the two-way data communication device with which HTTP server 749 is interacting. An application on HTTP server 749 can communicate with any two-way data communication device that includes the appropriate client and a module to transmit and receive data over the two-way data communication network. These two facts mean that an investment in developing an application is insulated from either advances in two-way data communication devices, or advances in two-way data communication network technology.

FIGS. 8A to 8D are a process flow diagram for one embodiment of this invention. Initially, when the user initiates communication over airnet network 750, client module 702 initializes a work space in memory 716 of cellular telephone 700 and then, in get home URL process 801, stores a URL in the work space. According to the principles of this invention, in one embodiment, each cellular telephone that utilizes the airnet network has a home URL stored in a non-volatile memory that is used to retrieve a home card deck for the cellular telephone. In another embodiment, the cellular telephone obtains the home URL from server 749. Thus, in get home URL process 801, client module 702 obtains the home URL. Herein, a URL is an example of a specific embodiment of a resource locator.

For example, in get home URL process 801, client module 702 obtains a home URL, such as

http://www.libris.com/airnet/home.cgi

and stores the home URL in the work space. The portion of the home URL, http://www.libris.com, identifies a particular HTTP server, i.e, server 749, on the world-wide web. The portion of the URL, /airnet/home.cgi, specifies a particular common gateway interface program within CGI programs 761. The use of a URL pointing to a server on the world-wide web is illustrative only is not intended to limit the invention to applications on the world-wide web. In general, cellular telephone 700 obtains an identifier, i.e,.a resource locator, of a home application on a home server that is executed by the server when the cellular telephone initially becomes active on airnet network 750, and stores the resource locator in the work space.

Next in create HTTP request process 802, client module 702 converts the URL in the work space to a HTTP request. For example, for the above URL, create HTTP request process 802 generates a method field, such as

GET /airnet/home.cgi HTTP/1.0

The GET method is part of HTTP. Thus, the format for the GET method is known to those skilled in the art. Also, this particular form of the method is used because a specific server connection is established by cellular telephone 700 and so identification of the server is unnecessary. Nevertheless, briefly, this command instructs server 749 to execute application home.cgi and execution of application home.cgi in turn results in generation of a home deck and a subsequent transmission of the home deck to cellular telephone 700. HTTP/1.0 specifies the HTTP version used by client module 702 in cellular telephone 700.

In addition to the method field, client module 702 in process 802 could also generate appropriate HTTP request

26

fields to pass information to server 749 about the capabilities of client module 702. The request fields can include information such as lists of the MIME content-types acceptable to the client; lists of data encoding types acceptable to the client; user authentication and encryption scheme information for the server; the length in bytes of the message being sent to the server; and the Internet mail address of the user accessing the server. This list of information is illustrative only and is not intended to limit the invention to the particular request fields described herein. Any request field defined by HTTP can be utilized by client module 702. However, in this embodiment, the defaults are utilized and so no HTTP request fields are generated.

Typical HTTP methods that can be generated in HTTP request process 802 are a GET method for requesting either a TIL deck from server 749, or execution of a common gateway interface program on server 749; and a GET method request to a common gateway interface program with data, e.g., a query string appended to the URL. In either case, a URL is transmitted to server 749 within the particular message. After create HTTP request process 802 is complete, client process transfers to transmit request process 804.

However, if the transmission control protocol is used instead of UDP, client module 702 would access a TCP module in establish server connection process 803 that replaced UDP module 714. Since, in this embodiment, UDP is used, establish connection process 803 is enclosed by a dashed line in FIG. 8A to indicate that this process is unnecessary when using UDP.

In establish server connection process 803, a virtual connection would be made over CDPD network 710 between TCP interface module 714 and a TCP interface module in HTTP server 749 so that data could be transmitted between cellular telephone 700 and computer 743 using TCP, e.g., buffers to support data exchange are defined. The establishment of a TCP connection is well-known and so is not described further.

In FIG. 8A, a dashed line connects establish server connection process 803 with establish client connection process 860, that is also dashed, that is performed by HTTP server 749. This indicates that both client module 702 and server 749 are required to complete process 803.

When the TCP virtual connection is established, client module 702 transfers processing from establish server connection process 803 to transmit request process 804. Similarly, server 749 transfers to request received check 861, in which server 749 waits until a request is received. Establish client connection process 860 is not needed for UDP and so HTTP server 749 initiates processing in request received check process 861. Process 860 is enclosed within a dashed line box to indicate that the process is used only for TCP.

In transmit request process 804, the HTTP request is sent from the work area in telephone 700 to HTTP server 749. Again, a dashed line connects process 804 of client module 702 to request received check 861 that is performed by HTTP server 749 to indicate that the check is dependent upon information from client module 702. When the transmission of the request is complete, client module 702 transfers to response received check 806.

Upon receipt and storage of the HTTP request, request received check 861 transfers to service request process 862 in which HTTP server 749 initiates service of the received request. In service request process 862, if the HTTP request only seeks transfer of a static deck, HTTP server 749 retrieves the requested static deck from TIL decks 760.

US 6,405,037 B1

27

Conversely, if the request requires server 749 to obtain data from the Internet or to append data to a particular file, server 749 launches the common gateway interface application addressed in the request, and passes the data in the HTTP request to this application for further processing.

For example, if the user of cellular telephone 700 requested a fax as in FIG. 2F, the HTTP request identifies a common gateway interface application in CGI programs 761 that accepts as input data the telephone number and grabs the information to be faxed. The CGI application generates an e-mail transmission to the fax gateway. Similarly, for a stock quote, server 749, in response to the HTTP request, launches a common gateway interface application that sends out a stock query over Internet 140 to a stock quote service provider using the ticker tape symbol passed as input data by server 749 to the common gateway interface application. When the response to the stock query is received, the common gateway interface application builds a PIDL deck that includes the data in the response to the stock query.

Upon completion of servicing the request, HTTP server 749 converts the PIDL deck to a TIL deck and returns the TIL deck to client module 702 using UDP in transfer response process 863, that is connected by a dotted line to response received check 806 in client module 702. As the TIL deck is transferred, client module 702 stores the deck in memory 716.

After the TIL deck is transferred, HTTP server 749 closes the process for responding to the message from cellular telephone 700. All the information needed by client module 702 to generate a user interface on display screen 705 and for responding to any selection or data entry presented in the user interface is included in the TIL deck. Consequently, client module 702 only has to interpret the TIL deck and interpret the user input to transmit the next message to HTTP server 749. The state for the HTTP server is defined in the next message. Consequently, HTTP server 749 is stateless because HTTP server 749 does not retain state information concerning a response to a message after the message is transmitted.

However, in another embodiment (not shown), a server could retain state information concerning each interaction with a client module. For example, if the server transmitted a choice card to the client module, the server would retain state information indicating that a choice was pending from the client module. In this embodiment, when the user makes a choice, e.g., depresses key two to indicate choice two, the choice is transmitted to the server which in turn accesses the. URL associated with choice two. If this URL addresses another application, the server executes that application. Thus, in this embodiment, the server retains state information concerning each interaction with a client module. In view of this disclosure, those skilled in the art can implement the principles of this invention utilizing a server that retains state information when such a client/server combination is advantageous.

Returning to the present embodiment, when the TIL deck is received, client module 702 leaves response received check process 806 and transfers to process first card 808. However, if TCP is used instead of UDP, client module 702 upon leaving check 806 would close the virtual TCP connection in transmission completed process 807. Upon closing the virtual TCP connection, processing would transfer to process first card 808. Again, transmission complete process 807 is enclosed within a dashed line box to indicate that process 807 is used only with TCP.

In process first card 808, client module 702 parses the TIL deck and interprets the first card. Processing transfers from process first card 808 to generate display process 809.

28

In generate display process 809, client module 702 passes the data to be displayed in the first card to display module 712. Display module 712, in response to the data, drives the text and images in the data on display screen 705. Generate display process 809 transfers processing to key press check 820 through node 813. In FIGS. 8A to 8D, any circular node with the same alphanumeric character and reference numeral is the same node. The circular nodes are used to establish connections between the various processes in the method of FIGS. 8A to 8D without cluttering the figures with a number of connection lines.

Client module 702 waits in key press check 820 for the user to press a key on keypad 715 of cellular telephone 700. In this embodiment, cellular telephone 700 is assumed to have the capability to support two soft keys, a scroll-up key, a scroll-down key, a previous key, a next key, and keys zero to 9 that are configured in the standard telephone keypad configuration. In view of the following disclosure, if one or more of these keys are not present, one of skill in the art can alter the method for the particular configuration of the cellular telephone keypad, or other two-way data communication device keypad. For example, if the cellular telephone included a home key, the key press processing described more completely below would include a check that detected more when the home key was pressed and would in turn transfer to get home URL process 801.

Briefly, the processes in FIGS. 8B to 8C, identify the key pressed by the user, identify the action required, and then transfer to a process that implements the action required. Specifically, when a key on the keypad is pressed, keypad module 711 stores an identifier for the key in work memory 716 and notifies client module 702 of the key press. Upon receipt of the notification from keypad module 711, client module 702 reads the storage location in work memory 716 to determine the key pressed and transfers processing from key press check 820 to scroll key check 821. In scroll key check 821, client module 702 determines whether the user pressed either of the scroll keys. If a scroll key was pressed, processing transfers to adjust display process 822 and otherwise to display card check 823.

In adjust display process 822, client module 702 determines which of the scroll-up or scroll-down keys was pressed. Client module 702 then sends information to display module 712 so that the current display is either scrolled-up one line or scrolled- down one line. If the scroll key would move the display beyond a boundary of the current card, the scroll key press is ignored in adjust display process 822.

In response to the information from client module 702, display module 712 adjusts the screen display on display screen 705. Client module 702 transfers processing from adjust display process 822 to key press check 820 through node 813.

If a scroll key was not pressed, processing is passed through scroll key check 821 to display card check 823. Client module 702 takes action that depends on the particular type of card that is currently being displayed on display screen 705. If the current card is a display card, client module 702 passes through display card check 823 to soft key check 828, and otherwise transfers to choice card check 824.

Assuming for the moment that the current card is not a display card, choice card check 824 determines whether the current card is a choice card. If the current card is a choice card, client module 702 passes through choice card check 824 to choice key check 826, and otherwise transfers to data key check 826.

US 6,405,037 B1

29

Assuming for the moment that the current card is neither a display card nor a choice card, the current card must be an entry card, because in this embodiment only three card types are defined. Thus, client module **702** does not check for an entry card. Rather, data key check **826** determines whether a valid data key was pressed. In this embodiment, the data keys are keys zero to nine on the key pad, and the # key. In other embodiments, other combinations of keys could be defined as data keys. If the pressed key was one of the data keys, data key check **826** transfers to process data entry **827** and otherwise transfers to soft key check **828**.

In process data entry **827**, client module **702** knows whether the predictive text entry process is turned-on, because one of the parameters on the entry card specifies whether to use the predictive text entry process, as described in Appendix I, which is incorporated herein by reference in its entirety.

If the predictive text entry process is not turned-on, client module **702** in process data entry **827** enters the pressed key value in a text entry buffer in work memory **716** at the appropriate location. Also, client module **702** sends information to display module **712** so the value of the pressed key is displayed in the appropriate location on display screen **705** by display module **712**.

If the predictive text entry process is turned-on, client module **702** uses the novel predictive text entry process in process data entry **827**, as described more completely below with respect to FIGS. **9, 10A** to **10T**, and **11**, to determine the letter to select from the set of letters associated with the pressed key. After the predictive text entry process determines the appropriate letter, a value representing the letter is stored at the appropriate location in the text buffer in work memory **716**. Also, client module **702** sends information to display module **712** so that the letter is displayed in the appropriate location on display screen **705**. Upon completion of process data entry **827**, client module **702** transfers processing through node **813** to key press check **820**.

The previous description assumed that the current card was an entry card, but if the current card is a choice card, choice card check **824** transferred to choice key check **826**. In generate display process **804** for the choice card, each of the choices are labeled according to information on the choice card and some or all of the choices are displayed on display screen **705**. Thus, choice key check **826** determines whether the pressed key corresponds to one of the choices. If the pressed key is one of the choices, client module **702**, in one embodiment, sends information to display module **712** to indicate the selected choice. Client module **702** also transfers from choice key check **826** through node **831** to store identifier process **850** (FIG. **8D**), that is described more completely below. Conversely, if the pressed key is not one of the choices, choice key check **826** transfers to soft key check **828**.

Soft keys can be specified both for a deck as a whole and per card, i.e., a physical key on the keypad is specified as a soft key as described more completely in Appendix I. Each soft key specification includes an identifier that defines the action to be taken when the soft key is pressed.

When a soft key is specified for a deck, the soft key remains in effect for the entire deck. However, when a soft key is specified for a card, the card soft key specification temporarily overrides the corresponding deck soft key specification, i.e., the deck soft key specification for the same physical key as the card soft key specification, while the card is visible, i.e., displayed on display screen **705**. This override is done independently for the two soft keys.

Thus, soft key check **828** transfers processing to first soft key check **829** if the key pressed is one of the two possible

30

physical soft keys. Conversely, soft key check **828** transfers processing to next key check **840** (FIG. **8C**), if neither of the two possible physical soft keys is pressed by the user.

In first soft key check **829**, client module **702** determines whether the pressed key corresponds to the first soft key. If the pressed key is the first soft key, check **829** passes the active identifier for the first soft key to store identifier process **850** through node **831**. Conversely, if the pressed key is not the first soft key, processing transfers from check **829** to second soft key check **830**.

If the pressed key is the second soft key, check **830** passes the active identifier for the second soft key to store identifier process **850** through node **831**. Conversely, if the pressed key is not the second soft key, e.g., a physical key that can be defined as a soft key was pressed but neither the current deck nor the current card defines a soft key for that physical key, processing transfers from check **830** to key press check **820** through node **813**.

When pressing transfers to next key check **840**, client module **702** determines whether the pressed key was the next key. If the next key was pressed, processing transfers to display card check **841** and otherwise to previous key check **846**.

If a display card is the current card, the next key is used to move to another card in a deck, or alternatively to another deck. Thus, display card check **841** transfers processing to last card check **842** when a display card is the current card, and otherwise to entry card check **843**.

Last card check **842** determines whether the current card is the last card in the deck. If the current display card is not the last card in the deck, last card check **842** transfers processing to read next card process **845**, which in turn reads the next card in the deck and transfers through node **812** to generate display process **809**.

If the current display card is the last card in the deck, the deck includes an identifier that specifies the location to transfer to from the last card. This identifier can be a URL to another deck, to a common gateway interface program, or an address for a card within the current deck, for example. Thus, last card check **842** transfers through node **831** to store identifier process **850** when the current display card is the last card in the deck.

If the current card is not a display card but is an entry card, display card check **841** transfers to entry card check **843**. In this embodiment, the next key is the predetermined key used to indicate that all the data for an entry on an entry card has been entered. Thus, if the current card is an entry card, entry card check **843** transfers processing to store data process **844**.

Store data process **844** stores the data entered in at an appropriate location in memory that is specified in the current entry card. Typically, the data is combined as an argument with a URL and stored. Upon completion, store data process **844** transfers through node **810** to create HTTP request process **802** (FIG. **8A**).

When the next key is pressed, if the current card is neither a display card nor an entry card, the current card is a choice card. However, as indicated above, in this embodiment client module **702** requires that the user make a choice and does not allow use of the next key. Consequently, if the current card is not an entry card, entry card check **843** transfers processing through node **813** to key press check **820**.

The previous discussion assumed that the next key was pressed and so next key check **840** transferred processing to display card check **841**. However, if the next key was not pressed, next key check **840** transfers processing to previous

US 6,405,037 B1

31

key check 846. If the previous key was pressed, check 846 transfers to first card check 847 and otherwise returns processing to key press check 820.

First card check 847 determines whether the current card is the first card of a deck. If the current card is not the first card, processing transfers from first card check 847 to read previous card 849, which in turn reads the previous card and transfers to generate display process 809 through node 813. Conversely, if the current card is the first card, processing transfers to home deck check 848.

If the current card is the first card in the home deck, there is not a previous card and so home deck check transfers processing to key press check 820 through node 813 and so the previous key press is ignored. If the current deck is not the home deck, home deck check 848 retrieves the identifier for the previous deck and transfers through node 831 to store identifier process 850.

Store identifier process 850 is reached through node 831 from several different points. The operations in store identifier process 850 are the same irrespective of the particular process that transfers to process 850. In each instance, an identifier is passed to store identifier process 850 and process 850 saves the identifier in working memory 716. The identifier can be, for example, a pointer to another location in the current card, an address of another card in the current deck, a URL to a deck stored in working memory 716, a URL to a TIL decks 760 on computer 743, or perhaps, a URL to a common gateway interface program in CGI programs 761 on computer 743. Thus, process 800 checks the stored identifier to determine the action required.

Specifically, in identifier to current deck check 851, client module 702 determines whether the identifier is to a card in the current deck. If the identifier points to the current deck, check 851 transfers processing to retrieve data process 852 and otherwise to URL to local deck check 853.

In retrieve data process 852, client module 702 retrieves the information stored at the location indicated by the identifier from working memory 716 and processes the information. Retrieve data process 852 transfers through node 812 to generate display 809 (FIG. 8A) that was described above.

URL to local deck check 853 determines whether the identifier is a URL to a deck that is stored in working memory 716, e.g., cached. If the deck is stored locally, check 853 transfers to retrieve local deck 854 which in turn moves the local deck into the storage location for the current deck. Retrieve local deck 854 transfers processing through node 811 to process first card 808 (FIG. 8A), that was described above.

If the identifier is neither to a location in the current deck, nor to a local deck, the identifier is a URL to an object on computer 743. Thus, in this case, check 853 returns processing to create HTTP request 802 through node 810.

Process 800 continues so long as the user continues to enter and process the information provided. In this embodiment, process 800 is terminated, for example, either by the user powering-off cellular telephone 700, selecting a choice or entry card that discontinues operations of client module 702, or remaining inactive for a time longer than a time-out period so that client module 702 shuts itself down.

To further illustrate the operations in process 800, consider the following example which is returned to client module 702 as a TIL deck in response to a HTTP request generated by process 802. For readability, Table 2 presents the deck in PIDL. In this example, all of the choices are for

32

applications on the same server. However, in another embodiment, each URL could address any desired combination of servers.

TABLE 2

| EXAMPLE OF PIDL CHOICE DECK |
| --- |
| <PIDL> |
| <CHOICE> |
| <CE URL=http://www.libris.com/airnet/nnn>News |
| <CE URL=http://www.libris.com/airnet/www>Weather |
| <CE URL=http://www.libris.com/airnet/sss>Sports |
| </CHOICE> |
| </PIDL> |

In process first card 808, client module 702 interprets the information in Table 2 and transfers to generate display process 809. In generate display process 809, client module 702 sends information to display module 712 so that the user is presented with a list of three choices on display screen 705, i.e, a user interface for the choice card is generated:

1. News
2. Weather
3. Sports

Generate display process 809 (FIG. 8A) transfers to key press check 820 (FIG. 8B). When the user 35 presses the two key on keypad 715, key press check 820 transfers through check 821 to display card check 823.

Since the current card is a choice card, check 823 transfers processing to choice card check 824, which in turn transfers to choice key check 826. Since the two key was pressed and that key is a choice key, check 826 transfers processing to store identifier process 850 (FIG. 8D). In process 850, client module 702 stores the URL corresponding to two, i.e,

URL=http://www.libris.com/airnet/www

in working memory 716.

Since this URL is to an object on computer 743, processing transfers through checks 851 and 853 to create HTTP request process 802, which in turn generates the request. When the HTTP request is transmitted to server 749, as described above with respect to process 804, server 749 in service request process 862 retrieves deck www from TIL decks 760. An example of the deck is given in Table 3. Again for readability, the deck in present herein in PIDL.

TABLE 3

| EXAMPLE OF A SECOND PIDL CHOICE DECK |
| --- |
| <PIDL> |
| <CHOICE> |
| <CE URL=http://www.libris.com/airnet/www-1>World |
| <CE URL=http://www.libris.com/airnet /www-2>National |
| <CE URL=http://www.libris.com/airnet/www-3>State |
| <CE URL=http://www.libris.com/airnet/www-4>Local |
| </CHOICE> |
| </PIDL> |

The deck in Table 3 is transmitted to cellular telephone 700 and stored in memory 716, as described above with respect to process 806. The choice card is processed in process 808 and displayed in process 809. As a result of process 809, the user is presented with a list of choices:

1. World
2. National
3. State
4. Local.

33

When the user makes another selection, the same sequence of processes as described above for the first choice card is executed by client module **702**, and another URL is stored that points to a program on server **749** that retrieves the desired weather information and generates a deck with that information. This deck is transferred to cellular telephone **700** and displayed.

As described above, if the current card is an entry card and a key is pressed, client process **702** reaches data key press check **826** (FIG. 8B). If the pressed key is a valid data key, check **826** transfers to process data entry **827**.

In one embodiment, process data entry **827** uses a novel predictive text entry process for text entry. Recall that on a typical telephone keypad, the keys are labeled with both a number and two or three letters. For example, the two key is also labeled abc. This leads to some ambiguity when using the telephone keypad to enter text. Is the user attempting to enter an a, b, or c when the two key is pressed?

In one prior art method, two keystrokes were required to enter each letter of text. The first keystroke identified the first key and the second key stroke identified the specific letter desired on the first key. For example, to enter the letter s, the user would first press the seven key that is labeled with letters p, r, and s. Next, the user would press the three key to select the letter s. While this method may work well for short sequences that consist of only three or four letters, the method does not work well for English text. For example, if the user has already entered th and then presses the three key that is labeled with letters d, e, and f, almost always the desired next letter is the letter e. Therefore, making the user press the two key is an extra and unnecessary step.

Client module **702** of this invention utilizes a novel predictive text entry process to reduce the number of key strokes required to enter text using a telephone keypad, or any similar keypad. Using this process, in most cases a single key stroke suffices to enter a single letter.

While this embodiment of the invention is described in terms of a telephone keypad, the principles of the invention are not limited to only a telephone keypad. In general, the process described more completely below, can be extended to any keypad where a single key is used to enter two or more letters. Further, the process is not limited to only letters, but rather is applicable to any keypad where a single key is used to represent two or more characters. In view of the following disclosure, those skilled in the art can use the principles of the predictive text entry process in a wide variety of applications.

The system for predictive text entry includes a predictive text entry module **901** that in this embodiment is included in client module **702**, keyboard module **711**, and a letter frequency table **902** that is loaded into memory **716**, when client module **702** is activated. Predictive text entry module **901** is used in process data entry **827** when specified by the current entry card. Predictive text entry module **901** performs routine buffer management processes, that are known to one of skill in the art and so are not described further to avoid detracting from the process.

Predictive text entry module **901** stores a letter entry for each letter entered in a text buffer **903** in memory **716**. In this embodiment, letters Q and Z are assigned to the one key and the zero key is used to enter a space, period, and comma, i.e., the zero key provides punctuation. However, these assignments are illustrative only, and are not intended to limit the invention to this particular embodiment.

The first letter entered is placed at the left end of the buffer and each additional letter is placed in the left most unused space in buffer **903**. Thus, the last letter entered in text buffer

34

**903** is the right most character. Letter frequency table **902**, sometimes referred to as a table of predictive letter entries, is a look-up table where each entry in the look-up table is addressed by three indices. The first two indices represent the two most recently entered letters in text buffer **903** and the third index represents the key that was pressed. Each predictive letter entry stored in letter frequency table **902** defines which of the letters associated with the pressed key to use given the previous two letters. For example, since the is a commonly occurring string, the entry in table **902** addressed by (t, h, **3**) returns e, or more concisely the predictive letter entry **2** is returned to indicate that the second letter of the group of letters d, e, and f associated with the three key is the predicted letter. Of course, letter frequency table **902** could be altered to return more than a single letter.

In this embodiment, letter frequency table **902** was empirically generated using a collection of e-mail. Appendix II is a computer program listing that was used to generate letter frequency table **902** that is illustrated in FIGS. 10A to 10T. Briefly, the computer program implements a process that sequentially steps through the data provided and (i) for each possible single letter determines the most likely letter that follows for each key on the keypad; and (ii) for each possible combination of two letters determines the most likely letter that follows for each key on the keypad. In this embodiment, the most likely letter is the letter having the greatest frequency after the single letter. Similarly, the most likely letter is the letter having the greatest frequency after the combination of two letters. If there is a tie in the frequency, the first letter associated with a key is selected. Of course, other measures of likelihood could be used to generate the entries in table **902**.

Thus, in FIGS. 10A to 10T, the first of the ten columns, i.e., the left most column, is the two letter sequence and the first row, i.e., the top row is the keys on the key pad used to enter text. A combination of an entry in the first column and a key in the top row is used to select the predicted text entry. Thus, using the example of th, this two key sequence appears in the first column of FIG. 10O. When the three key is pressed, the letter in the row with th as the first entry and in the column with three as the first entry, i.e., e, is retrieved. Alternatively, if the four key is pressed, letter i is retrieved from the table.

In this embodiment, table **902** is a buffer of two bit numbers. Each two bit number has a value in the range of zero to three, and the two bit number represents a predicted letter for the pressed key. Thus, for a two key labeled with letters A, B and C, a zero represents A; a one represents B; and a two represents C. In general, the number of bits used is determined by the key that represents the maximum number of characters. In this embodiment, the maximum number of characters represented by a key is three. The number of storage bits required is an integer S where S is the smallest number such that 2**S is greater than or equal to the maximum number of characters represented by a key.

In this embodiment, three indices i0, i1, and i2 are used generate a table index that in turn is used to access a particular predictive letter entry in table **902** of two bit numbers. Each letter is represented as a number, i.e., a letter entry, with letter A being zero, letter B being a one, letter C being a two, and so forth with letter Z being twenty-five. A space element is assigned a space element value of twenty-six. Thus, in this embodiment, there are twenty-seven possible characters.

Upon the initial entry to process **1100** (FIG. 11), letter indices i0, i1, and i2 were set to twenty-six in the initial

35

processing of the entry card to indicate that the text buffer is empty. Also, as explained more completely below, as each letter of text is entered, letter indices i0 and i1 are updated and stored in memory 716.

However, in another embodiment, an initialize indices process is the first operation in predictive text entry process 1100. In this embodiment, for the first letter entered, letter indices i0 and i1 are set to twenty six; for the second letter entered, letter index i0 is set to twenty six and letter index i1 is set to the value of the letter in text buffer 903; and for all letters entered after the first two, the value associated with next to the last letter in text buffer 903 is assigned to letter index i0 and the value associated with the last letter in text buffer 903 is assigned to letter index i1.

Punctuation key check 1101 determines whether the zero key was pressed, i.e., the key selected to represent punctuation.

If the zero key was pressed, processing transfers from check 1101 to process punctuation entry 1102. Process punctuation entry 1102 sets index i2 to twenty-six, and sends the space element value to display letter process 1108. Display letter process 1108 transfers the space element value to display module 712 which in turn drives a space in the text entry on display screen 705. This completes the operation of process data entry for a zero key press and so processing returns to key press check 820.

If the zero key was not pressed, processing transfers through punctuation key check 1101 to data entry process 1100 to key one-to-nine check 1103, i.e., to a data entry key check. If the pressed key was any one of keys one to nine, check 1103 transfers to set letter index process 1104 and otherwise to rotate last entry process 1109.

In set letter index process 1104, one is subtracted from the numeric value of the pressed key and the resulting value is assigned to index i2. Set index process 1104 transfers to generate table index process 1105.

Generate table index process 1105 combines indices i0, i1 and i2 to create a table index. In this embodiment, table index TABLE_INDEX is defined as:

$$TABLE\_INDEX = (((i0*27)+i1)*9)+i2$$

Upon completion of generate table index process 1105, generate text entry process 1106, retrieves the two bit value in the table at the location pointed to by table index TABLE_INDEX and converts the two bit value to a letter represented by the two bit value.

Generate text entry process 1106 transfers to update index process 1107, which in turn stores the value of letter index i1 as letter index i0; stores the value of the retrieved letter in letter index i1; and stores the predicted letter in text buffer 903. While this step assumes that letter indices i0, and i1 are stored and accessed each time in process 827, alternatively, the last two letters in text buffer 903 can be retrieved and assigned to indices i0 and i1, respectively, as described above.

Update index process 1107 transfers to display letter process 1108. Display letter process 1108 sends information to display module 712 which in turn generates the predicted letter on display screen 705.

If the pressed key is not one of keys one to nine, i.e., is not a data entry key, processing transfers from check 1103 to rotate last entry 1109. Recall that data key check 826 determined whether the pressed key was one of the zero to nine keys, or the # key. Thus, since checks 1101 and 1103 determined that keys zero to nine were not pressed, the only key press remaining is the # key, i.e., the rotate entry, rotate key, which indicates the user wants a letter different than the one

36

entered last in text buffer 903. In rotate last entry 1109, the last character, i.e., the right most character, in text buffer 903 is replaced by the next character in the set of characters assigned to the last key pressed before the # key was pressed. Again, the use of the # key is illustrative only and is not intended to limit the invention to the use of that particular key to rotate an entry.

For example, if the last character in the text buffer 903 was a t and the # key is pressed, process 1109 changes the t to u. If the # key is pressed again, the u is changed to a v. Alternatively, if the last character in text buffer 903 was a u and the # key is pressed, process 1109 changes the u to a v. If the last character in text buffer 903 was a v and the # key is pressed, process 1109 changes the v to a t. If index i1 is stored, as the last character in text buffer 903 is rotated, index i1 is updated.

Text entry in cellular telephone 700 in different languages or contexts can be supported by using different letter frequency tables. For example, for plumbers, the prediction table can be based on text about plumbing procedures. For Frenchmen, the prediction table can be based on French text. Also, multiple letter frequency tables could be stored in cellular telephone 700, or selectively transmitted to cellular telephone 700, and a particular letter frequency table would be selected on an entry card.

In addition, an entry in the table can be more that a single letter, and thus save even more key strokes. For example, if the text buffer contains sche then typing a 3 could return dule rather than just d. Further, this novel method of text entry can be utilized with other than a cellular telephone. The method is applicable to any device that has several characters assigned to a single key on a keypad.

In the above embodiment, the English alphabet and a space element were used as the character set. Thus, the number 27 used in defining the table index is just the number N of characters in the set. Similarly, the number 9 used in defining the table index is just the number M of keys in the keypad that represent two or more different characters. Hence, predictive text entry method of this invention is not limited to text and is directly applicable to any keypad where each key represents a plurality of different characters.

In the embodiment of FIGS. 7, 8, and 9, client module 702 and server module 749 communicate over CDPD network 710. However, this architecture is illustrative only of the principles of the invention and is not intended to limit the invention to the particular architecture described. Client module 702 and server module 749 can use a wide variety of two-way data communication links to exchange resource locators, e.g., URLs, and TIL decks. For example, the communications link could be a switched voice circuit in which the client module and server module communicate using modems. Alternatively, the communications link could be any other packet switched network, so long as there is some way for client module 702 to get requests to server module 749 and for server module 749 to send data back to client module 702. Further, a special purpose server could be used in place of HTTP server 749. For example, the principles of this invention can be used over various data transport mechanisms including circuit switched data and packet switched data. These data transport mechanisms are being defined and implemented for most of the cellular network standards including GSM, TDMA, and CDMA.

In the configuration of airnet network 750 (FIG. 7), client module 702 communicated directly with a server computer 743. In another embodiment, as illustrated in FIG. 5, the two-way data communication device first communicates with an airnet network translator 500 that in turn commu-

37                                        38

nicates with the appropriate server. In this embodiment, the operation of two-way data communication devices **100, 101,** and **102** is similar to that described above for cellular telephone **700**, except the method field in the request generated in process **802** has a different form. For example, using the same information as before, the method field in this embodiment is:

GET  http://www.libris.com/airnet/home.cgi?&cost=1 ANTP/1.0

The method field includes the full address of the server, the expected cost of the service, and the version of the protocol used for communicating with airnet network translator **500**. The two-way data communication device transmits the HTTP request including the complete URL to airnet network translator **500**.

FIG. **12** is a more detailed block diagram that illustrates the structures in one embodiment of airnet network translator **500**, according to the principles of this invention. In this embodiment, airnet network translator **500** is a computer running under the UNIX operating system with an interface to CDPD network **710**. Such computers are well known to those skilled in the art. Thus, herein only the structures and processes that must be added to such a computer are described.

Airnet network translator **500** supports internet protocol (IP) connections over CDPD network **710** and with each computer network with which translator **500** can interact. In this embodiment, each of the modules in network translator **500** are processes that are executed by the processor in the computer. Control module **1201** is a daemon that listens for transmissions over an IP connection from CDPD network **710**. When control module **1201** accepts a transmission, control module **1201** spawns an ANT request processor **1204**, which in this embodiment is a process, as indicated above. While in FIG. **12**, only one ANT request processor **1204** is shown, there is an ANT request processor spawned for each transmission that control module **1201** accepts and the ANT request processor remains active until the communication is terminated.

FIG. **13** is a process flow diagram that illustrates the operation of ANT request processor **1204**. This process flow diagram considers transmissions that utilize both TCP/IP and UDP/IP. However, the processes that are specific only to TCP/IP are enclosed in dashed-line boxes. Upon being spawned for a TCP/IP, in establish connection process **1300**, ANT request processor **1204** establishes a TCP connection using a TCP module in the server with the client module over CDPD network **710**. After the connection is established processing transfers from process **1300** to request received check **1301**.

If UDP is being used, upon being spawned ANT request processor **1204** initiates processing in request received check **1301**. In check **1301**, ANT request processor **1204** determines whether the request from cellular telephone **700** (FIG. **12**) has been received and stored in memory **1210**. Memory **1210** represents both RAM and non-volatile memory in this embodiment. When the request has been received and stored, processing transfers from check **1301** to retrieve data process **1302**.

In retrieve data process **1302**, ANT request processor **1204** retrieves information concerning the source of the URL, i.e., client module **702** of cellular telephone **700** from customer database **1213**, and the destination specified in the URL, i.e., the designated server, from server database **1212**. Both databases **1212** and **1213** are stored in memory **1210**. A customer record in database **1213** includes, for example, a carrier address, e.g., an IP number, an airnet network

translator account number, billing information, and server subscriptions. A server record in database **1212** includes a server IP address, name, category, and class of service. Class of service refers to the pricing of the service, e.g., basic services, premium services, or pay-per-view services. Other pricing schemes can be supported in other implementations. When the information is retrieved for the server and service specified in the URL, and for the customer, processing transfers to valid request check **1303**.

In valid request check **1303**, ANT request processor **1204** determines, for example, whether client module **702**, i.e., the customer, is authorized to access airnet network translator **500**; whether client module **702** is authorized to access the server specified in the URL; whether the specified server is available through translator **500**; and whether the specified server supports the requested service. Thus, valid request check **1303**, validates the client, the server, and the client/ server pair. Also, since an estimated cost is included in the request, the status and credit limits on the customer's account could be checked to determine whether the estimated cost is acceptable. If all of the checks are true, processing transfers to create HTTP request process **1306**. Conversely, if any one of the checks is untrue, valid request check **1303** passes information concerning the error to return error process **1304**.

Return error process **1304** launches a CGI program stored in memory **1210** based on the information received and passes appropriate information to the CGI program. The CGI program builds an appropriate PIDL deck describing the error and converts the PIDL deck to a TIL deck, as described above. When the TIL deck describing the error is complete, return error process **1304** transfers processing to log transaction process **1315** that is described more completely below.

If all the checks in valid request check **1303** are true, create HTTP request process **1306** converts the request in memory **1211** to a request specific to the server specified, which in this embodiment is a HTTP request. For example, for the above request, create HTTP request process **1306** generates a method field, such as

GET /airnet/home.cgi?&client=xyz&cost=1 HTTP/1.0

In this embodiment, the method field includes the same information as in the embodiment described above, and in addition, the method field includes a client identification and the estimated cost.

After create HTTP request process **1306** is complete, ANT request processor **1204** accesses TCP module **1203** in establish server connection process **1307** for TCP/IP and transfers to secure transmission check **1308** for UDP/IP. In establish connection process **1307**, a connection is made between the server designated in the client request and the TCP interface module (not shown) so that data can be transmitted between airnet network translator **500** and the server. When the TCP connection to the server is established, ANT request processor **1204** transfers processing from establish server connection process **1307** to secure transmission check **1308**.

In secure transmission check **1308**, ANT request processor **1204** determines whether the HTTP request from the client requested a server that utilizes a protocol that supports encryption. If such a server was requested, processing transfers to negotiate process **1309** and otherwise to transmit request process **1310**.

In negotiate process **1309**, ANT request processor **1204** negotiates an encryption technique with the server. Upon completion of the negotiation, processing transfers from process **1309** to encryption process **1311**. In encryption

39

process **1311**, the HTTP request is encrypted using the negotiated encryption technique, and then processing transfers to transmit request process **1310**.

In transmit request process **1310**, the HTTP request is sent from memory **1210** to the HTTP server. When the transmission is complete, ANT request processor **1204** goes to result received check **1312**.

As described above, upon receipt of the request, the HTTP server services the request. Upon completion of servicing the request, the HTTP server returns either a PIDL deck or a TIL deck to airnet network translator **500**. The deck is stored in memory **1210**. If the server does not convert the PIDL deck to a TIL deck, the translation is done by airnet network translator **500**.

When the deck is received and stored, ANT request processor **1204** transitions from check **1312** to transmission completed process **1313** for TCP/IP and to secure transmission check **1314** for UDP/IP. ANT request processor **1204** closes the TCP circuit with the server in transmission completed process **1313**. Upon closing the server TCP connection, processing transfers to secure transmission check **1314**.

If the server utilized encryption, the deck stored in memory **1210** is encrypted. Thus, secure transmission check **1314** transfers processing to decryption process **1316** if encryption was used and otherwise to log transaction **1315**.

In decryption process **1316**, the encrypted deck is decoded and stored in memory **1210**. Also, after the decoding, if the deck must be converted to a TIL deck, the translation is performed. Decryption process **1316** transfer to log transaction process **1315**.

In log transaction process **1315**, ANT request processor **1204** writes a description of the transaction to transaction log **1211** in memory **1210**. In this embodiment, each transaction record includes a customer identification, a server identification, time required for the transaction, cost of the transaction, and a completion code. In one embodiment, for security purposes, each cellular telephone is assigned to only one customer and only one account.

After the transaction is logged, processing transfers to transmit result **1317**. In transmit result **1317**, ANT request processor **1204** returns the deck to client **702**. After the deck is transmitted, ANT request processor **1204** is terminated.

In one embodiment, if an airnet network translator is fully loaded and another transmission comes in, the translator returns the address of another airnet network translator and refuses the transmission. The cellular telephone transmits the message to the other airnet network translator. In yet another embodiment, all incoming transmissions are directed to a router. A plurality of airnet network translators are connected to the router. The router monitors the status of each translator. Each incoming transmission is routed to the least busy translator, which in turn responds to the transmission and performs the necessary operations for continuing communications with the client module.

In the above description of client module **702**, module **702** interacted with components within the cellular telephone to perform the various operations specified by the user. To insulate client module **702** from the exigencies of various cellular telephones to the extent possible, a general architecture for client module **702** is described more completely below. This general architecture is designed to have specific manager modules that interact with the modules described above within the cellular telephone and to provide standard information to the remaining manager modules within client module **702**. The manager modules with client module **702** form an interpreter that interprets TIL decks to generate a

40

user interface; interprets data input by the user; and interprets the TIL decks so that the data input by the user is combined with an appropriate resource locator and either a message is sent to an appropriate server, or another local TIL deck is interpreted by client module **702**. While this embodiment is for a cellular telephone, the manager modules are generic and so are applicable to any client module in a two-way data communication device.

This approach limits the modifications that must be made to client module **702** to implement the principles of this invention in a wide variety of two-way data communication devices over a wide variety of two-way data communication networks. Also, in the above embodiment, client module **702** supported communications and interactions over the cellular telephone network. However, client module **702** can also support local services on cellular telephone **700**. Typical local services includes local messages, an address book, and preconfigured e-mail replies, or any combination of such services.

In this embodiment, client module **702** includes a plurality of manager modules including a navigation manager module **1401**, a network manager module **1402**, a TIL manager module **1403**, an archive manager module **1404**, a local manager module **1405**, an event manager module **1406**, a timer manager module **1407**, a user interface manager module **1408**, a memory manager module **1409**, and a device dependent module **1410**.

Navigation manager module **1401** handles card and deck navigation as well as managing any caches. Navigation manager module **1401** owns and manages a history list and as well as a pushed card list. In addition, navigation manager module **1401** functions as the main line of client module **702**; does all event distribution; and supports local services.

For local services, like local message store, there are two basic approaches that can be used. First, local services is implemented in a CGI-like manner. Each local service has an entry point which is called with an argument list. A TIL deck is returned via the event manager. From that point on, the TIL deck is processed in the standard manner. This approach limits local services to the same constraints as remote services. A less restrictive approach is to allow the local service to field events instead of the standard event loop. The local service would construct TIL cards on-the-fly and feed them to user interface manager **1406**. Note that the local service would need to cooperate with the standard event loop with regard to the history, the pushed card list, and any other state that is normally managed by the event loop. Table 4 is a listing of processes for the architecture for navigation manager module **1401**.

TABLE 4

ARCHITECTURE FOR NAVIGATION MANAGER MODULE 1401

```
ProcessEvents (void) ;
PushLocation (void * location, Boolean forStack) ;
void * PopLocation (Boolean forStack) ;
void * CurrentLocation( ) ;
struct LOCAL_SERVICE {
    char name[50] ;
    FUNC HandleEvent(Event * pevent) ;
    FUNC StartLocalService(void) ;
    FUNC StopLocalService(void) ;
    } ;
static LOCAL_SERVICE localServices[ ] = { . . . } ;
STATUS HandleEvent(Event * pevent) ;
STATUS StartLocalService( ) ;
STATUS StopLocalService( ) ;
```

Routine ProcessEvents is the main entry point for event processing in client module **702**. Typical events include key

US 6,405,037 B1

41

presses on the keypad, choice selection for a choice card, text entry for an entry card, network events, and history events. Routine ProcessEvents can be called at any time to process an event or events. Routine ProcessEvents does not return until all events on a queue generated by event manager module **1406** are processed. If a local service is running, events are distributed to the local service before being processed by routine ProcessEvents.

The remaining routines in Table 4 are called internally by navigation manager module **1401** and by local services. Routine PushLocation pushes a location on the history list and issues a request for that location. The forstack flag indicates a stack push of local cards.

Routine *PopLocation pops a location on the history stack and issues a request for the top location of the history stack. In routine *PopLocation the forStack flag indicates that all cards since the last stack push should be popped.

Routine *CurrentLocation returns the current location the current URL being displayed.

As shown in Table 4, each local service provides a number of functions. If a local service is running, function HandleEvent, the local service's event handler, is called before any processing by navigation manager module **1401**. If the event is handled by the local service, the event is not processed any further.

Function StartLocalService is the local services start function. Function StartLocalService is called before any events are distributed to the local function. Similarly, function StopLocalService is the stop function for the particular local service. Function StopLocalService is called when no more events are distributed to the local service.

Network manager module **1402** insulates the rest of client module **702** from the specific networking protocol used over the cellular telephone network. Network manager module **1402** delivers requests to the server specified in the URL via the cellular telephone network interface; segments responses from the server for lower latency; delivers responses from local services to navigation module **1406** via event module **1406**; handles request/response cycle (e.g. cancellation, retry strategy) with the server over the cellular telephone network; can receive asynchronous messages from the server; performs memory management of TIL decks; performs caching of TIL decks; handles all negotiations concerning protocols and server scaling with the server; handles any encryption for information exchanged between cellular telephone **700** and the server.

In some cellular telephone, the maximum message size is fixed. However, for UDP and TCP messages, a more direct interface is used that bypasses this limitation of message passing. It is important to avoid copying network data from memory buffer to memory buffer as such copying increases the memory "high water mark" as well as decreases performance. Since different cellular telephones have different interfaces for delivering network data, network manager module **1402** manages the network data. In this way, network data is only copied from the network buffer for long-term storage.

When a message or reply arrives, network manager module **1402** uses event manager module **1406** to report that fact. However, access to the data by other manager modules in client module **702** is through a protocol that allows storage of data in a variety of fashions on different telephones. Any transparent, short-term caching of TIL data is handled by network manager module **1402**. Table 5 is one architecture for network manager module **1402**.

42

### TABLE 5

#### SPECIFICATION FOR NETWORK MANAGER MODULE 1402

```
typedef short TID;
void NM_Init(void) ;
void NM_Terminate(void) ;
TID NM_SendRequest (void *requestData, int length,
    Boolean ignoreCache) ;
NM_CancelRequest (TID TRANSACTIONId) ;
NM_DataType(TID TRANSACTIONId) ;
NM_GetData(TID TRANSACTIONId, void *data, int
    *length, Boolean *complete) ;
void *NM_HoldData (TID TRANSACTIONId) ;
NM_ReleaseData(TID TRANSACTIONId) ;
TID NM_StartData(int data Type, char *requestData,
    int length) ;
STATUS NM_EndData(TID TRANSACTIONId) ;
STATUS NM_SetDataLength (TID TRANSACTIONId, int
    length) ;
STATUS NM_GrowDataLength (TID TRANSACTIONId, Int
    grow) ;
int NM_GetDataLength(TID TRANSACTIONId) ;
void *NM_GetDataPointer (TID TRANSACTIONId) ;
STATUS NM_DeliverData (TID TRANSACTIONId) ;
```

Network manager module **1402** identifies each network data transaction by a 16-bit transaction identification code TID. Network manager module **1402** increments transaction identification code TID by one for each new transaction. Transaction identification code TID rolls over after 0xffff.

Routine NM_Init initializes network manager module **1402** and so is called before any other calls in network manager module **1402**. Routine NM_Terminate closes processing of network manager module **1402** and so is called after all other calls in network manager module **1402**.

Network manager module **1402** uses routine TID NM_SendRequest as the standard process of sending a request to the server. Pointer *requestData in the call to routine TID MN_SendRequest is defined by the server protocol. Similarly, the state, e.g., the Boolean value, of variable ignoreCache is used to indicate whether any cached replies should be ignored. After sending the request, this routine returns a server transaction identification code TRANSACTIONId. A local service can also send a request to the server.

When the user instructs client module **702** to cancel a request, network manager module **1402** calls a routine NM_CancelRequest with cellular telephone transaction identification code TID and server transaction identification code TRANSACTIONId. Routine NM_CancelRequest issues a command to the server to cancel the specified request.

When data are received from the network, the data can be either a response to a request sent by routine TID MN_SendRequest, or by a local service. Thus, in response to receiving data from the server, network manager module **1402** generates an event that includes server transaction identification code TRANSACTIONId and the type of data DATAType. For replies to requests sent by routine TID MN_SendRequest, server transaction identification code TRANSACTIONId is the same as the one returned by the matching call to routine TID MN_SendRequest and data type DATAType indicates that the data is a response. For local service originated messages, server transaction ID is new, and data type DATAType depends on whether the data is an e-mail, pushed TIL, or another type.

After the network event is received by event manager module **1406**, and navigation manager module **1401** distributes control of the event to network manager module **1402**, network manager module **1402** users the server transaction

43

identification code TRANSACTIONId and the remaining routines in Table 5 to process the data.

Routine NM__DataType is used to return the particular data type dataTYPE, e.g, reply, MIME, server push, etc. Routine NM__GetData sets a pointer to the data identified by server transaction identification code TRANSACTIONId, retrieves the length of the data, and determines whether all the data has been received. The interface provided by this routine allows the first part of a data stream, e.g. the first card of a TIL deck, to be processed by client module **702** before the rest of the deck is received.

Routine NM__HoldData is called before calling NM__routine NM__GetData to hold the data and thus insure that the data remains valid during processing by client module **702**. If the data is not held, the data can be deleted or moved with the internal buffers of network manager module **1402**. If the data is held, routine NM__ReleaseData is called after network data has been processed to release the data.

Routines TID NM__StartData, NM__EndData, NM__SetDataLength, NM__GrowDataLength, NM__GetDataLength, NM__GetDataPointer, and NM__DeliverData are used internally by network manager module **1402**, and by local services to deliver data. By allowing local services to use these routines, the same buffers can be used to store both network and locally generated data thereby reducing the amount of memory required to support client module **702**.

Routine TID NM__StartData creates a new data transaction and triggers a data delivery event. Routine NM__EndData is called when all data for the given server transaction identification code TRANSACTIONId has been transmitted. Routine NM__SetDataLength sets the data segment to a given length and may cause the location of the data to change. Routine NM__GrowDataLength grows the data segment by a given length and also may cause the location of the data to change. Routine NM__GetDataLength returns the length of the data segment. Routine NM__GetDataPointer returns a,pointer to the data. This routine is preferably called before writing into the data buffer. Also, this routine is preferably called whenever the data's location may have changed. Routine NM__DeliverData can be called when at least one card has been stored to reduce latency while the other cards are being generated.

TIL manager module **1403** insulates the rest of client module **702** from changes to the TIL specification. The interface provided by TIL manager module **1403** has the following characteristics: removes the need for parsing by the rest of client module **702**; uses cursors to avoid generating data structures on-the-fly; does not need an entire deck to operate; and handles TIL versioning.

Each TIL deck contains a major and a minor version number. The minor version number is incremented when TIL changes in a way that does not break existing TIL manager modules. The major version number is incremented for non-compatible versions of TIL.

Each TIL deck has the same hierarchy. One embodiment of this hierarchy is presented in Table 6. In Table 6, indentation is used to represent the relationships of the various hierarchical levels.

44

TABLE 6

TIL DECK HIERARCHY

deck
  options
  softkeys
    options
  card
    options
    softkeys
      options
    formatted text
      formatted lines
    entries
      options
  formatted line

The interface presented in Table 7 for TIL manager module **1403** is designed with the assumption that TIL is a direct tokenization of PIDL as described in Appendix I. However, the interface does not have any dependencies on that tokenization and can support other PIDL encoding techniques. Given the above assumption, the opaque pointers described below are actual pointers into the TIL deck itself. A rudimentary object typing scheme based on where in the deck the opaque pointer points can be used to implement the generic functions described below. If this object typing is not feasible due to details of TIL encoding, the generic functions can be replaced with specific functions.

TABLE 7

ARCHITECTURE FOR TIL MANAGER MODULE 1403

```
typedef char *opaque;
typedef opaque Deck;
typedef opaque Card;
typedef opaque Text;
typedef opaque Entry;
typedef opaque Option;
typedef opaque SoftKey;
typedef opaque Object;
/* Generic functions */
  FirstOption(Object obj, Option *o);
      /* obj is a card, softkey, entry, or deck */
  GetSoftkey(Object obj, Option *o);
      /* obj is a card or deck */
  GetText(Object obj, Option *o);
      /* obj is a card or entry */
/* Deck functions */
  SetDeck(Deck d, int length);
      /* tells module which deck to use */
  DeckGetCard(Card *c, int num);
-or-
  DeckGetCard(Deck d, Card *c, int num);
/* Card functions */
  int CardType(Card c);
  CardFirstEntry(Card c, Entry *e);
  CardLookupSoftkey(Card c, int num, Softkey *s);
  CardIsLast(Card c);
/* Option cursor functions */
  OptionNext(Option *o);
  char *OptionKey(Option o);
  char *OptionValue(Option o)
/* Entry cursor functions */
/* Text (and image) cursor functions */
  TextNextToken(Text *t, int *type, int *subtype,
      int *length, char *data);
```

Archive manager module **1404** stores and retrieves long-lived information. This information includes: data related to the server's location and/or required to support server scaling; data related to encryption; TIL caching (transparent to user); TIL storage (specified by user); and message storage and retrieval (see local manager module). Archive manager

US 6,405,037 B1

45

module **1404** should support a variety of nonvolatile memory schemes that are provided by the two-way data communication devices.

Local manager module **1405** is an interface to local device resources, such as local messages, address book entries, and preconfigured e-mail replies. Local manager module **1405** should also define an abstract interface to navigation manager module **1401** for use by archive manager module **1404**.

Table 8 is an architecture for an interface within local manager module **1405** to access to an address book stored on cellular telephone **700**. The name of a routine in Table 8 is descriptive of the operations performed by the routine.

TABLE 8

ARCHITECTURE FOR ADDRESS BOOK ACCESS

```
int NumAddresses();
char *AddressName(int num);
char *AddressGetEMail(int num);
    // returns e-mail address
char *AddressGetPhone(int num);
    // returns phone number
char * AddressGetFax(int num);
    // returns fax number
SetAddress(int num, char *name, char *email,
    char *phone, char *fax);
DeleteAddress(int num);
InsertAddress(int before);
```

Table 9 is an architecture for an interface within local manager module **1405** to access predetermined replies stored on cellular telephone **700**. The name of a routine in Table 9 is descriptive of the operations performed by the routine.

TABLE 9

ARCHITECTURE FOR PREDETERMINED REPLY ACCESS

```
int NumReplies();
char * GetReply(int num);
DeleteReply(int num);
SetReply(int num, char *text);
InsertReply(int before);
```

Table 10 is an architecture for an interface within local manager module **1405** to access messages stored locally on cellular telephone **700**. The name of a routine in Table 10 is descriptive of the operations performed by the routine.

TABLE 10

ARCHITECTURE FOR LOCALLY STORED MESSAGE ACCESS

```
int NumMessages();
void *FirstMessage();
void *NextMessage();
int MessageType (void *msg);
    // e.g. e-mail, TIL, etc.
void *MessageContent(void *msg);
void *SaveMessage(int type, void *content, int
    contentLength);
DeleteMessage(void *msg);
```

Event manager module **1406** handles the distribution of events. In this embodiment, events include low-level events like key presses and higher level navigation and user interface events. There are typically only a small number of events at any one time. The main event loop in the two-way data communication device dependent module keeps calling EM__GetNextEvent( ) until no events are left in the queue. Note that processing one event can cause another event to be

46

pushed onto the queue. The main event loop is not restarted until another event is pushed onto the queue due to a user key press or a network event.

In this embodiment, the event types include:

1) keypad events, i.e., pressing of a key;
2) choice events relating to a current choice card, e.g., the user selecting choice three;
3) text entry events relating to a current entry card, e.g., the user keying in "Hello";
4) network events, e.g., response arrived, request arrived, transaction terminated, network status; and
5) history events, e.g., pop, pop to marker.

Table 11 is an architecture for event manager module **1406**. As in the other tables herein, the name of a routine in Table 11 is descriptive of the operations performed by the routine and in addition a brief description is given in the comment field.

TABLE 11

ARCHITECTURE FOR EVENT MANAGER MODULE 1406

```
struct Event {
    int type;
    void *data;
        /* e.g. keycode, choice num, entry
        text, status code, other data */
}
EM__QueueEvent(int type, void * data);
    /* Adds event at end of queue*/
EM__GetNextEvent(Event * event);
    /*Pops next event*/
EM__PeekNextEvent (Event event);
    /*Peeks at next event*/
```

Timer manager module **1407** allows timer events to support timeouts, animation, and other time-domain features. Timeouts are delivered via event manager module **1406**.

Table 12 is an architecture for timer manager module **1407**. As in the other tables herein, the name of a routine in Table 12 is descriptive of the operations performed by the routine.

TABLE 12

ARCHITECTURE FOR TIMER MANAGER MODULE 1407

```
TimerInit();
int TimerSet(int milliseconds, int code, void
    *clientData);
    /*Returns a timer identification timerId to
    be used for cancellations*/
TimerCancel(int timerId);
TimerCancelAll()
```

User interface manager module **1408** handles interactions with the keypad and the display. Each of the three types of user interfaces defined in Table 1 above requires a different version of user interface manager module **1408**. For most cellular telephones, only one card at a time is used. However, some cellular telephones can display multiple cards at once and so would require a different version of user interface manager module **1408** from the version that handled display of only one card at a time.

In this embodiment, user interface manager module provides a user interface for the three types of cards display, choice, and entry; provides hooks for custom user interfaces for the address list and e-mail reply entry; only cares about the user interface aspects of cards and provides no navigation, argument, or option processing; handles all text

US 6,405,037 B1

47

and graphic layout including word wrapping; handles scrolling of text; operates from PIDL data structures; generates keyboard events, some of which may be generated by soft keys; and generates high-level events, e.g. next card, choice entry **3**, text entry "IBM".

Table 13 is an architecture for processing cards by user interface manager module **1408**. As in the other tables herein, the name of a routine in Table 13 is descriptive of the operations performed by the routine.

TABLE 13

| ARCHITECTURE FOR CARD PROCESSING BY UI MANAGER MODULE 1408 |
| --- |
| void UI__StartCard(Card c);<br>    /* called to begin display and processing of<br>      a given card*/<br>void UI__EndCard(Card c);<br>    /*called when a card is no longer to be<br>      displayed*/<br>Boolean UI__HandleEvent(Event *pevent) ;<br>    /*returns true if the event is handled, false<br>      if not*/ |

Table 14 is an architecture for the user interface implementation by user interface manager module **1408**. As in the other tables herein, the name of a routine in Table 14 is descriptive of the operations performed by the routine.

TABLE 14

| ARCHITECTURE FOR UI IMPLEMENTATION BY UI MANAGER MODULE 1408 |
| --- |
| UI__LayoutCard(Card c, Boolean draw, Proc<br>          callback)<br>    /* relies on global data; needs to be able<br>      to: draw as it goes; and note the<br>      special function of the currentLine<br>      (e.g. none, choice, softkey)*/<br>int numLines, firstVisible, lastVisible,<br>                      currentLine;<br>char currentEntry[80];<br>int currentChoice;<br>void *currentSoftkey;<br>Card currentCard; and<br>    . . . other info as needed for in-line<br>      scrolling |

The callback routine is notified of the special function of each line as the line is laid out. Thus, routine UI__LayoutCard can be used to scroll to a particular choice. If the current line is too wide to display all at once, horizontal scrolling is used to display the complete line, one display width at a time.

Memory manager module **1409** is optional, and is used in two-way data communication devices that do not support dynamic memory allocation. In these devices, all memory allocation and releases must go through memory manager module **1409**. Also, by allocating memory in advance via memory manager module **1409**, client module **702** does not run out of memory due to some other process on the device using up memory.

Microfiche Appendix A is a computer source code listing in the C++ computer language of one embodiment of a client module within a cellular telephone, and one embodiment of an airnet network translator that was used with an Internet server to communicate with client module. The Internet server was a UNIX computer running the Mosaic HTTP server. The source code was used to generate executable code by compiling the source code on a computer running the Sun Microsystems Operating System Solaris 2.4 using

48

Sun Microsystems compiler SunPro C and C#, and the Sun Microsystems SDK make utility. All of these products are available from Sun Microsystems of Mountain View, Calif.

This application is related to copending and commonly filed U.S. patent application Ser. No. 09/332,436 entitled "A PREDICTIVE DATA ENTRY METHOD FOR A KEYPAD" of Alain Rossmann, which is incorporated herein by reference in its entirety.

Various embodiments of a novel interactive two-way data communication system, a two-way data communication device, an airnet network architecture, and a predictive text entry system have been described herein. These embodiments are illustrative only of the principles of the invention and are not intended to limit the invention to the specific embodiments described. In view of this disclosure, those skilled in the art will be able to use the principles of this invention in a wide variety of applications to obtain the advantages of this invention, as described above.

APPENDIX I

A Description of PIDL and TIL

Unpublished© 1995 Libris, Inc.

The main structure of PIDL is described by an abstract syntax. This appendix describes the elements of the language and their semantics. In the syntax description of each element, an element is defined in an enhanced BNF.

| | |
| --- | --- |
| a :: = b | the element a is defined as b |
| a :: = b<br>  :: = c | the element a is defined as b or c |
| b c | the element b followed by element c, the intervening space is just for clarity |
| a\|b\|c | element a or element b or element c |
| {a} | the element a is optional |
| a :: = bc | the element a is defined as b or c |
| {a}* | the element a may appear zero or more times in a row |
| {a}+ | the element a may appear one or more times in a row |
| abc | the characters abc literally |
| ol(a) | an option list with zero or more topions of the element a, see Options below |

In general, the element blank-space can optionally appear between any two other elements. To keep the diagram clear, it has been omitted except where required. Where a blank-space is illegal or treated specially, it is noted.

The PIDL Elements

deck ::=deck-header {softkey}* {card}+deck-footer
deck-header ::=<PIDL ol(deck-options)>
deck-options ::=o-args |o-cost|o-ttl
deck-footer ::=</PIDL>
    A deck consists of one or more cards. There must be at least one card. A deck may also have a number of softkeys defined that stay in force for the whole deck. See soft keys below for the syntax and full description.
o-cost ::=cost=value
o-ttl ::=ttl=integer
    Additional arguments to be passed on the next deck request are given in o-args. See Arguments below for syntax and full description.
    The cost of retrieving this page (exclusive of telephone system charges) is represented in o-cost. If no o-cost

49    50

is given, the deck cost is included with the user's standard service contract.

Decks can be cached by the cellular telephone for a period of time. The o-ttl entry indicates the number of seconds that the deck can be cached from time of reception. If no o-ttl entry is given, the deck can only be cached for short periods of time, for example, to implement a back function similar to that of most Web browsers. If the value of o-ttl is zero, the deck must not be cached.

## Card Elements

card ::=display-card|choice card|entry-card

A card is one of three types of card in this embodiment. These are described in the sections below.

card-options ::=o-name|o-next|o-prev

o-name ::=name=identifier

o-next ::=next=destination

o-prev ::=prev=destination

All cards can have these options. The optional o-name option gives a name to the card. If a card has a name, the card can be referred to by a destination.

The o-next and o-prev give destinations for the NEXT and PREV keys. If omitted, the defaults are the next and previous sequential card in the deck. If o-prev is omitted from the first card, the PREV key returns to the deck last visited. If o-next is omitted from the last card, the NEXT key returns to the first card of the current deck. However, this default behavior is only a fail-safe: the last card in a deck should always have either an o-next option, or be a choice card where each choice entry indicates a new destination.

## Display Card

display-card display-header display-content display-footer

display-header ::=<DISPLAY option-list>

display-options ::=card-options

display-content ::={softkey}* formatted text

display-footer ::=</DISPLAY>

Display cards give information for the user to read. See Formatted Text below for a full description of the format of information that can be displayed.

Softkeys can be described for this card only, see Softkeys below.

## Choice Card

choice-card ::=choice-header display-content {entries} choice-footer

choice-header ::=<CHOICE ol{choice-options}>

choice-options ::=card-options|o-method|o-key | o-default

o-method ::=method=method-type

method-type ::=number|list|alpha|group

entries ::={choice-entry}+
    ::=group-entry {choice-entry}+)+

choice-footer ::=</CHOICE>

Choices let user pick one from a list. The initial display content is shown to the user, followed by the choices. Each choice can have one line of formatted text (which may be wrapped or scrolled by the phone if too long).

How the choices are displayed and chosen is based on the o-method option. Note that this option is a hint only, and can be disregarded by the phone. The number method is the default and indicates that the choices are numbered sequentially from one and are chosen by pressing the appropriate digit on the keypad. If there are more than nine options, the phone may choose some other method of selection. The list method indicates that the list should be unnumbered and that the user should scroll through the list and hit some designated enter key to choose an entry. The alpha method is like list, only it is an indication that the text of the entries should be used to aid selection if at all possible. In this case, the entries are assumed to be alphabetically sorted. The group method is described in more detail below.

The o-key option indicates, if present, the key of an argument to be added to the argument list. See Arguments below for more information. The value of the argument comes from the choice entry; see below. The o-default option indicates the default value if the user just hit ENTER. See o-default under Entry Card below for more information.

choice-entry ::=<CE ol(entry-options)>formatted-line

entry-options ::=action-options|o-value

Each choice has text displayed to the user. If the action-options are given, the indicated action is performed if the choice is made. If the o-value option is present, it supplies the value to the argument identified with the o-key option in the choice header. If no o-value is given, the text of the entry is used (without any formatting) as the argument value.

group-entry ::=<GE ol(group-options)>

group-options ::=label=value

If the group method is used, the choices are divided into a number of groups. Each group is headed by a group-entry, which, via the label option, gives a short name to the group. The phone can then give the user a hierarchial interface for choosing among a large number of choices. The text of the label should be limited to eight characters and may be truncated by the phone.

## Entry Card

entry-card ::=entry-header display-content entry-footer

entry-header ::=<ENTRY ol(entry-options)>

entry-options ::=card-options|o-format|o-key | o-default

entry-footer ::=</ENTRY>

Entries let the user enter a value. The display content is shown to the user, followed by an entry line. The user's entry is controlled by the format. The o-key option indicates the argument that is being set by this entry. The value of the argument are the user's entry.

o-format ::=format=value{; format-hint}

format-hint ::=value

This option specifies the format for user input entries. The string consists of format control characters and static text which is displayed in the input area. Most of the format control characters control what data is expected to be keyed in by the user. They are displayed as blanks until the user types into them. The format codes are:

A entry of any alphabetic character

9 entry of any numeric character

X entry of any alphabetic or numeric character

*f allow entry of any number of characters; the next character, f, is one of A, 9 or X and specifies what kind of characters can be entered.

\c display the next character, c, in the entry field; allows display of the formatting characters in the entry field.

Format hints indicate what kind of value is expected. If a format hint is not understood, it is ignored. Currently defined format hints are:

US 6,405,037 B1

| 51 | 52 |

text text is expected to be text, use special input techniques; generally follows *A or *X

mail-reply like text, but expected text is for an e-mail message or page; may affect input algorithm

address-list entry is a list of e-mail addresses

o-default ::=default=value

The o-default option supplies a value that is used if the user simply hits NEXT. If no default value is given, then the user must supply a value.

Formatted Text

formatted-text ::={{flow-image}{line-format}text-line}*

formatted-line ::=text-line

text-line ::={text|image|text-format|alignment-format}*

Formatted text is what is shown to the user in most cards. Formatted lines are used for choice entries.

text-format ::=<B>|<I>|<BL>

::=B>/B<|>|<BL>

The format codes control Bold, Italic and Blinking. The slash versions cancel the formatting. Unlike HTML, these needn't be strictly nested and over application and over cancellation are tolerated. Formatted-text and formatted-line elements start in plain mode (no bold, italic, or blinking).

alignment-format ::=<CENTER>|<BOLD>|<TAB>

The alignment codes specify how parts of a line are to be laid out. The text following the alignment code is either centered or right justified on the same line as the other text. The text or image following the code is considered to be all text up to the next alignment code or line break. All lines start implicitly aligned left. Note that these do not include an implicit line break so that one can have both left and right justified text on a single line. If there is too much text and not enough room on the line then, if in wrap mode, the non-fitting text is moved to the next line and aligned the same way. If in line mode, the line may end up running together with two spaces between the left, center, and right justified segments.

The tab code is used to create aligned columns. Rather than tab to specific character positions, the tab code separates the text for each column. The width of the column is determined by the maximal width of the text (or images) in each line. The extent of the columns is from the first line with tab codes through the last contiguous line with tab codes. Some lines may have fewer tab codes than others, in which case they are assumed to have no text for the extra columns.

line-format ::=<WRAP>|<LINE>

::=<BR>

Multiple lines of text are separated by the <BR> code. If a line is too long to fit on the screen and, if in wrap mode, the line is word wrapped onto multiple lines. If in line mode, the line is left as one line and is scrolled horizontally. Formatted-text and formatted-line elements start in wrap mode and may be changed with either the <WRAP> or <LINE> codes. These codes are an implicit line break.

Images

image ::=<IMAGE ol(image-options)>

::=<INLINE ol(image-options)>

inline-data </INLINE>

flow-image ::=<IMAGE ol(flow-image-options)>

::=<INLINE ol(flow-image-options)>

inline-data </INLINE>

image-options ::=o-source

flow-image-options ::=image-options|o-flow

inline-data ::=ASCII85 encoding of image data

Images are treated as large words and, by default, are simply displayed as part of the text. Flow-Images have a flow option that causes them to be treated differently. The image data is stored in a separate data stream as identified by the source option.

Inline images are treated identically, only the data is part of the current data stream. ASCII85 is a standard way of encoding binary data in printable ASCII, whereby each four bytes of data is encoded in five characters. Note that TIL only uses inline images, and uses a different encoding.

o-source ::=src=location

This option specifies the location of the source for images.

o-flow ::=flow={left|right}

This option controls the alignment of flow-images. The option specifies that the image is flush left or flush right with the screen. Subsequent lines of text flow in the remaining right or left hand space.

Softkeys

softkey ::=<SOFTKEY ol(softkey-options)>

softkey-options ::=o-label|o-button|action-options

Softkeys supply definitions for two buttons known as SOFT-L and SOFT-R. They do not show up in the normal text and graphics area displayed to the user, but on a separate line for soft key labels. (Note: in some implementations, where screen real estate is scarce, this label line may get used for normal text and graphics display when there are no softkeys defined on the current card).

When the softkey is pressed, the indicated action takes place.

o-button ::=button=side

side ::=left|right

o-label ::=label=value

The button option specifies which physical key the softkey applies to. The label option is the text that is displayed on screen for that key. The phone may truncate the label. It is suggested that labels be fewer than eight characters.

Softkeys can be specified both for the deck as a whole and per card. When specified for the deck (after the deck-header, but before the first card) they remain in effect for the entire deck. When specified for a card (at the beginning of the formatted-text for the card), they temporarily override any deck softkeys while the card is visible. Note that the override is done independently for the two keys (a card can override one softkey, but not the other). To override a deck softkey with no softkey (in effect, to remove a softkey for the duration of a card) use a softkey with no label and no action.

Syntax: Options

Many of the syntactic elements of PIDL have option lists associated with them. Options refine the operation of the elements they are part of. Unless otherwise noted, options do not nest, even when the same option is given in two nested elements. Options that are not defined for an element are ignored, even if valid for an enclosing element.

ol(valid-option) ::={blank-space valid-option}* {blank-spaces}

option-list ::=ol(option)

US 6,405,037 B1

53

option ::=key =value
key ::=identifier
value ::=plain-text
    ::="{text}"
    An option list contains zero or more options. Each 5
    option is separated by blank-space (required!) and
    optionally followed by blank-space. In the syntax
    diagrams, option lists are shown as: ol (valid-option)
    where valid-option is replaced with an element that
    defines the possible options in this context. ol is a 10
    generic syntactic description of option-lists.
    Each option is a key and a value. They may be given in
    any order within the list of options. The key is always
    an alpha-numeric name that is case insensitive. The
    value, if it is composed of only alphanumeric 15
    characters, may appear directly after the equals sign.
    Otherwise, the value must be quoted. In quotes,
    blank-space is treated literally and is considered part
    of the value.
    In the syntax diagrams, the possible values for various 20
    options are specified without quotes. However,
    quotes are always acceptable around an option value.
    Unlike almost all other syntactic elements, blank space
    is not permitted between the key and the equals sign
    or between the equals sign and the value. 25
    Many options have a more restricted set of possible
    values than represented by the above syntax. See the
    individual options for details.
Destinations
destination ::=location {; animation} 30
    ::=card-loc {; animation}
    ::=stack-operation {; animation}
location ::=full-loc|partial-loc
    |relative-loc
full-loc ::=: service-id / deck-path 35
    ::=: service-host / deck-path
partial-loc ::=/ deck-path
relative-loc {../}* deck-path
card-loc ::=# identifier
deck-path ::=plain-text {/ plain-text}* 40
service-id ::=% plain-text
service-host ::=plain-text
    Destinations are used in some options to indicate the
    next, or previous deck or card to show. A deck is 45
    specified either with a full location (service-id and
    deck-path), just a deck-path (in which case the
    service is the same as the current deck's service), or
    a relative deck-path. In the later case, the last com-
    ponent of the current deck-path is removed, (and one 50
    additional component for each ../ in the relative
    deck-path), and the deck-path appended.
    A particular card can be a destination and is specified
    by a card-loc element.
stack-operation ::=+card-loc 55
    ::=-
    In addition to the normal history list of where a user has
    been that is kept by a phone, the phone also keeps a
    short stack of locations. Using a plus sign form
    causes the current location (deck and card, and 60
    location in the history list, and animation used) to be
    pushed on the stack before going to the new card.
    Using the minus sign form causes a return to the
    location on the top of the stack, and the history list
    to be pruned back to the saved point. If no animation 65
    is given, the inverse animation is used. The stack is
    popped.

54

animation ::=slideN|slides
    ::=slideW|slideE
    ::=slideSW|slideNE
    ::=slideSE|slideNW
    ::=flipV
    ::=flipH
    ::=fade
    ::=none
    The optional animation argument indicates what form
    of screen animation, if available, is to be used when
    going to the destination. The animation is remem-
    bered with the destination in the history and desti-
    nation stack. If the user moves to a destination via a
    'go' or 'next' operation, then the animation is per-
    formed. If the user moves to a destination via a 'prev'
    or 'pop' operation, the reverse animation associated
    with the current location is performed.
Actions
Choice entries and soft keys can specify actions to be
    performed when the user selects the choice or softkey.
action-options ::=o-args|o-call |o-page
o-go ::=go=destination
o-call ::=call=value
    The go operation indicates that the destination should
    be moved.
Argument Processing
Each time a deck is requested, arguments may be passed
    along with the request. These arguments may be used by
    the service end to compute a deck specific for the user
    rather than just return a pre-written deck.
    Arguments are built-up as the user traverses the deck. Each
    argument is a key-value pair. While arguments superfi-
    cially look like options, these two entities are quite
    distinct: Options are a part of PIDL and affect the opera-
    tion of the phone. Arguments are information gathered by
    the phone and returned to the service. Neither PIDL nor
    the phone understands the arguments beyond their basic
    syntactic structure.
    Arguments come from three places: Choice cards, Entry
    cards, and the args option. Each of these specifies a
    key-value pair that is added to a buffer of arguments to be
    sent. In the case of the args option, multiple arguments
    may be specified. When an argument key-value pair is
    added to the argument buffer, if the key is already present
    in the buffer, its value is replaced.
o-args ::=args=arg-list
argument-list ::=arg-key-value{{&|; }
    key-value}*
arg-key-value ::=arg-key=arg-value
arg-key ::=identifier
arg-value ::=plain-text
Note: The entire o-args element is actually the value of an
    option. If it has more than one arg-key-value it will need
    to be in quotes. Since the ampersand (&) and semi-colon
    (;) are used as key-value pair separators, these characters
    cannot be part of argument values.
o-key ::=key=arg-key
o-value ::=value=arg-value
    These options are used in choice and entry cards to
    specify the key and value for the arguments those
    cards use.
Basic Elements
alpha ::=any alphabetic character
numeric ::=any digit
alpha-numeric ::=alpha|numeric

US 6,405,037 B1

## 55

hex ::=numeric|any letter A through F, either case

blank-space ::={space|tab|new-line}+

space ::=the space character

tab ::=the tab character

new-line ::=the carriage return character
:::=the line feed character
:::=the sequence carriage return, line feed

word ::={alpha-numeric}+

identifier ::=alpha {alpha-numeric}*

integer ::={+|−}{numeric}+

text ::=any 7-bit ASCII character except<, >, ', or &
:::=&gt; |&lt; |&quot; |&amp;
| 
:::=any ISO-Latin-1 named entity
:::=&# hex hex;
In text, runs of blank-space are treated as single spaces
and my be used as point for word wrapping.

plain-text

safe ::={alpha|numeric|safe}*
:::=$|−|_|@|.|& |!
|*|,

**TIL Encoding**

Except where noted, TIL is identical to PIDL in structure. To translate PIDL to TIL several steps are conceptually needed (these may be done in one pass by a translator):

1. Escape characters with the high bit set.

2. Compress or remove all blank space where possible.

3. Tokenize comment elements with a single byte with the high bit set.

4. Inline images.
Fundamentally, TIL is just PIDL with certain common character sequences replaced by single bytes with the high-bit set. The first two steps above support this. Additionally, images are further compacted by including them inline in a dense format.
The tokenizing follows the encoding given in the table below. Note that for purposes of element separation, the tokens that represent option key identifiers (with the equal sign) can be considered to include all preceding blank space. Similarly, the tokens that represent option values can be considered to include all following blank space.

| | | | | | |
|---|---|---|---|---|---|
| <PILD> | 90 | args= | C0 | alpha | E0 |
| </PIDL> | 91 | button= | C1 | center | E1 |
| <DISPLAY> | 92 | call= | C2 | fade | E2 |
| </DISPLAY> | 93 | cost= | C3 | flipH | E3 |
| <CHOICE> | 94 | default= | C4 | flipV | E4 |
| </CHOICE> | 95 | flow= | C5 | group | E5 |
| <ENTRY> | 96 | format= | C6 | inline | E6 |
| </ENTRY> | 97 | go= | C7 | left | E7 |
| <CE | A0 | key= | C8 | list | E8 |
| <GE | A1 | label= | C9 | none | E9 |
| <IMAGE | A2 | method= | CA | number | EA |
| <INLINE | A3 | name= | CB | right | EB |
| <SOFTKEY | A4 | next= | CC | slideE | EC |
| <B> | B0 | page= | CD | slideN | ED |
| </B> | B1 | prev= | CE | slideNE | EE |
| <I> | B2 | src= | CF | slideNW | EF |
| </I> | B3 | ttl= | D0 | slideS | F0 |
| <BL> | B4 | value= | D1 | slideSE | F1 |
| </BL> | B5 | | | slideSW | F2 |
| <CENTER> | B6 | | | slideW | F3 |
| <RIGHT> | B7 | | | | |

## 56

-continued

| | |
|---|---|
| <WRAP> | B8 |
| <LINE> | B9 |
| <BR> | BA |

### APPENDIX II

A Computer Program to Generate a Letter Frequency Tables for Use in the Predictive Data Entry Process Unpublished © 1995 Libris, Inc.

```
/*   This program opens a text file selected by the
     user, generates the frequency table for that file,
     and then writes the frequency table to another
     file also selected by the user.
*/
#include <stdio.h>
#include <string.h>
#include <console.h>
#include <assert.h>
typedef unsigned char byte;
typedef byte triplet[3];
typedef byte tristorage[27][27][27];
IncrementTrigram(triplet t, tristorage trigrams)
{
    byte * pb;
    assert(t[0] < 27);
    assert(t[1] < 27);
    assert(t[2] < 27);
    pb = &trigrams[t[0]][t[1]][t[2]];
    if (*pb < 255) *pb = *pb + 1;
    return *pb;
}
StoreTrigramValue(triplet t, tristorage trigrams, byte
value)
{
    assert(t[0] < 27);
    assert(t[1] < 27);
    assert(t[2] < 27);
    trigrams[t[0]][t[1]][t[2]] = value;
}
byte FetchTrigramvalue(triplet t, tristorage trigrams)
{
    assert(t[0] < 27);
    assert(t[1] < 27);
    assert(t[2] < 27);
    return trigrams[t[0]][t[1]][t[2]];
}
byte DumpTrigram(triplet t, tristorage trigrams)
{
    byte value;
    assert(t[0] < 27);
    assert(t[1] < 27);
    assert(t[2] < 27);
    value = FetchTrigramValue(t, trigrams);
    if (value != 0)
        {
        printf("%c%c%c = ", t[0] + 'a', t[1] + 'a', t[2] +
'a');
        if (value == 255) printf("***");
        else        printf("%3d", value);
    }
    return value;
}
int IdFromChar(short c)
{
    c = tolower(c);
    if (c < 'a' || c > 'z') return 26;
    return c - 'a';
}
AddChar(tristorage trigrams, triplet t, byte b)
{
    byte value;
    unsigning short r;
```

US 6,405,037 B1

57

-continued

```
      assert(b <= 26);
      if (b == 26) { t[0]= t[1] = t[2] = 26; return; }
      t[0] = t[1];
      t[1] = t[2];
      t[2] = b;
      value = FetchTrigramValue(t, trigrams);
      of (value == 255) return;
#if 0
      if (value > 64) {
         r = Random( );
         if (value > 192 && r & 0xE000) return;
         else if (value > 128 && r & 0xC000) return;
         else if (value > 64 && r & 0x8000) return;
      }
#endif
      StoreTrigramValue(t, trigrams, value + 1);
}
DumpTrigrams(tristorage trigrams)
{
   int i, j, k;
   int x;
   triplet t;
   x = O;
   for (i = 0; i < 26; ++i)
   for (j = 0; j < 26; ++j)
      for (k = 0; k < 26; ++k)
         {
            byte value;
            t[0] = i;
            t[1] = j;
            t[2] = k;
            value = DumpTrigram(t, trigrams);
            if (value == 0) continue;
            if (++ x ==6) {
               printf("/n"); x = 0;
            }
            else
               printf("  ");
         }
}
OSErr BuildTrigram(short refNum, tristorage trigrams)
{
   OSErr err;
   triplet t;
   t[0] = t[1] = t[2] = 26;
   while (true)
      {
         long count = 80;
         char buf[80];
         int i;
         err = FSRead(refNum, &count, buf);
         if (count == 0) return err;
         for (i = 0; i < count; ++i) {
            AddChar(trigrams, t, IdFromChar(buf[i]));
         }
         if (err) return err;
      }
   return 0;
}
Handle OpenTrigrams(void)
{
   OSErr err;
   OSType type;
   StandardFileReply reply
   short refNum;
   short id;
   Handle h;
   Str63   name;
   tristorage *trigrams;
   type = 'TEXT';
   StandardGetFile(nil, 1, &type, &reply);
   if (!reply.sfGood)   return nil;
   err = FSpOpenDF(&reply.sfFile, fsCurPerm, &refNum);
   if (err) return nil;
   memcpy(name, reply.sfFile.name, sizeof(name));
   h = NewHandle(sizeof(tristorage));
   HLock(h);
   trigrams = (tristorage *)(*h);
   memset(*trigrams, 0, sizeof(tristorage));
```

58

-continued

```
      BuildTrigram(refNum, *trigrams);
      FSClose(refNum);
      DumpTrigrams(*trigrams);
      HUnlock(h);
      type = 'rsrc';
      StandardGetFile(nil, 1, &type, &reply);
      if (!reply.sfGood) return;
      refNum = FSpOpenResFile(&reply.sfFile, fsCurPerm);
      if (refNum == -1) return;
      UseResFile(refNum);
      id = Unique1ID('smrt');
      //id = 128;
      AddResource(h, 'smrt', id, name);
      UpdateResFile(refNum);
      FSClose(refNum);
      return h;
}
main( )
{
   OSErr   err;
   Handle   h;
   cshow(stdout);
   TEInit( );
   InitDialogs(OL);
   InitCursor( );
   h = OpenTrigrams( );
```

I claim:

1. A method for making available a newer version of an application to a mobile device with no changes in the mobile device, the method comprising:

receiving a message over a wireless network from a first server, the message pertaining to the newer version of the application offered from a second server;

displaying, on a screen of the mobile device, a graphic user interface in response to the message;

generating a response message in response to an interaction by a user with the graphic user interface; and

providing access to the newer version of the application from the second server after the response message is successfully transported by the first server to the second server.

2. The method of claim 1, wherein the first server is the second server.

3. The method of claim 1, wherein the first server, remotely located with respect to the second server, coupled to the second server over a landline data network.

4. The method of claim 1, wherein the wireless network complies with a first protocol and the landline data network complies with a second protocol.

5. The method of claim 4, wherein the first protocol and the second protocol are compliant to each other.

6. The method and claim 4, wherein the first protocol and the second protocol are based on the Internet Protocol (IP) but function differently.

7. The method of claim 6, wherein the first protocol and the second protocol are respectively User Datagram Protocol (UDP) and Transmission Control Protocol (TCP).

8. The method of claim 6, wherein the first server functions as a protocol conversion to facilitate data communication between the mobile device and the second server.

9. The method of claim 4, wherein the landline data network is one or more of a corporate wide area network, a corporate local area network and the Internet.

10. The method of claim 3, wherein the first server maintains an authority to control access by the mobile device to the second server.

11. The method of claim 10, wherein the response message is authenticated by the first server upon being received in the first server.

US 6,405,037 B1

59

60

12. The method of claim **1**, wherein the message includes information for the mobile device to generate the graphic user interface.

13. The method of claim **12**, wherein the displaying of the graphic user interface in response to the message comprises:

extracting the parameters from the message received from the first server; and

interacting appropriately with hardware of the mobile device with respect to the extracted information to formulate the graphic user interface for display.

14. The method of claim **1**, wherein the new application is resident on either the first server or the second server.

15. A method for making available a newer version of an application to a mobile device with no changes in the mobile device, the method comprising:

sending from a first server a message over a wireless network to the mobile device, the message pertaining to the newer version of the application being offered in a second server and including parameters that are to be extracted by the mobile device to generate a graphic user interface for display on the mobile device in response to the message;

receiving in the first server a response from the mobile device, the response including an interaction by a user of the mobile device with the graphic user interface; and

providing access to the newer version of the application by the mobile device when the response message is successfully transported by the first server to the second server.

16. The method of claim **15**, wherein the first server is the second server.

17. The method of claim **15**, wherein the first server, remotely located with respect to the second server, coupled to the second server over a landline data network.

18. The method of claim **17**, wherein the wireless network complies with a first protocol and the landline data network complies with a second protocol.

19. The method of claim **18**, wherein the landline data network is one or more of a corporate wide area network, a corporate local area network and the Internet.

20. The method of claim **17**, wherein the first protocol and the second protocol are compliant to each other.

21. The method of claim **20**, wherein the first protocol and the second protocol are based on the Internet Protocol (IP) but function differently.

22. The method of claim **21**, wherein the first protocol and the second protocol are respectively User Datagram Protocol (UDP) and Transmission Control Protocol (TCP).

23. The method of claim **21**, wherein the first server functions as a protocol conversion to facilitate data communication between the mobile device and the second server.

24. The method of claim **17**, wherein the first server maintains an authority to control access by the mobile device to the second server.

25. The method of claim **24**, wherein the response message is authenticated by the first server upon being received in the first server.

26. The method of claim **15**, wherein the message includes information for the mobile device to generate the graphic user interface.

27. A computer product for making available a newer version of an application to a mobile device with no changes in the mobile device, the computer product to be executed in the mobile device, the computer product comprising:

program code for receiving a message over a wireless network from a first server, the message pertaining to the newer version of the application offered from a second server;

program code for displaying, on a screen of the mobile device, a graphic user interface in response to the message;

program code for generating a response message in response to an interaction by a user with the graphic user interface; and

program code for providing access to the newer version of the application from the second server after the response message is successfully transported by the first server to the second server.

28. A computer product for making available a newer version of an application to a mobile device with no changes in the mobile device, the computer product to be executed in a first server, the computer product comprising:

program code for sending from the first server a message over a wireless network to the mobile device, the message pertaining to the newer version of the application being offered in a second server and including parameters that are to be extracted by the mobile device to generate a graphic user interface for display on the mobile device in response to the message;

program code for receiving in the first server a response message from the mobile device, the response including an interaction by a user of the mobile device with the graphic user interface; and

program code for providing access to the newer version of the application by the mobile device when the response message is successfully transported by the first server to the second server.

\* \* \* \* \*

# ADDENDUM 7



US006430409B1

(12) **United States Patent**

Rossmann

(10) Patent No.: **US 6,430,409 B1**

(45) Date of Patent: **Aug. 6, 2002**

(54) **METHOD AND ARCHITECTURE FOR AN INTERACTIVE TWO-WAY DATA COMMUNICATION NETWORK**

(75) Inventor: **Alain Rossmann**, Menlo Park, CA (US)

(73) Assignee: **Openwave Systems Inc.**, Redwood City, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **08/978,701**

(22) Filed: **Nov. 26, 1997**

**Related U.S. Application Data**

(63) Continuation of application No. 08/570,210, filed on Dec. 11, 1995.

(51) Int. Cl.[7] ............................ **H04Q 7/20**; H04Q 7/32; H04Q 7/28

(52) U.S. Cl. ....................... **455/422**; 455/426; 455/564; 455/565; 455/466; 455/552; 455/517; 709/203; 709/217; 370/230; 370/352; 370/328

(58) Field of Search ................................ 455/426, 3.05, 455/550, 564, 565, 517, 412, 413, 414, 419, 466, 556, 557, 552, 422; 709/203, 224, 246, 228, 236, 217; 370/230, 352, 328

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,787,028 A | 11/1988 | Finfrock et al. |
| 4,812,843 A | 3/1989 | Champion, III et al. |
| 5,008,925 A | 4/1991 | Pireh |
| 5,335,276 A | 8/1994 | Thompson et al. |
| 5,465,401 A | 11/1995 | Thompson |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0812120 A3 | 12/1997 |
| EP | 0812120 A2 | 12/1997 |
| WO | WO 97/41654 | 11/1997 |

OTHER PUBLICATIONS

HDTP Specification, Version 1.1–Draft, pp. 1–40, Redwood Shores, CA, Unwired Planet, Inc., Jul. 15, 1997.
HDML 2.0 Language Reference, Version 2.0, pp. 1–56, Redwood Shores, CA, Unwired Planet, Inc., Jul. 1997.

*Primary Examiner*—William Trost
*Assistant Examiner*—Keith Ferguson
(74) *Attorney, Agent, or Firm*—Blakely, Sokoloff, Taylor & Zafman LLP

(57) **ABSTRACT**

A two-way data communication device such as a data ready cellular telephone, a two-way pager, or a telephone communicates via a two-way data communication network with a server computer on a computer network that has an interface to the two-way data communication network, i.e, is coupled to the two-way data communication network. For example, the computer network can be a corporate wide area network, a corporate local area network, the Internet, or any combination of computer networks. The two-way data communication device utilizes a client module to transmit message including a resource selector chosen by the user to a server on a server computer on the computer network. The server processes the message and transmits a response over the two-way data communication network to the client module. The client module interprets the response and presents the response to the user via a structured user interface. Alternatively, the user transmits a request that directs the server to transmit the response to the request to another location or to another user.

**93 Claims, 36 Drawing Sheets**

Microfiche Appendix Included
(6 Microfiche, 369 Pages)



## US 6,430,409 B1

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,491,605 A | 2/1996 | Hughbanks et al. | |
| 5,548,636 A | 8/1996 | Bannister et al. | |
| 5,555,446 A | 9/1996 | Jasinski | |
| 5,560,008 A | 9/1996 | Johnson et al. | |
| 5,577,100 A | 11/1996 | McGregor et al. | |
| 5,577,103 A | 11/1996 | Foti | |
| 5,577,209 A | 11/1996 | Boyle et al. | |
| 5,579,535 A | 11/1996 | Orlen et al. | |
| 5,606,786 A | 3/1997 | Presby | |
| 5,625,605 A | 4/1997 | Sullivan et al. | |
| 5,671,354 A | 9/1997 | Ito et al. | |
| 5,708,828 A | 1/1998 | Coleman | |
| 5,727,159 A | 3/1998 | Kikinis | |
| 5,740,252 A * | 4/1998 | Minor et al. | 455/412 |
| 5,742,668 A | 4/1998 | Pepe et al. | |
| 5,745,706 A | 4/1998 | Wolfberg et al. | |
| 5,751,798 A | 5/1998 | Mumick et al. | |
| 5,854,936 A | 12/1998 | Pickett | |
| 5,867,153 A | 2/1999 | Grandcolas et al. | |
| 5,884,284 A | 3/1999 | Peters et al. | |
| 5,909,485 A | 6/1999 | Martin et al. | |
| 5,918,023 A | 6/1999 | Mighdoll et al. | |
| 5,940,589 A | 8/1999 | Donovan et al. | |
| 5,958,006 A | 9/1999 | Eggleston et al. | |
| 6,049,711 A | 4/2000 | Ben-Yehezkel et al. | |
| 6,085,105 A | 7/2000 | Becher | |
| 6,119,137 A | 9/2000 | Smith et al. | |
| 6,122,403 A * | 9/2000 | Rhoads | 709/203 |
| 6,157,823 A | 12/2000 | Fougnies et al. | |
| 6,167,253 A * | 12/2000 | Farris et al. | 455/414 |
| 6,185,184 B1 * | 2/2001 | Mattaway et al. | 709/203 |

* cited by examiner



*FIG. 1*

*FIG. 2A*



*FIG. 2B*



*FIG. 2C*



*FIG. 2D*



Case: 15-1108    Document: 44    Page: 148    Filed: 02/27/2015

*FIG. 2E*



*FIG. 2F*



*FIG. 2G*



*FIG. 2H*





*FIG. 3A*

*FIG. 3B*

*FIG. 3C*

*FIG. 3D*

*FIG. 3E*

*FIG. 3F*



*FIG. 4A*

*FIG. 4B*

*FIG. 4C*

*FIG. 4D*

*FIG. 4E*

*FIG. 4F*

*FIG. 4G*

*FIG. 4H*

*FIG. 4I*



FIG. 5



*Fig. 6*



*FIG. 7*



**FIG. 8A**



*FIG. 8B*



*FIG. 8C*



*FIG. 9*



*FIG. 8D*

| "-      -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|-----------|---|---|---|---|---|---|---|---|---|
| "a    a" | q | a | d | g | j | m | r | t | w |
| "a    b" | q | a | e | i | l | o | r | u | w |
| "a    c" | q | c | e | h | k | m | r | t | w |
| "a    d" | q | a | d | i | j | m | s | v | y |
| "a    e" | q | a | d | g | j | m | p | t | w |
| "a    f" | q | a | f | g | j | m | r | t | w |
| "a    g" | q | a | e | i | j | o | r | t | w |
| "a    h" | q | a | e | g | j | m | p | u | w |
| "a    i" | q | c | d | g | l | n | r | t | w |
| "a    j" | q | a | d | g | j | o | p | t | w |
| "a    k" | q | a | e | i | j | m | s | t | w |
| "a    l" | q | a | e | i | l | o | s | t | w |
| "a    m" | q | a | e | i | l | o | p | u | w |
| "a    n" | q | c | d | g | k | n | s | t | y |
| "a    o" | q | a | d | g | j | m | p | t | w |
| "a    p" | q | a | e | h | l | o | p | t | w |
| "a    q" | q | a | d | g | j | m | s | t | w |
| "a    r" | q | c | e | g | k | o | r | t | y |
| "a    s" | q | c | e | i | k | o | s | t | y |
| "a    t" | q | a | e | i | l | o | s | t | w |
| "a    u" | q | c | d | g | l | m | s | t | w |
| "a    v" | q | a | e | i | j | o | p | t | w |
| "a    w" | q | a | d | g | k | m | p | t | w |
| "a    x" | q | a | e | i | l | m | s | t | w |
| "a    y" | q | b | e | i | j | m | s | t | w |
| "a    z" | q | a | d | i | j | m | p | t | w |
| "a     " | q | a | d | g | j | m | p | t | w |
| "b    a" | q | c | d | g | k | n | s | t | y |
| "b    b" | q | a | d | i | j | m | s | t | y |
| "b    c" | q | a | d | g | j | o | r | t | w |
| "b    d" | q | a | d | g | j | m | s | t | w |
| "b    e" | q | c | e | g | l | n | s | t | x |
| "b    f" | q | a | d | g | j | m | p | t | w |
| "b    g" | q | a | d | g | j | m | p | t | w |
| "b    h" | q | a | d | g | j | m | p | t | w |
| "b    i" | q | c | d | g | l | n | s | t | w |
| "b    j" | q | a | e | g | j | m | p | t | w |

*FIG. 10A*

| "-" | -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|-----|-----|---|---|---|---|---|---|---|---|---|
| "b | k" | q | a | d | g | j | m | p | t | w |
| "b | l" | q | a | e | i | j | o | p | t | y |
| "b | m" | q | a | d | g | j | m | r | t | w |
| "b | n" | q | a | d | g | j | m | p | t | w |
| "b | o" | q | a | d | i | j | o | s | u | x |
| "b | p" | q | a | d | g | j | m | s | t | w |
| "b | q" | q | a | d | g | j | m | p | t | w |
| "b | r" | q | a | e | i | j | o | p | u | w |
| "b | s" | q | c | d | i | j | o | s | t | w |
| "b | t" | q | a | d | g | j | m | p | t | w |
| "b | u" | q | a | d | i | l | m | s | t | y |
| "b | v" | q | a | d | i | j | m | p | t | w |
| "b | w" | q | a | e | g | j | m | p | t | w |
| "b | x" | q | a | d | g | j | m | p | t | w |
| "b | y" | q | a | d | g | j | m | p | t | w |
| "b | z" | q | a | d | g | j | m | p | t | w |
| "b | " | q | a | d | g | j | m | p | t | w |
| "c | a" | q | b | d | g | l | n | r | t | w |
| "c | b" | q | a | e | g | j | m | p | t | w |
| "c | c" | q | a | e | i | j | o | s | t | w |
| "c | d" | q | a | d | g | j | m | p | t | w |
| "c | e" | q | a | d | i | l | n | s | t | w |
| "c | f" | q | a | d | i | j | m | p | t | w |
| "c | g" | q | a | d | i | j | m | p | t | w |
| "c | h" | q | a | e | i | j | o | r | t | w |
| "c | i" | q | a | f | i | l | n | p | t | w |
| "c | j" | q | a | d | g | j | m | p | t | w |
| "c | k" | q | b | e | i | l | m | s | t | y |
| "c | l" | q | a | e | i | j | o | r | u | w |
| "c | m" | q | c | d | g | j | m | p | t | w |
| "c | n" | q | a | d | g | j | m | p | t | w |
| "c | o" | q | a | d | g | l | m | r | u | w |
| "c | p" | q | a | d | g | j | m | p | t | w |
| "c | q" | q | a | d | g | j | m | p | t | w |
| "c | r" | q | a | e | i | j | o | p | u | y |
| "c | s" | q | a | d | i | l | o | s | t | w |
| "c | t" | q | a | e | i | l | o | r | u | w |

## FIG. 10B

| "- -" | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| "c | u" | q | b | e | i | l | m | s | t | w |
| "c | v" | q | a | d | g | j | m | p | t | w |
| "c | w" | q | a | d | g | j | m | p | t | w |
| "c | x" | q | a | d | g | j | m | p | t | w |
| "c | y" | q | c | d | g | j | m | p | t | w |
| "c | z" | q | a | d | g | j | n | p | t | w |
| "c | " | q | a | d | g | j | m | p | t | w |
| "d | a" | q | b | d | g | j | n | r | t | y |
| "d | b" | q | a | d | g | j | m | p | t | w |
| "d | c" | q | a | d | g | j | m | p | t | w |
| "d | d" | q | a | e | i | l | m | r | t | w |
| "d | e" | q | a | d | g | l | m | r | v | x |
| "d | f" | q | a | d | i | j | m | p | t | w |
| "d | g" | q | a | e | g | j | m | p | t | w |
| "d | h" | q | a | e | g | j | m | p | t | w |
| "d | i" | z | a | f | g | l | n | s | t | w |
| "d | j" | q | a | d | g | j | m | p | t | w |
| "d | k" | q | a | d | g | j | m | p | t | w |
| "d | l" | q | a | e | i | j | m | p | t | y |
| "d | m" | q | a | d | i | j | m | s | t | w |
| "d | n" | q | a | e | g | j | m | p | t | w |
| "d | o" | q | c | e | i | j | n | p | t | w |
| "d | p" | q | a | d | g | j | m | p | t | w |
| "d | q" | q | a | d | g | j | m | p | u | w |
| "d | r" | q | a | e | i | j | o | p | t | w |
| "d | s" | q | a | e | i | j | m | p | t | w |
| "d | t" | q | a | d | g | j | m | r | t | w |
| "d | u" | q | c | e | g | l | m | r | t | w |
| "d | v" | q | a | d | i | j | m | p | t | w |
| "d | w" | q | a | d | i | j | o | p | t | w |
| "d | x" | q | a | d | g | j | m | p | t | w |
| "d | y" | q | a | d | g | j | m | p | t | w |
| "d | z" | q | a | d | g | j | m | p | t | w |
| "d | " | q | a | d | g | j | m | p | t | w |
| "e | a" | q | c | d | g | l | n | r | t | w |
| "e | b" | q | c | f | g | j | m | r | t | y |
| "e | c" | q | a | e | h | k | o | s | t | w |

## FIG. 10C

| "-    -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "e   d" | q | b | e | i | l | n | s | u | w |
| "e   e" | z | a | d | i | k | n | r | t | w |
| "e   f" | q | a | e | i | l | o | r | t | w |
| "e   g" | q | a | d | i | j | o | r | u | y |
| "e   h" | q | a | e | i | j | m | p | t | w |
| "e   i" | q | a | d | g | j | n | r | v | w |
| "e   j" | q | a | e | g | j | m | p | t | w |
| "e   k" | q | a | e | i | j | m | s | t | w |
| "e   l" | q | a | e | i | l | o | p | v | y |
| "e   m" | q | a | e | i | j | o | s | u | w |
| "e   n" | q | c | d | g | l | o | s | t | w |
| "e   o" | q | a | f | g | j | n | p | u | w |
| "e   p" | q | a | e | h | l | o | r | t | w |
| "e   q" | q | a | d | g | j | m | p | u | w |
| "e   r" | q | a | e | i | l | n | s | v | y |
| "e   s" | q | c | e | i | k | n | s | t | w |
| "e   t" | z | c | e | i | j | m | s | t | w |
| "e   u" | q | a | d | g | j | m | r | t | w |
| "e   v" | q | a | e | i | j | o | p | t | w |
| "e   w" | q | a | e | h | j | o | s | t | w |
| "e   x" | q | a | e | i | j | m | p | t | w |
| "e   y" | q | a | d | g | j | o | s | t | w |
| "e   z" | q | a | e | g | j | m | p | t | w |
| "e   " | q | a | d | g | j | m | p | t | w |
| "f   a" | q | c | d | i | k | m | s | v | x |
| "f   b" | q | a | d | g | j | m | p | t | w |
| "f   c" | q | c | d | g | j | m | p | t | w |
| "f   d" | q | a | d | g | j | m | p | t | w |
| "f   e" | q | a | e | g | l | m | r | t | w |
| "f   f" | q | a | e | i | j | o | s | t | w |
| "f   g" | q | a | d | g | j | m | p | t | w |
| "f   h" | q | a | d | g | j | m | p | t | w |
| "f   i" | q | c | e | g | l | n | r | t | x |
| "f   j" | q | a | d | g | j | m | p | t | w |
| "f   k" | q | a | d | g | j | m | p | t | w |
| "f   l" | q | a | e | i | j | o | p | t | y |
| "f   m" | q | a | d | g | j | m | p | t | w |

## FIG. 10D

| "-    -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "f    n" | q | a | d | g | j | m | p | t | w |
| "f    o" | q | c | d | g | l | n | r | u | w |
| "f    p" | q | a | d | g | j | m | p | t | w |
| "f    q" | q | a | d | g | j | m | p | t | w |
| "f    r" | q | a | e | i | j | o | p | t | y |
| "f    s" | q | a | d | g | j | m | p | t | w |
| "f    t" | q | a | e | g | k | m | p | t | w |
| "f    u" | q | a | d | g | l | n | r | t | w |
| "f    v" | q | a | d | g | j | m | p | t | w |
| "f    w" | q | a | d | g | j | m | p | t | w |
| "f    x" | q | a | d | g | j | m | p | t | w |
| "f    y" | q | a | d | i | j | m | p | t | w |
| "f    z" | q | a | d | g | j | m | p | t | w |
| "f      " | q | a | d | g | j | m | p | t | w |
| "g    a" | z | a | d | i | l | n | r | t | w |
| "g    b" | q | a | d | g | j | m | p | t | w |
| "g    c" | q | a | d | g | j | m | s | t | w |
| "g    d" | q | a | d | g | j | o | p | t | w |
| "g    e" | q | a | d | g | l | n | s | t | w |
| "g    f" | q | a | d | g | j | m | p | u | w |
| "g    g" | q | a | e | g | l | m | p | t | w |
| "g    h" | q | a | e | g | j | o | p | t | w |
| "g    i" | q | c | f | g | j | n | s | v | w |
| "g    j" | q | a | d | g | j | m | p | t | w |
| "g    k" | q | a | d | g | j | m | p | t | w |
| "g    l" | q | a | e | i | j | o | p | t | y |
| "g    m" | q | a | d | g | l | m | s | t | w |
| "g    n" | q | a | e | i | j | o | p | t | w |
| "g    o" | q | a | e | i | j | o | p | t | w |
| "g    p" | q | a | d | g | j | m | p | t | w |
| "g    q" | q | a | d | g | j | m | p | t | w |
| "g    r" | q | a | e | g | j | o | p | t | w |
| "g    s" | q | a | d | g | j | m | p | t | w |
| "g    t" | q | a | e | h | j | o | p | t | w |
| "g    u" | q | a | e | i | l | m | r | t | y |
| "g    v" | q | a | d | g | j | m | p | t | w |
| "g    w" | q | a | d | g | j | m | p | t | w |

## FIG. 10E

| "_ _" | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| "g | x" | q | a | d | g | j | m | p | t | w |
| "g | y" | q | a | d | g | j | m | p | t | w |
| "g | z" | q | a | d | g | j | m | p | t | w |
| "g | " | q | a | d | g | j | m | p | t | w |
| "h | a" | q | b | d | i | l | n | s | t | w |
| "h | b" | q | a | d | g | j | m | s | t | w |
| "h | c" | q | a | d | g | j | o | p | t | w |
| "h | d" | q | a | d | g | j | m | r | t | w |
| "h | e" | q | c | d | i | l | n | r | t | y |
| "h | f" | q | a | d | g | j | m | p | t | w |
| "h | g" | q | a | d | g | j | m | p | t | w |
| "h | h" | q | a | d | g | j | m | p | t | w |
| "h | i" | q | c | e | g | l | n | s | t | w |
| "h | j" | q | a | d | g | j | m | p | t | w |
| "h | k" | q | a | d | g | j | m | p | t | w |
| "h | l" | q | a | d | g | j | m | p | t | y |
| "h | m" | q | a | e | g | j | m | p | t | w |
| "h | n" | q | a | d | i | j | o | p | t | w |
| "h | o" | q | b | d | i | l | n | r | u | w |
| "h | p" | q | a | d | g | j | m | p | u | w |
| "h | q" | q | a | d | g | j | m | p | t | w |
| "h | r" | q | a | e | i | j | o | p | t | w |
| "h | s" | q | a | d | g | j | m | p | t | w |
| "h | t" | q | a | d | g | l | m | s | t | w |
| "h | u" | q | a | d | g | l | m | r | t | w |
| "h | v" | q | a | d | g | j | m | p | t | w |
| "h | w" | q | a | d | g | j | m | p | t | w |
| "h | x" | q | a | d | g | j | m | p | t | w |
| "h | y" | q | a | d | g | j | m | p | t | w |
| "h | z" | q | a | d | g | j | m | p | t | w |
| "h | " | q | a | d | g | j | m | p | t | w |
| "i | a" | q | b | d | g | l | n | r | t | w |
| "i | b" | q | a | e | i | l | m | r | u | w |
| "i | c" | q | a | e | h | k | o | r | t | y |
| "i | d" | q | a | e | i | l | n | p | u | w |
| "i | e" | q | c | d | g | l | n | r | v | w |
| "i | f" | q | a | f | i | j | o | p | t | y |

## FIG. 10F

| "-    -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "i    g" | q | a | e | h | j | n | r | u | w |
| "i    h" | q | a | d | g | j | m | p | t | w |
| "i    i" | q | a | d | g | j | m | p | t | w |
| "i    j" | q | a | d | g | j | o | p | t | w |
| "i    k" | q | a | e | g | k | m | p | t | w |
| "i    l" | q | a | e | i | l | o | s | t | y |
| "i    m" | q | a | e | i | j | m | p | u | w |
| "i    n" | q | c | e | g | k | n | s | t | w |
| "i    o" | q | a | d | g | l | n | r | u | w |
| "i    p" | q | a | d | i | l | m | s | t | w |
| "i    q" | q | a | d | g | j | m | p | u | w |
| "i    r" | q | c | e | i | l | n | s | t | w |
| "i    s" | q | c | e | h | k | n | s | t | w |
| "i    t" | q | a | e | h | l | o | s | t | y |
| "i    u" | q | a | d | g | j | m | p | t | w |
| "i    v" | q | a | e | i | j | m | p | t | w |
| "i    w" | q | a | d | g | j | m | p | t | w |
| "i    x" | q | a | e | g | j | m | p | t | w |
| "i    y" | q | a | d | g | j | m | p | t | w |
| "i    z" | q | a | e | i | j | o | p | t | w |
| "i    " | q | a | d | g | j | m | p | t | w |
| "j    a" | q | c | d | g | j | n | p | t | w |
| "j    b" | q | a | d | g | j | m | p | t | w |
| "j    c" | q | a | d | g | j | m | p | t | w |
| "j    d" | q | a | d | g | j | m | p | t | w |
| "j    e" | q | c | d | g | j | m | r | t | w |
| "j    f" | q | a | d | g | j | m | p | t | w |
| "j    g" | q | a | d | g | j | m | p | t | w |
| "j    h" | q | a | d | g | j | m | p | t | w |
| "j    i" | q | a | d | g | j | m | p | t | w |
| "j    j" | q | a | d | g | j | m | p | t | w |
| "j    k" | q | a | d | g | j | m | p | t | w |
| "j    l" | q | a | d | g | j | m | p | t | w |
| "j    m" | q | a | d | g | j | m | p | t | w |
| "j    n" | q | a | d | g | j | m | p | t | w |
| "j    o" | q | b | e | i | j | m | r | t | w |
| "j    p" | q | a | d | g | j | m | p | t | w |

## FIG. 10G

| "-     -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "j    q" | q | a | d | g | j | m | p | t | w |
| "j    r" | q | a | d | g | j | m | p | t | w |
| "j    s" | q | a | d | g | j | m | p | t | w |
| "j    t" | q | a | d | g | j | m | p | t | w |
| "j    u" | q | a | d | g | l | m | s | t | w |
| "j    v" | q | a | d | g | j | m | p | t | w |
| "j    w" | q | a | d | g | j | m | p | t | w |
| "j    x" | q | a | d | g | j | m | p | t | w |
| "j    y" | q | a | d | g | j | m | p | t | w |
| "j    z" | q | a | d | g | j | m | p | t | w |
| "j     " | q | a | d | g | j | m | p | t | w |
| "k    a" | q | a | d | g | j | n | s | t | y |
| "k    b" | q | a | d | g | j | o | p | t | w |
| "k    c" | q | a | d | g | j | m | p | t | w |
| "k    d" | q | a | d | g | j | o | p | t | w |
| "k    e" | q | a | d | g | l | n | s | t | y |
| "k    f" | q | a | d | g | j | m | p | t | w |
| "k    g" | q | a | d | g | j | m | r | t | w |
| "k    h" | q | a | d | g | j | m | p | t | w |
| "k    i" | q | a | d | g | l | n | p | t | w |
| "k    j" | q | a | d | g | j | m | p | t | w |
| "k    k" | q | a | d | g | j | o | p | t | w |
| "k    l" | q | a | d | i | j | m | p | t | y |
| "k    m" | q | a | d | g | j | m | p | t | w |
| "k    n" | q | a | d | g | j | o | p | t | w |
| "k    o" | q | a | d | g | l | n | p | t | w |
| "k    p" | q | a | d | g | j | m | p | t | w |
| "k    q" | q | a | d | g | j | m | p | t | w |
| "k    r" | q | a | d | g | j | m | p | t | w |
| "k    s" | q | a | d | g | j | m | p | t | w |
| "k    t" | q | a | d | g | j | m | p | t | w |
| "k    u" | q | a | d | g | j | m | p | t | w |
| "k    v" | q | a | d | g | j | m | p | t | w |
| "k    w" | q | a | d | g | j | m | p | t | w |
| "k    x" | q | a | d | g | j | m | p | t | w |
| "k    y" | q | a | d | g | j | m | p | t | w |
| "k    z" | q | a | d | g | j | m | p | t | w |

## FIG. 10H

| "- -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|-------|---|---|---|---|---|---|---|---|---|
| "k   " | q | a | d | g | j | m | p | t | w |
| "l a" | q | b | d | i | j | n | r | t | y |
| "l b" | q | a | d | g | j | o | p | t | w |
| "l c" | q | a | d | g | j | o | p | t | w |
| "l d" | q | a | e | i | j | n | s | t | w |
| "l e" | q | a | d | g | l | m | s | t | x |
| "l f" | q | a | d | g | j | m | p | t | w |
| "l g" | q | a | d | g | j | m | p | t | w |
| "l h" | q | a | d | g | j | m | p | t | w |
| "l i" | z | c | e | g | k | n | s | t | w |
| "l j" | q | a | d | g | j | m | p | t | w |
| "l k" | q | a | e | i | j | m | s | t | w |
| "l l" | q | c | e | i | j | o | s | u | y |
| "l m" | q | a | d | g | j | o | s | t | w |
| "l n" | q | a | e | g | j | m | p | t | w |
| "l o" | q | c | d | g | j | o | s | t | w |
| "l p" | q | a | d | h | j | m | s | t | w |
| "l q" | q | a | d | g | j | m | p | t | w |
| "l r" | q | a | e | g | j | m | p | t | w |
| "l s" | q | a | e | i | j | o | p | t | w |
| "l t" | q | a | e | i | j | o | s | t | w |
| "l u" | q | c | d | g | l | m | s | t | w |
| "l v" | q | a | e | i | j | m | p | t | w |
| "l w" | q | a | e | g | j | m | p | t | w |
| "l x" | q | a | d | g | j | m | p | t | w |
| "l y" | z | a | d | i | j | n | s | t | w |
| "l z" | q | a | d | g | j | m | p | t | w |
| "l   " | q | a | d | g | j | m | p | t | w |
| "m a" | q | c | d | i | k | n | r | t | y |
| "m b" | q | a | e | i | l | m | p | t | y |
| "m c" | q | c | d | i | j | o | p | t | w |
| "m d" | q | a | d | g | j | m | p | t | w |
| "m e" | q | a | e | g | l | n | s | t | w |
| "m f" | q | a | d | g | j | o | p | t | w |
| "m g" | q | a | d | g | j | m | p | t | w |
| "m h" | z | a | d | g | j | m | p | t | w |
| "m i" | z | c | d | g | l | n | s | t | x |

**FIG. 10I**

| "- -" | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|-------|---|---|---|---|---|---|---|---|---|---|
| "m | j" | q | a | d | g | j | m | p | t | w |
| "m | k" | q | a | d | g | j | m | p | t | w |
| "m | l" | q | a | e | g | j | m | p | t | y |
| "m | m" | q | a | e | i | j | o | p | u | w |
| "m | n" | q | a | d | g | j | m | p | t | w |
| "m | o" | q | b | d | i | j | n | r | v | w |
| "m | p" | q | a | e | i | l | o | r | t | w |
| "m | q" | q | a | d | g | j | m | p | t | w |
| "m | r" | q | a | d | g | j | m | p | t | w |
| "m | s" | q | a | e | g | j | m | p | t | w |
| "m | t" | q | a | d | g | j | m | p | t | w |
| "m | u" | q | c | d | g | l | n | s | t | w |
| "m | v" | q | a | d | g | j | m | p | t | w |
| "m | w" | q | a | d | h | j | m | p | t | w |
| "m | x" | q | a | d | g | j | m | p | t | w |
| "m | y" | q | c | d | g | j | m | s | t | w |
| "m | z" | q | a | d | g | j | m | p | t | w |
| "m | " | q | a | d | g | j | m | p | t | w |
| "n | a" | q | b | d | g | l | m | r | t | w |
| "n | b" | q | a | d | g | j | m | p | t | w |
| "n | c" | q | a | e | i | l | o | r | t | y |
| "n | d" | q | a | e | i | l | o | s | t | y |
| "n | e" | q | c | e | i | l | n | s | t | w |
| "n | f" | q | a | e | i | j | o | s | u | w |
| "n | g" | q | a | e | i | l | m | s | u | w |
| "n | h" | q | a | d | g | j | m | p | t | w |
| "n | i" | z | c | e | g | l | n | s | t | x |
| "n | j" | q | a | d | g | j | m | p | u | w |
| "n | k" | q | a | e | i | j | n | s | t | w |
| "n | l" | q | a | e | i | j | o | p | t | y |
| "n | m" | q | a | e | g | j | m | p | t | w |
| "n | n" | q | a | e | i | j | o | p | u | y |
| "n | o" | q | b | d | g | l | n | r | t | w |
| "n | p" | q | a | d | g | j | o | p | u | w |
| "n | q" | q | a | d | g | j | m | p | u | w |
| "n | r" | q | a | d | g | j | m | p | t | w |
| "n | s" | q | a | e | i | l | m | p | t | w |

## FIG. 10J

| "-  -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "n  t" | q | a | e | i | l | o | s | u | y |
| "n  u" | q | a | f | g | j | m | s | t | x |
| "n  v" | q | a | e | i | j | o | p | t | w |
| "n  w" | q | a | e | g | j | m | p | t | w |
| "n  X" | q | a | d | g | j | m | p | t | w |
| "n  y" | q | b | d | h | j | m | p | t | w |
| "n  z" | q | a | d | g | j | m | p | t | w |
| "n  " | q | a | d | g | j | m | p | t | w |
| "o  a" | q | b | d | g | l | m | s | t | w |
| "o  b" | q | a | e | i | l | o | s | t | w |
| "o  c" | q | a | e | h | k | o | s | u | w |
| "o  d" | q | a | e | i | l | o | s | u | y |
| "o  e" | q | a | d | g | j | m | s | t | w |
| "o  f" | q | a | f | g | j | m | p | t | w |
| "o  g" | q | a | e | i | j | o | r | t | y |
| "o  h" | q | a | d | g | j | n | p | t | w |
| "o  i" | q | c | d | g | l | n | p | t | w |
| "o  j" | q | a | e | g | j | m | p | t | w |
| "o  k" | q | a | e | i | j | m | s | t | w |
| "o  l" | q | b | d | i | l | o | s | u | w |
| "o  m" | q | a | e | i | l | m | p | t | w |
| "o  n" | q | a | e | g | l | n | s | t | y |
| "o  o" | q | a | d | g | k | n | s | t | w |
| "o  p" | q | a | e | h | l | m | p | t | y |
| "o  q" | q | a | d | g | j | m | p | t | w |
| "o  r" | q | a | e | g | k | m | r | t | w |
| "o  s" | q | c | e | i | j | o | s | t | y |
| "o  t" | q | a | e | h | j | o | s | t | y |
| "o  u" | q | c | d | g | l | n | r | t | y |
| "o  v" | q | a | e | i | j | m | p | t | w |
| "o  w" | q | a | e | i | j | n | s | t | w |
| "o  x" | q | a | d | i | j | m | p | t | w |
| "o  y" | q | a | e | g | j | m | s | t | w |
| "o  z" | q | a | d | g | j | m | p | t | w |
| "o  " | q | a | d | g | j | m | p | t | w |
| "p  a" | q | c | d | g | l | n | r | t | y |
| "p  b" | q | a | e | g | j | m | p | t | w |

## FIG. 10K

| "- -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "p c" | q | a | d | g | j | m | s | t | w |
| "p d" | q | a | d | g | j | m | p | t | w |
| "p e" | q | c | d | g | j | n | r | t | w |
| "p f" | q | a | d | g | j | m | r | t | w |
| "p g" | q | a | d | g | j | m | p | t | w |
| "p h" | q | a | e | i | j | o | s | t | y |
| "p i" | q | c | d | g | l | n | r | t | x |
| "p j" | q | a | d | g | j | m | p | t | w |
| "p k" | q | a | d | g | j | m | p | t | w |
| "p l" | q | a | e | i | j | o | p | u | y |
| "p m" | q | a | e | g | j | m | p | t | w |
| "p n" | q | a | d | g | j | m | p | t | w |
| "p o" | q | c | d | i | l | n | r | t | w |
| "p p" | q | a | e | i | l | o | p | t | y |
| "p q" | q | a | d | g | j | m | p | t | w |
| "p r" | q | a | e | i | j | o | p | t | y |
| "p s" | q | a | d | g | j | m | p | t | w |
| "p t" | q | c | e | i | j | o | s | t | w |
| "p u" | q | b | d | g | j | m | r | t | w |
| "p v" | q | a | d | g | j | m | p | t | w |
| "p w" | q | a | d | g | j | m | p | t | w |
| "p x" | q | a | d | g | j | m | p | t | w |
| "p y" | q | a | d | g | j | m | r | t | w |
| "p z" | q | a | d | g | j | m | p | t | w |
| "p " | q | a | d | g | j | m | p | t | w |
| "q a" | q | a | d | g | j | m | p | t | w |
| "q b" | q | a | d | g | j | m | p | t | w |
| "q c" | q | a | d | g | j | m | p | t | w |
| "q d" | q | a | d | g | j | m | p | t | w |
| "q e" | q | a | d | g | j | m | p | t | w |
| "q f" | q | a | d | g | j | m | p | t | w |
| "q g" | q | a | d | g | j | m | p | t | w |
| "q h" | q | a | d | g | j | m | p | t | w |
| "q i" | q | a | d | g | j | m | p | t | w |
| "q j" | q | a | d | g | j | m | p | t | w |
| "q k" | q | a | d | g | j | m | p | t | w |
| "q l" | q | a | d | g | j | m | p | t | w |

## FIG. 10L

| "_ | _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| "q | m" | q | a | d | g | j | m | p | t | w |
| "q | n" | q | a | d | g | j | m | p | t | w |
| "q | o" | q | a | d | g | j | m | p | t | w |
| "q | p" | q | a | d | g | j | m | p | t | w |
| "q | q" | q | a | d | g | j | m | p | t | w |
| "q | r" | q | a | d | g | j | m | p | t | w |
| "q | s" | q | a | d | g | j | m | p | t | w |
| "q | t" | q | a | d | g | j | m | p | t | w |
| "q | u" | q | a | e | i | j | o | p | t | w |
| "q | v" | q | a | d | g | j | m | p | t | w |
| "q | w" | q | a | d | g | j | m | p | t | w |
| "q | x" | q | a | d | g | j | m | p | t | w |
| "q | y" | q | a | d | g | j | m | p | t | w |
| "q | z" | q | a | d | g | j | m | p | t | w |
| "q | " | q | a | d | g | j | m | p | t | w |
| "r | a" | q | c | d | g | l | n | p | t | w |
| "r | b" | q | a | d | g | j | o | p | t | w |
| "r | c" | q | a | e | h | l | m | p | u | w |
| "r | d" | q | a | e | i | j | n | s | v | w |
| "r | e" | q | a | e | g | l | n | s | v | w |
| "r | f" | q | a | e | g | j | o | p | t | w |
| "r | g" | q | a | e | i | j | m | s | u | w |
| "r | h" | q | a | e | g | j | o | p | t | w |
| "r | i" | z | c | e | g | l | n | p | t | w |
| "r | j" | q | a | d | g | j | m | p | t | w |
| "r | k" | q | a | e | i | l | m | s | t | y |
| "r | l" | q | a | d | i | j | o | p | t | y |
| "r | m" | q | a | e | i | j | m | s | t | w |
| "r | n" | q | a | e | i | j | o | s | t | w |
| "r | o" | q | b | d | g | l | m | p | u | w |
| "r | p" | q | a | d | g | j | o | r | t | w |
| "r | q" | q | a | d | g | j | m | p | t | w |
| "r | r" | q | a | e | i | j | o | p | t | y |
| "r | s" | q | a | e | i | j | o | p | t | w |
| "r | t" | z | a | e | h | j | n | s | u | w |
| "r | u" | q | c | e | g | l | n | s | t | w |
| "r | v" | q | a | e | i | j | m | p | t | w |

**FIG. 10M**

| "-      -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "r w" | q | a | d | i | j | o | p | t | w |
| "r x" | q | a | d | g | j | m | p | t | w |
| "r y" | q | b | d | i | j | m | p | t | w |
| "r z" | q | a | d | g | j | m | p | t | w |
| "r " | q | a | d | g | j | m | p | t | w |
| "s a" | q | b | d | g | l | m | p | v | y |
| "s b" | q | a | d | g | j | m | p | t | w |
| "s c" | q | a | d | h | l | o | r | u | w |
| "s d" | q | a | d | g | j | n | p | t | w |
| "s e" | q | c | e | g | l | n | r | t | y |
| "s f" | q | a | e | g | j | m | p | u | w |
| "s g" | q | a | d | g | j | m | r | t | w |
| "s h" | q | a | e | i | l | o | r | t | w |
| "s i" | z | c | d | g | l | n | s | t | x |
| "s j" | q | a | d | g | j | m | p | t | w |
| "s k" | q | a | e | i | j | m | p | t | w |
| "s l" | q | a | e | i | j | o | p | t | y |
| "s m" | q | a | e | i | j | o | s | t | w |
| "s n" | q | a | e | g | j | m | p | t | w |
| "s o" | q | c | f | g | l | m | r | u | w |
| "s p" | q | a | e | g | l | o | r | t | w |
| "s q" | q | a | d | g | l | m | p | u | w |
| "s r" | q | c | d | g | j | m | p | t | w |
| "s s" | q | a | e | i | j | o | p | u | w |
| "s t" | q | a | e | i | l | o | r | u | y |
| "s u" | q | b | e | g | l | m | p | t | w |
| "s v" | q | a | d | g | j | m | p | t | w |
| "s w" | q | a | e | i | j | o | p | t | w |
| "s x" | q | a | d | g | j | m | p | t | w |
| "s y" | q | a | d | g | j | m | s | t | w |
| "s z" | q | a | d | g | j | m | p | t | w |
| "s " | q | a | d | g | j | m | p | t | w |
| "t a" | q | c | f | i | l | n | r | t | y |
| "t b" | q | a | d | g | j | m | p | t | w |
| "t c" | z | a | d | h | j | o | p | t | w |
| "t d" | q | a | d | g | j | m | p | t | w |
| "t e" | q | c | d | g | l | m | r | u | x |

**FIG. 10N**

| "_   _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---------|---|---|---|---|---|---|---|---|---|
| "t  f" | q | a | d | i | j | o | p | t | w |
| "t  g" | q | a | e | g | j | o | p | t | w |
| "t  h" | q | a | e | i | l | o | r | u | w |
| "t  i" | z | c | e | g | l | o | s | v | w |
| "t  j" | q | a | d | g | j | m | p | t | w |
| "t  k" | q | a | e | g | j | m | p | t | w |
| "t  l" | q | a | e | i | j | m | p | t | y |
| "t  m" | q | a | e | g | l | o | p | t | w |
| "t  n" | q | a | e | g | j | m | p | t | w |
| "t  o" | q | c | d | g | l | m | r | u | w |
| "t  p" | q | c | d | g | j | m | p | u | w |
| "t  q" | q | a | d | g | j | m | p | t | w |
| "t  r" | q | a | e | i | j | o | p | u | y |
| "t  s" | q | c | e | i | j | o | p | u | w |
| "t  t" | q | a | e | i | l | o | p | t | y |
| "t  u" | q | a | f | i | j | n | r | t | w |
| "t  v" | q | a | d | g | j | m | p | t | w |
| "t  w" | q | a | e | i | j | o | p | t | w |
| "t  x" | q | a | d | g | j | m | p | t | w |
| "t  y" | q | a | d | g | l | m | p | t | w |
| "t  z" | q | a | d | g | j | m | p | t | w |
| "t   " | q | a | d | g | j | m | p | t | w |
| "u  a" | q | a | d | g | l | n | r | t | w |
| "u  b" | q | a | e | i | j | m | s | t | w |
| "u  c" | q | c | e | h | k | m | p | t | w |
| "u  d" | q | a | e | i | j | o | p | t | y |
| "u  e" | q | a | d | g | j | n | s | t | w |
| "u  f" | q | a | f | g | j | m | p | t | w |
| "u  g" | q | a | e | h | j | m | s | t | w |
| "u  h" | q | a | d | g | j | m | p | t | w |
| "u  i" | q | c | d | g | l | n | r | t | w |
| "u  j" | q | a | d | g | j | m | p | t | w |
| "u  k" | q | a | d | g | j | m | p | t | w |
| "u  l" | q | a | d | g | l | m | p | t | y |
| "u  m" | q | b | e | i | j | m | p | t | w |
| "u  n" | q | c | d | i | l | n | s | t | w |
| "u  o" | q | a | d | g | j | m | p | t | w |

**FIG. 10O**

| "-    -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "u    p" | q | a | d | i | l | o | p | t | y |
| "u    q" | q | a | d | g | j | m | p | t | w |
| "u    r" | q | c | e | i | l | n | s | t | y |
| "u    s" | q | a | e | i | l | m | s | t | y |
| "u    t" | q | a | e | i | l | o | s | t | w |
| "u    u" | q | c | d | g | j | m | p | t | w |
| "u    v" | q | a | d | g | j | m | p | t | w |
| "u    w" | q | a | d | g | j | m | p | t | w |
| "u    x" | q | a | d | g | j | m | p | t | w |
| "u    y" | q | a | e | g | j | m | s | t | w |
| "u    z" | q | a | d | g | j | m | p | t | w |
| "u    " | q | a | d | g | j | m | p | t | w |
| "v    a" | q | c | d | i | l | n | r | t | w |
| "v    b" | q | a | d | g | j | m | p | t | w |
| "v    c" | q | a | d | g | j | m | s | t | w |
| "v    d" | q | a | d | g | j | m | p | t | w |
| "v    e" | q | a | d | g | l | n | r | t | w |
| "v    f" | q | a | d | g | j | m | p | t | w |
| "v    g" | q | a | d | g | j | m | p | t | w |
| "v    h" | q | a | d | g | j | m | p | t | w |
| "v    i" | q | c | e | g | j | n | s | t | w |
| "v    j" | q | a | d | g | j | m | p | t | w |
| "v    k" | q | a | d | g | j | m | p | t | w |
| "v    l" | q | a | d | g | j | m | s | t | w |
| "v    m" | q | a | d | g | j | m | p | t | w |
| "v    n" | q | a | d | g | j | m | p | t | w |
| "v    o" | q | a | d | i | l | o | r | t | w |
| "v    p" | q | a | d | g | j | m | p | t | w |
| "v    q" | q | a | d | g | j | m | p | t | w |
| "v    r" | q | a | d | g | j | m | p | t | w |
| "v    s" | q | a | d | g | j | m | p | t | w |
| "v    t" | q | a | d | g | j | m | p | t | w |
| "v    u" | q | a | d | g | j | m | p | t | w |
| "v    v" | q | a | d | g | j | m | p | t | w |
| "v    w" | q | a | d | g | j | m | p | t | w |
| "v    x" | q | a | d | g | j | m | p | t | w |
| "v    y" | q | a | d | g | j | m | p | t | w |

## FIG. 10P

| "-  -" | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| "v | z" | q | a | d | g | j | m | p | t | w |
| "v | " | q | a | d | g | j | m | p | t | w |
| "w | a" | q | b | d | i | l | n | r | v | y |
| "w | b" | q | a | d | g | j | m | p | t | w |
| "w | c" | q | a | e | g | j | m | p | t | w |
| "w | d" | q | a | f | g | j | m | p | t | w |
| "w | e" | q | b | e | i | l | n | r | v | w |
| "w | f" | q | a | d | g | j | m | p | t | w |
| "w | g" | q | a | d | g | j | m | p | t | w |
| "w | h" | q | a | e | i | j | o | p | t | y |
| "w | i" | q | c | d | g | l | n | s | t | w |
| "w | j" | q | a | d | g | j | m | p | t | w |
| "w | k" | q | a | d | g | j | m | p | t | w |
| "w | l" | q | a | d | g | j | m | p | t | w |
| "w | m" | q | a | d | g | j | m | p | t | w |
| "w | n" | q | a | d | g | l | m | s | t | w |
| "w | o" | q | a | d | g | j | n | r | u | w |
| "w | p" | q | a | d | h | j | m | p | t | w |
| "w | q" | q | a | d | g | j | m | p | t | w |
| "w | r" | q | a | d | i | j | o | p | t | w |
| "w | s" | q | a | e | g | j | m | p | t | w |
| "w | t" | q | a | d | g | j | m | p | t | w |
| "w | u" | q | a | d | g | j | m | p | t | w |
| "w | v" | q | a | d | g | j | m | p | t | w |
| "w | w" | q | a | d | g | j | m | p | t | w |
| "w | x" | q | a | d | g | j | m | p | t | w |
| "w | y" | q | a | d | g | j | m | p | t | w |
| "w | z" | q | a | d | g | j | m | p | t | w |
| "w | " | q | a | d | g | j | m | p | t | w |
| "x | a" | q | c | d | g | j | m | p | t | w |
| "x | b" | q | a | d | g | j | m | p | t | w |
| "x | c" | q | a | e | h | j | m | p | t | w |
| "x | d" | q | a | d | g | j | m | p | t | w |
| "x | e" | q | c | d | g | l | m | s | t | x |
| "x | f" | q | a | d | g | j | m | p | t | w |
| "x | g" | q | a | d | g | j | m | p | t | w |
| "x | h" | q | a | d | g | j | m | p | t | w |

**FIG. 10Q**

| "_    _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "x    i" | q | c | d | g | j | n | s | t | w |
| "x    j" | q | a | d | g | j | m | p | t | w |
| "x    k" | q | a | d | g | j | m | p | t | w |
| "x    l" | q | a | d | i | j | m | p | t | w |
| "x    m" | q | a | d | g | j | m | p | t | w |
| "x    n" | q | a | d | g | j | m | p | t | w |
| "x    o" | q | a | d | g | j | m | p | t | w |
| "x    p" | q | a | e | i | l | o | p | t | w |
| "x    q" | q | a | d | g | j | m | p | t | w |
| "x    r" | q | a | d | g | j | m | p | t | w |
| "x    s" | q | a | e | i | j | m | p | t | w |
| "x    t" | q | a | e | g | j | m | r | u | w |
| "x    u" | q | a | d | g | j | m | p | t | w |
| "x    v" | q | a | d | g | j | m | p | t | w |
| "x    w" | q | a | d | g | j | m | p | t | w |
| "x    x" | q | a | d | g | j | m | p | t | w |
| "x    y" | z | a | d | g | j | m | p | t | w |
| "x    z" | q | a | d | g | j | n | p | t | w |
| "x    " | q | a | d | g | j | m | p | t | w |
| "y    a" | q | a | d | g | j | m | p | t | w |
| "y    b" | q | a | e | i | j | o | p | t | w |
| "y    c" | q | a | d | g | l | o | p | t | w |
| "y    d" | q | a | d | g | j | m | p | t | w |
| "y    e" | q | a | e | g | j | m | s | t | w |
| "y    f" | q | a | d | g | j | m | p | t | w |
| "y    g" | q | a | d | g | j | m | p | t | w |
| "y    h" | q | a | d | g | j | o | p | t | w |
| "y    i" | q | c | d | g | j | n | p | t | w |
| "y    j" | q | a | d | g | j | m | p | t | w |
| "y    k" | q | a | d | g | j | m | p | t | w |
| "y    l" | q | a | e | g | j | m | p | t | w |
| "y    m" | q | a | e | g | j | o | p | t | w |
| "y    n" | q | c | d | g | j | m | p | t | x |
| "y    o" | q | a | d | g | j | n | r | u | w |
| "y    p" | q | a | e | i | j | m | p | t | w |
| "y    q" | q | a | d | g | j | m | p | t | w |
| "y    r" | q | a | d | i | j | m | p | t | w |

## FIG. 10R

| "-" | -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| "y | s" | q | c | e | i | j | m | p | t | w |
| "y | t" | q | a | e | h | j | m | p | t | w |
| "y | u" | q | a | d | g | k | m | r | t | w |
| "y | v" | q | a | d | g | j | m | p | t | w |
| "y | w" | q | a | d | h | j | m | p | t | w |
| "y | x" | q | a | d | g | j | m | p | t | w |
| "y | y" | q | a | d | g | j | m | p | t | w |
| "y | z" | q | a | e | g | j | m | p | t | w |
| "y | " | q | a | d | g | j | m | p | t | w |
| "z | a" | q | a | d | g | j | m | p | t | w |
| "z | b" | q | a | d | g | j | m | p | t | w |
| "z | c" | q | a | d | g | j | m | p | t | w |
| "z | d" | q | a | d | g | j | m | p | t | w |
| "z | e" | q | a | d | g | j | n | r | t | w |
| "z | f" | q | a | d | g | j | m | p | t | w |
| "z | g" | q | a | d | g | j | m | p | t | w |
| "z | h" | q | a | d | g | j | m | p | t | w |
| "z | i" | q | a | d | g | j | n | p | t | w |
| "z | j" | q | a | d | g | j | m | p | t | w |
| "z | k" | q | a | d | g | j | m | p | t | w |
| "z | l" | q | a | d | g | j | m | p | t | w |
| "z | m" | q | a | d | g | j | m | p | t | w |
| "z | n" | q | a | e | g | j | m | p | t | w |
| "z | o" | q | a | d | g | j | n | p | t | w |
| "z | p" | q | a | d | g | j | m | p | t | w |
| "z | q" | q | a | d | g | j | m | p | t | w |
| "z | r" | q | a | d | g | j | m | p | t | w |
| "z | s" | q | a | d | g | j | m | p | t | w |
| "z | t" | q | a | d | g | j | m | p | t | w |
| "z | u" | q | a | d | g | j | m | p | t | w |
| "z | v" | q | a | d | g | j | m | p | t | w |
| "z | w" | q | a | d | g | j | m | p | t | w |
| "z | x" | q | a | d | g | j | m | p | t | w |
| "z | y" | q | a | d | g | j | m | p | t | w |
| "z | z" | q | a | d | g | j | m | p | t | w |
| "z | " | q | a | d | g | j | m | p | t | w |
| " | a" | q | c | d | i | l | n | r | t | w |

## FIG. 10S

| "_    _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| " b" | q | a | e | i | l | o | r | u | y |
| " c" | q | a | e | h | l | o | r | u | y |
| " d" | q | a | e | i | j | o | r | u | w |
| " e" | q | a | d | i | l | n | s | v | x |
| " f" | q | a | e | i | l | o | r | u | w |
| " g" | q | a | e | i | l | o | r | u | w |
| " h" | q | a | e | i | j | o | p | t | w |
| " i" | q | c | f | g | j | n | s | u | w |
| " j" | q | a | e | g | j | o | p | u | w |
| " k" | q | b | e | i | j | n | p | t | w |
| " l" | q | a | e | i | l | o | p | u | y |
| " m" | q | a | e | i | k | o | s | u | y |
| " n" | q | a | e | i | j | o | p | u | w |
| " o" | z | b | f | g | k | n | r | u | w |
| " p" | q | a | e | h | l | o | r | u | w |
| " q" | z | a | d | g | j | m | p | u | w |
| " r" | q | a | e | i | j | o | s | u | w |
| " s" | q | c | e | h | l | o | p | t | y |
| " t" | q | a | e | h | j | o | r | u | w |
| " u" | q | a | d | i | k | n | s | t | w |
| " v" | q | a | e | i | l | o | p | t | w |
| " w" | q | a | e | i | j | o | r | t | w |
| " x" | q | a | d | g | j | m | p | t | y |
| " y" | q | a | e | i | j | o | p | u | w |
| " z" | q | a | e | i | j | o | p | t | y |
| "  " | q | a | f | i | l | o | s | t | w |

## FIG. 10T



*FIG. 11*



*FIG. 12*



*FIG. 13*



FIG. 14

US 6,430,409 B1

1

# METHOD AND ARCHITECTURE FOR AN INTERACTIVE TWO-WAY DATA COMMUNICATION NETWORK

This application is a continuation of application Ser. No. 08/570,210, filed Dec. 11, 1995.

## CROSS REFERENCE TO MICROFICHE APPENDIX

Appendix A, which is a part of the present disclosure, is a microfiche appendix consisting of six sheets of microfiche having a total of 369 frames. Microfiche Appendix A is a listing of one embodiment of the client module of this invention, which is described more completely below, and a server, as described more completely below, to communicate and interact with the client module of this invention.

A portion of the disclosure of this patent document contains material, that includes, but is not limited to, Microfiche Appendix A, Appendix I, Appendix II, and FIGS. **10A** to **10T**, which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure, as it appears in the Patent and Trademark Office patent files or records, but otherwise reserves all copyright rights whatsoever.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates generally to data communications, and in particular to two-way data communication devices including a cellular telephone, a two-way pager, and a telephone that permit a user to interface with and interact with a server on a computer network.

### 2. Description of Related Art

For at least the last five years, the wireless communication industry has tried to merge computing with wireless communications. This industry wide effort has held the promise of bringing software intelligence to telecommunication devices including mobile wireless communications devices such as cellular telephones and two-way pagers as well as standard telephones.

After years of research and development, and hundreds of millions of dollars' investment by some of the largest companies in the field such as Motorola, AT&T, Sony, Matsushita, Phillips and IBM, the results have been nothing but disappointing. Typically, the intelligent communication devices resulting from these efforts include both the hardware necessary for a computer module and the hardware for a wireless communications module. Examples of such products are Simon from IBM and Bell South, MagicLink from Sony, and Envoy from Motorola.

Fundamental design and cost problems arising directly from the approach taken by the designers of these intelligent communication devices have limited widespread market acceptance of these devices. The combination of a wireless communication module with a computing module leads to a device that is too bulky, too expensive, and too inflexible to address the market requirements.

The combination of the two modules is too large and too heavy to fit in a user's pocket. Pocket size is a key requirement of the mobile communication market which remains unmet by these devices.

In addition, the cost of these devices is close to the sum of the cost of the computer module and of the communications module, which is around a one thousand dollar end-user price. Market research indicates that the market for intelligent wireless communications devices is at prices around $300. Even with a 20% compound cost decline, it would take five years for the combination units to meet today's customers' price requirements. It is therefore unlikely that devices designed by combining a computer and a wireless module, no matter how miniaturized and cost reduced, can satisfy the cost requirement of the market during this decade.

To succeed in the market place, intelligent wireless communication devices must be able to support a wide variety of applications specific to each market segment. Typically, these applications must be added to the device by the end-user after purchase. Thus, the device must provide a method for loading the initial application and for subsequent updating of the application.

The price sensitivity for intelligent communication devices and the size limitations means that an intelligent communication device cannot support the amount of core memory (RAM), a hard disk or non-erasable memory, or a traditional floppy disk drive, commonly found on computers. These limitations close the traditional routes for delivering new applications or updates to intelligent communications devices.

As a result, the current crop of intelligent communication devices run only the few applications which were burned into their ROMs at the factory or which are contained in a ROM card plugged into a slot designed for this purpose. This scheme lacks the flexibility needed to run the thousands of applications required to address the fragmented requirements of the market and provides no simple method for updating the applications after the device has been sold.

Two other communication oriented attempts at bringing intelligence to telephones are Short Messaging Service (SMS) and Analog Display Service Interface (ADSI). SMS specifies how messages are delivered to and from a cellular telephone and how the cellular telephone should store the messages. SMS also defines some simple processing which the cellular telephone can perform on the message, such as calling a telephone number embedded in the message.

SMS's architecture is similar to that of paging networks with the difference that devices implementing the SMS architecture operate over the control channel of the cellular telephone network. SMS is deployed primarily in Europe over the GSM network.

SMS messages are not delivered in real time. The time delays can range from 30 seconds up to 10 minutes, which makes SMS unsuitable for real time applications. The main purpose of SMS is the delivery of messages. SMS does not specify an application protocol or cellular telephone application module which further restricts its usefulness in running applications on cellular telephones. After a few years of deployment in Europe, SMS implementations have been limited to notification services such as two-way paging and voice mail notification.

SMS as a medium is unsuitable for to building applications which allows the retrieval, manipulation, and storage of information. This is the reason why the industry giants have not turned to SMS in their quest to add intelligence to cellular telephones, but have consistently attempted to combine a computer module with a wireless communications module.

ADSI was designed as an extension to Interactive Voice Response Systems. ADSI allows a smart telephone with a small screen to display prompts to assist users in choosing among various options. By using visual prompts instead of

cumbersome voice prompts, ADSI is thought to make the use of interactive voice services easier and faster.

ADSI allows data to be sent from the service provider to the telephone in the form of screens. ADSI also allows the telephone to respond through touch tone signaling with a special coding to describe the full alphanumeric character set. With ADSI, a telephone is primarily a passive device. Services send text screens to the telephone, and the telephone sends back short strings indicating the choices the user made from the text screen.

ADSI makes no provisions for performance of processing in the telephone. As a result, ADSI generates a high traffic load on the telephone network since each user input is sent back to the service for processing. This makes ADSI unsuitable for wireless networks where bandwidth is at a premium and "air efficiency" is one of the most sought after qualities. The lack of processing capability in the telephone and the high bandwidth requirements of ADSI have prevented it from being considered by the industry for implementing intelligent wireless devices.

Up to now, intelligent communication devices have combined a computing module with a wireless communications module. However, to gain widespread acceptance, a two-way data communication device with processing capability and the ability to run a wide variety of differing user applications is needed. In addition, such a device should be comparable in size, cost, and weight to a cellular telephone.

## SUMMARY OF THE INVENTION

According to the principles of this invention, the prior art limitations of combining a computer module with a wireless communication module have been overcome. In particular, a two-way data communication device of this invention, such as a cellular telephone, two-way pager, or telephone includes a client module that communicates with a server computer over a two-way data communication network. The principles of this invention can be used with a wide variety of two-way data communication networks. For example, two-way data communication networks for cellular telephones that may be used include a cellular digital packet data network as well as TDMA, CDMA, and GSM circuit switched data networks; and the AMPS analog cellular network with a modem. Similarly, for two-way pagers, two-way data communication networks include PACT, the new AT&T endorsed two way paging standard, or other priority two-way paging networks with data transport capability. The two-way data communication network for a telephone is the public switched telephone network.

Using the two-way communication device that includes the client module, a user can provide information to the server computer, retrieve information from the server computer, provide data to an application on the server computer which uses the data and provides information to the two-way communication device, or sends the information to another location. The functionally provided to the user of the two-way communication device is limited only by the applications available on a server computer that is accessible to the user over the two-way data communication network.

This invention allows for the first time two-way communications devices such as cellular telephones, two-way pagers, and telephones to become open application platforms which in turn empowers software developers to deliver value-added applications and services to any two-way communication device that incorporates the principles of this invention. This is a radical shift from the current situation where telephones and two-way pagers are closed, proprietary systems. Consequently, an even playing field is created for the market to invent new uses for two-way communication devices and for two-way communication networks. Any entity from corporations to individuals can make new applications available to the installed base of two-way data communication devices that include this invention without physical modification or addition to the two-way communication device. Years after purchase, a two-way communication device incorporating this invention will run all the applications which were developed since its purchase.

Further, all these applications are available without the end user having to add anything or make any modification to the two-way communication device. Also, the applications are independent of the two-way data communication network. The applications do not depend on any feature of the two-way data communication network. Thus, the applications are unaffected by a change in the two-way data communication network.

Also, the applications on the server computer are independent of the two-way data communication device with which the server computer is interacting. An application on the server computer can communicate with any two-way data communication device that includes the client module of this invention and a network interface module to transmit data over, and receive data from the two-way data communication network. These two features mean that an investment in developing an application is insulated from either advances in two-way data communication devices, or advances in two-way data communication network technology.

As indicated above, the two-way data communication device of this invention utilizes a client module to transmit a message including a resource locator selected by the user over the two-way data communication network to a server on a server computer on the computer network. For example, the computer network can be a corporate wide area network, a corporate local area network, the Internet, or any combination of computer networks.

The server processes the message, i.e, executes the application addressed by the resource locator and transmits a response over the two-way data communication network to the two-way data communication device, which stores the response in a memory. The client module interprets the response and generates a user interface using information in the response. In one embodiment, the user interface includes at least one user data input option that is associated with a resource locator. In another embodiment, the user interface is a display.

The resource locator associated with the at least one user data input option can address any one of a wide variety of objects. In one embodiment, the resource locator associated with the at least one user data input option addresses an object on the server computer that transmitted the response. In another embodiment, the resource locator addresses an object on another server computer coupled to the two-way data communication network. In yet another embodiment the resource locator addresses an object stored in the two-way communication device.

When the user selects the at least one user data input option, the client module interprets the selection and if required, appends any input data to the resource allocator associated with the at least one user data input option. The client module transmits a message including the resource locator with any appended input data to the server computer.

5

6

Alternatively, the resource locator with any appended data can be addressed to another server computer, or can address an object stored in the two-way communication device. If the resource locator addresses an object on a server computer, the client module provides the message to the network interface module which in turn transmits the message over the two-way data communication network.

Thus, in this embodiment, the message originally transmitted to the two-way data communication device included all the information necessary for the client module to generate the user interface, to associate the user selection and any data entered with a particular resource locator, and to transmit the appropriate resource locator in a subsequent message. The client module includes an interpreter that processed the information in the message. since the message included all the information needed by the client module, the server computer that transmitted the message retained no state information concerning the message. Consequently, the server computer is defined as a stateless server computer.

An important aspect of this invention is that the message includes all information necessary for the client module to generate the user interface and a particular user interface can be independent from other user interfaces. Unlike prior art systems that gave the user a predetermined menu from which to select items, or limited the user to an E-mail like format, according to the principles of this invention, the user interfaces and possible interactions available to the user are determined only by the applications that developers make available. The possible interactions and user interfaces for one application can be totally different and independent from the possible interactions and user interfaces of another application. Thus, a cellular telephone, two-way pager, and a telephone all truly become an open platform.

These features of the invention are a significant departure from prior art systems. Typically, in the prior art, use of a particular application on a particular platform required that the application be compatible with the operating system on that platform. Further, each time a new version of the application was released, the user was required to take steps to update the application on the user's platform. Further, if the user of the platform did not modify the operating system as new versions of the operating system were released, at some point in time, the platform would no longer be capable of processing a new version of an application that required a current version of the operating system.

This invention eliminates these problems. As explained above, the client module in the two-way data communication device functions as an interpreter. The application on the server computer provides all information necessary for the interpreter to generate a user interface on the two-way data communication device, and in response to user selections or data input using the user interface, to route messages to an appropriate server, i.e, either the server that sent the original information or another server.

Thus, the client module only interprets this information and interacts appropriately with the hardware of the two-way data communication device. Consequently, to update an application requires only changes on the server computer and not changes in each two-way data communication device that communicates with that server computer. This invention eliminates the usual requirement for distribution of application software, and application software updates to the end user of the two-way data communication device.

In one embodiment, a two-way data communication system for communication between a server computer and a two-way data communication device selected from a group consisting of a cellular telephone, a two-way pager, and a telephone, includes a two-way data communication network, a server computer coupled to the two-way data communication network, and a two-way data communication device coupled to the two-way data communication network. The server computer includes a two-way data communication interface module coupled to the two-way data communication network, and a server coupled to the two-way data communication interface module. The server receives a message including a resource locator from the two-way data communication network. The resource locator includes an address of the server computer and of an application on that server computer. The server processes the message using the resource locator. In this embodiment, the server transmits a response to the message over the two-way data communication network.

The two-way data communication device, selected from the group consisting of a cellular telephone, a two-way pager, and a telephone, includes a network interface module coupled to the two-way data communication network, and a client module coupled to the network interface module. The client module transmitted the message including the resource locator to the server over the two-way data communication network. The client module also processes the response to the message from the server. The response includes information for a user interaction over the two-way data communication network.

The client module of this invention is lightweight, and thus requires only lightweight resources in a two-way data communication device. Consequently, the client module can use existing resources in such a device and therefore does not add to the cost of the two-way data communication device.

In one embodiment, the interpreter within the client module includes a plurality of managers including a user interface manager coupled to a display of the two-way data communication device where the user interface manager handles interactions with the display. The user interface manager also is coupled to a keypad of the two-way data communication device and handle interactions with the keypad. Herein, a keypad can be a telephone keypad, the keys found on a two-way pager, or other data input interface of a two-way communication device.

In one embodiment, the response generated by the server computer includes a plurality of resource locators and at least one of the plurality of resource locators includes an address to another server coupled to the communication network.

According to the principles of this invention, a method for using a two-way data communication device, selected from a group consisting of a cellular telephone, a two-way pager, and a telephone, to communicate with a server computer includes:

   generating a message by a client module in response to
      data entered by the user of a two-way data communication device coupled to a two-way data communication network,
      wherein the client module executes on a microcontroller of the two-way data communication device; and
      the message includes a resource locator;
         transmitting the message over the two-way data communication network to a server computer wherein the server computer is identified by the resource locator;

   executing an application on the server computer identified by the resource locator to generate a response to the message; and

US 6,430,409 B1

7

transmitting the response to a location identified by the application.

As indicated above the location can be the two-way communication device, another server computer, or some other device coupled to the server computer.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates one embodiment of the airnet network of this invention that includes the two-way data communication devices of this invention.

FIGS. 2A to 2H are illustrations of a series of screen displays of the two-way data communication device of this invention that illustrate one application of the principles of this invention.

FIGS. 3A to 3F are illustrations of a series of screen displays of the two-way data communication device of this invention that illustrate a second application of the principles of this invention.

FIGS. 4A to 4I are illustrations of a series of screen displays of the two-way data communication device of this invention that illustrate yet another application of the principles of this invention.

FIG. 5 illustrates another embodiment of the airnet network of this invention that includes the two-way data communication devices of this invention and an airnet network translator.

FIG. 6 is a block diagram of a mobile wireless communication device that includes the client and support modules of this invention.

FIG. 7 is a more detailed diagram of the mobile wireless communication device and a server computer within the airnet network architecture of this invention.

FIGS. 8A to 8D are a process flow diagram showing the process performed by the client in the mobile wireless communication device and the server on the server computer of FIG. 7.

FIG. 9 is a diagram of a mobile wireless communication device of this invention that includes a novel predictive text entry system that is a part of this invention.

FIGS. 10A to 10T are one embodiment of a letter frequency table.

FIG. 11 is a process flow diagram for one embodiment of a data entry process that includes the novel predictive data entry process of this invention.

FIG. 12 is a more detailed diagram of the mobile wireless communication device and the airnet network translator within the airnet network architecture of the another embodiment of this invention.

FIG. 13 is a process flow diagram showing the various processes performed by the airnet network translator of FIG. 12.

FIG. 14 is a diagram illustrating the various module managers included in one embodiment of the client module of this invention.

Herein, objects with the same reference numeral are the same object. Also, the first number of a reference numeral indicates the Figure where the object first appeared.

DETAILED DESCRIPTION

According to the principles of this invention, a novel airnet network 150, i.e., a two-way data communication network, interconnects any one, any combination, or all of two-way data communication devices 100, 101, or 102, that each include this invention, with a wide variety of computer

8

networks 120, 130, and 140, for example. As explained more completely below, each two-way data communication device 100, 101, and 102 can be configured to transmit data to and receive data from any desired combination of computers on computer networks 120, 130, and 140. Airnet network 150 is the two-way data communication path from the two-way data communication device to the particular computer that is accessed by the user of that two-way data communication device.

Each wireless communication device 100 that includes this invention can communicate over airnet network 150 with any server computer 121, 131, and 141 on airnet network 150 that includes at least one application that communicates and interacts with the processes of this invention that are included within device 100. Thus, device 100 can access information on the computer network and provide information to the computer network. Similarly, a two-way pager 101, and a telephone 102 with a modem 103, that each include this invention, can communicate over airnet network 150 with any of server computers 121, 131, and 141 that includes at least one application that communicates and interacts with the processes of this invention that are included within devices 101 and 102.

As explained more completely below, an application on a server computer can be accessed by any two-way data communication device that can communicate with that server computer. The application is independent of the particular type of two-way data communication device that is used to access the application and independent of the particular two-way data communication network used. This means that a user can access an application from anywhere so long as the user has a two-way data communication device that can communicate with the server computer.

In one embodiment, a process on wireless communication device 100 is configured as a client process and the applications on server computers 121, 131 and 141 on airnet network 150, that communicate with the client process, are server processes. This architecture allows some of the processing burden to be moved away from cellular telephone 100, across airnet network 150, to a server module on any computer on airnet network 150.

Specifically, a wireless communication device 100 e.g., a cellular telephone, with a telephone like keypad, communicates via a data capable cellular telephone network 110, e.g., a cellular digital packet data telephone network, with an application on a server computer on a computer network that has an interface to data capable cellular telephone network 110. For example, the computer network can be a corporate wide area network 120, a corporate local area network 130, or perhaps the Internet 140.

Similarly, a two-way pager 101 communicates via a two-way pager network 111 with an application on a server computer on a computer network that has an interface to two-way pager network 111. Again, for example, the computer network can be a corporate wide area network 120, a corporate local area network 130, or perhaps the Internet 140. Finally, a telephone 102 communicates via a modem 103 and public switched telephone network 112 with an application on a server computer on a computer network that has an interface to public switched telephone network 112. As with the other two-way data communication devices, the computer network can be, for example, a corporate wide area network 120, a corporate local area network 130, or perhaps the Internet 140.

In each of two-way data communication devices 100, 101, and 102, the client process is stored as a client module in the

US 6,430,409 B1

9

device and the execution of the client module on a micro-controller in the device is sometimes referred to as the client process. The client process performs important processing functions locally. This allows the communication between the client process, hereinafter sometimes referred to as simply client, and the server process, hereinafter sometimes referred to as server, to be minimized and the server computing requirements to grow slowly as the number of clients, i.e., users, grows.

The client module is small, e.g., under 64 KByte, and requires only low processing power congruent with the memory chips and built-in microcontrollers in two-way data communication devices such as cellular telephone **100**, two-way pager **101**, and telephone **102**. Thus, unlike the prior art attempts at an intelligent telephone, the cost, size, and battery life of either cellular telephones, two-way pagers, or telephones that incorporate this invention are not adversely affected.

While client/server architectures have been used extensively in computer networks, a client/server architecture implemented using two-way communication data devices such as cellular telephone **100**, two-way pager **101**, or telephone **102** yields new and unexpected results. This invention allows for the first time a wide variety of two-way data communication devices including but not limited to cellular telephones, two-way pagers, and telephones to become open application platforms which in turn empowers software developers to deliver value added applications and services to any two-way data communication device which incorporates the principles of this invention.

This is a radical shift from the current situation where cellular telephones, two-way pagers, and telephones are closed, proprietary systems. Consequently, an even playing field is created for the market to invent new uses for cellular telephones and data capable cellular networks, for two-way pagers and two-way pager networks, and for telephones on the public switched network.

Any entity from corporations to individuals can make new applications available to the installed base of data ready cellular telephones, two-way pagers, and telephones, that include this invention without physical modification or addition to the devices. Years after purchase, a two-way data communication device with this invention can run all the applications which were developed since its purchase. Further, all these applications are available without the user having to add anything or make any modification to the two-way data communication device. These features of the invention are a significant departure from prior art systems. Typically, in the prior art, use of a particular application on a particular platform required that the application be compatible with the operating system on that platform. Further, each time a new version of the application was released, the user was required to take steps to update the application on the user's platform. Further, if the user of the platform did not modify the operating system as new versions of the operating system were released, at some point in time, the platform would no longer be capable of processing a new version of an application that required a current version of the operating system.

Also, small devices, such as cellular telephones or pagers, usually do not have card slots, floppy or hard disk drives, or other means commonly found on computers to add or update applications. This limitation has led prior art attempts at intelligent communication devices to design closed systems with fixed functionality. Such devices can neither adapt nor be adapted to the fast changing requirements of the market place and so have not met with market success.

10

This invention eliminates these problems. The client process in the two-way data communication device functions an interpreter. The application on the server computer provides all information necessary for the interpreter to generate a user interface on the two-way data communication device, and in response to user selections or data input using the user interface, to route messages to an appropriate server, i.e., either the server that sent the original information or another server.

Thus, the client process only interprets this information and interacts appropriately with the hardware of the two-way data communication device. Consequently, to update an application requires only changes on the server computer and not changes in each two-way data communication device that communicates with that server computer. This invention eliminates the usual requirement for distribution of application software, and application software updates to the end user of the two-way data communication device.

For example, if initially, two-way pager **101** receives a response to a message from an application on server computer **121** on corporate wide area network **120**, the interpreter in two-way pager **101** generates a user interface on display screen **106** using information in the message. As described more completely below, options presented in the user interface can allow the user to access information, or provide information to any one, any combination of, or all of networks **120**, **130**, and **140**.

Specifically, in the response to the message from two-way pager **101**, the application initially accessed on server computer **121** included resource locators for applications on each of networks **120**, **130**, **140**, typically common gateway interface programs, accessible to the user of pager **101** as well as information required to generate the user interface. Consequently, when the user makes a particular selection or enters data, the interpreter accesses the appropriate resource locator and appends any necessary data to the resource locator. The client transmits a message including the resource locator to the appropriate server.

As shown by this example, the applications on networks **120**, **130**, **140** send to the two-way data communication device all information necessary to generate a user interface, and to process all user input. Consequently, only an application must be changed to update the information provided to the two-way data communication device.

In addition, since all the information needed by the client to generate a user interface and all information necessary for the client process to respond to any input data is included in the message, the computer server does not retain any state information concerning the information transmitted to the client process. Consequently, the computer server is stateless.

Each two-way data communication device **100**, **101**, and **102** that utilizes airnet network **150**, includes a data communication capability, a display screen, preferably a multi-line display screen, and storage capability for the processes of this invention in an on-board memory, and for the message being processed. Nearly every data capable cellular telephone, e.g., a telephone that utilizes a cellular digital packet data network, includes excess on-board memory capacity and a multi-line display screen. These hardware resources are often available, but unused in a data capable cellular telephone because of the indivisibility of memory chip packages. The inclusion of the processes of this invention in such cellular telephones therefore has very little effect on the cost, size, and power consumption of the cellular telephone. Similarly, the inclusion of the processes of this

11

12

invention in two-way pagers and telephones, that include a microcontroller and memory, has very little affect on the cost, size, and power consumption of these devices.

Thus, unlike prior art approaches that attempted to combine a computer module and a wireless communication module in a single package, this embodiment of the invention preferably utilizes the memory and processing power that currently exists in the cellular telephone **100**, two-way pager **101**, telephone **102** or other wireless or landline two-way data communication devices. This approach limits the cost of the resulting device and overcomes many of the problems of the prior art devices, e.g., the size and weight of the two-way data communication device is not changed, and, as explained above, updating user applications is removed from cellular telephone **100**, two-way pager **101**, and telephone **102**.

In particular, unlike devices produced by previous industry attempts at combining computing modules and a wireless cellular module, two-way data communication devices which incorporate this invention are size and cost competitive with voice-only telephones and can, for the first time, satisfy the market cost and size requirements for an intelligent cellular telephone, for example.

The incremental cost of supporting interactive applications on cellular telephone **100**, two-way pager **101**, and telephone **102** is reduced to at most a slightly larger screen that is required to display the application to the user. This is a fraction of the cost of adding a complete computer module to a cellular telephone, for example.

The incremental power consumption required to support this invention is also very small, as the incremental memory and screen required are small consumers of power compared to the cellular radio itself. Intelligent two-way data communication devices built according to the principles of this invention are not expected to have a significantly lower battery life than standard cellular telephones, or two-way pagers, for example.

The configuration and processes of the client process in two-way data communication devices **100**, **101**, and **102** are similar when the differences in the devices and the two-way data communication network over which the devices communicate are considered. Consequently, in the following description, the operation of data-ready cellular telephone **100** is considered. The same or similar operations can be performed on two-way data communication devices **101**, and **102**. The main difference is that some device dependent features within the client module must be changed to accommodate the particular hardware used in the two-way communication device. However, the client module architecture described more completely below limits the number of changes that must be made.

As indicated above, in response to user actions, wireless communication device **100** transmits a message, typically a data request, to a server computer **121** on computer network **120** and receives a response to the message. Alternatively, the user action can result in directions to server computer **121** on computer network **120** to transmit the response to the message to another location or to another user. Also, wireless communication device **100** can receive a message from any one of the computers coupled to airnet network **150**.

An important aspect of this invention is that the client module interpreter in wireless communication device **100** generates a user interface by which the user can both initiate and receive messages from a variety of applications. The interactions take place in real-time and are not limited by the client module interpreter. The uses of wireless communica-

tion device **100** are limited only by the availability of applications on server computers.

The applications available are determined by application developers. Prior to considering one implementation of the invention in further detail, several illustrative examples of applications that can be implemented according to the principles of this invention are described. These applications are illustrative only and are not intended to limit the invention to the particular applications and features described.

In one use, the user configures cellular telephone **100** to access server computer **121** on XYZ corporate wide area network **120**. In response to the access by the user, server computer **121** transmits a card deck to cellular telephone **100** over data capable cellular telephone network **110**. As explained more completely below, a card deck includes one or more cards, and each card is interpreted by the client module to generate a user interface screen.

In the embodiment illustrated in FIG. 2A, the initial card deck transmitted to cellular telephone **100** includes an introductory display card and a choice card. FIG. 2A is an example of introductory screen display **200** that is generated on display screen **105** by the client process in cellular telephone **100** by interpreting the display card. As used herein, a display screen is the physical display apparatus in a two-way communication device. A screen display is the image presented on the display screen.

In this embodiment, display screen **105** is a pixel display that displays graphics. In another embodiment, display screen **105** displays only text and so the graphics would not appear on display screen **105**. Screen display **200**, and other screen displays described more completely below, include a horizontal arrow, i.e., a multi-card deck indicator, to communicate to the user that the current deck includes another card. The inclusion of screen indicators, such as the multi-card deck indicator, to communicate with the user is optional. The functionality of this invention is independent of such screen indicators.

When the user presses a predetermined key, or key sequence, the client process in cellular telephone **100** interprets the next card in the card deck, i.e., the choice card, and in turn generates a menu **201** (FIG. 2B) of items that can be accessed by the user. In this embodiment, each of the menu items is available on server computer **121** to the user who, in this example, is a representative of XYZ corporation visiting ABC Designs.

As explained more completely below, each of the menu items is associated with a resource locator that includes an address of the particular object associated with that menu item, typically an address to a common gateway interface program on server computer **121**. In general, a resource locator includes an address and may include appended data. The address can be to a local object within the two-way data communication device or to a remote object on a server computer. As is known to those skilled in the art, the common gateway interface is an Internet standard that is used to dynamically generate information, e.g., cards. In view of this disclosure, other techniques to generate dynamic cards could be used.

Initially, the highlighting of the first line of menu **201** is not present. When a key on the keypad of cellular telephone **100** is pressed, the menu item corresponding to that key is highlighted on screen **105**. Thus, menu **201** shows the first item highlighted to indicate that the one key was pressed by the user. However, highlighting a selected item is a feature that is specific to this example, and in general is not required to implement the invention. Other methods can be used to

13

indicate the user's choice on display screen **105** such as an arrow pointing at the choice, if such an indication is desired.

After the one key is pressed, the user presses a predetermined key, e.g., an enter key, to verify the selection. Alternatively, in another embodiment, the verification of the selection is not required. In both embodiments, the resource locator for the selection is transmitted to server computer **121** by the client process in cellular telephone **100** over data capable cellular telephone network **110**. In response to the selection, server computer **121** processes the message containing the selection, and in this embodiment, transmits another card deck to cellular telephone **100**.

The client process in cellular telephone **100** interprets the first card in the deck received from server computer **121**, which is a choice card, and generates a screen display **202**, that includes a second menu as illustrated in FIG. 2C, on display screen **105**. Initially, none of the items in the second menu are highlighted.

Notice that screen display **202** includes a header, that describes the selection made by the user on screen display **201**, in addition to the second menu of choices available to the user. A multi-display screen card indicator **203**, e.g., in this embodiment, a hand icon with a finger pointing down, shows that the screen associated with the current choice card includes additional items that are not shown on display screen **105**. Herein, a screen can be larger than the number of lines available on display screen **105** and so the user must scroll the screen display to view the complete screen.

Thus, to view the additional items, the user presses a first screen scroll key, e.g., a next key, on cellular telephone **100**. In this embodiment, when the first screen scroll key is pressed, each line of the display is rolled up one line. The resulting display has an icon with a finger pointing up (not shown) if the menu requires only two screen displays. If the menu requires more than two screen displays, the second screen display of the menu would have two icons, one with a finger pointing up, and another with a finger pointing down. To scroll between the various lines in the second menu, the user uses the first screen scroll key, and a second screen scroll key.

If the user displays the last line of a card, e.g., the last line in the second menu, and presses the first screen scroll key nothing happens. In this embodiment, the user must make a choice before the next card is available.

Screen display **202** also includes representations of two soft keys, a home key **204**, and an info key **205**. In this example, these soft keys are defined only for the card used to generate screen display **202**. When the user presses a predetermined key sequence, the home key is highlighted to indicate the selection. In this embodiment, when the home key is selected, the user is returned to screen display **200**. In another embodiment, the user could be returned, for example, to a home screen display that is displayed each time the user activates cellular telephone **100** for use on airnet network **150**.

The home key is associated with a pointer, that in one embodiment is a resource locator, and the card addressed by the pointer is displayed by the client process when the home key is selected by the user. Specifically, if the pointer is to a card in the current deck, the client process simply displays that card. If the pointer is to other than a card in the current deck, the client process in cellular telephone **100** retrieves the deck containing the card at the location identified by the pointer. The location could be, for example, either a memory in cellular telephone **100**, or a memory in computer **121**.

Similarly, when the user presses another predetermined key sequence, the info key is highlighted to indicate the

14

selection. In this embodiment, when the info key is selected, a help screen is displayed for the user that describes the possible selections. The particular contents of the help screen are determined by the provider of the service. Specifically, a pointer is associated with the info key and when the info key is depressed by the user, the information stored at the location identified by the pointer is retrieved and interpreted by the client process in cellular telephone **100**.

Returning to the menu in FIG. 2C, since the user wants to determine the status of an order, the user pushes the two key on the keypad of cellular telephone **100**. In response to the key press, the second choice in the menu is highlighted as shown in FIG. 2C. In response to verification of the key press, e.g., the user presses a predetermined key sequence, cellular telephone **100** transmits a check open order request to computer **121**, i.e, the client process transmits a message that includes a resource locator associated with the menu item selected by pressing the two key.

In response to the check open order request, computer **121** transmits yet another card deck to cellular telephone **100**. The client process in cellular telephone **100** interprets this deck, that is an entry card, and in turn generates a purchase order number entry screen display **206** (FIG. 2D) on display screen **105**. Notice that screen display **206** has a previous soft key **207** and a fax soft key **208**. Again, each of these soft keys has an associated pointer and the information stored at the location identified by the pointer is retrieved and interpreted by the client process when the user selects the soft key.

In this example, the user does not select a soft key, but rather the user enters the purchase order number as shown in FIG. 2E using the keypad of cellular telephone **100**. The user enters only the various numbers. The client process formats the number and inserts the dashes as shown in FIG. 2E.

After the purchase order is entered, the user presses a predetermined key sequence to indicate to the client process that entry of the purchase order number is complete. Notice that the user is entering data and not simply selecting a menu item. The user is utilizing cellular telephone **100** as if cellular telephone **100** was a computer connected to network **120**, but, as explained more completely below, cellular telephone **100** is similar to a standard digital data capable cellular telephone that communicates over data capable cellular telephone network **110**. Specifically, cellular telephone **100** is not a combination of a computer module and a wireless communication module as in prior art attempts to create an intelligent telephone.

In addition, the user enters data using only the standard cellular telephone keypad. Thus, cellular telephone **100** eliminates the need for a computer keyboard or for a sophisticated touch screen that recognizes motion of a pointing object. This is important to maintaining the size, weight, and power requirements of cellular telephone **100** similar to those of a voice-only cellular telephone. In one embodiment, to facilitate data entry, as explained more completely below, cellular telephone **100** includes a text prediction process that reduces the number of key strokes required to enter text data. In this embodiment, the text prediction process is turned on or off for each entry card.

In response to entry of the purchase order number, the client process transmits a request to server computer **121** for the particular purchase order. Specifically, the client process appends the entered data to a resource locator and transmits a message containing the resource locator to server computer **121**. Server computer **121**, in response to the message,

US 6,430,409 B1

15                                                    16

retrieves the appropriate purchase order and transmits the purchase order as a card deck to the client process in cellular telephone **100** over airnet network **150**.

The client process interprets the card deck and generates a screen display **209** (FIG. 2F). Initially, fax key **208** is not highlighted in screen display **209**.

Notice that screen display **209** includes multi-display screen card indicator **203** to show the user that the purchase order screen contains more information that can be displayed at one time on display screen **105**.

After the user reviews the purchase order, the user presses the key sequence for fax key **208** and in response, fax key **208** is highlighted as illustrated in FIG. 2F.

In response to selection of fax key **208**, the client process retrieves the card deck at the location identified by the pointer associated with fax key **208**. If the location is on server computer **121**, the client process transmits a message including a resource locator to server computer **121** and in response to the message, server computer **121** transmits back yet another card deck. If the location is on a server computer other than server computer **121**, the client process transmits a message including a resource locator to that server computer and in response to the message, that server computer transmits back yet another card deck. If the location identified by the pointer is within cellular telephone **100**, the client process simply retrieves the deck. In either case, fax form **210** (FIG. 2G), that is an entry card, is displayed on display screen **105** by cellular telephone **100**. This example demonstrates the information accessed by the client process can be located in any number of locations. The resource locator associated with the fax key identifies the appropriate location.

When fax form **210** is displayed, the user enters the facsimile machine telephone number at ABC Designs, as shown in FIG. 2H, using the cellular telephone keypad. In this embodiment, the telephone number is automatically formatted by the client process. After the telephone number is entered, the client process appends the telephone number to a resource locator and transmits the information to server computer **121**.

When server computer **121** receives the information, server computer **121** executes a common gateway interface application (CGI) pointed to by the resource locator. The CGI application grabs the necessary information and transmits the information via e-mail to a fax gateway. The fax gateway, upon receipt of the e-mail, converts the information to a fax and sends the information to the specified telephone number. Thus, cellular telephone **100** requires neither a printer connection nor a print driver, but yet can print using the facsimile machine at ABC Designs.

As illustrated in this example, cellular telephone **100** transmitted a request for a particular purchase order, and scheduled transmission of data responsive to the request to a local machine capable of printing the data. Thus, the processes of this invention, as described more completely below, in cellular telephone **100** in combination with data capable cellular telephone network **110** and server computer **121** permit cellular telephone **100** to effectively utilize an application on server computer **121** on network **120** even though cellular telephone **100** utilizes only a microcontroller found in telephone **100** and does not required a separate computer module as in the prior art.

In addition, the client process using the information transmitted from server computer **121**, i.e, the cards, generates a wide-variety of user interfaces as illustrated in FIGS. 2A to 2H. The particular configuration of the various user interfaces is defined by the cards transmitted in a card deck. Consequently, the user interface is not fixed to one particular format such as an E-mail type format, but rather the format is variable and can be redefined by each card that is interpreted by the client process. Also, in general, the user interface for one application on a server computer is independent from the user interface for another application on that server computer.

Specifically, the application accessed on server computer **121** generates the card deck and so in turn defines each of the various user interfaces. Each user interface permits the user to identify a particular selection. Each particular selection could result in generation of a different user interface with different selections. Thus, the user interfaces are limited only by the applications accessible to the two-way data communication device.

As shown below, a wide variety of applications can be provided on a server computer. Despite the robustness of the client module in interpreting a wide variety of application, typically, the client process is lightweight and thus requires only lightweight resources, e.g., 60 Kbytes of read-only memory (ROM) for the client module, 10 Kbytes of random access memory (RAM), and less than one million instructions per second (MIPS) of processing power. Since the client process needs only these lightweight resources in a two-way data communication device, the client can use existing resources in such a device and therefore does not add to the cost of the two-way data communication device such as data capable cellular telephone **100**.

In another embodiment, the user can configure cellular telephone **100** to access server computer **131** on corporate local area network **130**. In response to the access by the user, computer **131** transmits a home card (not shown) to cellular telephone **100** which in turn generates a home screen display on display screen **105**.

When the user selects personal information on the home screen display or on a subsequent screen display associated with the home card, a message including a resource locator for a personal information deck is transmitted from cellular telephone **100** to computer **131**. In response to the message, computer **131** transmits a card deck that includes a display card and a choice card to cellular telephone **100**. In these examples, the card deck is described as including one of three cards, a display card, a choice card, and an entry card. However, these examples are illustrative only, and are not intended to limit the invention to those particular embodiments of cards. In view of this disclosure, those skilled in the art will be able to form combinations of these types of cards and define other types of cards, if such cards are appropriate for the particular application.

The client process in cellular telephone **100** interprets the display card that includes image and text data and generates screen display **300** on display screen **105** (FIG. 3A). Screen display **300** includes a home key **301**, and an info key **302**. When the user selects home key **301**, the user is returned to the home screen. Info key **302** functions in a manner similar to that described above for info key **205**.

When the user presses a predetermined key, the client process interprets the choice card and a second screen display **304** (FIG. 3B) is driven on display screen **105**. Screen display **304** is a menu of the personal information that is stored on server computer **131** for use by the user of cellular telephone **100**. Multi-display screen card indicator **203**, e.g., the hand with a finger pointing down, illustrates to the user that the list has additional items that appear on the next screen display. Screen display **304** also indicates the

US 6,430,409 B1

17

number of E-mail messages, faxes, and voice messages waiting for the user.

The user scrolls the screen display line by line until screen display **305** is on display screen **105**. Initially, the fourth item in the menu is not highlighted. In this example, the user presses the four key on the keypad of cellular telephone **100** to view the user's schedule. In response to the key press, the client module in cellular telephone **100** transmits a message, including a resource locator associated with the menu item selected by pressing the four key, to server computer **131** using data capable cellular telephone network **110** and corporate local area network **130**.

In response to the message, server computer **131** executes the application identified in the resource locator. Upon completion of the execution, server computer **131** transmits, over corporate local area network **130** and data capable cellular telephone network **110** to cellular telephone **100**, a card deck that includes a choice card that describes the user's schedule for that day.

In this embodiment, when server computer **131** completes the transmission, server computer **131** has completed the response to the message and has transmitted all necessary information to cellular telephone **100**. Therefore, server computer **131** does not retain any state information concerning the transmitted information and so is referred to as a stateless server computer **131**. In this embodiment, the client process can only request a card deck. However, as demonstrated herein, card decks and the two-way interactive data communication system of this invention provide the user with a new level of capability.

When cellular telephone **100** receives the card deck, the client process in cellular telephone **100** interprets the choice card and drives screen display **306** (FIG. 3D) on display screen **105**. Initially, the first item in the menu of screen display **306** is not highlighted. When the user depresses the one key on the keypad of cellular telephone **100**, cellular telephone **100** highlights the first item in the menu. Cellular telephone **100** generates screen display **308** (FIG. 3E) upon the user subsequently depressing a predetermined key. Screen display **308** includes a schedule key **309**, that when selected returns the user to screen display **306** (FIG. 3D). Screen display **308** also includes a more detailed description of the 10:00 a.m. meeting.

While screen display **308** is active, if the user depresses a predetermined key, the user is presented with the options in screen display **310** (FIG. 3F). Initially, item two in screen display **310** is not highlighted.

In this example, the user depresses key two on the keypad of cellular telephone **100** and so cellular telephone **100** sends a message including a resource locator to server computer **131** to send an E-mail message to Bill Smith confirming the meeting at 10:00 a.m. When server computer **131** executes the application addressed by the resource locator, an E-mail message is sent.

In another example, the user of cellular telephone **100** connects to Internet service provider computer **141** on Internet **140** using data capable cellular telephone network **110**. Upon connection of cellular telephone **100**, service provider **141** transmits to cellular telephone **100** a card deck to generate FIGS. 4A to 4C.

The client process in cellular telephone **100** interprets the first card in the card deck from computer **141** and generates screen display **400** (FIG. 4A). When the user presses a predetermined key, cellular telephone **100** displays screen display **401** (FIG. 4B). Screen display **401** provides the user with a series of choices that group services alphabetically.

18

When the user depresses the seven key on the keypad of cellular telephone **100**, cellular telephone **100** displays a list of the services that have letters P, R, or S as the first letter in the service name. In this embodiment, screen displays **401** and **402** are a single card, e.g., a single screen. Each of the various services associated with a key has an index and when a particular choice is made by the user, the choice defines an index. The client process then displays all of the services with the index that corresponds to the index defined by the user's choice.

In screen display **402**, the user is given a series of choices of services that are available to the user under tab seven. Initially, item three in screen display **402** is not highlighted. In this example, the user depresses the three key on the keypad of cellular telephone **100** to select the stock quotes and item three in screen display **402** is highlighted.

In response to this selection, cellular telephone **100** transmits a request for a stock quote, i.e, a message including a resource locator, over cellular telephone network **100** and internet **140** to service provider **141**. In response to the request, service provider computer **141** executes the application addressed by the resource locator. The application retrieves a card deck that, in turn is transmitted to cellular telephone **100**. The card deck includes a display card and an entry card.

Upon receiving the card deck, the client process in cellular telephone **100** interprets the display card and generates screen display **403** (FIG. 4D). When the user depresses a predetermined key, entry screen display **406** (FIG. 4E) is generated on display screen **105** of cellular telephone **100**.

Initially, the box with letters SUNW in screen, display **406** is empty. The letters SUNW are entered in the box by the user to indicate the ticker symbol of the stock for which the user wants information. After the user has entered the stock ticker symbol, the user presses the predetermined key to indicate that the entry is complete.

In response to the entry by the user, the client module appends the stock ticker symbol to the resource locator and transmits the resource locator to service provider computer **141** which, in turn, executes an application addressed by the resource locator to retrieve the latest stock market information for the stock ticker symbol. Service provider **141** uses the retrieved information to generate a card deck that contains the information and then transmits the card deck to cellular telephone **100**.

The client process in cellular telephone **100** interprets the first card in the deck and generates screen display **409** (FIG. 4F). For convenience, the FIGS. 4F to 4I are grouped together and separated by a dotted line. However, at any given time, in this embodiment, display screen **105** can display any four adjacent lines and so the grouping of lines in FIGS. 4F to 4I is for convenience only to demonstrate the level of information that can be retrieved and displayed by the client process. The use of a four line display screen is illustrative only. The client process of this invention can work with any size display screen, even a one line display screen. However, a multi-line display screen is preferred.

In the Figures discussed above, the display screen is a pixel display and so can display images. In another embodiment, the display screen only displays text and is smaller in size. For such an embodiment, the various entries are abbreviated and only text is displayed, but the general operation is identical to that just described. Also, the various computer networks can be interlinked so that a user with access to one computer network can obtain information on

US 6,430,409 B1

19                                                                    20

another computer network. Moreover, the embodiments described above are merely illustrative. One important aspect of this invention is that cellular telephone 100 can interact with any type of server application that is configured to communicate with and interact with the client process in cellular telephone 100. Thus, the user is no longer limited to only a few services offered by a telephone network provider.

In FIG. 1, the cellular telephone user must address, i.e., connect to, each computer of interest to access the different services. Consequently, each computer requires the information necessary to communicate with cellular telephone 100. In another embodiment, not illustrated, cellular telephone 100 contacts a single central computer over data capable cellular telephone network 110. This computer is connected to each of the other networks illustrated in FIG. 1. Consequently, the user of cellular telephone 100 sends a message including a resource locator to the central computer, the central computer processes the message and retrieves the information addressed by the resource locator from the appropriate network shown in FIG. 1. After the requested information is retrieved, the central computer generates a card deck and transmits the card deck to cellular telephone 100. In this embodiment, only one computer must be configured to communicate with cellular telephone 100. However, that same computer must be configured to communicate with all other computer networks that are of interest to the user of cellular telephone 100.

Hence, according to the principles of this invention, the client process on a two-way data communication device can initiate an interaction with a particular server computer. The server computer transmits (i) information to the client process to generate a user interface, and (ii) a resource locator for each possible selection by the user from the user interface. The resource locators can address applications on the server computer, applications on over server computers, or an application on the server computer that in turn accesses other server computers. Consequently, the user of a two-way data communication device is limited only by the applications provided on the server computers.

Further, the user can be provided new and/or updated capabilities by modifying the applications on the server computers. There is no requirement that the client process be changed for a new or updated application. The client process must only interpret the information received from an application and transmit a message for additional information. These operations are unaffected by a new or updated application. Consequently, as noted above, this invention does not require distribution of application updates or new applications to the end user of the two-way data communication device.

FIG. 5 is an illustration of another embodiment of airnet network 150. In this embodiment, the messages from a two-way data communication device, e.g., devices 100, 101, and 102 are directed to an airnet network translator 500. Airnet network translator 500 and a particular two-way data communication device, e.g., any one of devices 100, 101, and 102 communicate using the protocol for point-to-point communication on the particular network linking airnet network translator 500 and that two-way data communication device. For example, if data capable cellular telephone network 110 is a cellular digital packet data network, either the transmission control protocol (TCP) or the user datagram protocol (UDP) can be used.

Airnet network translator 500 transfers data between the two-way data communication device and the selected computer network after translator 500 validates the communi-

cation path, as explained more completely below, and encrypts the message transferred to the computer network if necessary. In addition, airnet network translator 500 collects transaction and billing information concerning the communication between the two-way data communication device and the designated computer network. Specifically, airnet network translator 500 provides access control for paying services and a logging mechanism for billing. Airnet network translator 500 can also provide a directory service to users.

FIG. 6 is a block diagram of a typical GSM digital cellular telephone. Each of the hardware components in cellular telephone 600 is known to those skilled in the art and so the hardware components are not described in detail herein. The compiled and linked processes of this invention are stored in ROM 601 as a client module 602 and support modules 603. Upon activation of a predetermined key sequence utilizing the keypad, physical layer processor 610, that is sometimes referred to herein as a microcontroller, initiates a client process using client module 602 in ROM 601.

In this embodiment, client module 602 includes a plurality of manager modules, as explained more completely below. The particular manager modules utilized is determined by the characteristics of the particular cellular telephone 100 in which client module 602 is implemented. Client module 602 must include manager modules to interface with modules that control the particular hardware in cellular telephone 100, a manager module to interface with the particular cellular telephone network protocol used by cellular telephone 100, and a manager module to interpret the card decks received. Therefore, the particular manager modules described herein are only illustrative of the principles of this invention and are not intended to limit the invention to the specific modules described more completely below.

In this embodiment, the client process controls the operations of a plurality of cellular telephone dependent support processes that are stored in ROM 601 such as a display module, a keypad module, and a network and terminal control module, that were referred to above collectively as support modules 603. The combination of the client process, display process, keypad process, and network and terminal control process are considered foreground tasks by the microkernel in cellular telephone 600. Also, herein module and process are used interchangeably, but those skilled in the art will appreciate that the module is the computer software as stored in a memory, preferably, a ROM, of cellular telephone 600 and the corresponding process is the execution of the module by the microcontroller in cellular telephone 600. Again, note that this invention does not require a separate processor and instead can utilize the processing power that already exists in cellular telephone 600, because as described above, the client process of this invention is so lightweight.

The user interface for cellular telephone 600 determines the version of the user interface manager module that is stored in ROM 601. In one embodiment, the parameters used to define the user interface level are the display resolution, the pixel access of the display, and the support of soft keys. One definition of the user interface levels is given in Table 1.

21

TABLE 1

USER INTERFACE LEVEL DEFINITIONS

| Level 1 | Text only; 1 or more lines; 12 to 15 characters per line; and no soft keys. |
| Level 2 | Text only; 4 or more lines; 20 to 25 characters per line; and soft keys. |
| Level 3 | Pixel access; 150 by 75 pixels or larger; and soft keys. |

The user interface manager module presents data to the display module which in turn drives display screen **605**; and captures data entered by the user on display screen **605**. In response to this information, the client process prepares a message for transmission by a network manager module.

To more completely explain the operations performed over airnet network **150**, FIG. 7 is a block diagram that illustrates the various components in one embodiment of this invention of cellular telephone **700**. Those skilled in the art will appreciate that cellular telephone **700** includes circuitry and software similar to that illustrated in cellular telephone **600** for voice and data operations supported by cellular telephone **700** in addition to the modules for operation on airnet network **750**. Similarly, server computer **743** includes other software and hardware that is known to those skilled in the art and so is not illustrated in FIG. 7 for clarity.

In this embodiment, client module **702** in digital cellular telephone **700**, that is executing on the microcontroller of telephone **700**, communicates with server computer **743** over cellular digital packet data (CDPD) network **710**. Cellular digital packet data network **710** is used to illustrate one embodiment of this invention on one two-way data communication network. The principles of this invention can be used with a wide variety of two-way data communication networks. For example other two-way data communication networks for cellular telephones that may be used include TDMA, CDMA, and GSM circuit switched data networks; and the AMPS analog cellular network with a modem. Similarly, for two-way pagers, two-way data communication networks include PACT, or other priority two-way paging networks with data transport capability.

Prior to considering the operation of this configuration of airnet network **750** in more detail, another aspect of this invention is required. Specifically, a technique is required for conveying instructions from digital cellular telephone **700** to a server application on server computer **743**, and conversely.

A telephone interaction description language (PIDL) is defined for use by service developers. A terminal interaction language (TIL) is a distillation of the telephone interaction description language and describes the same interaction to digital cellular telephone **700** as the telephone interaction description language describes to computer **743**.

With the exceptions described more completely below, a process in the terminal interaction language is a compressed version of the same process written in the telephone interaction description language. The terminal interaction language allows easy parsing on the two-way data communication device, which in turn makes the client smaller than a client for the telephone interaction description language that is readable by humans, but is not optimized for parsing by a machine.

The compression from the telephone interaction description language to the terminal interaction description lan-

22

guage is done typically at run time because some cards are computed cards and so cannot be precompiled. A wide variety of techniques can be used to convert the telephone interaction description language to terminal interaction language. The important aspect is that, if bandwidth across the cellular telephone network is limited, a compressed form of the telephone interaction description language is used.

Preferably, each data type is compressed to facilitate optimal transfer over the two-way data communication network. For example, the verbs in the telephone interaction description language are compressed using a binary tokenization. Graphics are compressed using run length limited compression and text is compressed using any one of the well-known techniques for text compression. While compression of the telephone interaction description language is not required to implement this invention, compression makes the invention more efficient by utilizing the bandwidth of the network more effectively.

Instructions in the telephone interaction description language and in the terminal interaction language are grouped into a deck and a card. Each deck includes one or more cards. A card includes the information, i.e., a set of telephone interaction description language, required to generate a screen. As indicated above, a screen can be larger than the number of lines in a display screen. Other equivalent terms for a card include a page and an atomic interaction. Thus, a card deck is simply a group of screens. The number of cards in a card deck is selected to facilitate efficient use of the resources in the two-way data communication device and in the, airnet network.

For simplicity, in this embodiment, each card is a single operation. Herein, an operation is defined as a related set of actions such that the user does not encounter an unanticipated delay in moving from one action to the next, i.e, the user does not have to wait for client module **702** to retrieve another card deck from computer **743**. Also, a deck may include definitions of soft keys that stay in force while the deck is active, i.e, being executed by the cellular telephone microcontroller.

Computer **743** may contain stored static telephone interaction description language decks. Computer **743** also generates telephone interaction description language decks in response to data from, or choices made by, the user of cellular telephone **700**.

In the embodiment shown in FIG. 7, computer **743** converts a telephone interaction description language deck to a terminal interaction language deck, that in turn is transmitted to cellular telephone **700**. The terminal interaction language is designed so that decks can be stored unaltered in memory **716** of cellular telephone **700** and referenced directly with little or no parsing. While telephone interaction description language decks on computer **743** may contain references to images, a terminal interaction language deck contains the images at the end of the deck. Thus, if a particular two-way data communication device does not support the display of images, the images are easily stripped from the terminal interaction language deck before the deck is transmitted to that particular two-way data communication device.

As indicated above, each interaction with the user of cellular telephone **700** is described by a deck or a series of decks. Logically, the user retrieves a terminal interaction language deck stored in a memory **716** of cellular telephone **700** after receipt from computer **743** over CDPD network **710**. The user reviews the information displayed by cards in the deck and makes choices and/or enters requested infor-

US 6,430,409 B1

23

mation and then requests another deck, as described above with respect to FIGS. 2A to 2H, for example.

When the user receives a deck, the first card of information is displayed on display screen **705**. Typically, as shown above, the first card is text, an image, or a combination of an image and text. After the user has reviewed the first card, the user hits a NEXT key to view the next card in the deck. Similarly, a user can return to a previous card in the deck by using a PREV key. Thus, using the NEXT and PREV keys, the user can navigate back and forth through the deck. Within a card, the user uses a scroll key or keys to move the portion of the card displayed up and down. This description of a particular method used to navigate through a deck and within a card is not intended to limit the invention to this particular method. In view of this disclosure, those skilled in the art will be able to use a wide variety of ways to navigate through a deck and within a card.

Cards, in this embodiment, are one of three types, a display card, a choice card, and an entry card. Independent of the type of card, the card can contain text and images. In addition, the invention is not limited to these three particular types of cards. The definition of the three particular types of cards is used to facilitate a description of the invention and to assist the developer's in organizing applications.

A display card gives information to the user to read. The display content can include any one of, or any combination of text, an image, and a soft key. The soft key is in effect only while the display card is active.

A choice card displays a list of choices for the user. The choices are automatically presented in a format specified on the choice card. See Appendix I, which is a part of the present disclosure and is incorporated herein by reference in its entirety. As explained above, the user makes a choice by depressing the key corresponding to the choice.

An entry card is used to obtain input data from the user. An entry card displays one or more entry lines. Typically, each entry line includes a display followed by an entry line. The entry line, in this embodiment, can be for either numeric or text data.

In this embodiment, choice and entry cards prevent the user from moving to the next card until the user has entered the requested information. When the user reaches the last card in a deck and hits the NEXT key, a request for a new deck is initiated. The deck requested is determined by either the deck that the user has completed, or by the choices made by the user. Also, when the deck is completed, the choices and/or data entered by the user typically are transmitted along with the request for the new deck to computer **743**.

Appendix I is one embodiment of a syntax for the telephone interaction description language and the terminal interaction language of this invention. In one embodiment, the telephone interaction description language is described using a subset of the standard generalized markup language. Only a subset of the standard generalized markup language is utilized so that telephone interaction description language parsers also can be written easily using simple tools like lex and yacc.

Returning to operation over airnet network **750**, cellular telephone **700** includes a display module **712**, a keyboard module **711**, a client module **702**, and a UDP interface module **714**. In this embodiment, module **702** is stored in a non-volatile memory (not shown) of telephone **700** and is executed by the microcontroller (not shown) in telephone **700**. Modules **711**, **712**, and **714** operate under the control of client module **702**.

Client module **702** includes instructions that direct the microcontroller in cellular telephone **700** to perform the

24

operations described more completely below with respect to FIGS. 8A to 8D. The operations include sending uniform resource locator (URL) requests to HyperText Transfer Protocol (HTTP) server **749**, parsing and displaying a TIL deck or decks returned by HTTP server **749**, and generating new URLs based on the user's key presses. For a description of HTTP server software and platforms that can run the HTTP server software, see, for example, Ian S. Graham, *The HTML Sourcebook,* John Wiley & Sons, Inc., New York, Chapt. 8, (1995), which is incorporated herein by reference.

User datagram protocol (UDP) interface module **714** couples CDPD network **710** to client module **702**, and allows client module **702** to communicate using UDP over CDPD network **710**. The user datagram protocol is well known to those skilled in the art and is documented extensively. UDP interface module **714** supports transmission of simple stand-alone messages between the connection partners.

Display module **712** is a display driver that couples client module **702** to display screen **705** and so allows client module **702** to specify the information presented on display screen **705**. The user interface manager module within client module **702** converts the display information in a card to instructions for display module **704** which in turn provides signals that drive the hardware that controls the operation of display screen **705**. For example, if the TIL deck includes an image, the user interface manager module determines whether the active card calls for display of the image. If the active card directs the user interface manager module to display the image, the user interface manager module passes the image in memory **716** to display module **712**, which in turn displays the image on display screen **705**.

Keyboard module **705** couples keypad **715** to client module **702**, and stores data representing keys pressed by the user on physical keypad **715** in memory **716**. Keyboard module **705** notifies client module **702** when the user has pressed a key.

When client module **702** is notified of a key press, the user interface manager module within client module **702** passes information about the key press to display module **712** that in turn displays the appropriate character on display screen **705**, if an entry card is active. If the user interface manager module determines that a choice card is active, and the key press corresponds to one of the choices, the user interface manager module sends instructions to display module **712** that result in the choice being identified for the user, e.g., highlighted as described above.

In addition to HTTP server **749**, host computer **743** includes a UDP interface module **748**, CGI programs **761** stored in a memory **755** of host computer **743**, and TIL decks **760** stored in memory **755**.

HTTP server **749** uses UDP interface module **748** to send data to and receive data from CDPD network **710**. TIL decks **760** are TIL decks that can be accessed by HTTP server **749**. Static files containing PIDL decks are converted to TIL decks only once on HTTP server **749**. CGI programs **761** are common gateway interface programs that produce PIDL decks that are used by HTTP server **749** to produce TIL decks that in turn are transmitted via UDP interface modules **748** and **714** and cellular telephone network **710** to client module **702**. In this embodiment, the services available over airnet network **750** are applications accessible by HTTP server **749** on Internet **140** for which a service developer has written a PIDL deck, or a CGI script that in turn generates a PIDL deck, and is stored on computer **743**.

The architecture in FIG. 7 demonstrates some important aspects of this invention. First, the applications, the PIDL

US 6,430,409 B1

25
26

decks and CGI scripts in this embodiment, are independent of the particular two-way data communication network. For HTTP server 749 to communicate over a different two-way data communication network that does not support UDP, only UDP interface module 748 must be changed. The applications are unaffected by such a change.

Second, the applications on HTTP server 749 are independent of the two-way data communication device with which HTTP server 749 is interacting. An application on HTTP server 749 can communicate with any two-way data communication device that includes the appropriate client and a module to transmit and receive data over the two-way data communication network. These two facts mean that an investment in developing an application is insulated from either advances in two-way data communication devices, or advances in two-way data communication network technology.

FIGS. 8A to 8D are a process flow diagram for one embodiment of this invention. Initially, when the user initiates communication over airnet network 750, client module 702 initializes a work space in memory 716 of cellular telephone 700 and then, in get home URL process 801, stores a URL in the work space. According to the principles of this invention, in one embodiment, each cellular telephone that utilizes the airnet network has a home URL stored in a non-volatile memory that is used to retrieve a home card deck for the cellular telephone. In another embodiment, the cellular telephone obtains the home URL from server 749. Thus, in get home URL process 801, client module 702 obtains the home URL. Herein, a URL is an example of a specific embodiment of a resource locator.

For example, in get home URL process 801, client module 702 obtains a home URL, such as

http://www.libris.com/airnet/home.cgi

and stores the home URL in the work space. The portion of the home URL, http:/www.libris.com, identifies a particular HTTP server, i.e, server 749, on the world-wide web. The portion of the URL, /airnet/home.cgi, specifies a particular common gateway interface program within CGI programs 761. The use of a URL pointing to a server on the world-wide web is illustrative only is not intended to limit the invention to applications on the world-wide web. In general, cellular telephone 700 obtains an identifier, i.e, a resource locator, of a home application on a home server that is executed by the server when the cellular telephone initially becomes active on airnet network 750, and stores the resource locator in the work space.

Next in create HTTP request process 802, client module 702 converts the URL in the work space to a HTTP request. For example, for the above URL, create HTTP request process 802 generates a method field, such as

GET /airnet/home.cgi HTTP/1.0

The GET method is part of HTTP. Thus, the format for the GET method is known to those skilled in the art. Also, this particular form of the method is used because a specific server connection is established.by cellular telephone 700 and so identification of the server is unnecessary. Nevertheless, briefly, this command instructs server 749 to execute application home.cgi and execution of application home.cgi in turn results in generation of a home deck and a subsequent transmission of the home deck to cellular telephone 700. HTTP/1.0 specifies the HTTP version used by client module 702 in cellular telephone 700.

In addition to the method field, client module 702 in process 802 could also generate appropriate HTTP request

fields to pass information to server 749 about the capabilities of client module 702. The request fields can include information such as lists of the MIME content-types acceptable to the client; lists of data encoding types acceptable to the client; user authentication and encryption scheme information for the server; the length in bytes of the message being sent to the server; and the Internet mail address of the user accessing the server. This list of information is illustrative only and is not intended to limit the invention to the particular request fields described herein. Any request field defined by HTTP can be utilized by client module 702. However, in this embodiment, the defaults are utilized and so no HTTP request fields are generated.

Typical HTTP methods that can be generated in HTTP request process 802 are a GET method for requesting either a TIL deck from server 749, or execution of a common gateway interface program on server 749; and a GET method request to a common gateway interface program with data, e.g., a query string appended to the URL. In either case, a URL is transmitted to server 749 within the particular message. After create HTTP request process 802 is complete, client process transfers to transmit request process 804.

However, if the transmission control protocol is used instead of UDP, client module 702 would access a TCP module in establish server connection process 803 that replaced UDP module 714. Since, in this embodiment, UDP is used, establish connection process 803 is enclosed by a dashed line in FIG. 8A to indicate that this process is unnecessary when using UDP.

In establish server connection process 803, a virtual connection would be made over CDPD network 710 between TCP interface module 714 and a TCP interface module in HTTP server 749 so that data could be transmitted between cellular telephone 700 and computer 743 using TCP, e.g., buffers to support data exchange are defined. The establishment of a TCP connection is well-known and so is not described further.

In FIG. 8A, a dashed line connects establish server connection process 803 with establish client connection process 860, that is also dashed, that is performed by HTTP server 749. This indicates that both client module 702 and server 749 are required to complete process 803.

When the TCP virtual connection is established, client module 702 transfers processing from establish server connection process 803 to transmit request process 804. Similarly, server 749 transfers to request received check 861, in which server 749 waits until a request is received. Establish client connection process 860 is not needed for UDP and so HTTP server 749 initiates processing in request received check process 861. Process 860 is enclosed within a dashed line box to indicate that the process is used only for TCP.

In transmit request process 804, the HTTP request is sent from the work area in telephone 700 to HTTP server 749. Again, a dashed line connects process 804 of client module 702 to request received check 861 that is performed by HTTP server 749 to indicate that the check is dependent upon information from client module 702. When the transmission of the request is complete, client module 702 transfers to response received check 806.

Upon receipt and storage of the HTTP request, request received check 861 transfers to service request process 862 in which HTTP server 749 initiates service of the received request. In service request process 862, if the HTTP request only seeks transfer of a static deck, HTTP server 749 retrieves the requested static deck from TIL decks 760.

US 6,430,409 B1

27                                                                                28

Conversely, if the request requires server 749 to obtain data from the Internet or to append data to a particular file, server 749 launches the common gateway interface application addressed in the request, and passes the data in the HTTP request to this application for further processing.

For example, if the user of cellular telephone 700 requested a fax as in FIG. 2F, the HTTP request identifies a common gateway interface application in CGI programs 761 that accepts as input data the telephone number and grabs the information to be faxed. The CGI application generates an e-mail transmission to the fax gateway. Similarly, for a stock quote, server 749, in response to the HTTP request, launches a common gateway interface application that sends out a stock query over Internet 140 to a stock quote service provider using the ticker tape symbol passed as input data by server 749 to the common gateway interface application. When the response to the stock query is received, the common gateway interface application builds a PIDL deck that includes the data in the response to the stock query.

Upon completion of servicing the request, HTTP server 749 converts the PIDL deck to a TIL deck and returns the TIL deck to client module 702 using UDP in transfer response process 863, that is connected by a dotted line to response received check 806 in client module 702. As the TIL deck is transferred, client module 702 stores the deck in memory 716.

After the TIL deck is transferred, HTTP server 749 closes the process for responding to the message from cellular telephone 700. All the information needed by client module 702 to generate a user interface on display screen 705 and for responding to any selection or data entry presented in the user interface is included in the TIL deck. Consequently, client module 702 only has to interpret the TIL deck and interpret the user input to transmit the next message to HTTP server 749. The state for the HTTP server is defined in the next message. Consequently, HTTP server 749 is stateless because HTTP server 749 does not retain state information concerning a response to a message after the message is transmitted.

However, in another embodiment (not shown), a server could retain state information concerning each interaction with a client module. For example, if the server transmitted a choice card to the client module, the server would retain state information indicating that a choice was pending from the client module. In this embodiment, when the user makes a choice, e.g., depresses key two to indicate choice two, the choice is transmitted to the server which in turn accesses the URL associated with choice two. If this URL addresses another application, the server executes that application. Thus, in this embodiment, the server retains state information concerning each interaction with a client module. In view of this disclosure, those skilled in the art can implement the principles of this invention utilizing a server that retains state information when such a client/server combination is advantageous.

Returning to the present embodiment, when the TIL deck is received, client module 702 leaves response received check process 806 and transfers to process first card 808. However, if TCP is used instead of UDP, client module 702 upon leaving check 806 would close the virtual TCP connection in transmission completed process 807. Upon closing the virtual TCP connection, processing would transfer to process first card 808. Again, transmission complete process 807 is enclosed within a dashed line box to indicate that process 807 is used only with TCP.

In process first card 808, client module 702 parses the TIL deck and interprets the first card. Processing transfers from process first card 808 to generate display process 809.

In generate display process 809, client module 702 passes the data to be displayed in the first card to display module 712. Display module 712, in response to the data, drives the text and images in the data on display screen 705. Generate display process 809 transfers processing to key press check 820 through node 813. In FIGS. 8A to 8D, any circular node with the same alphanumeric character and reference numeral is the same node. The circular nodes are used to establish connections between the various processes in the method of FIGS. 8A to 8D without cluttering the figures with a number of connection lines.

Client module 702 waits in key press check 820 for the user to press a key on keypad 715 of cellular telephone 700. In this embodiment, cellular telephone 700 is assumed to have the capability to support two soft keys, a scroll-up key, a scroll-down key, a previous key, a next key, and keys zero to 9 that are configured in the standard telephone keypad configuration. In view of the following disclosure, if one or more of these keys are not present, one of skill in the art can alter the method for the particular configuration of the cellular telephone keypad, or other two-way data communication device keypad. For example, if the cellular telephone included a home key, the key press processing described more completely below would include a check that detected when the home key was pressed and would in turn transfer to get home URL process 801.

Briefly, the processes in FIGS. 8B to 8C, identify the key pressed by the user, identify the action required, and then transfer to a process that implements the action required. Specifically, when a key on the keypad is pressed, keypad module 711 stores an identifier for the key in work memory 716 and notifies client module 702 of the key press. Upon receipt of the notification from keypad module 711, client module 702 reads the storage location in work memory 716 to determine the key pressed and transfers processing from key press check 820 to scroll key check 821.

In scroll key check 821, client module 702 determines whether the user pressed either of the scroll keys. If a scroll key was pressed, processing transfers to adjust display process 822 and otherwise to display card check 823.

In adjust display process 822, client module 702 determines which of the scroll-up or scroll-down keys was pressed. Client module 702 then sends information to display module 712 so that the current display is either scrolled-up one line or scrolled-down one line. If the scroll key would move the display beyond a boundary of the current card, the scroll key press is ignored in adjust display process 822.

In response to the information from client module 702, display module 712 adjusts the screen display on display screen 705. Client module 702 transfers processing from adjust display process 822 to key press check 820 through node 813.

If a scroll key was not pressed, processing is passed through scroll key check 821 to display card check 823. Client module 702 takes action that depends on the particular type of card that is currently being displayed on display screen 705. If the current card is a display card, client module 702 passes through display card check 823 to soft key check 828, and otherwise transfers to choice card check 824.

Assuming for the moment that the current card is not a display card, choice card check 824 determines whether the current card is a choice card. If the current card is a choice card, client module 702 passes through choice card check 824 to choice key check 826, and otherwise transfers to data key check 826.

Assuming for the moment that the current card is neither a display card nor a choice card, the current card must be an

US 6,430,409 B1

29                                                          30

entry card, because in this embodiment only three card types are defined. Thus, client module **702** does not check for an entry card. Rather, data key check **826** determines whether a valid data key was pressed. In this embodiment, the data keys are keys zero to nine on the key pad, and the # key. In other embodiments, other combinations of keys could be defined as data keys. If the pressed key was one of the data keys, data key check **826** transfers to process data entry **827** and otherwise transfers to soft key check **828**.

In process data entry **827**, client module **702** knows whether the predictive text entry process is turned-on, because one of the parameters on the entry card specifies whether to use the predictive text entry process, as described in Appendix I, which is incorporated herein by reference in its entirety.

If the predictive text entry process is not turned-on, client module **702** in process data entry **827** enters the pressed key value in a text entry buffer in work memory **716** at the appropriate location. Also, client module **702** sends information to display module **712** so the value of the pressed key is displayed in the appropriate location on display screen **705** by display module **712**.

If the predictive text entry process is turned-on, client module **702** uses the novel predictive text entry process in process data entry **827**, as described more completely below with respect to FIGS. **9, 10A** to **10T**, and **11**, to determine the letter to select from the set of letters associated with the pressed key. After the predictive text entry process determines the appropriate letter, a value representing the letter is stored at the appropriate location in the text buffer in work memory **716**. Also, client module **702** sends information to display module **712** so that the letter is displayed in the appropriate location on display screen **705**. Upon completion of process data entry **827**, client module **702** transfers processing through node **813** to key press check **820**.

The previous description assumed that the current card was an entry card, but if the current card is a choice card, choice card check **824** transferred to choice key check **826**. In generate display process **804** for the choice card, each of the choices are labeled according to information on the choice card and some or all of the choices are displayed on display screen **705**. Thus, choice key check **826** determines whether the pressed key corresponds to one of the choices. If the pressed key is one of the choices, client module **702**, in one embodiment, sends information to display module **712** to indicate the selected choice. Client module **702** also transfers from choice key check **826** through node **831** to store identifier process **850** (FIG. 8D), that is described more completely below. Conversely, if the pressed key is not one of the choices, choice key check **826** transfers to soft key check **828**.

Soft keys can be specified both for a deck as a whole and per card, i.e., a physical key on the keypad is specified as a soft key as described more completely in Appendix I. Each soft key specification includes an identifier that defines the action to be taken when the soft key is pressed.

When a soft key is specified for a deck, the soft key remains in effect for the entire deck. However, when a soft key is specified for a card, the card soft key specification temporarily overrides the corresponding deck soft key specification, i.e., the deck soft key specification for the same physical key as the card soft key specification, while the card is visible, i.e., displayed on display screen **705**. This override is done independently for the two soft keys. Thus, soft key check **828** transfers processing to first soft key check **829** if the key pressed is one of the two possible physical soft keys. Conversely, soft key check **828** transfers

processing to next key check **840** (FIG. 8C), if neither of the two possible physical soft keys is pressed by the user.

In first soft key check **829**, client module **702** determines whether the pressed key corresponds to the first soft key. If the pressed key is the first soft key, check **829** passes the active identifier for the first soft key to store identifier process **850** through node **831**. Conversely, if the pressed key is not the first soft key, processing transfers from check **829** to second soft key check **830**.

If the pressed key is the second soft key, check **830** passes the active identifier for the second soft key to store identifier process **850** through node **831**. Conversely, if the pressed key is not the second soft key, e.g., a physical key that can be defined as a soft key was pressed but neither the current deck nor the current card defines a soft key for that physical key, processing transfers from check **830** to key press check **820** through node **813**.

When pressing transfers to next key check **840**, client module **702** determines whether the pressed key was the next key. If the next key was pressed, processing transfers to display card check **841** and otherwise to previous key check **846**.

If a display card is the current card, the next key is used to move to another card in a deck, or alternatively to another deck. Thus, display card check **841** transfers processing to last card check **842** when a display card is the current card, and otherwise to entry card check **843**.

Last card check **842** determines whether the current card is the last card in the deck. If the current display card is not the last card in the deck, last card check **842** transfers processing to read next card process **845**, which in turn reads the next card in the deck and transfers through node **812** to generate display process **809**.

If the current display card is the last card in the deck, the deck includes an identifier that specifies the location to transfer to from the last card. This identifier can be a URL to another deck, to a common gateway interface program, or an address for a card within the current deck, for example. Thus, last card check **842** transfers through node **831** to store identifier process **850** when the current display card is the last card in the deck.

If the current card is not a display card but is an entry card, display card check **841** transfers to entry card check **843**. In this embodiment, the next key is the predetermined key used to indicate that all the data for an entry on an entry card has been entered. Thus, if the current card is an entry card, entry card check **843** transfers processing to store data process **844**.

Store data process **844** stores the data entered in at an appropriate location in memory that is specified in the current entry card. Typically, the data is combined as an argument with a URL and stored. Upon completion, store data process **844** transfers through node **810** to create HTTP request process **802** (FIG. 8A).

When the next key is pressed, if the current card is neither a display card nor an entry card, the current card is a choice card. However, as indicated above, in this embodiment client module **702** requires that the user make a choice and does not allow use of the next key. Consequently, if the current card is not an entry card, entry card check **843** transfers processing through node **813** to key press check **820**.

The previous discussion assumed that the next key was pressed and so next key check **840** transferred processing to display card check **841**. However, if the next key was not pressed, next key check **840** transfers processing to previous key check **846**. If the previous key was pressed, check **846**

US 6,430,409 B1

31

transfers to first card check **847** and otherwise returns processing to key press check **820**.

First card check **847** determines whether the current card is the first card of a deck. If the current card is not the first card, processing transfers from first card check **847** to read previous card **849**, which in turn reads the previous card and transfers to generate display process **809** through node **813**. Conversely, if the current card is the first card, processing transfers to home deck check **848**.

If the current card is the first card in the home deck, there is not a previous card and so home deck check transfers processing to key press check **820** through node **813** and so the previous key press is ignored. If the current deck is not the home deck, home deck check **848** retrieves the identifier for the previous deck and transfers through node **831** to store identifier process **850**.

Store identifier process **850** is reached through node **831** from several different points. The operations in store identifier process **850** are the same irrespective of the particular process that transfers to process **850**. In each instance, an identifier is passed to store identifier process **850** and process **850** saves the identifier in working memory **716**. The identifier can be, for example, a pointer to another location in the current card, an address of another card in the current deck, a URL to a deck stored in working memory **716**, a URL to a TIL deck in TIL decks **760** on computer **743**, or perhaps, a URL to a common gateway interface program in CGI programs **761** on computer **743**. Thus, process **800** checks the stored identifier to determine the action required.

Specifically, in identifier to current deck check **851**, client module **702** determines whether the identifier is to a card in the current deck. If the identifier points to the current deck, check **851** transfers processing to retrieve data process **852** and otherwise to URL to local deck check **853**.

In retrieve data process **852**, client module **702** retrieves the information stored at the location indicated by the identifier from working memory **716** and processes the information. Retrieve data process **852** transfers through node **812** to generate display **809** (FIG. 8A) that was described above.

URL to local deck check **853** determines whether the identifier is a URL to a deck that is stored in working memory **716**, e.g., cached. If the deck is stored locally, check **853** transfers to retrieve local deck **854** which in turn moves the local deck into the storage location for the current deck. Retrieve local deck **854** transfers processing through node **811** to process first card **808** (FIG. 8A), that was described above.

If the identifier is neither to a location in the current deck, nor to a local deck, the identifier is a URL to an object on computer **743**. Thus, in this case, check **853** returns processing to create HTTP request **802** through node **810**.

Process **800** continues so long as the user continues to enter and process the information provided. In this embodiment, process **800** is terminated, for example, either by the user powering-off cellular telephone **700**, selecting a choice or entry card that discontinues operations of client module **702**, or remaining inactive for a time longer than a time-out period so that client module **702** shuts itself down.

To further illustrate the operations in process **800**, consider the following example which is returned to client module **702** as a TIL deck in response to a HTTP request generated by process **802**. For readability, Table 2 presents the deck in PIDL. In this example, all of the choices are for applications on the same server. However, in another embodiment, each URL could address any desired combination of servers.

32

TABLE 2

EXAMPLE OF PIDL CHOICE DECK

```
<PIDL>
<CHOICE>
<CE URL=http://www.libris.com/airnet/nnn>News
<CE URL=http://www.libris.com/airnet/www>Weather
<CE URL=http://www.libris.com/airnet/sss>Sports
</CHOICE>
</PIDL>
```

In process first card **808**, client module **702** interprets the information in Table 2 and transfers to generate display process **809**. In generate display process **809**, client module **702** sends information to display module **712** so that the user is presented with a list of three choices on display screen **705**, i.e, a user interface for the choice card is generated:

1. News
2. Weather
3. Sports

Generate display process **809** (FIG. 8A) transfers to key press check **820** (FIG. 8B). When the user presses the two key on keypad **715**, key press check **820** transfers through check **821** to display card check **823**.

Since the current card is a choice card, check **823** transfers processing to choice card check **824**, which in turn transfers to choice key check **826**. Since the two key was pressed and that key is a choice key, check **826** transfers processing to store identifier process **850** (FIG. 8D). In process **850**, client module **702** stores the URL corresponding to two, i.e,

URL=http://www.libris.com/airnet/www

in working memory **716**.

Since this URL is to an object on computer **743**, processing transfers through checks **851** and **853** to create HTTP request process **802**, which in turn generates the request. When the HTTP request is transmitted to server **749**, as described above with respect to process **804**, server **749** in service request process **862** retrieves deck www from TIL decks **760**. An example of the deck is given in Table 3. Again for readability, the deck in present herein in PIDL.

TABLE 3

EXAMPLE OF A SECOND PIDL CHOICE DECK

```
<PIDL>
<CHOICE>
<CE URL=http://www.libris.com/airnet/www-1>World
<CE URL=http://www.libris.com/airnet
                      /www-2>National
<CE URL=http://www.libris.com/airnet/www-3>State
<CE URL=http://www.libris.com/airnet/www-4>Local
</CHOICE>
</PIDL>
```

The deck in Table 3 is transmitted to cellular telephone **700** and stored in memory **716**, as described above with respect to process **806**. The choice card is processed in process **808** and displayed in process **809**. As a result of process **809**, the user is presented with a list of choices:

1. World
2. National
3. State
4. Local.

When the user makes another selection, the same sequence of processes as described above for the first choice card is executed by client module **702**, and another URL is

US 6,430,409 B1

33                                                                                                34

stored that points to a program on server **749** that retrieves the desired weather information and generates a deck with that information. This deck is transferred to cellular telephone **700** and displayed.

As described above, if the current card is an entry card and a key is pressed, client process **702** reaches data key press check **826** (FIG. 8B). If the pressed key is a valid data key, check **826** transfers to process data entry **827**.

In one embodiment, process data entry **827** uses a novel predictive text entry process for text entry. Recall that in a typical telephone keypad, the keys are labeled with both a number and two or three letters. For example, the two key is also labeled abc. This leads to some ambiguity when using the telephone keypad to enter text. Is the user attempting to enter an a, b, or c when the two key is pressed?

In one prior art method, two keystrokes were required to enter each letter of text. The first keystroke identified the first key and the second key stroke identified the specific letter desired on the first key. For example, to enter the letter s, the user would first press the seven key that is labeled with letters p, r, and s. Next, the user would press the three key to select the letter s. While this method may work well for short sequences that consist of only three or four letters, the method does not work well for English text. For example, if the user has already entered th and then presses the three key that is labeled with letters d, e, and f, almost always the desired next letter is the letter e. Therefore, making the user press the two key is an extra and unnecessary step.

Client module **702** of this invention utilizes a novel predictive text entry process to reduce the number of key strokes required to enter text using a telephone keypad, or any similar keypad. Using this process, in most cases a single key stroke suffices to enter a single letter.

While this embodiment of the invention is described in terms of a telephone keypad, the principles of the invention are not limited to only a telephone keypad. In general, the process described more completely below, can be extended to any keypad where a single key is used to enter two or more letters. Further, the process is not limited to only letters, but rather is applicable to any keypad where a single key is used to represent two or more characters. In view of the following disclosure, those skilled in the art can use the principles of the predictive text entry process in a wide variety of applications.

The system for predictive text entry includes a predictive text entry module **901** that in this embodiment is included in client module **702**, keyboard module **711**, and a letter frequency table **902** that is loaded into memory **716**, when client module **702** is activated. Predictive text entry module **901** is used in process data entry **827** when specified by the current entry card. Predictive text entry module **901** performs routine buffer management processes, that are known to one of skill in the art and so are not described further to avoid detracting from the process.

Predictive text entry module **901** stores a letter entry for each letter entered in a text buffer **903** in memory **716**. In this embodiment, letters Q and Z are assigned to the one key and the zero key is used to enter a space, period, and comma, i.e., the zero key provides punctuation. However, these assignments are illustrative only, and are not intended to limit the invention to this particular embodiment.

The first letter entered is placed at the left end of the buffer and each additional letter is placed in the left most unused space in buffer **903**. Thus, the last letter entered in text buffer **903** is the right most character. Letter frequency table **902**, sometimes referred to as a table of predictive letter entries, is a look-up table where each entry in the look-table is

addressed by three indices. The first two indices represent the two most recently entered letters in text buffer **903** and the third index represents the key that was pressed. Each predictive letter entry stored in letter frequency table **902** defines which of the letters associated with the pressed key to use given the previous two letters. For example, since the is a commonly occurring string, the entry in table **902** addressed by (t, h, **3**) returns e, or more concisely the predictive letter entry **2** is returned to indicate that the second letter of the group of letters d, e, and f associated with the three key is the predicted letter. Of course, letter frequency table **902** could be altered to return more than a single letter.

In this embodiment, letter frequency table **902** was empirically generated using a collection of e-mail. Appendix II is a computer program listing that was used to generate letter frequency table **902** that is illustrated in FIGS. **10A** to **10T**. Briefly, the computer program implements a process that sequentially steps through the data provided and (i) for each possible single letter determines the most likely letter that follows for each key on the keypad; and (ii) for each possible combination of two letters determines the most likely letter that follows for each key on the keypad. In this embodiment, the most likely letter is the letter having the greatest frequency after the single letter. Similarly, the most likely letter is the letter having the greatest frequency after the combination of two letters. If there is a tie in the frequency, the first letter associated with a key is selected. Of course, other measures of likelihood could be used to generate the entries in table **902**.

Thus, in FIGS. **10A** to **10T**, the first of the ten columns, i.e., the left most column, is the two letter sequence and the first row, i.e., the top row is the keys on the key pad used to enter text. A combination of an entry in the first column and a key in the top row is used to select the predicted text entry. Thus, using the example of th, this two key sequence appears in the first column of FIG. **10O**. When the three key is pressed, the letter in the row with th as the first entry and in the column with three as the first entry, i.e., e, is retrieved. Alternatively, if the four key is pressed, letter i is retrieved from the table.

In this embodiment, table **902** is a buffer of two bit numbers. Each two bit number has a value in the range of zero to three, and the two bit number represents a predicted letter for the pressed key. Thus, for a two key labeled with letters A, B and C, a zero represents A; a one represents B; and a two represents C. In general, the number of bits used is determined by the key that represents the maximum number of characters. In this embodiment, the maximum number of characters represented by a key is three. The number of storage bits required is an integer S where S is the smallest number such that 2**S is greater than or equal to the maximum number of characters represented by a key.

In this embodiment, three indices i0, i1, and i2 are used generate a table index that in turn is used to access a particular predictive letter entry in table **902** of two bit numbers. Each letter is represented as a number, i.e., a letter entry, with letter A being zero, letter B being a one, letter C being a two, and so forth with letter Z being twenty-five. A space element is assigned a space element value of twenty-six. Thus, in this embodiment, there are twenty-seven possible characters.

Upon the initial entry to process **1100** (FIG. 11), letter indices i0, i1, and i2 were set to twenty-six in the initial processing of the entry card to indicate that the text buffer is empty. Also, as explained more completely below, as each letter of text is entered, letter indices i0 and i1 are updated and stored in memory **716**.

US 6,430,409 B1

35

However, in another embodiment, an initialize indices process is the first operation in predictive text entry process 1100. In this embodiment, for the first letter entered, letter indices i0 and i1 are set to twenty six; for the second letter entered, letter index i0 is set to twenty six and letter index i1 is set to the value of the letter in text buffer 903; and for all letters entered after the first two, the value associated with next to the last letter in text buffer 903 is assigned to letter index i0 and the value associated with the last letter in text buffer 903 is assigned to letter index i1.

Punctuation key check 1101 determines whether the zero key was pressed, i.e., the key selected to represent punctuation.

If the zero key was pressed, processing transfers from check 1101 to process punctuation entry 1102. Process punctuation entry 1102 sets index i2 to twenty-six, and sends the space element value to display letter process 1108. Display letter process 1108 transfers the space element value to display module 712 which in turn drives a space in the text entry on display screen 705. This completes the operation of process data entry for a zero key press and so processing returns to key press check 820.

If the zero key was not pressed, processing transfers through punctuation key check 1101 in data entry process 1100 to key one-to-nine check 1103, i.e., to a data entry key check. If the pressed key was any one of keys one to nine, check 1103 transfers to set letter index process 1104 and otherwise to rotate last entry process 1109.

In set letter index process 1104, one is subtracted from the numeric value of the pressed key and the resulting value is assigned to index i2. Set index process 1104 transfers to generate table index process 1105.

Generate table index process 1105 combines indices i0, i1 and i2 to create a table index. In this embodiment, table index TABLE_INDEX is defined as:

TABLE_INDEX=((((i0*27)+i1)*9)+i2

Upon completion of generate table index process 1105, generate text entry process 1106, retrieves the two bit value in the table at the location pointed to by table index TABLE_INDEX and converts the two bit value to a letter represented by the two bit value.

Generate text entry process 1106 transfers to update index process 1107, which in turn stores the value of letter index i1 as letter index i0; stores the value of the retrieved letter in letter index i1; and stores the predicted letter in text buffer 903. While this step assumes that letter indices i0, and i1 are stored and accessed each time in process 827, alternatively, the last two letters in text buffer 903 can be retrieved and assigned to indices i0 and i1, respectively, as described above.

Update index process 1107 transfers to display letter process 1108. Display letter process 1108 sends information to display module 712 which in turn generates the predicted letter on display screen 705.

If the pressed key is not one of keys one to nine, i.e, is not a data entry key, processing transfers from check 1103 to rotate last entry 1109. Recall that data key check 826 determined whether the pressed key was one of the zero to nine keys, or the # key. Thus, since checks 1101 and 1103 determined that keys zero to nine were not pressed, the only key press remaining is the # key, i.e., the rotate entry key, which indicates the user wants a letter different than the one entered last in text buffer 903. In rotate last entry 1109, the last character, i.e., the right most character, in text buffer 903 is replaced by the next character in the set of characters assigned to the last key pressed before the # key was pressed.

36

Again, the use of the # key is illustrative only and is not intended to limit the invention to the use of that particular key to rotate an entry.

For example, if the last character in the text buffer 903 was a t and the # key is pressed, process 1109 changes the t to u. If the # key is pressed again, the u is changed to a v. Alternatively, if the last character in text buffer 903 was a u and the # key is pressed, process 1109 changes the u to a V. If the last character in text buffer 903 was a v and the # key is pressed, process 1109 changes the v to a t. If index i1 is stored, as the last character in text buffer 903 is rotated, index i1 is updated.

Text entry in cellular telephone 700 in different languages or contexts can be supported by using different letter frequency tables. For example, for plumbers, the prediction table can be based on text about plumbing procedures. For Frenchmen, the prediction table can be based on French text. Also, multiple letter frequency tables could be stored in cellular telephone 700, or selectively transmitted to cellular telephone 700, and a particular letter frequency table would be selected on an entry card.

In addition, an entry in the table can be more that a single letter, and thus save even more key strokes. For example, if the text buffer contains sche then typing a 3 could return dule rather than just d. Further, this novel method of text entry can be utilized with other than a cellular telephone. The method is applicable to any device that has several characters assigned to a single key on a keypad.

In the above embodiment, the English alphabet and a space element were used as the character set. Thus, the number 27 used in defining the table index is just the number N of characters in the set. Similarly, the number 9 used in defining the table index is just the number M of keys in the keypad that represent two or more different characters. Hence, predictive text entry method of this invention is not limited to text and is directly applicable to any keypad where each key represents a plurality of different characters.

In the embodiment of FIGS. 7, 8, and 9, client module 702 and server module 749 communicate over CDPD network 710. However, this architecture is illustrative only of the principles of the invention and is not intended to limit the invention to the particular architecture described. Client module 702 and server module 749 can use a wide variety of two-way data communication links to exchange resource locators, e.g., URLs, and TIL decks. For example, the communications link could be a switched voice circuit in which the client module and server module communicate using modems. Alternatively, the communications link could be any other packet switched network, so long as there is some way for client module 702 to get requests to server module 749 and for server module 749 to send data back to client module 702. Further, a special purpose server could be used in place of HTTP server 749. For example, the principles of this invention can be used over various data transport mechanisms including circuit switched data and packet switched data. These data transport mechanisms are being defined and implemented for most of the cellular network standards including GSM, TDMA, and CDMA.

In the configuration of airnet network 750 (FIG. 7), client module 702 communicated directly with a server computer 743. In another embodiment, as illustrated in FIG. 5, the two-way data communication device first communicates with an airnet network translator 500 that in turn communicates with the appropriate server. In this embodiment, the operation of two-way data communication devices 100, 101, and 102 is similar to that described above for cellular telephone 700, except the method field in the request gen-

US 6,430,409 B1

37                                                              38

erated in process 802 has a different form. For example, using the same information as before, the method field in this embodiment is:

GET http://www.libris.com/airnet/home.cgi?&cost=1ANTP/1.0

The method field includes the full address of the server, the expected cost of the service, and the version of the protocol used for communicating with airnet network translator 500. The two-way data communication device transmits the HTTP request including the complete URL to airnet network translator 500.

FIG. 12 is a more detailed block diagram that illustrates the structures in one embodiment of airnet network translator 500, according to the principles of this invention. In this embodiment, airnet network translator 500 is a computer running under the UNIX operating system with an interface to CDPD network 710. Such computers are well known to those skilled in the art. Thus, herein only the structures and processes that must be added to such a computer are described.

Airnet network translator 500 supports internet protocol (IP) connections over CDPD network 710 and with each computer network with which translator 500 can interact. In this embodiment, each of the modules in network translator 500 are processes that are executed by the processor in the computer. Control module 1201 is a daemon that listens for transmissions over an IP connection from CDPD network 710. When control module 1201 accepts a transmission, control module 1201 spawns an ANT request processor 1204, which in this embodiment is a process, as indicated above. While in FIG. 12, only one ANT request processor 1204 is shown, there is an ANT request processor spawned for each transmission that control module 1201 accepts and the ANT request processor remains active until the communication is terminated.

FIG. 13 is a process flow diagram that illustrates the operation of ANT request processor 1204. This process flow diagram considers transmissions that utilize both TCP/IP and UDP/IP. However, the processes that are specific only to TCP/IP are enclosed in dashed-line boxes. Upon being spawned for a TCP/IP, in establish connection process 1300, ANT request processor 1204 establishes a TCP connection using a TCP module in the server with the client module over CDPD network 710. After the connection is established processing transfers from process 1300 to request received check 1301.

If UDP is being used, upon being spawned ANT request processor 1204 initiates processing in request received check 1301. In check 1301, ANT request processor 1204 determines whether the request from cellular telephone 700 (FIG. 12) has been received and stored in memory 1210. Memory 1210 represents both RAM and non-volatile memory in this embodiment. When the request has been received and stored, processing transfers from check 1301 to retrieve data process 1302.

In retrieve data process 1302, ANT request processor 1204 retrieves information concerning the source of the URL, i.e., client module 702 of cellular telephone 700 from customer database 1213, and the destination specified in the URL, i.e., the designated server, from server database 1212. Both databases 1212 and 1213 are stored in memory 1210. A customer record in database 1213 includes, for example, a carrier address, e.g., an IP number, an airnet network translator account number, billing information, and server subscriptions. A server record in database 1212 includes a server IP address, name, category, and class of service. Class of service refers to the pricing of the service, e.g., basic

services, premium services, or pay-per-view services. Other pricing schemes can be supported in other implementations. When the information is retrieved for the server and service specified in the URL, and for the customer, processing transfers to valid request check 1303.

In valid request check 1303, ANT request processor 1204 determines, for example, whether client module 702, i.e., the customer, is authorized to access airnet network translator 500; whether client module 702 is authorized to access the server specified in the URL; whether the specified server is available through translator 500; and whether the specified server supports the requested service. Thus, valid request check 1303, validates the client, the server, and the client/server pair. Also, since an estimated cost is included in the request, the status and credit limits on the customer's account could be checked to determine whether the estimated cost is acceptable. If all of the checks are true, processing transfers to create HTTP request process 1306. Conversely, if any one of the checks is untrue, valid request check 1303 passes information concerning the error to return error process 1304.

Return error process 1304 launches a CGI program stored in memory 1210 based on the information received and passes appropriate information to the CGI program. The CGI program builds an appropriate PIDL deck describing the error and converts the PIDL deck to a TIL deck, as described above. When the TIL deck describing the error is complete, return error process 1304 transfers processing to log transaction process 1315 that is described more completely below.

If all the checks in valid request check 1303 are true, create HTTP request 1306 converts the request in memory 1211 to a request specific to the server specified, which in this embodiment is a HTTP request. For example, for the above request, create HTTP request process 1306 generates a method field, such as

GET/airnet/home.cgi?&client=xyz&cost=1HTTP/1.0

In this embodiment, the method field includes the same information as in the embodiment described above, and in addition, the method field includes a client identification and the estimated cost.

After create HTTP request process 1306 is complete, ANT request processor 1204 accesses TCP module 1203 in establish server connection process 1307 for TCP/IP and transfers to secure transmission check 1308 for UDP/IP. In establish connection process 1307, a connection is made between the server designated in the client request and the TCP interface module (not shown) so that data can be transmitted between airnet network translator 500 and the server. When the TCP connection to the server is established, ANT request processor 1204 transfers processing from establish server connection process 1307 to secure transmission check 1308.

In secure transmission check 1308, ANT request processor 1204 determines whether the HTTP request from the client requested a server that utilizes a protocol that supports encryption. If such a server was requested, processing transfers to negotiate process 1309 and otherwise to transmit request process 1310.

In negotiate process 1309, ANT request processor 1204 negotiates an encryption technique with the server. Upon completion of the negotiation, processing transfers from process 1309 to encryption process 1311. In encryption process 1311, the HTTP request is encrypted using the negotiated encryption technique, and then processing transfers to transmit request process 1310.

US 6,430,409 B1

39

In transmit request process **1310**, the HTTP request is sent from memory **1210** to the HTTP server. When the transmission is complete, ANT request processor **1204** goes to result received check **1312**.

As described above, upon receipt of the request, the HTTP server services the request. Upon completion of servicing the request, the HTTP server returns either a PIDL deck or a TIL deck to airnet network translator **500**. The deck is stored in memory **1210**. If the server does not convert the PIDL deck to a TIL deck, the translation is done by airnet network translator **500**.

When the deck is received and stored, ANT request processor **1204** transitions from check **1312** to transmission completed process **1313** for TCP/IP and to secure transmission check **1314** for UDP/IP. ANT request processor **1204** closes the TCP circuit with the server in transmission completed process **1313**. Upon closing the server TCP connection, processing transfers to secure transmission check **1314**.

If the server utilized encryption, the deck stored in memory **1210** is encrypted. Thus, secure transmission check **1314** transfers processing to decryption process **1316** if encryption was used and otherwise to log transaction **1315**.

In decryption process **1316**, the encrypted deck is decoded and stored in memory **1210**. Also, after the decoding, if the deck must be converted to a TIL deck, the translation is performed. Decryption process **1316** transfer to log transaction process **1315**.

In log transaction process **1315**, ANT request processor **1204** writes a description of the transaction to transaction log **1211** in memory **1210**. In this embodiment, each transaction record includes a customer identification, a server identification, time required for the transaction, cost of the transaction, and a completion code. In one embodiment, for security purposes, each cellular telephone is assigned to only one customer and only one account.

After the transaction is logged, processing transfers to transmit result **1317**. In transmit result **1317**, ANT request processor **1204** returns the deck to client **702**. After the deck is transmitted, ANT request processor **1204** is terminated.

In one embodiment, if an airnet network translator is fully loaded and another transmission comes in, the translator returns the address of another airnet network translator and refuses the transmission. The cellular telephone transmits the message to the other network translator. In yet another embodiment, all incoming transmissions are directed to a router. A plurality of airnet network translators are connected to the router. The router monitors the status of each translator. Each incoming transmission is routed to the least busy translator, which in turn responds to the transmission and performs the necessary operations for continuing communications with the client module.

In the above description of client module **702**, module **702** interacted with components within the cellular telephone to perform the various operations specified by the user. To insulate client module **702** from the exigencies of various cellular telephones to the extent possible, a general architecture for client module **702** is described more completely below. This general architecture is designed to have specific manager modules that interact with the modules described above within the cellular telephone and to provide standard information to the remaining manager modules within client module **702**. The manager modules with client module **702** form an interpreter that interprets TIL decks to generate a user interface; interprets data input by the user; and interprets the TIL decks so that the data input by the user is combined with an appropriate resource locator and either a

40

message is sent to an appropriate server, or another local TIL deck is interpreted by client module **702**. While this embodiment is for a cellular telephone, the manager modules are generic and so are applicable to any client module in a two-way data communication device.

This approach limits the modifications that must be made to client module **702** to implement the principles of this invention in a wide variety of two-way data communication devices over a wide variety of two-way data communication networks. Also, in the above embodiment, client module **702** supported communications and interactions over the cellular telephone network. However, client module **702** can also support local services on cellular telephone **700**. Typical local services includes local messages, an address book, and preconfigured e-mail replies, or any combination of such services.

In this embodiment, client module **702** includes a plurality of manager modules including a navigation manager module **1401**, a network manager module **1402**, a TIL manager module **1403**, an archive manager module **1404**, a local manager module **1405**, an event manager module **1406**, a timer manager module **1407**, a user interface manager module **1408**, a memory manager module **1409**, and a device dependent module **1410**.

Navigation manager module **1401** handles card and deck navigation as well as managing any caches. Navigation manager module **1401** owns and manages a history list and as well as a pushed card list. In addition, navigation manager module **1401** functions as the main line of client module **702**; does all event distribution; and supports local services.

For local services, like local message store, there are two basic approaches that can be used. First, local services are implemented in a CGI-like manner. Each local service has an entry point which is called with an argument list. A TIL deck is returned via the event manager. From that point on, the TIL deck is processed in the standard manner. This approach limits local services to the same constraints as remote services. A less restrictive approach is to allow the local service to field events instead of the standard event loop. The local service would construct TIL cards on-the-fly and forward them to user interface manager **1406**. Note that the local service would need to cooperate with the standard event loop with regard to the history, the pushed card list, and any other state that is normally managed by the event loop. Table 4 is a listing of processes for the architecture for navigation manager module **1401**.

TABLE 4

| ARCHITECTURE FOR NAVIGATION MANAGER MODULE 1401 |
| --- |
| ProcessEvents (void);<br>PushLocation (void * location, Boolean forStack);<br>void * PopLocation (Boolean forStack);<br>void * CurrentLocation();<br>struct LOCAL_SERVICE {<br>    char name[50];<br>    FUNC HandleEvent(Event * pevent);<br>    FUNC StartLocalService(void);<br>    FUNC StopLocalService(void);<br>    };<br>static LOCAL_SERVICE localServices[]={ . . . };<br>STATUS HandleEvent(Event * pevent);<br>STATUS StartLocalService();<br>STATUS StopLocalService(); |

Routine ProcessEvents is the main entry point for event processing in client module **702**. Typical events include key presses on the keypad, choice selection for a choice card, text entry for an entry card, network events, and history

**A0143**

US 6,430,409 B1

41

events. Routine ProcessEvents can be called at any time to process an event or events. Routine ProcessEvents does not return until all events on a queue generated by event manager module **1406** are processed. If a local service is running, events are distributed to the local service before being processed by routine ProcessEvents.

The remaining routines in Table 4 are called internally to navigation manager module **1401** and by local services. Routine PushLocation pushes a location on the history list and issues a request for that location. The forStack flag indicates a stack push of local cards.

Routine *PopLocation pops a location on the history stack and issues a request for the top location of the history stack. In routine *PopLocation the forStack flag indicates that all cards since the last stack push should be popped.

Routine *CurrentLocation returns the current location the current URL being displayed.

As shown in Table 4, each local service provides a number of functions. If a local service is running, function HandleEvent, the local service's event handler, is called before any processing by navigation manager module **1401**. If the event is handled by the local service, the event is not processed any further.

Function StartLocalService is the local services start function. Function StartLocalService is called before any events are distributed to the local function. Similarly, function StopLocalService is the stop function for the particular local service. Function StopLocalService is called when no more events are distributed to the local service.

Network manager module **1402** insulates the rest of client module **702** from the specific networking protocol used over the cellular telephone network. Network manager module **1402** delivers requests to the server specified in the URL via the cellular telephone network interface; segments responses from the server for lower latency; delivers responses from local services to navigation module **1401** via event module **1406**; handles request/response cycle (e.g. cancellation, retry strategy) with the server over the cellular telephone network; can receive asynchronous messages from the server; performs memory management of TIL decks; performs caching of TIL decks; handles all negotiations concerning protocols and server scaling with the server; handles any encryption for information exchanged between cellular telephone **700** and the server.

In some cellular telephone, the maximum message size is fixed. However, for UDP and TCP messages, a more direct interface is used that bypasses this limitation of message passing. It is important to avoid copying network data from memory buffer to memory buffer as such copying increases the memory "high water mark" as well as decreases performance. Since different cellular telephones have different interfaces for delivering network data, network manager module **1402** manages the network data. In this way, network data is only copied from the network buffer for long-term storage.

When a message or reply arrives, network manager module **1402** uses event manager module **1406** to report that fact. However, access to the data by other manager modules in client module **702** is through a protocol that allows storage of data in a variety of fashions on different telephones. Any transparent, short-term caching of TIL data is handled by network manager module **1402**. Table 5 is one architecture for network manager module **1402**.

42

TABLE 5

SPECIFICATION FOR NETWORK MANAGER MODULE 1402

```
typedef short TID;
void NM__Init(void);
void NM__Terminate(void);
TID NM__SendRequest (void *requestData, int length,
        Boolean ignoreCache);
NM__CancelRequest (TID TRANSACTIONId);
NM__DataType(TID TRANSACTIONId);
NM__GetData(TID TRANSACTIONId, void *data, int
        *length, Boolean *complete);
void *NM__HoldData (TID TRANSACTIONId);
NM__ReleaseData(TID TRANSACTIONId);
TID NM__StartData(int data Type, char *requestData,
        int length);
STATUS NM__EndData(TID TRANSACTIONId);
STATUS NM__SetDataLength (TID TRANSACTIONId, int
        length);
STATUS NM__GrowDataLength (TID TRANSACTIONId, Int
        grow);
int NM__GetDataLength(TID TRANSACTIONId);
void *NM__GetDataPointer (TID TRANSACTIONId);
STATUS NM__DeliverData (TID TRANSACTIONId);
```

Network manager module **1402** identifies each network data transaction by a 16-bit transaction identification code TID. Network manager module **1402** increments transaction identification code TID by one for each new transaction. Transaction identification code TID rolls over after 0xffff.

Routine NM__Init initializes network manager module **1402** and so is called before any other calls in network manager module **1402**. Routine NM__Terminate closes processing of network manager module **1402** and so is called after all other calls in network manager module **1402**.

Network manager module **1402** uses routine TID NM__SendRequest as the standard process of sending a request to the server. Pointer *requestData in the call to routine TID MN__SendRequest is defined by the server protocol. Similarly, the state, e.g., the Boolean value, of variable ignorecache is used to indicate whether any cached replies should be ignored. After sending the request, this routine returns a server transaction identification code TRANSACTIONId. A local service can also send a request to the server.

When the user instructs client module **702** to cancel a request, network manager module **1402** calls a routine NM__CancelRequest with cellular telephone transaction identification code TID and server transaction identification code TRANSACTIONId. Routine NM__CancelRequest issues a command to the server to cancel the specified request.

When data are received from the network, the data can be either a response to a request sent by routine TID MN__SendRequest, or by a local service. Thus, in response to receiving data from the server, network manager module **1402** generates an event that includes server transaction identification code TRANSACTIONId and the type of data DATAType. For replies to requests sent by routine TID MN__SendRequest, server transaction identification code TRANSACTIONId is the same as the one returned by the matching call to routine TID MN__SendRequest and data type DATAType indicates that the data is a response. For local service originated messages, server transaction ID is new, and data type DATAType depends on whether the data is an e-mail, pushed TIL, or another type.

US 6,430,409 B1

43                                                              44

After the network event is received by event manager module **1406**, and navigation manager module **1401** distributes control of the event to network manager module **1402**, network manager module **1402** users the server transaction identification code TRANSACTIONId and the remaining routines in Table 5 to process the data.

Routine NM__DataType is used to return the particular data type dataTYPE, e.g, reply, MIME, server push, etc. Routine NM__GetData sets a pointer to the data identified by server transaction identification code TRANSACTIONId, retrieves the length of the data, and determines whether all the data has been received. The interface provided by this routine allows the first part of a data stream, e.g. the first card of a TIL deck, to be processed by client module **702** before the rest of the deck is received.

Routine NM__HoldData is called before calling routine NM__GetData to hold the data and thus insure that the data remains valid during processing by client module **702**. If the data is not held, the data can be deleted or moved with the internal buffers of network manager module **1402**. If the data is held, routine NM__ReleaseData is called after network data has been processed to release the data.

Routines TID NM__StartData, NM__EndData, NM__SetDataLength, NM__GrowDataLength, NM__GetDataLength, NM__GetDataPointer, and NM__DeliverData are used internally by network manager module **1402**, and by local services to deliver data. By allowing local services to use these routines, the same buffers can be used to store both network and locally generated data thereby reducing the amount of memory required to support client module **702**.

Routine TID NM__StartData creates a new data transaction and triggers a data delivery event. Routine NM__EndData is called when all data for the given server transaction identification code TRANSACTIONId has been transmitted. Routine NM__SetDataLength sets the data segment to a given length and may cause the location of the data to change. Routine NM__GrowDataLength grows the data segment by a given length and also may cause the location of the data to change. Routine NM__GetDataLength returns the length of the data segment. Routine NM__GetDataPointer returns a pointer to the data. This routine is preferably called before writing into the data buffer. Also, this routine is preferably called whenever the data's location may have changed. Routine NM__DeliverData can be called when at least one card has been stored to reduce latency while the other cards are being generated.

TIL manager module **1403** insulates the rest of client module **702** from changes to the TIL specification. The interface provided by TIL manager module **1403** has the following characteristics: removes the need for parsing by the rest of client module **702**; uses cursors to avoid generating data structures on-the-fly; does not need an entire deck to operate; and handles TIL versioning.

Each TIL deck contains a major and a minor version number. The minor version number is incremented when TIL changes in a way that does not break existing TIL manager modules. The major version number is incremented for non-compatible versions of TIL.

Each TIL deck has the same hierarchy. One embodiment of this hierarchy is presented in Table 6. In Table 6, indentation is used to represent the relationships of the various hierarchical levels.

### TABLE 6

TIL DECK HIERARCHY

```
deck
      options
      softkeys
            options
      card
            options
            softkeys
                  options
            formatted text
                  formatted lines
            entries
                  options
      formatted line
```

The interface presented in Table 7 for TIL manager module **1403** is designed with the assumption that TIL is a direct tokenization of PIDL as described in Appendix I. However, the interface does not have any dependencies on that tokenization and can support other PIDL encoding techniques. Given the above assumption, the opaque pointers described below are actual pointers into the TIL deck itself. A rudimentary object typing scheme based on where in the deck the opaque pointer points can be used to implement the generic functions described below. If this object typing is not feasible due to details of TIL encoding, the generic functions can be replaced with specific functions.

### TABLE 7

ARCHITECTURE FOR TIL MANAGER MODULE 1403

```
typedef char *opaque;
typedef opaque Deck;
typedef opaque Card;
typedef opaque Text;
typedef opaque Entry;
typedef opaque Option;
typedef opaque SoftKey;
typedef opaque Object;
/* Generic functions */
      FirstOption(Object obj, Option *o);
            /* obj is a card, softkey, entry, or deck */
      GetSoftkey(Object obj, Option *o);
            /* obj is a card or deck */
      GetText(Object obj, Option *o);
            /* obj is a card or entry */
/* Deck functions */
      SetDeck(Deck d, int length);
            /* tells module which deck to use */
      DeckGetCard(Card *c, int num);
-or-
      DeckGetCard(Deck d, Card *c, int num);
/* Card functions */
      int CardType(Card c);
      CardFirstEntry(Card c, Entry *e);
      CardLookupSoftkey(Card c, int num, Softkey *s);
      CardIsLast(Card c);
/* Option cursor functions */
      OptionNext(Option *o);
      char *OptionKey(Option o);
      char *OptionValue(Option o)
/* Entry cursor functions */
/* Text (and image) cursor functions */
      TextNextToken(Text *t, int *type, int *subtype,
                        int *length, char *data);
```

Archive manager module **1404** stores and retrieves long-lived information. This information includes: data related to the server's location and/or required to support server scaling; data related to encryption; TIL caching (transparent to user); TIL storage (specified by user); and message storage and retrieval (see local manager module). Archive manager

US 6,430,409 B1

45

module **1404** should support a variety of nonvolatile memory schemes that are provided by the two-way data communication devices.

Local manager module **1405** is an interface to local device resources, such as local messages, address book entries, and preconfigured e-mail replies. Local manager module **1405** should also define an abstract interface to navigation manager module **1401** for use by archive manager module **1404**.

Table 8 is an architecture for an interface within local manager module **1405** to access to an address book stored on cellular telephone **700**. The name of a routine in Table 8 is descriptive of the operations performed by the routine.

TABLE 8

| ARCHITECTURE FOR ADDRESS BOOK ACCESS |
| --- |
| int NumAddresses (); |
| char *AddressName (int num); |
| char *AddressGetEMail (int num); |
| // returns e-mail address |
| char *AddressGetPhone (int num); |
| // returns phone number |
| char * AddressGetFax (int num); |
| // returns fax number |
| SetAddress (int num, char *name, char *email, |
| char *phone, char *fax); |
| DeleteAddress (int num); |
| InsertAddress (int before); |

Table 9 is an architecture for an interface within local manager module **1405** to access predetermined replies stored on cellular telephone **700**. The name of a routine in Table 9 is descriptive of the operations performed by the routine.

TABLE 9

| ARCHITECTURE FOR PREDETERMINED REPLY ACCESS |
| --- |
| int NumReplies (); |
| char * GetReply (int num); |
| DeleteReply (int num); |
| SetReply (int num, char *text); |
| InsertReply (int before); |

Table 10 is an architecture for an interface within local manager module **1405** to access messages stored locally on cellular telephone **700**. The name of a routine in Table 10 is descriptive of the operations performed by the routine.

TABLE 10

| ARCHITECTURE FOR LOCALLY STORED MESSAGE ACCESS |
| --- |
| int NumMessages (); |
| void *FirstMessage (); |
| void *NextMessage (); |
| int MessageType (void *msg); |
| // e.g. e-mail, TIL, etc. |
| void *MessageContent (void *msg); |
| void *SaveMessage (int type, void *content, int |
| contentLength); |
| DeleteMessage (void *msg); |

Event manager module **1406** handles the distribution of events. In this embodiment, events include low-level events like key presses and higher level navigation and user interface events. There are typically only a small number of events at any one time. The main event loop in the two-way data communication device dependent module keeps calling EM__GetNextEvent ( ) until no events are left in the queue. Note that processing one event can cause another event to be

46

pushed onto the queue. The main event loop is not restarted until another event is pushed onto the queue due to a user key press or a network event.

In this embodiment, the event types include:
1) keypad events, i.e., pressing of a key;
2) choice events relating to a current choice card, e.g., the user selecting choice three;
3) text entry events relating to a current entry card, e.g., the user keying in "Hello";
4) network events, e.g., response arrived, request arrived, transaction terminated, network status; and
5) history events, e.g., pop, pop to home.

Table 11 is an architecture for event manager module **1406**. As in the other tables herein, the name of a routine in Table 11 is descriptive of the operations performed by the routine and in addition a brief description is given in the comment field.

TABLE 11

| ARCHITECTURE FOR EVENT MANAGER MODULE 1406 |
| --- |
| struct Event { |
| int type; |
| void *data; |
| /* e.g. keycode, choice num, entry |
| text, status code, other data */ |
| } |
| EM__QueueEvent (int type, void * data); |
| /* Adds event at end of queue*/ |
| EM__GetNextEvent (Event * event); |
| /*Pops next event*/ |
| EM__PeekNextEvent (Event event); |
| /*Peeks at next event*/ |

Timer manager module **1407** allows timer events to support timeouts, animation, and other time-domain features. Timeouts are delivered via event manager module **1406**.

Table 12 is an architecture for timer manager module **1407**. As in the other tables herein, the name of a routine in Table 12 is descriptive of the operations performed by the routine.

TABLE 12

| ARCHITECTURE FOR TIMER MANAGER MODULE 1407 |
| --- |
| TimerInit (); |
| int TimerSet (int milliseconds, int code, void |
| *clientData); |
| /*Returns a timer identification timerId to |
| be used for cancellations*/ |
| TimerCancel (int timerId); |
| TimerCancelAll () |

User interface manager module **1408** handles interactions with the keypad and the display. Each of the three types of user interfaces defined in Table 1 above requires a different version of user interface manager module **1408**. For most cellular telephones, only one card at a time is used. However, some cellular telephones can display multiple cards at once and so would require a different version of user interface manager module **1408** from the version that handled display of only one card at a time.

In this embodiment, user interface manager module provides a user interface for the three types of cards display, choice, and entry; provides hooks for custom user interfaces for the address list and e-mail reply entry; only cares about the user interface aspects of cards and provides no navigation, argument, or option processing; handles all text and graphic layout including word wrapping; handles scroll-

US 6,430,409 B1

47

ing of text; operates from PIDL data structures; generates keyboard events, some of which may be generated by soft keys; and generates high-level events, e.g. next card, choice entry **3**, text entry "IBM".

Table 13 is an architecture for processing cards by user interface manager module **1408**. As in the other tables herein, the name of a routine in Table 13 is descriptive of the operations performed by the routine.

TABLE 13

ARCHITECTURE FOR CARD PROCESSING
BY UI MANAGER MODULE 1408

```
void UI_StartCard (Card c);
        /* called to begin display and processing of
        a given card*/
void UI_EndCard (Card c);
        /*called when a card is no longer to be
        displayed* /
Boolean UI_HandleEvent (Event *pevent) ;
        /*returns true if the event is handled, false
        if not*/
```

Table 14 is an architecture for the user interface implementation by user interface manager module **1408**. As in the other tables herein, the name of a routine in Table 14 is descriptive of the operations performed by the routine.

TABLE 14

ARCHITECTURE FOR UI IMPLEMENTATION
BY UI MANAGER MODULE 1408

```
UI_ LayoutCard (Card c, Boolean draw, Proc
                                    callback)
        /* relies on global data; needs to be able
        to: draw as it goes; and note the
        special function of the currentLine
        (e.g. none, choice, softkey)*/
int numLines, firstVisible, lastVisible,
                                    currentLine;
char currentEntry[80];
int currentChoice;
void *currentSoftkey;
Card currentCard; and
        . . . other info as needed for in-line
        scrolling
```

The callback routine is notified of the special function of each line as the line is laid out. Thus, routine UI_LayoutCard can be used to scroll to a particular choice. If the current line is too wide to display all at once, horizontal scrolling is used to display the complete line, one display width at a time.

Memory manager module **1409** is optional, and is used in two-way data communication devices that do not support dynamic memory allocation. In these devices, all memory allocation and releases must go through memory manager module **1409**. Also, by allocating memory in advance via memory manager module **1409**, client module **702** does not run out of memory due to some other process on the device using up memory.

Microfiche Appendix A is a computer source code listing in the C++ computer language of one embodiment of a client module within a cellular telephone, and one embodiment of an airnet network translator that was used with an Internet server to communicate with client module. The Internet server was a UNIX computer running the Mosaic HTTP server. The source code was used to generate executable code by compiling the source code on a computer running the Sun Microsystems Operating System Solaris 2.4 using Sun Microsystems compiler SunPro C and C#, and the Sun

48

Microsystems SDK make utility. All of these products are available from Sun Microsystems of Mountain View, Calif.

This application is related to copending and commonly filed U.S. patent application Ser. No. 08/570,384 entitled "A PREDICTIVE DATA ENTRY METHOD FOR A KEY-PAD" of Alain Rossmann, which is incorporated herein by reference in its entirety.

Various embodiments of a novel interactive two-way data communication system, a two-way data communication device, an airnet network architecture, and a predictive text entry system have been described herein. These embodiments are illustrative only of the principles of the invention and are not intended to limit the invention to the specific embodiments described. In view of this disclosure, those skilled in the art will be able to use the principles of this invention in a wide variety of applications to obtain the advantages of this invention, as described above.

I claim:

1. A wireless mobile telephone having a processor, wherein said wireless mobile telephone comprises:

a memory;

a display;

a display module coupled to said display wherein said display module drives said display;

a key pad including a plurality of keys;

a keypad module coupled to said keypad wherein upon a user activating a key in said keypad, said keypad module stores information identifying the activated key in said memory;

a network interface module receiving data from and sending data to a data network over a wireless link;

a client module executing on said processor and coupled to said display module, said network interface module, said keypad module, and said memory;

wherein said client module, in response to a signal from said keypad module, processes said stored information identifying the activated key and stores a symbol representing said pressed key in a memory buffer; and

wherein upon completion of data entry, said client module retrieves the symbols in said memory buffer which generates a request including said symbols and a resource locator identifying a resource in a server on said data network to said network interface module for transmission over said wireless link to said server.

2. A wireless mobile telephone as set forth in claim **1** further comprising a card deck stored in said memory, said card deck comprising one or more cards received from said data network over said wireless link.

3. A wireless mobile telephone as set forth in claim **2** wherein said card deck includes a display card for displaying on said display.

4. A wireless mobile telephone as set forth in claim **3** wherein said client module processes said display card and sends information to said display module.

5. A wireless mobile telephone as set forth in claim **2** wherein said card deck includes a choice card providing a plurality of items for user selection.

6. A wireless mobile telephone set forth as in claim **5** wherein upon said client module processing said choice card, said client module retrieves said stored information identifying the activated key, and generates a request for a choice correspond to the activated key to said server.

7. A wireless mobile telephone as set forth in claim **2** wherein said card deck includes an entry card requiring user input.

8. A wireless mobile telephone as set forth in claim **2** wherein said card deck includes a card for display and user input.

US 6,430,409 B1

49 50

9. A wireless mobile telephone as set forth in claim **8** wherein said client module receives said user input retrieve a second card from said card deck in accordance with said user input, and sends said second card to said display module for display.

10. A wireless mobile telephone as set forth in claim **2** wherein said card deck includes a card for display and for presenting choices for selection by a user.

11. A wireless mobile telephone as set forth in claim **2** wherein said card deck includes a card for user input and for presenting choices for selection by a user.

12. A method for a wireless mobile telephone, said wireless mobile telephone having a display and an input interface, the method comprising:

creating, in a client module executing on a processor in said wireless mobile telephone, a request to a server in a data network, said request specifying a resource locator identifying a resource associated with said server, said server communicating with said wireless mobile telephone over a wireless network, said creating comprising

retrieving said resource locator from a memory in said wireless mobile telephone,

generating said request using said resource locator and identification information, and

displaying on said display information relating to said request;

transmitting said request over said wireless network to said server;

receiving from said server a response over said wireless network; and

processing said response in said client module, to cause information in said response to be displayed on said display.

13. The method of claim **12** wherein said identification information identifies said wireless mobile telephone.

14. The method of claim **12** wherein said identification information identifies a user of said wireless mobile telephone.

15. The method of claim **12**, said method further comprising:

displaying information regarding the transmission of said request prior to receiving said response.

16. The method of claim **12** wherein said wireless mobile telephone communicates with said server using a data transport protocol which transports data using headers identifying content-types.

17. The method of claim **16** wherein said data transport protocol uses transmission control protocol (TCP).

18. The method of claim **12** wherein said request is transmitted using an application level protocol which transporting data using headers identifying content-types.

19. The method of claim **18** wherein said application level protocol uses Hypertext Transfer Protocol (HTTP).

20. The method of claim **12** wherein said a message results from accessing said server using said resource locator, said message being provided in a markup language.

21. The method of claim **20** wherein said response is a processed version of said message.

22. The method of claim **21** wherein said processed version is a distilled version of said message.

23. The method of claim **22** wherein said distilled version is a compressed version of said message.

24. The method of claim **12** wherein said response comprises a card deck having one or more cards, each card including information to be displayed on said display.

25. The method of claim **24** wherein said processing said response in said client module comprises:

storing said card deck in a memory; and

displaying one of said cards from said card deck on said display.

26. The method of claim **25** wherein one of said cards is retrieved from said card deck in said memory and displayed as a result of navigating a displayed card and activating a predefined key.

27. The method of claim **26** wherein said input interface comprises a keypad including said predefined key.

28. The method of claim **27** wherein said input interface comprises soft keys displayed on said display, said soft keys including a first soft key designated as said predefined key.

29. The method of claim **24** wherein one of said cards in said card deck provides for receiving user input through said input interface.

30. The method of claim **29** wherein said user data input is performed in conjunction with a predictive data entry process.

31. The method of claim **30** wherein said memory includes a character frequency table used by said predictive entry process.

32. The method of claim **30** wherein, in response to said user data input, a second card from said card deck is displayed.

33. The method of claim **12** wherein said response comprises a plurality of choices, each choice identifying a resource locator, and wherein said client module, upon one of said choices being selected, generates a request using said resource locator identified by said selected choice, and transmits said request over said wireless network.

34. A computer readable medium including computer program code for execution in a wireless mobile telephone, said wireless mobile telephone having a display and an input interface for interacting with a data network, said computer readable medium comprising:

first computer program code for generating a request in said wireless mobile telephone to communicate with a server in said data network;

said request including a resource locator identifying said server, said first computer program code further for retrieving said resource locator from a memory in said wireless mobile telephone, constructing said request using said resource locator and identification information, and displaying on said display status information relating to said request;

second computer program code for transmitting said request over a wireless network;

third computer program code for receiving a response from said server over said wireless network; and

fourth computer program code for displaying said response on said display.

35. The computer readable medium of claim **34** wherein said wireless mobile telephone operates a data transport protocol which transports data with headers indicating content-types.

36. The computer readable medium of claim **35** wherein said data transport protocol uses transmission control protocol (TCP).

37. The computer readable medium of claim **36** wherein said data transport protocol comprises Hypertext Transfer Protocol (HTTP) request.

38. The computer readable medium of claim **34** wherein said a message results from accessing said server using said resource locator, and wherein said message is provided in a markup language.

US 6,430,409 B1

51

**39**. The computer readable medium of claim **38** wherein said response is a processed version of said message.

**40**. The computer readable medium of claim **39** wherein said processed version comprises a distilled version of said message.

**41**. The computer readable medium of claim **40** wherein said distilled version comprises a compressed version of said message.

**42**. The computer readable medium of claim **34** wherein said response comprises a card deck having one or more cards, including a card to be displayed on said display.

**43**. The computer readable medium of claim **42** wherein said response comprises:

a plurality of choices, each choice identifying a resource locator; and

wherein said first computer program code, upon said on of said choices being selected, causes a request to be generated using said resource locator identified by said selected choice and said second computer program code causes said request to be transmitted over said wireless network.

**44**. The computer readable medium of claim **34** wherein said fourth computer program code comprises:

computer program code for storing said card deck in a memory; and

computer program code for displaying one of said cards from said card deck on said display.

**45**. A method for a server interacting with a wireless mobile telephone, said wireless mobile telephone having a display and a keypad, said method comprising:

receiving a request over a wireless network from a client module executing in said wireless mobile telephone, said request including a resource locator identifying a resource associated with said server and identification information, said request created by retrieving said resource locator from a memory in said wireless mobile telephone, constructing said request using said resource locator and identification information, and displaying on said display information relating to said request;

processing said identification information;

generating in said server a response to said request; and

transmitting said response to said wireless mobile telephone over said wireless network through a two-way data communication interface module in said server such that said wireless mobile telephone can display information corresponding to said response on said display.

**46**. The method of claim **45** wherein said identification information identifies said wireless mobile telephone.

**47**. The method of claim **45** wherein said identification information identifies a user of said wireless mobile telephone.

**48**. The method of claim **45** wherein said response is generated based on said identification information.

**49**. The method of claim **48** wherein said resource comprises an electronic mail message.

**50**. The method of claim **45** wherein said resource is provided in a markup language.

**51**. The method of claim **50** wherein said generating comprises generating a processed version of said resource according to a set of predetermined rules.

**52**. The method of claim **51** wherein said processed version is a distilled version of said resource.

**53**. The method of claim **52** wherein said distilled version of said resource is a compressed version of said resource.

**54**. A computer readable medium for a server communicating with a wireless mobile telephone, said wireless

52

mobile telephone having a display and a keypad, said computer readable medium comprising:

first computer program code for receiving over a wireless network a request from a client module executing on said wireless mobile telephone, said request including a resource locator identifying a resource in said server and identification information, said request created by retrieving said resource locator from a memory in said wireless mobile telephone, constructing said request using said resource locator and identification information, and displaying on said display information relating to said request;

second computer program code for processing said identification information to determine how to respond to said request;

third computer program code for generating in said server a response to said request; and

fourth computer program code for transmitting said response to said wireless mobile telephone such that said wireless mobile telephone can display information corresponding to said response on said display, said response transmitted over said wireless network through a two-way data communication interface module in said server.

**55**. The computer readable medium of claim **54** wherein said identification information identifies said wireless mobile telephone.

**56**. The computer readable medium of claim **54** wherein said identification information identifies a user of said wireless mobile telephone.

**57**. The computer readable medium of claim **54** wherein said response is generated based on said identification information.

**58**. The computer readable medium of claim **57** wherein said resource is provided in a markup language.

**59**. The computer readable medium of claim **54** wherein said third computer program code further comprises computer program code for generating a processed version of said resource according to a set of predetermined rules.

**60**. The computer readable medium of claim **59** wherein said processed version is a distilled version of said resource.

**61**. The computer readable medium of claim **60** wherein said distilled version of said resource is a compressed version of said resource.

**62**. The computer readable medium of claim **54** wherein said resource comprises an electronic mail message.

**63**. A method for a wireless mobile telephone, the method comprising:

creating, in a client module executing on a processor in said wireless mobile telephone, a request to a server in a data network, said request specifying a resource locator identifying a resource associated with said server;

transmitting said request over a wireless network to said server;

receiving a response from said server over said wireless network, said response comprising a card deck having one or more cards, each card including information for generating a display screen on said display; and

processing said response in said client module, to cause information in said response to be displayed on a display of the wireless mobile telephone.

**64**. The method of claim **63** wherein said creating comprises:

retrieving said resource locator from a memory in said wireless mobile telephone;

US 6,430,409 B1

53

generating said request using said resource locator and identification information; and

displaying on said display information relating to said request.

**65.** The method of claim **63** wherein said identification information identifies said wireless mobile telephone.

**66.** The method of claim **63** wherein said identification information identifies a user of said wireless mobile telephone.

**67.** The method of claim **63**, said method further comprising:

displaying information regarding the transmission of said request prior to receiving said response.

**68.** The method of claim **63** wherein said wireless mobile telephone communicates with said server using a data transport protocol which transports data using headers identifying content-types.

**69.** The method of claim **68** wherein said data transport protocol uses transmission control protocol (TCP).

**70.** The method of claim **63** wherein said request is transmitted using an application level protocol which transporting data using headers identifying content-types.

**71.** The method of claim **70** wherein said application level protocol uses Hypertext Transfer Protocol (HTTP).

**72.** The method of claim **63** wherein said a message results from accessing said server using said resource locator, said message being provided in a markup language.

**73.** The method of claim **72** wherein said response is a processed version of said message.

**74.** The method of claim **73** wherein said processed version is a distilled version of said message.

**75.** The method of claim **74** wherein said distilled version is a compressed version of said message.

**76.** The method of claim **63** wherein one of said cards is retrieved from said card deck in said memory and displayed as a result of navigating a displayed card and activating a predefined key.

**77.** The method of claim **63** wherein said processing said response in said client module comprises:

storing said card deck in a memory; and

displaying one of said cards from said card deck on said display.

**78.** The method of claim **63** wherein said wireless mobile telephone further comprises an input interface which comprises a keypad including said predefined key.

**79.** The method of claim **63** wherein one of said cards in said card deck provides for receiving user input through said input interface.

**80.** The method of claim **79** wherein said input interface comprises soft keys displayed on said display, said soft keys including a first soft key designated as said predefined key.

**81.** The method of claim **79** wherein said user data input is performed in conjunction with a predictive data entry process.

54

**82.** The method of claim **81** wherein said memory includes a character frequency table used by said predictive entry process.

**83.** The method of claim **79** wherein, in response to said user data input, a second card from said card deck is displayed.

**84.** The method of claim **63** wherein said response comprises a plurality of choices, each choice identifying a resource locator, and wherein said client module, upon one of said choices being selected, generates a request using said resource locator identified by said selected choice, and transmits said request over said wireless network.

**85.** A method for a server interacting with a wireless mobile telephone, said wireless mobile telephone having a display, said method comprising:

receiving a request over a wireless network from a client module executing in said wireless mobile telephone, said request including a resource locator identifying a resource associated with said server and identification information;

processing said identification information;

generating in said server a response to said request, said response comprising a card deck having one or more cards, each card including information to be displayed on said display of said wireless mobile telephone; and

transmitting said response to said wireless mobile telephone over said wireless network through a two-way data communication interface module in said server such that said wireless mobile telephone can display information corresponding to said response on said display of said wireless mobile telephone.

**86.** The method of claim **85** wherein said identification information identifies said wireless mobile telephone.

**87.** The method of claim **85** wherein said identification information identifies a user of said wireless mobile telephone.

**88.** The method of claim **85** wherein said response is generated based on said identification information.

**89.** The method of claim **85** wherein said resource comprises an electronic mail message.

**90.** The method of claim **85** wherein said resource is provided in a markup language.

**91.** The method of claim **90** wherein said generating comprises generating a processed version of said resource according to a set of predetermined rules.

**92.** The method of claim **91** wherein said processed version is a distilled version of said resource.

**93.** The method of claim **92** wherein said distilled version of said resource is a compressed version of said resource.

\* \* \* \* \*

# ADDENDUM 8

(12) **United States Patent**

Rossmann

(10) Patent No.: **US 6,625,447 B1**

(45) Date of Patent: *****Sep. 23, 2003**

(54) **METHOD AND ARCHITECTURE FOR AN INTERACTIVE TWO-WAY DATA COMMUNICATION NETWORK**

(75) Inventor: **Alain Rossmann**, Menlo Park, CA (US)

(73) Assignee: **Openwave Systems Inc.**, Redwood City, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/200,359**

(22) Filed: **Nov. 24, 1998**

**Related U.S. Application Data**

(63) Continuation of application No. 08/978,701, filed on Nov. 26, 1997, which is a continuation of application No. 08/570, 210, filed on Dec. 11, 1995, now Pat. No. 5,809,415.

(51) Int. Cl.[7] ............................................. **H04M 11/00**

(52) U.S. Cl. ...................... **455/422**; 455/412; 455/426; 455/517; 340/825.27; 709/217

(58) Field of Search ................................. 455/422, 426, 455/461, 414, 552, 566, 466, 412, 517; 709/217; 340/825.26, 825.27

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,787,028 A | 11/1988 | Finfrock et al. | |
| 4,812,843 A | 3/1989 | Champion, III et al. | |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0 646 856 A2 | 4/1995 | |
| EP | 0691619 A2 | 1/1996 | |

(List continued on next page.)

OTHER PUBLICATIONS

GloMop Group, "GloMop: Global Mobile Computing By Proxy", pp. 1–12, Sep. 13, 1995, University of California, Berkeley, California, XP–002094009.

S.S. Chakraborty, "Mobile Multimedia: In Context to ATM Transport and GSM/GPRS Mobile Access Networks", pp. 1937–1941, Helsinki University of Technology, Espoo, Finland, 1995.

HDTP Specification, Version 1.1–Draft, pp. 1–40, Redwood Shores, CA, Unwired Planet, Inc., Jul. 15, 1997.

(List continued on next page.)

Primary Examiner—William Trost
Assistant Examiner—Simon Nguyen
(74) *Attorney, Agent, or Firm*—Blakely, Sokoloff, Taylor & Zafman LLP

(57) **ABSTRACT**

A two-way data communication device such as a data ready cellular telephone, a two-way pager, or a telephone communicates via a two-way data communication network with a server computer on a computer network that has an interface to the two-way data communication network, i.e, is coupled to the two-way data communication network. For example, the computer network can be a corporate wide area network, a corporate local-area network, the Internet, or any combination of computer networks. The two-way data communication device utilizes a client module to transmit message including a resource selector chosen by the user to a server on a server computer on the computer network. The server processes the message and transmits a response over the two-way data communication network to the client module. The client module interprets the response and presents the response to the user via a structured user interface. Alternatively, the user transmits a request that directs the server to transmit the response to the request to another location or to another user.

**30 Claims, 36 Drawing Sheets**

Microfiche Appendix Included
(6 Microfiche, 369 Pages)



**US 6,625,447 B1**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,008,925 | A | 4/1991 | Pireh |
| 5,128,672 | A | 7/1992 | Kaehler |
| 5,335,276 | A | 8/1994 | Thompson et al. |
| 5,428,823 | A | * 6/1995 | Ness-Cohn et al. ........ 455/31.1 |
| 5,465,401 | A | 11/1995 | Thompson |
| 5,491,745 | A | 2/1996 | Roeder |
| 5,543,789 | A | * 8/1996 | Behr et al. ................... 340/995 |
| 5,548,636 | A | 8/1996 | Bannister et al. |
| 5,555,446 | A | * 9/1996 | Jasinski ..................... 455/31.1 |
| 5,560,008 | A | * 9/1996 | Johnson et al. ........ 395/187.01 |
| 5,577,100 | A | 11/1996 | McGregor et al. |
| 5,577,103 | A | 11/1996 | Foti |
| 5,577,209 | A | * 11/1996 | Boyle et al. .......... 395/200.06 |
| 5,579,535 | A | 11/1996 | Orlen et al. |
| 5,581,595 | A | * 12/1996 | Iwashita et al. .............. 379/57 |
| 5,600,703 | A | * 2/1997 | Dang et al. ................ 455/31.3 |
| 5,608,786 | A | 3/1997 | Gordan |
| 5,623,605 | A | 4/1997 | Keshav et al. |
| 5,638,450 | A | * 6/1997 | Robson ..................... 455/31.3 |
| 5,649,289 | A | * 7/1997 | Wang et al. ............... 455/31.3 |
| 5,671,354 | A | * 9/1997 | Ito et al. ............... 395/187.01 |
| 5,673,322 | A | 9/1997 | Pepe et al. |
| 5,675,507 | A | 10/1997 | Bobo, II ................. 364/514 R |
| 5,708,780 | A | * 1/1998 | Levergood et al. .... 395/200.12 |
| 5,708,828 | A | 1/1998 | Coleman |
| 5,727,159 | A | 3/1998 | Kikinis |
| 5,740,252 | A | 4/1998 | Minor et al. |
| 5,742,668 | A | * 4/1998 | Pepe et al. ..................... 455/57 |
| 5,742,905 | A | * 4/1998 | Pepe et al. ................... 455/461 |
| 5,745,706 | A | 4/1998 | Wolfberg et al. |
| 5,751,798 | A | 5/1998 | Mumick et al. |
| 5,809,415 | A | 9/1998 | Rossmann |
| 5,812,768 | A | 9/1998 | Page et al. |
| 5,841,764 | A | 11/1998 | Roderique et al. |
| 5,852,717 | A | 12/1998 | Bhide et al. |
| 5,854,936 | A | * 12/1998 | Pickett ....................... 395/710 |
| 5,867,153 | A | 2/1999 | Grandcolas et al. |
| 5,884,284 | A | 3/1999 | Peters et al. |
| 5,898,904 | A | * 4/1999 | Wang ....................... 455/31.3 |
| 5,909,485 | A | 6/1999 | Martin et al. |
| 5,918,013 | A | 6/1999 | Mighdoll et al. |
| 5,940,589 | A | 8/1999 | Donovan et al. |
| 5,943,046 | A | * 8/1999 | Cave et al. ................... 455/5.1 |
| 5,943,399 | A | 8/1999 | Bannister et al. |
| 5,958,006 | A | 9/1999 | Eggleston et al. |
| 5,995,606 | A | 11/1999 | Civanlar et al. |
| 5,999,827 | A | * 12/1999 | Sudo et al. ................. 455/566 |
| 6,009,413 | A | * 12/1999 | Webber et al. ............... 705/26 |
| 6,009,422 | A | 12/1999 | Ciccarelli |
| 6,021,437 | A | 2/2000 | Chen et al. |
| 6,023,698 | A | 2/2000 | Lavey, Jr. et al. |
| 6,031,904 | A | 2/2000 | An et al. |
| 6,035,189 | A | 3/2000 | Ali-Vehmas et al. |
| 6,049,711 | A | 4/2000 | Ben-Yehezkel et al. |
| 6,049,821 | A | 4/2000 | Theriault et al. |
| 6,055,441 | A | 4/2000 | Wieand et al. |
| 6,058,422 | A | 5/2000 | Ayanoglu et al. |
| 6,065,120 | A | 5/2000 | Laursen et al. |
| 6,085,105 | A | 7/2000 | Becher |
| 6,108,554 | A | 8/2000 | Kawamoto |
| 6,119,137 | A | 9/2000 | Smith et al. |
| 6,119,155 | A | 9/2000 | Rossmann et al. |
| 6,122,403 | A | 9/2000 | Rhoades |
| 6,131,067 | A | 10/2000 | Girerd et al. |
| 6,138,158 | A | 10/2000 | Boyle et al. |
| 6,157,823 | A | 12/2000 | Fougnies et al. |
| 6,161,140 | A | 12/2000 | Moriya |
| 6,167,253 | A | 12/2000 | Farris et al. |
| 6,185,184 | B1 | 2/2001 | Mattaway et al. |
| 6,195,693 | B1 | 2/2001 | Berry et al. |

| | | | |
|---|---|---|---|
| 6,233,608 | B1 | 5/2001 | Laursen et al. |
| 6,237,031 | B1 | 5/2001 | Knauerhase et al. |
| 6,247,048 | B1 | 6/2001 | Greer et al. |

### FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| EP | 0 646 856 | A3 | 12/1996 | |
| EP | 0691619 | A3 | 6/1997 | |
| EP | 0812120 | A2 | 12/1997 | |
| EP | 0893760 | A2 | 1/1999 | |
| EP | 0812120 | A3 | 5/1999 | |
| JP | 59-41047 | | 3/1984 | |
| JP | 5-35421 | | 2/1993 | |
| JP | 5-233191 | | 9/1993 | |
| JP | 6-110637 | | 4/1994 | |
| JP | 6-175764 | | 6/1994 | |
| JP | 7-13671 | | 1/1995 | |
| JP | 7-263187 | | 10/1995 | |
| WO | WO 93/16550 | | 8/1993 | .......... H04M/11/00 |
| WO | WO 93/16550 | A1 | 8/1993 | |
| WO | WO 97/14244 | A1 | 4/1997 | |
| WO | WO 97/27546 | A1 | 7/1997 | |
| WO | WO 97/41654 | A1 | 11/1997 | |

### OTHER PUBLICATIONS

HDML 2.0 Language Reference, Version 2.0, pp. 1–56, Redwood Shores, CA, Unwired Planet, Inc., Jul. 1997.

Japanese Publication, "Nifty Serve", pp. 14, 34, 39, and 58–159 Oct. 5, 1992.

Japanese Article, "Mosaic", Unix Magazine, pp. 36–44, Mar. 1994.

Japanese Publication, "Introduction to HTML–WWW Publishing", pp. 9, 12, 14, 15, 20, 32–34, 162–163, 269, 286, 287, and 270, Jun. 30, 1995.

Japanese Publication, Larry Aronson, "Introduction to HTML", Jul. 1, 1995.

Nekkei Multimedia Magazine, pp. 109–111, Nov. 1995.

Mac Power Magazine, pp. 105 and 268, Jun. 1995.

M. Liljeberg et al., "Optimizing World–Wide Web for Weakly Connected Mobile Workstations: An Indirect Approach" International Workshop on Services in Distributed and Networked Environments, pp. 132–139, Jun. 5, 1995, XP000764774.

M.F. Kaashoek et al., "Dynamic Documents: Mobile Wireless Access to the WWW", pp. 179–184, Dec. 8, 1994, XP0002016896.

S. Gessler et al., "PDAs as mobile WWW Browsers", Computer Networks and ISDN System, vol. 28, No. 1, pp. 53–59, Dec. 1, 1995, XP004001210.

G.M. Voelker et al., "Mobisaic: An Information System for a Mobile Wireless Computing Enviroment", vol. 5, No. 10, pp. 185–190, Jan. 1, 1995, XP002062595.

C. Erlandson et al., "WAP–The Wireless Application Protocol" Ericsson Review No. 4, pp. 150–153, Stockholm, 1998, XP–000792053.

M. F. Kaashoek et al.: "Dynamic Documents: Mobile Wireless Access to the WWW" Proceedings, Workshop on Mobile Computing Systems and Applications, Dec. 8, 1994, pp. 179–184, XP0002016896.

G. M. Voelker et al.: "Mobisaic: An Information System for a Mobile Wireless Computing Environment" Proceedings, Workshop on Mobile computing Systems and Applications, vol. 5, No. 10, Jan. 1, 1995, pp. 185–190, XP002062595.

\* cited by examiner



*FIG. 1*

Case: 15-1108    Document: 44    Page: 213    Filed: 02/27/2015



**FIG. 2A**



**FIG. 2B**



**FIG. 2C**



**FIG. 2D**



*FIG. 2E*



*FIG. 2F*



*FIG. 2G*



*FIG. 2H*



*FIG. 3D*

*FIG. 3E*

*FIG. 3F*

*FIG. 3A*

*FIG. 3B*

*FIG. 3C*



*FIG. 4A*

*FIG. 4B*

*FIG. 4C*

*FIG. 4D*

*FIG. 4E*

*FIG. 4F*

*FIG. 4G*

*FIG. 4H*

*FIG. 4I*



FIG. 5



*Fig. 6*



*FIG. 7*



*FIG. 8A*



*FIG. 8B*



*FIG. 8C*

Case: 15-1108    Document: 44    Page: 223    Filed: 02/27/2015



**FIG. 9**



**FIG. 8D**

| "-    -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "a    a" | q | a | d | g | j | m | r | t | w |
| "a    b" | q | a | e | i | l | o | r | u | w |
| "a    c" | q | c | e | h | k | m | r | t | w |
| "a    d" | q | a | d | i | j | m | s | v | y |
| "a    e" | q | a | d | g | j | m | p | t | w |
| "a    f" | q | a | f | g | j | m | r | t | w |
| "a    g" | q | a | e | i | j | o | r | t | w |
| "a    h" | q | a | e | g | j | m | p | u | w |
| "a    i" | q | c | d | g | l | n | r | t | w |
| "a    j" | q | a | d | g | j | o | p | t | w |
| "a    k" | q | a | e | i | j | m | s | t | w |
| "a    l" | q | a | e | i | l | o | s | t | w |
| "a    m" | q | a | e | i | l | o | p | u | w |
| "a    n" | q | c | d | g | k | n | s | t | y |
| "a    o" | q | a | d | g | j | m | p | t | w |
| "a    p" | q | a | e | h | l | o | p | t | w |
| "a    q" | q | a | d | g | j | m | s | t | w |
| "a    r" | q | c | e | g | k | o | r | t | y |
| "a    s" | q | c | e | i | k | o | s | t | y |
| "a    t" | q | a | e | i | l | o | s | t | w |
| "a    u" | q | c | d | g | l | m | s | t | w |
| "a    v" | q | a | e | i | j | o | p | t | w |
| "a    w" | q | a | d | g | k | m | p | t | w |
| "a    x" | q | a | e | i | l | m | s | t | w |
| "a    y" | q | b | e | i | j | m | s | t | w |
| "a    z" | q | a | d | i | j | m | p | t | w |
| "a     " | q | a | d | g | j | m | p | t | w |
| "b    a" | q | c | d | g | k | n | s | t | y |
| "b    b" | q | a | d | i | j | m | s | t | y |
| "b    c" | q | a | d | g | j | o | r | t | w |
| "b    d" | q | a | d | g | j | m | s | t | w |
| "b    e" | q | c | e | g | l | n | s | t | x |
| "b    f" | q | a | d | g | j | m | p | t | w |
| "b    g" | q | a | d | g | j | m | p | t | w |
| "b    h" | q | a | d | g | j | m | p | t | w |
| "b    i" | q | c | d | g | l | n | s | t | w |
| "b    j" | q | a | e | g | j | m | p | t | w |

## FIG. 10A

| "-    -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "b    k" | q | a | d | g | j | m | p | t | w |
| "b    l" | q | a | e | i | j | o | p | t | y |
| "b    m" | q | a | d | g | j | m | r | t | w |
| "b    n" | q | a | d | g | j | m | p | t | w |
| "b    o" | q | a | d | i | j | o | s | u | x |
| "b    p" | q | a | d | g | j | m | s | t | w |
| "b    q" | q | a | d | g | j | m | p | t | w |
| "b    r" | q | a | e | i | j | o | p | u | w |
| "b    s" | q | a | c | d | i | j | o | s | t | w |
| "b    t" | q | a | d | g | j | m | p | t | w |
| "b    u" | q | a | d | i | l | m | s | t | y |
| "b    v" | q | a | d | i | j | m | p | t | w |
| "b    w" | q | a | e | g | j | m | p | t | w |
| "b    x" | q | a | d | g | j | m | p | t | w |
| "b    y" | q | a | d | g | j | m | p | t | w |
| "b    z" | q | a | d | g | j | m | p | t | w |
| "b    " | q | a | d | g | j | m | p | t | w |
| "c    a" | q | b | d | g | l | n | r | t | w |
| "c    b" | q | a | e | g | j | m | p | t | w |
| "c    c" | q | a | e | i | j | o | s | t | w |
| "c    d" | q | a | d | g | j | m | p | t | w |
| "c    e" | q | a | d | i | l | n | s | t | w |
| "c    f" | q | a | d | i | j | m | p | t | w |
| "c    g" | q | a | d | i | j | m | p | t | w |
| "c    h" | q | a | e | i | j | o | r | t | w |
| "c    i" | q | a | f | i | l | n | p | t | w |
| "c    j" | q | a | d | g | j | m | p | t | w |
| "c    k" | q | b | e | i | l | m | s | t | y |
| "c    l" | q | a | e | i | j | o | r | u | w |
| "c    m" | q | c | d | g | j | m | p | t | w |
| "c    n" | q | a | d | g | j | m | p | t | w |
| "c    o" | q | a | d | g | l | m | r | u | w |
| "c    p" | q | a | d | g | j | m | p | t | w |
| "c    q" | q | a | d | g | j | m | p | t | w |
| "c    r" | q | a | e | i | j | o | p | u | y |
| "c    s" | q | a | d | i | l | o | s | t | w |
| "c    t" | q | a | e | i | l | o | r | u | w |

**FIG. 10B**

| "-    -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "c    u" | q | b | e | i | l | m | s | t | w |
| "c    v" | q | a | d | g | j | m | p | t | w |
| "c    w" | q | a | d | g | j | m | p | t | w |
| "c    x" | q | a | d | g | j | m | p | t | w |
| "c    y" | q | c | d | g | j | m | p | t | w |
| "c    z" | q | a | d | g | j | n | p | t | w |
| "c    " | q | a | d | g | j | m | p | t | w |
| "d    a" | q | b | d | g | j | n | r | t | y |
| "d    b" | q | a | d | g | j | m | p | t | w |
| "d    c" | q | a | d | g | j | m | p | t | w |
| "d    d" | q | a | e | i | l | m | r | t | w |
| "d    e" | q | a | d | g | l | m | r | v | x |
| "d    f" | q | a | d | i | j | m | p | t | w |
| "d    g" | q | a | e | g | j | m | p | t | w |
| "d    h" | q | a | e | g | j | m | p | t | w |
| "d    i" | z | a | f | g | l | n | s | t | w |
| "d    j" | q | a | d | g | j | m | p | t | w |
| "d    k" | q | a | d | g | j | m | p | t | w |
| "d    l" | q | a | e | i | j | m | p | t | y |
| "d    m" | q | a | d | i | j | m | s | t | w |
| "d    n" | q | a | e | g | j | m | p | t | w |
| "d    o" | q | c | e | i | j | n | p | t | w |
| "d    p" | q | a | d | g | j | m | p | t | w |
| "d    q" | q | a | d | g | j | m | p | u | w |
| "d    r" | q | a | e | i | j | o | p | t | w |
| "d    s" | q | a | e | i | j | m | p | t | w |
| "d    t" | q | a | d | g | j | m | r | t | w |
| "d    u" | q | c | e | g | l | m | r | t | w |
| "d    v" | q | a | d | i | j | m | p | t | w |
| "d    w" | q | a | d | i | j | o | p | t | w |
| "d    x" | q | a | d | g | j | m | p | t | w |
| "d    y" | q | a | d | g | j | m | p | t | w |
| "d    z" | q | a | d | g | j | m | p | t | w |
| "d    " | q | a | d | g | j | m | p | t | w |
| "e    a" | q | c | d | g | l | n | s | t | w |
| "e    b" | q | c | f | g | j | m | r | t | y |
| "e    c" | q | a | e | h | k | o | s | t | w |

## FIG. 10C

| "_   _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---------|---|---|---|---|---|---|---|---|---|
| "e   d" | q | b | e | i | l | n | s | u | w |
| "e   e" | z | a | d | i | k | n | r | t | w |
| "e   f" | q | a | e | i | l | o | r | t | w |
| "e   g" | q | a | d | i | j | o | r | u | y |
| "e   h" | q | a | e | i | j | m | p | t | w |
| "e   i" | q | a | d | g | j | n | r | v | w |
| "e   j" | q | a | e | g | j | m | p | t | w |
| "e   k" | q | a | e | i | j | m | s | t | w |
| "e   l" | q | a | e | i | l | o | p | v | y |
| "e   m" | q | a | e | i | j | o | s | u | w |
| "e   n" | q | c | d | g | l | o | s | t | w |
| "e   o" | q | a | f | g | j | n | p | u | w |
| "e   p" | q | a | e | h | l | o | r | t | w |
| "e   q" | q | a | d | g | j | m | p | u | w |
| "e   r" | q | a | e | i | l | n | s | v | y |
| "e   s" | q | c | e | i | k | n | s | t | w |
| "e   t" | z | c | e | i | j | m | s | t | w |
| "e   u" | q | a | d | g | j | m | r | t | w |
| "e   v" | q | a | e | i | j | o | p | t | w |
| "e   w" | q | a | e | h | j | o | s | t | w |
| "e   x" | q | a | e | i | j | m | p | t | w |
| "e   y" | q | a | d | g | j | o | s | t | w |
| "e   z" | q | a | e | g | j | m | p | t | w |
| "e    " | q | a | d | g | j | m | p | t | w |
| "f   a" | q | c | d | i | k | m | s | v | x |
| "f   b" | q | a | d | g | j | m | p | t | w |
| "f   c" | q | c | d | g | j | m | p | t | w |
| "f   d" | q | a | d | g | j | m | p | t | w |
| "f   e" | q | a | e | g | l | m | r | t | w |
| "f   f" | q | a | e | i | j | o | s | t | w |
| "f   g" | q | a | d | g | j | m | p | t | w |
| "f   h" | q | a | d | g | j | m | p | t | w |
| "f   i" | q | a | c | e | g | l | n | r | x |
| "f   j" | q | a | d | g | j | m | p | t | w |
| "f   k" | q | a | d | g | j | m | p | t | w |
| "f   l" | q | a | e | i | j | o | p | t | y |
| "f   m" | q | a | d | g | j | m | p | t | w |

*FIG. 10D*

| "_   _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "f n" | q | a | d | g | j | m | p | t | w |
| "f o" | q | c | d | g | l | n | r | u | w |
| "f p" | q | a | d | g | j | m | p | t | w |
| "f q" | q | a | d | g | j | m | p | t | w |
| "f r" | q | a | e | i | j | o | p | t | y |
| "f s" | q | a | d | g | j | m | p | t | w |
| "f t" | q | a | e | g | k | m | p | t | w |
| "f u" | q | a | d | g | l | n | r | t | w |
| "f v" | q | a | d | g | j | m | p | t | w |
| "f w" | q | a | d | g | j | m | p | t | w |
| "f x" | q | a | d | g | j | m | p | t | w |
| "f y" | q | a | d | i | j | m | p | t | w |
| "f z" | q | a | d | g | j | m | p | t | w |
| "f  " | q | a | d | g | j | m | p | t | w |
| "g a" | z | a | d | i | l | n | r | t | w |
| "g b" | q | a | d | g | j | m | p | t | w |
| "g c" | q | a | d | g | j | m | s | t | w |
| "g d" | q | a | d | g | j | o | p | t | w |
| "g e" | q | a | d | g | l | n | s | t | w |
| "g f" | q | a | d | g | j | m | p | u | w |
| "g g" | q | a | e | g | l | m | p | t | w |
| "g h" | q | a | e | g | j | o | p | t | w |
| "g i" | q | c | f | g | j | n | s | v | w |
| "g j" | q | a | d | g | j | m | p | t | w |
| "g k" | q | a | d | g | j | m | p | t | w |
| "g l" | q | a | e | i | j | o | p | t | y |
| "g m" | q | a | d | g | l | m | s | t | w |
| "g n" | q | a | e | i | j | o | p | t | w |
| "g o" | q | a | e | i | l | o | p | t | w |
| "g p" | q | a | d | g | j | m | p | t | w |
| "g q" | q | a | d | g | j | m | p | t | w |
| "g r" | q | a | e | g | j | o | p | t | w |
| "g s" | q | a | d | g | j | m | p | t | w |
| "g t" | q | a | e | h | j | o | p | t | w |
| "g u" | q | a | e | i | l | m | r | t | y |
| "g v" | q | a | d | g | j | m | p | t | w |
| "g w" | q | a | d | g | j | m | p | t | w |

*FIG. 10E*

| "-    -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "g    x" | q | a | d | g | j | m | p | t | w |
| "g    y" | q | a | d | g | j | m | p | t | w |
| "g    z" | q | a | d | g | j | m | p | t | w |
| "g    " | q | a | d | g | j | m | p | t | w |
| "h    a" | q | b | d | i | l | n | s | t | w |
| "h    b" | q | a | d | g | j | m | p | t | w |
| "h    c" | q | a | d | g | j | o | p | t | w |
| "h    d" | q | a | d | g | l | m | r | t | w |
| "h    e" | q | c | d | i | l | n | r | t | y |
| "h    f" | q | a | d | g | j | m | p | t | w |
| "h    g" | q | a | d | g | j | m | p | t | w |
| "h    h" | q | a | d | g | j | m | p | t | w |
| "h    i" | q | c | e | g | l | n | s | t | w |
| "h    j" | q | a | d | g | j | m | p | t | w |
| "h    k" | q | a | d | g | j | m | p | t | w |
| "h    l" | q | a | d | g | j | m | p | t | y |
| "h    m" | q | a | e | g | j | m | p | t | w |
| "h    n" | q | a | d | i | j | o | p | t | w |
| "h    o" | q | b | d | i | l | n | r | u | w |
| "h    p" | q | a | d | g | j | m | p | u | w |
| "h    q" | q | a | d | g | j | m | p | t | w |
| "h    r" | q | a | e | i | j | o | p | t | w |
| "h    s" | q | a | d | g | j | m | p | t | w |
| "h    t" | q | a | d | g | l | m | s | t | w |
| "h    u" | q | a | d | g | l | m | r | t | w |
| "h    v" | q | a | d | g | j | m | p | t | w |
| "h    w" | q | a | d | g | j | m | p | t | w |
| "h    x" | q | a | d | g | j | m | p | t | w |
| "h    y" | q | a | d | g | j | m | p | t | w |
| "h    z" | q | a | d | g | j | m | p | t | w |
| "h    " | q | a | d | g | j | m | p | t | w |
| "i    a" | q | b | d | g | l | n | r | t | w |
| "i    b" | q | a | e | i | l | m | r | u | w |
| "i    c" | q | a | e | h | k | o | r | t | y |
| "i    d" | q | a | e | i | l | n | p | u | w |
| "i    e" | q | c | d | g | l | n | r | v | w |
| "i    f" | q | a | f | i | j | o | p | t | y |

## FIG. 10F

| "_ _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|-------|---|---|---|---|---|---|---|---|---|
| "i g" | q | a | e | h | j | n | r | u | w |
| "i h" | q | a | d | g | j | m | p | t | w |
| "i i" | q | a | d | g | j | m | p | t | w |
| "i j" | q | a | d | g | j | o | p | t | w |
| "i k" | q | a | e | g | k | m | p | t | w |
| "i l" | q | a | e | i | l | o | s | t | y |
| "i m" | q | a | e | i | j | m | p | u | w |
| "i n" | q | c | e | g | k | n | s | t | w |
| "i o" | q | a | d | g | l | n | r | u | w |
| "i p" | q | a | d | i | l | m | s | t | w |
| "i q" | q | a | d | g | j | m | p | u | w |
| "i r" | q | c | e | i | l | n | s | t | w |
| "i s" | q | c | e | h | k | n | s | t | w |
| "i t" | q | a | e | h | l | o | s | t | y |
| "i u" | q | a | d | g | j | m | p | t | w |
| "i v" | q | a | e | i | j | m | p | t | w |
| "i w" | q | a | d | g | j | m | p | t | w |
| "i x" | q | a | e | g | j | m | p | t | w |
| "i y" | q | a | d | g | j | m | p | t | w |
| "i z" | q | a | e | i | j | o | p | t | w |
| "i " | q | a | d | g | j | m | p | t | w |
| "j a" | q | c | d | g | j | n | p | t | w |
| "j b" | q | a | d | g | j | m | p | t | w |
| "j c" | q | a | d | g | j | m | p | t | w |
| "j d" | q | a | d | g | j | m | p | t | w |
| "j e" | q | c | d | g | j | m | r | t | w |
| "j f" | q | a | d | g | j | m | p | t | w |
| "j g" | q | a | d | g | j | m | p | t | w |
| "j h" | q | a | d | g | j | m | p | t | w |
| "j i" | q | a | d | g | j | m | p | t | w |
| "j j" | q | a | d | g | j | m | p | t | w |
| "j k" | q | a | d | g | j | m | p | t | w |
| "j l" | q | a | d | g | j | m | p | t | w |
| "j m" | q | a | d | g | j | m | p | t | w |
| "j n" | q | a | d | g | j | m | p | t | w |
| "j o" | q | b | e | i | j | m | r | t | w |
| "j p" | q | a | d | g | j | m | p | t | w |

## FIG. 10G

| "-    -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "j    q" | q | a | d | g | j | m | p | t | w |
| "j    r" | q | a | d | g | j | m | p | t | w |
| "j    s" | q | a | d | g | j | m | p | t | w |
| "j    t" | q | a | d | g | j | m | p | t | w |
| "j    u" | q | a | d | g | l | m | s | t | w |
| "j    v" | q | a | d | g | j | m | p | t | w |
| "j    w" | q | a | d | g | j | m | p | t | w |
| "j    x" | q | a | d | g | j | m | p | t | w |
| "j    y" | q | a | d | g | j | m | p | t | w |
| "j    z" | q | a | d | g | j | m | p | t | w |
| "j     " | q | a | d | g | j | m | p | t | w |
| "k    a" | q | a | d | g | j | n | s | t | y |
| "k    b" | q | a | d | g | j | o | p | t | w |
| "k    c" | q | a | d | g | j | m | p | t | w |
| "k    d" | q | a | d | g | j | o | p | t | w |
| "k    e" | q | a | d | g | l | n | s | t | y |
| "k    f" | q | a | d | g | j | m | p | t | w |
| "k    g" | q | a | d | g | j | m | r | t | w |
| "k    h" | q | a | d | g | j | m | p | t | w |
| "k    i" | q | a | d | g | l | n | p | t | w |
| "k    j" | q | a | d | g | j | m | p | t | w |
| "k    k" | q | a | d | g | j | o | p | t | w |
| "k    l" | q | a | d | i | j | m | p | t | y |
| "k    m" | q | a | d | g | j | m | p | t | w |
| "k    n" | q | a | d | g | j | o | p | t | w |
| "k    o" | q | a | d | g | l | n | p | t | w |
| "k    p" | q | a | d | g | j | m | p | t | w |
| "k    q" | q | a | d | g | j | m | p | t | w |
| "k    r" | q | a | d | g | j | m | p | t | w |
| "k    s" | q | a | d | g | j | m | p | t | w |
| "k    t" | q | a | d | g | j | m | p | t | w |
| "k    u" | q | a | d | g | j | m | p | t | w |
| "k    v" | q | a | d | g | j | m | p | t | w |
| "k    w" | q | a | d | g | j | m | p | t | w |
| "k    x" | q | a | d | g | j | m | p | t | w |
| "k    y" | q | a | d | g | j | m | p | t | w |
| "k    z" | q | a | d | g | j | m | p | t | w |

**FIG. 10H**

| "-     -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "k     " | q | a | d | g | j | m | p | t | w |
| "l   a" | q | b | d | i | j | n | r | t | y |
| "l   b" | q | a | d | g | j | o | p | t | w |
| "l   c" | q | a | d | g | j | o | p | t | w |
| "l   d" | q | a | e | i | j | n | s | t | w |
| "l   e" | q | a | d | g | l | m | s | t | x |
| "l   f" | q | a | d | g | j | m | p | t | w |
| "l   g" | q | a | d | g | j | m | p | t | w |
| "l   h" | q | a | d | g | j | m | p | t | w |
| "l   i" | z | c | e | g | k | n | s | t | w |
| "l   j" | q | a | d | g | j | m | p | t | w |
| "l   k" | q | a | e | i | j | m | s | t | w |
| "l   l" | q | c | e | i | j | o | s | u | y |
| "l   m" | q | a | d | g | j | o | s | t | w |
| "l   n" | q | a | e | g | j | m | p | t | w |
| "l   o" | q | c | d | g | j | o | s | t | w |
| "l   p" | q | a | d | h | j | m | s | t | w |
| "l   q" | q | a | d | g | j | m | p | t | w |
| "l   r" | q | a | e | g | j | m | p | t | w |
| "l   s" | q | a | e | i | j | o | p | t | w |
| "l   t" | q | a | e | i | j | o | s | t | w |
| "l   u" | q | c | d | g | l | m | s | t | w |
| "l   v" | q | a | e | i | j | m | p | t | w |
| "l   w" | q | a | e | g | j | m | p | t | w |
| "l   x" | q | a | d | g | j | m | p | t | w |
| "l   y" | z | a | d | i | j | n | s | t | w |
| "l   z" | q | a | d | g | j | m | p | t | w |
| "l     " | q | a | d | g | j | m | p | t | w |
| "m   a" | q | c | d | i | k | n | r | t | y |
| "m   b" | q | a | e | i | l | m | p | t | y |
| "m   c" | q | c | d | i | j | o | p | t | w |
| "m   d" | q | a | d | g | j | m | p | t | w |
| "m   e" | q | a | e | g | l | n | s | t | w |
| "m   f" | q | a | d | g | j | o | p | t | w |
| "m   g" | q | a | d | g | j | m | p | t | w |
| "m   h" | z | a | d | g | j | m | p | t | w |
| "m   i" | z | c | d | g | l | n | s | t | x |

**FIG. 10I**

| "_    _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "m    j" | q | a | d | g | j | m | p | t | w |
| "m    k" | q | a | d | g | j | m | p | t | w |
| "m    l" | q | a | d | e | g | j | m | p | t | y |
| "m    m" | q | a | e | i | j | o | p | u | w |
| "m    n" | q | a | d | g | j | m | p | t | w |
| "m    o" | q | b | d | i | j | n | r | v | w |
| "m    p" | q | a | e | i | l | o | r | t | w |
| "m    q" | q | a | d | g | j | m | p | t | w |
| "m    r" | q | a | d | g | j | m | p | t | w |
| "m    s" | q | a | e | g | j | m | p | t | w |
| "m    t" | q | a | d | g | j | m | p | t | w |
| "m    u" | q | c | d | g | l | n | s | t | w |
| "m    v" | q | a | d | g | j | m | p | t | w |
| "m    w" | q | a | d | h | j | m | p | t | w |
| "m    x" | q | a | d | g | j | m | p | t | w |
| "m    y" | q | c | d | g | j | m | s | t | w |
| "m    z" | q | a | d | g | j | m | p | t | w |
| "m     " | q | a | d | g | j | m | p | t | w |
| "n    a" | q | b | d | g | l | m | r | t | w |
| "n    b" | q | a | d | g | j | m | p | t | w |
| "n    c" | q | a | e | i | l | o | r | t | y |
| "n    d" | q | a | e | i | l | o | s | t | y |
| "n    e" | q | c | e | i | l | n | s | t | w |
| "n    f" | q | a | e | i | j | o | s | u | w |
| "n    g" | q | a | e | i | l | m | s | u | w |
| "n    h" | q | a | d | g | j | m | p | t | w |
| "n    i" | z | c | e | g | l | n | s | t | x |
| "n    j" | q | a | d | g | j | m | p | u | w |
| "n    k" | q | a | e | i | j | n | s | t | w |
| "n    l" | q | a | e | i | l | o | p | t | y |
| "n    m" | q | a | e | g | j | m | p | t | w |
| "n    n" | q | a | e | i | j | o | p | u | y |
| "n    o" | q | b | d | g | l | n | r | t | w |
| "n    p" | q | a | d | g | j | o | p | u | w |
| "n    q" | q | a | d | g | j | m | p | u | w |
| "n    r" | q | a | d | g | j | m | p | t | w |
| "n    s" | q | a | e | i | l | m | p | t | w |

## FIG. 10J

| "- -" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "n t" | q | a | e | i | l | o | s | u | y |
| "n u" | q | a | f | g | j | m | s | t | x |
| "n v" | q | a | e | i | j | o | p | t | w |
| "n w" | q | a | e | g | j | m | p | t | w |
| "n X" | q | a | d | g | j | m | p | t | w |
| "n y" | q | b | d | h | j | m | p | t | w |
| "n z" | q | a | d | g | j | m | p | t | w |
| "n " | q | a | d | g | j | m | p | t | w |
| "o a" | q | b | d | g | l | m | s | t | w |
| "o b" | q | a | e | i | l | o | s | t | w |
| "o c" | q | a | e | h | k | o | s | u | w |
| "o d" | q | a | e | i | l | o | s | u | y |
| "o e" | q | a | d | g | j | m | s | t | w |
| "o f" | q | a | f | g | j | m | p | t | w |
| "o g" | q | a | e | i | j | o | r | t | y |
| "o h" | q | a | d | g | j | n | p | t | w |
| "o i" | q | c | d | i | l | n | p | t | w |
| "o j" | q | a | e | g | j | m | p | t | w |
| "o k" | q | a | e | i | j | m | s | t | w |
| "o l" | q | b | d | i | l | o | s | u | w |
| "o m" | q | a | e | i | l | m | p | t | w |
| "o n" | q | a | e | g | l | n | s | t | y |
| "o o" | q | a | d | g | k | n | s | t | w |
| "o p" | q | a | e | h | l | m | p | t | y |
| "o q" | q | a | d | g | j | m | p | t | w |
| "o r" | q | a | e | g | k | m | r | t | w |
| "o s" | q | c | e | i | j | o | s | t | y |
| "o t" | q | a | e | h | j | o | s | t | w |
| "o u" | q | c | d | g | l | n | r | t | y |
| "o v" | q | a | e | i | j | m | p | t | w |
| "o w" | q | a | e | i | j | n | s | t | w |
| "o x" | q | a | d | i | j | m | p | t | w |
| "o y" | q | a | e | g | j | m | s | t | w |
| "o z" | q | a | e | g | j | m | p | t | w |
| "o " | q | a | d | g | j | m | p | t | w |
| "p a" | q | c | d | g | l | n | r | t | y |
| "p b" | q | a | e | g | j | m | p | t | w |

## FIG. 10K

| "_    _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "p    c" | q | a | d | g | j | m | s | t | w |
| "p    d" | q | a | d | g | j | m | p | t | w |
| "p    e" | q | c | d | g | j | n | r | t | w |
| "p    f" | q | a | d | g | j | m | r | t | w |
| "p    g" | q | a | d | g | j | m | p | t | w |
| "p    h" | q | a | e | i | j | o | s | t | y |
| "p    i" | q | c | d | g | l | n | r | t | x |
| "p    j" | q | a | d | g | j | m | p | t | w |
| "p    k" | q | a | d | g | j | m | p | t | w |
| "p    l" | q | a | e | i | j | o | p | u | y |
| "p    m" | q | a | e | g | j | m | p | t | w |
| "p    n" | q | a | d | g | j | m | p | t | w |
| "p    o" | q | c | d | i | l | n | r | t | w |
| "p    p" | q | a | e | i | l | o | p | t | y |
| "p    q" | q | a | d | g | j | m | p | t | w |
| "p    r" | q | a | e | i | j | o | p | t | y |
| "p    s" | q | a | d | g | j | m | p | t | w |
| "p    t" | q | c | e | i | j | o | s | t | w |
| "p    u" | q | b | d | g | j | m | r | t | w |
| "p    v" | q | a | d | g | j | m | p | t | w |
| "p    w" | q | a | d | g | j | m | p | t | w |
| "p    x" | q | a | d | g | j | m | p | t | w |
| "p    y" | q | a | d | g | j | m | r | t | w |
| "p    z" | q | a | d | g | j | m | p | t | w |
| "p     " | q | a | d | g | j | m | p | t | w |
| "q    a" | q | a | d | g | j | m | p | t | w |
| "q    b" | q | a | d | g | j | m | p | t | w |
| "q    c" | q | a | d | g | j | m | p | t | w |
| "q    d" | q | a | d | g | j | m | p | t | w |
| "q    e" | q | a | d | g | j | m | p | t | w |
| "q    f" | q | a | d | g | j | m | p | t | w |
| "q    g" | q | a | d | g | j | m | p | t | w |
| "q    h" | q | a | d | g | j | m | p | t | w |
| "q    i" | q | a | d | g | j | m | p | t | w |
| "q    j" | q | a | d | g | j | m | p | t | w |
| "q    k" | q | a | d | g | j | m | p | t | w |
| "q    l" | q | a | d | g | j | m | p | t | w |

**FIG. 10L**

| "_   _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "q  m" | q | a | d | g | j | m | p | t | w |
| "q  n" | q | a | d | g | j | m | p | t | w |
| "q  o" | q | a | d | g | j | m | p | t | w |
| "q  p" | q | a | d | g | j | m | p | t | w |
| "q  q" | q | a | d | g | j | m | p | t | w |
| "q  r" | q | a | d | g | j | m | p | t | w |
| "q  s" | q | a | d | g | j | m | p | t | w |
| "q  t" | q | a | d | g | j | m | p | t | w |
| "q  u" | q | a | e | i | j | o | p | t | w |
| "q  v" | q | a | d | g | j | m | p | t | w |
| "q  w" | q | a | d | g | j | m | p | t | w |
| "q  x" | q | a | d | g | j | m | p | t | w |
| "q  y" | q | a | d | g | j | m | p | t | w |
| "q  z" | q | a | d | g | j | m | p | t | w |
| "q   " | q | a | d | g | j | m | p | t | w |
| "r  a" | q | c | d | g | l | n | p | t | w |
| "r  b" | q | a | d | g | j | o | p | t | w |
| "r  c" | q | a | e | h | l | m | p | u | w |
| "r  d" | q | a | e | i | j | n | s | v | w |
| "r  e" | q | a | e | g | l | n | s | v | w |
| "r  f" | q | a | e | g | j | o | p | t | w |
| "r  g" | q | a | e | i | j | m | s | u | w |
| "r  h" | q | a | e | g | j | o | p | t | w |
| "r  i" | z | c | e | g | l | n | p | t | w |
| "r  j" | q | a | d | g | j | m | p | t | w |
| "r  k" | q | a | d | i | l | m | s | t | y |
| "r  l" | q | a | d | i | j | o | p | t | y |
| "r  m" | q | a | e | i | j | m | s | t | w |
| "r  n" | q | a | e | i | j | o | s | t | w |
| "r  o" | q | b | d | g | l | m | p | u | w |
| "r  p" | q | a | d | g | j | o | r | t | w |
| "r  q" | q | a | d | g | j | m | p | t | w |
| "r  r" | q | a | e | i | j | o | p | t | y |
| "r  s" | q | a | e | i | j | o | p | t | w |
| "r  t" | z | a | e | h | j | n | s | u | w |
| "r  u" | q | c | e | g | l | n | s | t | w |
| "r  v" | q | a | e | i | j | m | p | t | w |

**FIG. 10M**

| "_  _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|--------|---|---|---|---|---|---|---|---|---|
| "r  w" | q | a | d | i | j | o | p | t | w |
| "r  x" | q | a | d | g | j | m | p | t | w |
| "r  y" | q | b | d | i | j | m | p | t | w |
| "r  z" | q | a | d | g | j | m | p | t | w |
| "r   " | q | a | d | g | j | m | p | t | w |
| "s  a" | q | b | d | g | l | m | p | v | y |
| "s  b" | q | a | d | g | j | m | p | t | w |
| "s  c" | q | a | d | h | l | o | r | u | w |
| "s  d" | q | a | d | g | j | n | p | t | w |
| "s  e" | q | c | e | g | l | n | r | t | y |
| "s  f" | q | a | e | g | j | m | p | u | w |
| "s  g" | q | a | d | g | j | m | r | t | w |
| "s  h" | q | a | e | i | l | o | r | t | w |
| "s  i" | z | c | d | g | l | n | s | t | x |
| "s  j" | q | a | d | g | j | m | p | t | w |
| "s  k" | q | a | e | i | j | m | p | t | w |
| "s  l" | q | a | e | i | j | o | p | t | y |
| "s  m" | q | a | e | i | j | o | s | t | w |
| "s  n" | q | a | e | g | j | m | p | t | w |
| "s  o" | q | c | f | g | l | m | r | u | w |
| "s  p" | q | a | e | g | l | o | r | t | w |
| "s  q" | q | a | d | g | l | m | p | u | w |
| "s  r" | q | c | d | g | j | m | p | t | w |
| "s  s" | q | a | e | i | j | o | p | u | w |
| "s  t" | q | a | e | i | l | o | r | u | y |
| "s  u" | q | b | e | g | l | m | p | t | w |
| "s  v" | q | a | d | g | j | m | p | t | w |
| "s  w" | q | a | e | i | j | o | p | t | w |
| "s  x" | q | a | d | g | j | m | p | t | w |
| "s  y" | q | a | d | g | j | m | s | t | w |
| "s  z" | q | a | d | g | j | m | p | t | w |
| "s   " | q | a | d | g | j | m | p | t | w |
| "t  a" | q | c | f | i | l | n | r | t | y |
| "t  b" | q | a | d | g | j | m | p | t | w |
| "t  c" | z | a | d | h | j | o | p | t | w |
| "t  d" | q | a | d | g | j | m | p | t | w |
| "t  e" | q | c | d | g | l | m | r | u | x |

## FIG. 10N

| "_  _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "t f" | q | a | d | i | j | o | p | t | w |
| "t g" | q | a | e | g | j | o | p | t | w |
| "t h" | q | a | e | i | l | o | r | u | w |
| "t i" | z | c | e | g | l | o | s | v | w |
| "t j" | q | a | d | g | j | m | p | t | w |
| "t k" | q | a | e | g | j | m | p | t | w |
| "t l" | q | a | e | i | j | m | p | t | y |
| "t m" | q | a | e | g | l | o | p | t | w |
| "t n" | q | a | e | g | j | m | p | t | w |
| "t o" | q | c | d | g | l | m | r | u | w |
| "t p" | q | c | d | g | j | m | p | u | w |
| "t q" | q | a | d | g | j | m | p | t | w |
| "t r" | q | a | e | i | j | o | p | u | y |
| "t s" | q | c | e | i | j | o | p | u | w |
| "t t" | q | a | e | i | l | o | p | t | y |
| "t u" | q | a | f | i | j | n | r | t | w |
| "t v" | q | a | d | g | j | m | p | t | w |
| "t w" | q | a | e | i | l | o | p | t | w |
| "t x" | q | a | d | g | j | m | p | t | w |
| "t y" | q | a | d | g | l | m | p | t | w |
| "t z" | q | a | d | g | j | m | p | t | w |
| "t " | q | a | d | g | j | m | p | t | w |
| "u a" | q | a | d | g | l | n | r | t | w |
| "u b" | q | a | e | i | j | m | s | t | w |
| "u c" | q | c | e | h | k | m | p | t | w |
| "u d" | q | a | e | i | j | o | p | t | y |
| "u e" | q | a | d | g | j | n | s | t | w |
| "u f" | q | a | f | g | j | m | p | t | w |
| "u g" | q | a | e | h | j | m | s | t | w |
| "u h" | q | a | d | g | j | m | p | t | w |
| "u i" | q | c | d | g | l | n | r | t | w |
| "u j" | q | a | d | g | j | m | p | t | w |
| "u k" | q | a | d | g | j | m | p | t | w |
| "u l" | q | a | d | g | l | m | p | t | y |
| "u m" | q | b | e | i | j | m | p | t | w |
| "u n" | q | c | d | i | l | n | s | t | w |
| "u o" | q | a | d | g | j | m | p | t | w |

**FIG. 10O**

| "_   _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---------|---|---|---|---|---|---|---|---|---|
| "u  p" | q | a | d | i | l | o | p | t | y |
| "u  q" | q | a | d | g | j | m | p | t | w |
| "u  r" | q | c | e | i | l | n | s | t | y |
| "u  s" | q | a | e | i | l | m | s | t | y |
| "u  t" | q | a | e | i | l | o | s | t | y |
| "u  u" | q | c | d | g | j | m | p | t | w |
| "u  v" | q | a | d | g | j | m | p | t | w |
| "u  w" | q | a | d | g | j | m | p | t | w |
| "u  x" | q | a | d | g | j | m | p | t | w |
| "u  y" | q | a | e | g | j | m | s | t | w |
| "u  z" | q | a | d | g | j | m | p | t | w |
| "u  " | q | a | d | g | j | m | p | t | w |
| "v  a" | q | c | d | i | l | n | r | t | w |
| "v  b" | q | a | d | g | j | m | n | t | w |
| "v  c" | q | a | d | g | j | m | s | t | w |
| "v  d" | q | a | d | g | j | m | p | t | w |
| "v  e" | q | a | d | g | l | n | r | t | w |
| "v  f" | q | a | d | g | j | m | p | t | w |
| "v  g" | q | a | d | g | j | m | p | t | w |
| "v  h" | q | a | d | g | j | m | p | t | w |
| "v  i" | q | c | e | g | j | n | s | t | w |
| "v  j" | q | a | d | g | j | m | p | t | w |
| "v  k" | q | a | d | g | j | m | p | t | w |
| "v  l" | q | a | d | g | j | m | s | t | w |
| "v  m" | q | a | d | g | j | m | p | t | w |
| "v  n" | q | a | d | g | j | m | p | t | w |
| "v  o" | q | a | d | i | l | o | r | t | w |
| "v  p" | q | a | d | g | j | m | p | t | w |
| "v  q" | q | a | d | g | j | m | p | t | w |
| "v  r" | q | a | d | g | j | m | p | t | w |
| "v  s" | q | a | d | g | j | m | p | t | w |
| "v  t" | q | a | d | g | j | m | p | t | w |
| "v  u" | q | a | d | g | j | m | p | t | w |
| "v  v" | q | a | d | g | j | m | p | t | w |
| "v  w" | q | a | d | g | j | m | p | t | w |
| "v  x" | q | a | d | g | j | m | p | t | w |
| "v  y" | q | a | d | g | j | m | p | t | w |

## FIG. 10P

| "_ | _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| "v | z" | q | a | d | g | j | m | p | t | w |
| "v | " | q | a | d | g | j | m | p | t | w |
| "w | a" | q | b | d | i | l | n | r | v | y |
| "w | b" | q | a | d | g | j | m | p | t | w |
| "w | c" | q | a | e | g | j | m | p | t | w |
| "w | d" | q | a | f | g | j | m | p | t | w |
| "w | e" | q | b | e | i | l | n | r | v | w |
| "w | f" | q | a | d | g | j | m | p | t | w |
| "w | g" | q | a | d | g | j | m | p | t | w |
| "w | h" | q | a | e | i | j | o | p | t | y |
| "w | i" | q | c | d | g | l | n | s | t | w |
| "w | j" | q | a | d | g | j | m | p | t | w |
| "w | k" | q | a | d | g | j | m | p | t | w |
| "w | l" | q | a | d | g | j | m | p | t | w |
| "w | m" | q | a | d | g | j | m | p | t | w |
| "w | n" | q | a | d | g | l | m | s | t | w |
| "w | o" | q | a | d | g | j | n | r | u | w |
| "w | p" | q | a | d | h | j | m | p | t | w |
| "w | q" | q | a | d | g | j | m | p | t | w |
| "w | r" | q | a | d | i | j | o | p | t | w |
| "w | s" | q | a | e | g | j | m | p | t | w |
| "w | t" | q | a | d | g | j | m | p | t | w |
| "w | u" | q | a | d | g | j | m | p | t | w |
| "w | v" | q | a | d | g | j | m | p | t | w |
| "w | w" | q | a | d | g | j | m | p | t | w |
| "w | x" | q | a | d | g | j | m | p | t | w |
| "w | y" | q | a | d | g | j | m | p | t | w |
| "w | z" | q | a | d | g | j | m | p | t | w |
| "w | " | q | a | d | g | j | m | p | t | w |
| "x | a" | q | c | d | g | j | m | p | t | w |
| "x | b" | q | a | d | g | j | m | p | t | w |
| "x | c" | q | a | e | h | j | m | p | t | w |
| "x | d" | q | a | d | g | j | m | p | t | w |
| "x | e" | q | c | d | g | l | m | s | t | x |
| "x | f" | q | a | d | g | j | m | p | t | w |
| "x | g" | q | a | d | g | j | m | p | t | w |
| "x | h" | q | a | d | g | j | m | p | t | w |

## FIG. 10Q

| "_    _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| "x  i" | q | c | d | g | j | n | s | t | w |
| "x  j" | q | a | d | g | j | m | p | t | w |
| "x  k" | q | a | d | g | j | m | p | t | w |
| "x  l" | q | a | d | i | j | m | p | t | w |
| "x  m" | q | a | d | g | j | m | p | t | w |
| "x  n" | q | a | d | g | j | m | p | t | w |
| "x  o" | q | a | d | g | j | m | p | t | w |
| "x  p" | q | a | e | i | l | o | p | t | w |
| "x  q" | q | a | d | g | j | m | p | t | w |
| "x  r" | q | a | d | g | j | m | p | t | w |
| "x  s" | q | a | e | i | j | m | p | t | w |
| "x  t" | q | a | e | g | j | m | r | u | w |
| "x  u" | q | a | d | g | j | m | p | t | w |
| "x  v" | q | a | d | g | j | m | p | t | w |
| "x  w" | q | a | d | g | j | m | p | t | w |
| "x  x" | q | a | d | g | j | m | p | t | w |
| "x  y" | z | a | d | g | j | m | p | t | w |
| "x  z" | q | a | d | g | j | m | p | t | w |
| "x  " | q | a | d | g | j | m | p | t | w |
| "y  a" | q | a | d | g | j | m | p | t | w |
| "y  b" | q | a | e | i | j | o | p | t | w |
| "y  c" | q | a | d | g | l | o | p | t | w |
| "y  d" | q | a | d | g | j | m | p | t | w |
| "y  e" | q | a | e | g | j | m | s | t | w |
| "y  f" | q | a | d | g | j | m | p | t | w |
| "y  g" | q | a | d | g | j | m | p | t | w |
| "y  h" | q | a | d | g | j | o | p | t | w |
| "y  i" | q | c | d | g | j | n | p | t | w |
| "y  j" | q | a | d | g | j | m | p | t | w |
| "y  k" | q | a | d | g | j | m | p | t | w |
| "y  l" | q | a | e | g | j | m | p | t | w |
| "y  m" | q | a | e | g | j | o | p | t | w |
| "y  n" | q | c | d | g | j | m | p | t | x |
| "y  o" | q | a | d | g | j | n | r | u | w |
| "y  p" | q | a | e | i | j | m | p | t | w |
| "y  q" | q | a | d | g | j | m | p | t | w |
| "y  r" | q | a | d | i | j | m | p | t | w |

## FIG. 10R

| "_ _" | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| "y | s" | q | c | e | i | j | m | p | t | w |
| "y | t" | q | a | e | h | j | m | p | t | w |
| "y | u" | q | a | d | g | k | m | r | t | w |
| "y | v" | q | a | d | g | j | m | p | t | w |
| "y | w" | q | a | d | h | j | m | p | t | w |
| "y | x" | q | a | d | g | j | m | p | t | w |
| "y | y" | q | a | d | g | j | m | p | t | w |
| "y | z" | q | a | e | g | j | m | p | t | w |
| "y | " | q | a | d | g | j | m | p | t | w |
| "z | a" | q | a | d | g | j | m | p | t | w |
| "z | b" | q | a | d | g | j | m | p | t | w |
| "z | c" | q | a | d | g | j | m | p | t | w |
| "z | d" | q | a | d | g | j | m | p | t | w |
| "z | e" | q | a | d | g | j | n | r | t | w |
| "z | f" | q | a | d | g | j | m | p | t | w |
| "z | g" | q | a | d | g | j | m | p | t | w |
| "z | h" | q | a | d | g | j | m | p | t | w |
| "z | i" | q | a | d | g | j | n | p | t | w |
| "z | j" | q | a | d | g | j | m | p | t | w |
| "z | k" | q | a | d | g | j | m | p | t | w |
| "z | l" | q | a | d | g | j | m | p | t | w |
| "z | m" | q | a | d | g | j | m | p | t | w |
| "z | n" | q | a | e | g | j | m | p | t | w |
| "z | o" | q | a | d | g | j | n | p | t | w |
| "z | p" | q | a | d | g | j | m | p | t | w |
| "z | q" | q | a | d | g | j | m | p | t | w |
| "z | r" | q | a | d | g | j | m | p | t | w |
| "z | s" | q | a | d | g | j | m | p | t | w |
| "z | t" | q | a | d | g | j | m | p | t | w |
| "z | u" | q | a | d | g | j | m | p | t | w |
| "z | v" | q | a | d | g | j | m | p | t | w |
| "z | w" | q | a | d | g | j | m | p | t | w |
| "z | x" | q | a | d | g | j | m | p | t | w |
| "z | y" | q | a | d | g | j | m | p | t | w |
| "z | z" | q | a | d | g | j | m | p | t | w |
| "z | " | q | a | d | g | j | m | p | t | w |
| " | a" | q | c | d | i | l | n | r | t | w |

**FIG. 10S**

| " _ _" | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|--------|---|---|---|---|---|---|---|---|---|
| " b" | q | a | e | i | l | o | r | u | y |
| " c" | q | a | e | h | l | o | r | u | y |
| " d" | q | a | e | i | j | o | r | u | w |
| " e" | q | a | d | i | l | n | s | v | x |
| " f" | q | a | e | i | l | o | r | u | w |
| " g" | q | a | e | i | l | o | r | u | w |
| " h" | q | a | e | i | j | o | p | t | w |
| " i" | q | c | f | g | j | n | s | t | w |
| " j" | q | a | e | g | j | o | p | u | w |
| " k" | q | b | e | i | j | n | p | t | w |
| " l" | q | a | e | i | l | o | p | u | y |
| " m" | q | a | e | i | k | o | s | u | y |
| " n" | q | a | e | i | j | o | p | u | w |
| " o" | z | b | f | g | k | n | r | u | w |
| " p" | q | a | e | h | l | o | r | u | w |
| " q" | z | a | d | g | j | m | p | u | w |
| " r" | q | a | e | i | j | o | s | u | w |
| " s" | q | c | e | h | l | o | p | t | y |
| " t" | q | a | e | h | j | o | r | u | w |
| " u" | q | a | d | i | k | n | s | t | w |
| " v" | q | a | e | i | l | o | p | t | w |
| " w" | q | a | e | i | j | o | r | t | w |
| " x" | q | a | d | g | j | m | p | t | y |
| " y" | q | a | e | i | j | o | p | u | w |
| " z" | q | a | e | i | j | o | p | t | y |
| " " | q | a | f | i | l | o | s | t | w |

## FIG. 10T



*FIG. 11*



*FIG. 12*



**FIG. 13**



*FIG. 14*

US 6,625,447 B1

1

# METHOD AND ARCHITECTURE FOR AN INTERACTIVE TWO-WAY DATA COMMUNICATION NETWORK

The present application is a continuation application of U.S. patent application Ser. No. 08/978,701, filed on Nov. 26, 1997, and entitled "A Method and Architecture for an Interactive Two-Way Data Communication Network," which is a continuation application of U.S. patent application Ser. No. 08/570,210, filed on Dec. 11, 1995, and entitled "A Method and Architecture for an Interactive Two-Way Data Communication Network," now issued as U.S. Pat. No. 5,809,415.

## CROSS REFERENCE TO MICROFICHE APPENDIX

Appendix A, which is a part of the present disclosure, is a microfiche appendix consisting of six sheets of microfiche having a total of 369 frames. Microfiche Appendix A is a listing of one embodiment of the client module of this invention, which is described more completely below, and a server, as described more completely below, to communicate and interact with the client module of this invention.

A portion of the disclosure of this patent document contains material, that includes, but is not limited to, Microfiche Appendix A, Appendix I, Appendix II, and FIGS. **10A** to **10T**, which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure, as it appears in the Patent and Trademark Office patent files or records, but otherwise reserves all copyright rights whatsoever.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates generally to data communications, and in particular to two-way data communication devices including a cellular telephone,sa two-way pager, and a telephone that permit a user to interface with and interact with a server on a computer network.

### 2. Description of Related Art

For at least the last five years, the wireless communication industry has tried to merge computing with wireless communications. This industry wide effort has held the promise of bringing software intelligence to telecommunication devices including mobile wireless communications devices such as cellular telephones and two-way pagers as well as standard telephones.

After years of research and development, and hundreds of millions of dollars' investment by some of the largest companies in the field such as Motorola, AT&T, Sony, Matsushita, Phillips and IBM, the results have been nothing but disappointing. Typically, the intelligent communication devices resulting from these efforts include both the hardware necessary for a computer module and the hardware for a wireless communications module. Examples of such products are Simon from IBM and Bell South, MagicLink from Sony, and Envoy from Motorola.

Fundamental design and cost problems arising directly from the approach taken by the designers of these intelligent communication devices have limited widespread market acceptance of these devices. The combination of a wireless communication module with a computing module leads to a device that is too bulky, too expensive, and too inflexible to address the market requirements.

2

The combination of the two modules is too large and too heavy to fit in a user's pocket. Pocket size is a key requirement of the mobile communication market which remains unmet by these devices

In addition, the cost of these devices is close to the sum of the cost of the computer module and of the communications module, which is around a one thousand dollar end-user price. Market research indicates that the market for intelligent wireless communications devices is at prices around $300. Even with a 20% compound cost decline, it would take five years for the combination units to meet today's customers' price requirements. It is therefore unlikely that devices designed by combining a computer and a wireless module, no matter how miniaturized and cost reduced, can satisfy the cost requirement of the market during this decade.

To succeed in the market place, intelligent wireless communication devices must be able to support a wide variety of applications specific to each market segment. Typically, these applications must be added to the device by the end-user after purchase. Thus, the device must provide a method for loading the initial application and for subsequent updating of the application.

The price sensitivity for intelligent communication devices and the size limitations means that an intelligent communication device cannot support the amount of core memory (RAM), a hard disk or non-erasable memory, or a traditional floppy disk drive, commonly found on computers. These limitations close the traditional routes for delivering new applications or updates to intelligent communications devices.

As a result, the current crop of intelligent communication devices run only the few applications which were burned into their ROMs at the factory or which are contained in a ROM card plugged into a slot designed for this purpose. This scheme lacks the flexibility needed to run the thousands of applications required to address the fragmented requirements of the market and provides no simple method for updating the applications after the device has been sold.

Two other communication oriented attempts at bringing intelligence to telephones are Short Messaging Service (SMS) and Analog Display Service Interface (ADSI). SMS specifies how messages are delivered to and from a cellular telephone and how the cellular telephone should store the messages. SMS also defines some simple processing which the cellular telephone can perform on the message, such as calling a telephone number embedded in the message.

SMS's architecture is similar to that of paging networks with the difference that devices implementing the SMS architecture operate over the control channel of the cellular telephone network. SMS is deployed primarily in Europe over the GSM network.

SMS messages are not delivered in real time. The time delays can range from 30 seconds up to 10 minutes, which makes SMS unsuitable for real time applications. The main purpose of SMS is the delivery of messages. SMS does not specify an application protocol or cellular telephone application module which further restricts its usefulness in running applications on cellular telephones. After a few years of deployment in Europe, SMS implementations have been limited to notification services such as two-way paging and voice mail notification.

SMS as a medium is unsuited to building applications which allows the retrieval, manipulation, and storage of information. This is the reason why the industry giants have not turned to SMS in their quest to add intelligence to

US 6,625,447 B1

3

cellular telephones, but have consistently attempted to combine a computer module with a wireless communications module.

ADSI was designed as an extension to Interactive Voice Response Systems. ADSI allows a smart telephone with a small screen to display prompts to assist users in choosing among various options. By using visual prompts instead of cumbersome voice prompts, ADSI is thought to make the use of interactive voice services easier and faster.

ADSI allows data to be sent from the service provider to the telephone in the form of screens. ADSI also allows the telephone to respond through touch tone signaling with a special coding to describe the full alphanumeric character set. With ADSI, a telephone is primarily a passive device. Services send text screens to the telephone, and the telephone sends back short strings indicating the choices the user made from the text screen.

ADSI makes no provisions for performance of processing in the telephone. As a result, ADSI generates a high traffic load on the telephone network since each user input is sent back to the service for processing. This makes ADSI unsuitable for wireless networks where bandwidth is at a premium and "air efficiency" is one of the most sought after qualities. The lack of processing capability in the telephone and the high bandwidth requirements of ADSI have prevented it from being considered by the industry for implementing intelligent wireless devices.

Up to now, intelligent communication devices have combined a computing module with a wireless communications module. However, to gain widespread acceptance, a two-way data communication device with processing capability and the ability to run a wide variety of differing user applications is needed. In addition, such a device should be comparable in size, cost, and weight to a cellular telephone.

## SUMMARY OF THE INVENTION

According to the principles of this invention, the prior art limitations of combining a computer module with a wireless communication module have been overcome. In particular, a two-way data communication device of this invention, such as a cellular telephone, two-way pager, or telephone includes a client module that communicates with a server computer over a two-way data communication network. The principles of this invention can be used with a wide variety of two-way data communication networks. For example, two-way data communication networks for cellular telephones that may be used include a cellular digital packet data network as well as TDMA, CDMA, and GSM circuit switched data networks; and the AMPS analog cellular network with a modem. Similarly, for two-way pagers, two-way data communication networks include PACT, the new AT&T endorsed two way paging standard, or other priority two-way paging networks with data transport capability. The two-way data communication network for a telephone is the public switched telephone network.

Using the two-way communication device that includes the client module, a user can provide information to the server computer, retrieve information from the server computer, provide data to an application on the server computer which uses the data and provides information to the two-way communication device, or sends the information to another location. The functionally provided to the user of the two-way communication device is limited only by the applications available on a server computer that is accessible to the user over the two-way data communication network.

4

This invention allows for the first time two-way communications devices such as cellular telephones, two-way pagers, and telephones to become open application platforms which in turn empowers software developers to deliver value-added applications and services to any two-way communication device that incorporates the principles of this invention. This is a radical shift from the current situation where telephones and two-way pagers are closed, proprietary systems. Consequently, an even playing field is created for the market to invent new uses for two-way communication devices and for two-way communication networks. Any entity from corporations to individuals can make new applications available to the installed base of two-way data communication devices that include this invention without physical modification or addition to the two-way communication device. Years after purchase, a two-way communication device incorporating this invention will run all the applications which were developed since its purchase.

Further, all these applications are available without the end user having to add anything or make any modification to the two-way communication device. Also, the applications are independent of the two-way data communication network. The applications do not depend on any feature of the two-way data communication network. Thus, the applications are unaffected by a change in the two-way data communication network.

Also, the applications on the server computer are independent of the two-way data communication device with which the server computer is interacting. An application on the server computer can communicate with any two-way data communication device that includes the client module of this invention and a network interface module to transmit data over, and receive data from the two-way data communication network. These two features mean that an investment in developing an application is insulated from either advances in two-way data communication devices, or advances in two-way data communication network technology.

As indicated above, the two-way data communication device of this invention utilizes a client module to transmit a message including a resource locator selected by the user over the two-way data communication network to a server on a server computer on the computer network. For example, the computer network can be a corporate wide area network, a corporate local area network, the Internet, or any combination of computer networks.

The server processes the message, i.e, executes the application addressed by the resource locator and transmits a response over the two-way data communication network to the two-way data communication device, which stores the response in a memory. The client module interprets the response and generates a user interface using information in the response. In one embodiment, the user interface includes at least one user data input option that is associated with a resource locator. In another embodiment, the user interface is a display.

The resource locator associated with the at least one user data input option can address any one of a wide variety of objects. In one embodiment, the resource locator associated with the at least one user data input option addresses an object on the server computer that transmitted the response. In another embodiment, the resource locator addresses an object on another server computer coupled to the two-way data communication network. In yet another embodiment the resource locator addresses an object stored in the two-way communication device.

5

When the user selects the at least one user data input option, the client module interprets the selection and if required, appends any input data to the resource allocator associated with the at least one user data input option. The client module transmits a message including the resource locator with any appended input data to the server computer. Alternatively, the resource locator with any appended data can be addressed to another server computer, or can address an object stored in the two-way communication device. If the resource locator addresses an object on a server computer, the client module provides the message to the network interface module which in turn transmits the message over the two-way data communication network.

Thus, in this embodiment, the message originally transmitted to the two-way data communication device included all the information necessary for the client module to generate the user interface, to associate the user selection and any data entered with a particular resource locator, and to transmit the appropriate resource locator in a subsequent message. The client module includes an interpreter that processed the information in the message. Since the message included all the information needed by the client module, the server computer that transmitted the message retained no state information concerning the message. Consequently, the server computer is defined as a stateless server computer.

An important aspect of this invention is that the message includes all information necessary for the client module to generate the user interface and a particular user interface can be independent from other user interfaces. Unlike prior art systems that gave the user a predetermined menu from which to select items, or limited the user to an E-mail like format, according to the principles of this invention, the user interfaces and possible interactions available to the user are determined only by the applications that developers make available. The possible interactions and user interfaces for one application can be totally different and independent from the possible interactions and user interfaces of another application. Thus, a cellular telephone, two-way pager, and a telephone all truly become an open platform.

These features of the invention are a significant departure from prior art systems. Typically, in the prior art, use of a particular application on a particular platform required that the application be compatible with the operating system on that platform. Further, each time a new version of the application was released, the user was required to take steps to update the application on the user's platform. Further, if the user of the platform did not modify the operating system as new versions of the operating system were released, at some point in time, the platform would no longer be capable of processing a new version of an application that required a current version of the operating system.

This invention eliminates these problems. As explained above, the client module in the two-way data communication device functions an interpreter. The application on the server computer provides all information necessary for the interpreter to generate a user interface on the two-way data communication device, and in response to user selections or data input using the user interface, to route messages to an appropriate server, i.e, either the server that sent the original information or another server.

Thus, the client module only interprets this information and interacts appropriately with the hardware of the two-way data communication device. Consequently, to update an application requires only changes on the server computer and not changes in each two-way data communication device that communicates with that server computer. This

6

invention eliminates the usual requirement for distribution of application software, and application software updates to the end user of the two-way data communication device.

In one embodiment, a two-way data communication system for communication between a server computer and a two-way data communication device selected from a group consisting of a cellular telephone, a two-way pager, and a telephone, includes a two-way data communication network, a server computer coupled to the two-way data communication network, and a two-way data communication device coupled to the two-way data communication network. The server computer includes a two-way data communication interface module coupled to the two-way data communication network, and a server coupled to the two-way data communication interface module. The server receives a message including a resource locator from the two-way data communication network. The resource locator includes an address of the server computer and of an application on that server computer. The server processes the message using the resource locator. In this embodiment, the server transmits a response to the message over the two-way data communication network.

The two-way data communication device, selected from the group consisting of a cellular telephone, a two-way pager, and a telephone, includes a network interface module coupled to the two-way data communication network, and a client module coupled to the network interface module. The client module transmitted the message including the resource locator to the server over the two-way data communication network. The client module also processes the response to the message from the server. The response includes information for a user interaction over the two-way data communication network.

The client module of this invention is lightweight, and thus requires only lightweight resources in a two-way data communication device. Consequently, the client module can use existing resources in such a device and therefore does not add to the cost of the two-way data communication device.

In one embodiment, the interpreter within the client module includes a plurality of managers including a user interface manager coupled to a display of the two-way data communication device where the user interface manager handles interactions with the display. The user interface manager also is coupled to a keypad of the two-way data communication device and handle interactions with the keypad. Herein, a keypad can be a telephone keypad, the keys found on a two-way pager, or other data input interface of a two-way communication device.

In one embodiment, the response generated by the server computer includes a plurality of resource locators and at least one of the plurality of resource locators includes an address to another server coupled to the communication network.

According to the principles of this invention, a method for using a two-way data communication device, selected from a group consisting of a cellular telephone, a two-way pager, and a telephone, to communicate with a server computer includes:

generating a message by a client module in response to data entered by the user of a two-way data communication device coupled to a two-way data communication network,

wherein the client module executes on a microcontroller of the two-way data communication device; and the message includes a resource locator;

US 6,625,447 B1

| 7 | 8 |

transmitting the message over the two-way data communication network to a server computer wherein the server computer is identified by the resource locator;

executing an application on the server computer identified by the resource locator to generate a response to the message; and

transmitting the response to a location identified by the application.

As indicated above the location can be the two-way communication device, another server computer, or some other device coupled to the server computer.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates one embodiment of the airnet network of this invention that includes the two-way data communication devices of this invention.

FIGS. 2A to 2H are illustrations of a series of screen displays of the two-way data communication device of this invention that illustrate one application of the principles of this invention.

FIGS. 3A to 3F are illustrations of a series of screen displays of the two-way data communication device of this invention that illustrate a second application of the principles of this invention.

FIGS. 4A to 4I are illustrations of a series of screen displays of the two-way data communication device of this invention that illustrate yet another application of the principles of this invention.

FIG. 5 illustrates another embodiment of the airnet network of this invention that includes the two-way data communication devices of this invention and an airnet network translator.

FIG. 6 is a block diagram of a mobile wireless communication device that includes the client and support modules of this invention.

FIG. 7 is a more detailed diagram of the mobile wireless communication device and a server computer within the airnet network architecture of this invention.

FIGS. 8A to 8D are a process flow diagram showing the process performed by the client in the mobile wireless communication device and the server on the server computer of FIG. 7.

FIG. 9 is a diagram of a mobile wireless communication device of this invention that includes a novel predictive text entry system that is a part of this invention.

FIGS. 10A to 10T are one embodiment of a letter frequency table.

FIG. 11 is a process flow diagram for one embodiment of a data entry process that includes the novel predictive data entry process of this invention.

FIG. 12 is a more detailed diagram of the mobile wireless communication device and the airnet network translator within the airnet network architecture of the another embodiment of this is invention.

FIG. 13 is a process flow diagram showing the various processes performed by the airnet network translator of FIG. 12.

FIG. 14 is a diagram illustrating the various module managers included in one embodiment of the client module of this invention.

Herein, objects with the same reference numeral are the same object. Also, the first number of a reference numeral indicates the Figure where the object first appeared.

## DETAILED DESCRIPTION

According to the principles of this invention, a novel airnet network 150, i.e., a two-way data communication network, interconnects any one, any combination, or all of two-way data communication devices 100, 101, or 102, that each include this invention, with a wide variety of computer networks 120, 130, and 140, for example. As explained more completely below, each two-way data communication device 100, 101, and 102 can be configured to transmit data to and receive data from any desired combination of computers on computer networks 120, 130, and 140. Airnet network 150 is the two-way data communication path from the two-way data communication device to the particular computer that is accessed by the user of that two-way data communication device.

Each wireless communication device 100 that includes this invention can communicate over airnet network 150 with any server computer 121, 131, and 141 on airnet network 150 that includes at least one application that communicates and interacts with the processes of this invention that are included within device 100. Thus, device 100 can access information on the computer network and provide information to the computer network. Similarly, a two-way pager 101, and a telephone 102 with a modem 103, that each include this invention, can communicate over airnet network 150 with any of server computers 121, 131, and 141 that includes at least one application that communicates and interacts with the processes of this invention that are included within devices 101 and 102.

As explained more completely below, an application on a server computer can be accessed by any two-way data communication device that can communicate with that server computer. The application is independent of the particular type of two-way data communication device that is used to access the application and independent of the particular two-way data communication network used. This means that a user can access an application from anywhere so long as the user has a two-way data communication device that can communicate with the server computer.

In one embodiment, a process on wireless communication device 100 is configured as a client process and the applications on server computers 121, 131 and 141 on airnet network 150, that communicate with the client process, are server processes. This architecture allows some of the processing burden to be moved away from cellular telephone 100, across airnet network 150, to a server module on any computer on airnet network 150.

Specifically, a wireless communication device 100 e.g., a cellular telephone, with a telephone like keypad, communicates via a data capable cellular telephone network 110, e.g., a cellular digital packet data telephone network, with an application on a server computer on a computer network that has an interface to data capable cellular telephone network 110. For example, the computer network can be a corporate wide area network 120, a corporate local area network 130, or perhaps the Internet 140.

Similarly, a two-way pager 101 communicates via a two-way pager network 111 with an application on a server computer on a computer network that has an interface to two-way pager network 111. Again, for example, the computer network can be a corporate wide area network 120, a corporate local area network 130, or perhaps the Internet 140. Finally, a telephone 102 communicates via a modem 103 and public switched telephone network 112 with an application on a server computer on a computer network that has an interface to public switched telephone network 112.

9

As with the other two-way data communication devices, the computer network can be, for example, a corporate wide area network **120**, a corporate local area network **130**, or perhaps the Internet **140**.

In each of two-way data communication devices **100, 101,** and **102,** the client process is stored as a client module in the device and the execution of the client module on a micro-controller in the device is sometimes referred to as the client process. The client process performs important processing functions locally. This allows the communication between the client process, hereinafter sometimes referred to as simply client, and the server process, hereinafter sometimes referred to as server, to be minimized and the server computing requirements to grow slowly as the number of clients, i.e., users, grows.

The client module is small, e.g., under 64 KByte, and requires only low processing power congruent with the memory chips and built-in microcontrollers in two-way data communication devices such as cellular telephone **100,** two-way pager **101,** and telephone **102.** Thus, unlike the prior art attempts at an intelligent telephone, the cost, size, and battery life of either cellular telephones, two-way pagers, or telephones that incorporate this invention are not adversely affected.

While client/server architectures have been used exten-sively in computer networks, a client/server architecture implemented using two-way communication data devices such as cellular telephone **100,** two-way pager **101,** or telephone **102** yields new and unexpected results. This invention allows for the first time a wide variety of two-way data communication devices including but not limited to cellular telephones, two-way pagers, and telephones to become open application platforms which in turn empowers software developers to deliver value added applications and services to any two-way data communication device which incorporates the principles of this invention.

This is a radical shift from the current situation where cellular telephones, two-way pagers, and telephones are closed, proprietary systems. Consequently, an even playing field is created for the market to invent new uses for cellular telephones and data capable cellular networks, for two-way pagers and two-way pager networks, and for telephones on the public switched network.

Any entity from corporations to individuals can make new applications available to the installed base of data ready cellular telephones, two-way pagers, and telephones, that include this invention without physical modification or addition to the devices. Years after purchase, a two-way data communication device with this invention can run all the applications which were developed since its purchase. Further, all these applications are available without the user having to add anything or make any modification to the two-way data communication device. These features of the invention are a significant departure from prior art systems. Typically, in the prior art, use of a particular application on a particular platform required that the application be com-patible with the operating system on that platform. Further, each time a new version of the application was released, the user was required to take steps to update the application on the user's platform. Further, if the user of the platform did not modify the operating system as new versions of the operating system were released, at some point in time, the platform would no longer be capable of processing a new version of an application that required a current version of the operating system.

Also, small devices, such as cellular telephones or pagers, usually do not have card slots, floppy or hard disk drives, or

10

other means commonly found on computers to add or update applications. This limitation has led prior art attempts at intelligent communication devices to design closed systems with fixed functionality. Such devices can neither adapt nor be adapted to the fast changing requirements of the market place and so have not met with market success.

This invention eliminates these problems. The client process in the two-way data communication device func-tions an interpreter. The application on the server computer provides all information necessary for the interpreter to generate a user interface on the two-way data communica-tion device, and in response to user selections or data input using the user interface, to route messages to an appropriate server, i.e, either the server that sent the original information or another server.

Thus, the client process only interprets this information and interacts appropriately with the hardware of the two-way data communication device. Consequently, to update an application requires only changes on the server computer and not changes in each two-way data communication device that communicates with that server computer. This invention eliminates the usual requirement for distribution of application software, and application software updates to the end user of the two-way data communication device.

For example, if initially, two-way pager **101** receives a response to a message from an application on server com-puter **121** on corporate wide area network **120,** the inter-preter in two-way pager **101** generates a user interface on display screen **106** using information in the message. As described more completely below, options presented in the user interface can allow the user to access information, or provide information to any one, any combination of, or all of networks **120, 130,** and **140.**

Specifically, in the response to the message from two-way pager **101,** the application initially accessed on server com-puter **121** included resource locators for applications on each of networks **120, 130, 140,** typically common gateway interface programs, accessible to the user of pager **101** as well as information required to generate the user interface. Consequently, when the user makes a particular selection or enters data, the interpreter accesses the appropriate resource locator and appends any necessary data to the resource locator. The client transmits a message including the resource locator to the appropriate server.

As shown by this example, the applications on networks **120, 130, 140** send to the two-way data communication device all information necessary to generate a user interface, and to process all user input. Consequently, only an appli-cation must be changed to update the information provided to the two-way data communication device.

In addition, since all the information needed by the client to generate a user interface and all information necessary for the client process to respond to any input data is included in the message, the computer server does not retain any state information concerning the information transmitted to the client process. Consequently, the computer server is state-less.

Each two-way data communication device **100, 101,** and **102** that utilizes airnet network **150,** includes a data com-munication capability, a display screen, preferably a multi-line display screen, and storage capability for the processes of this invention in an on-board memory, and for the message being processed. Nearly every data capable cellular telephone, e.g., a telephone that utilizes a cellular digital packet data network, includes excess on-board memory capacity and a multi-line display screen. These hardware

US 6,625,447 B1

11

resources are often available, but unused in a data capable cellular telephone because of the indivisibility of memory chip packages. The inclusion of the processes of this invention in such cellular telephones therefore has very little effect on the cost, size, and power consumption of the cellular telephone. Similarly, the inclusion of the processes of this invention in two-way pagers and telephones, that include a microcontroller and memory, has very little affect on the cost, size, and power consumption of these devices.

Thus, unlike prior art approaches that attempted to combine a computer module and a wireless communication module in a single package, this embodiment of the invention preferably utilizes the memory and processing power that currently exists in the cellular telephone 100, two-way pager 101, telephone 102 or other wireless or landline two-way data communication devices. This approach limits the cost of the resulting device and overcomes many of the problems of the prior art devices, e.g., the size and weight of the two-way data communication device is not changed, and, as explained above, updating user applications is removed from cellular telephone 100, two-way pager 101, and telephone 102.

In particular, unlike devices produced by previous industry attempts at combining computing modules and a wireless cellular module, two-way data communication devices which incorporate this invention are size and cost competitive with voice-only telephones and can, for the first time, satisfy the market cost and size requirements for an intelligent cellular telephone, for example.

The incremental cost of supporting interactive applications on cellular telephone 100, two-way pager 101, and telephone 102 is reduced to at most a slightly larger screen that is required to display the application to the user. This is a fraction of the cost of adding a complete computer module to a cellular telephone, for example.

The incremental power consumption required to support this invention is also very small, as the incremental memory and screen required are small consumers of power compared to the cellular radio itself. Intelligent two-way data communication devices built according to the principles of this invention are not expected to have a significantly lower battery life than standard cellular telephones, or two-way pagers, for example.

The configuration and processes of the client process in two-way data communication devices 100, 101, and 102 are similar when the differences in the devices and the two-way data communication network over which the devices communicate are considered. Consequently, in the following description, the operation of data-ready cellular telephone 100 is considered. The same or similar operations can be performed on two-way data communication devices 101, and 102. The main difference is that some device dependent features within the client module must be changed to accommodate the particular hardware used in the two-way communication device. However, the client module architecture described more completely below limits the number of changes that must be made.

As indicated above, in response to user actions, wireless communication device 100 transmits a message, typically a data request, to a server computer 121 on computer network 120 and receives a response to the message. Alternatively, the user action can result in directions to server computer 121 on computer network 120 to transmit the response to the message to another location or to another user. Also, wireless communication device 100 can receive a message from any one of the computers coupled to airnet network 150.

12

An important aspect of this invention is that the client module interpreter in wireless communication device 100 generates a user interface by which the user can both initiate and receive messages from a variety of applications. The interactions take place in real-time and are not limited by the client module interpreter. The uses of wireless communication device 100 are limited only by the availability of applications on server computers.

The applications available are determined by application developers. Prior to considering one implementation of the invention in further detail, several illustrative examples of applications that can be implemented according to the principles of this invention are described. These applications are illustrative only and are not intended to limit the invention to the particular applications and features described.

In one use, the user configures cellular telephone 100 to access server computer 121 on XYZ corporate wide area network 120. In response to the access by the user, server computer 121 transmits a card deck to cellular telephone 100 over data capable cellular telephone network 110. As explained more completely below, a card deck includes one or more cards, and each card is interpreted by the client module to generate a user interface screen.

In the embodiment illustrated in FIG. 2A, the initial card deck transmitted to cellular telephone 100 includes an introductory display card and a choice card. FIG. 2A is an example of introductory screen display 200 that is generated on display screen 105 by the client process in cellular telephone 100 by interpreting the display card. As used herein, a display screen is the physical display apparatus in a two-way communication device. A screen display is the image presented on the display screen.

In this embodiment, display screen 105 is a pixel display that displays graphics. In another embodiment, display screen 105 displays only text and so the graphics would not appear on display screen 105. Screen display 200, and other screen displays described more completely below, include a horizontal arrow, i.e., a multi-card deck indicator, to communicate to the user that the current deck includes another card. The inclusion of screen indicators, such as the multi-card deck indicator, to communicate with the user is optional. The functionality of this invention is independent of such screen indicators.

When the user presses a predetermined key, or key sequence, the client process in cellular telephone 100 interprets the next card in the card deck, i.e., the choice card, and in turn generates a menu 201 (FIG. 2B) of items that can be accessed by the user. In this embodiment, each of the menu items is available on server computer 121 to the user who, in this example, is a representative of XYZ corporation visiting ABC Designs.

As explained more completely below, each of the menu items is associated with a resource locator that includes an address of the particular object associated with that menu item, typically an address to a common gateway interface program on server computer 121. In general, a resource locator includes an address and may include appended data. The address can be to a local object within the two-way data communication device or to a remote object on a server computer. As is known to those skilled in the art, the common gateway interface is an Internet standard that is used to dynamically generate information, e.g., cards. In view of this disclosure, other techniques to generate dynamic cards could be used.

Initially, the highlighting of the first line of menu 201 is not present. When a key on the keypad of cellular telephone

A0194

US 6,625,447 B1

13

100 is pressed, the menu item corresponding to that key is highlighted on screen 105. Thus, menu 201 shows the first item highlighted to indicate that the one key was pressed by the user. However, highlighting a selected item is a feature that is specific to this example, and in general is not required to implement the invention. Other methods can be used to indicate the user's choice on display screen 105 such as an arrow pointing at the choice, if such an indication is desired.

After the one key is pressed, the user presses a predetermined key, e.g., an enter key, to verify the selection. Alternatively, in another embodiment, the verification of the selection is not required. In both embodiments, the resource locator for the selection is transmitted to server computer 121 by the client process in cellular telephone 100 over data capable cellular telephone network 110. In response to the selection, server computer 121 processes the message containing the selection, and in this embodiment, transmits another card deck to cellular telephone 100.

The client process in cellular telephone 100 interprets the first card in the deck received from server computer 121, which is a choice card, and generates a screen display 202, that includes a second menu as illustrated in FIG. 2C, on display screen 105. Initially, none of the items in the second menu are highlighted.

Notice that screen display 202 includes a header, that describes the selection made by the user on screen display 201, in addition to the second menu of choices available to the user. A multi-display screen card indicator 203, e.g., in this embodiment, a hand icon with a finger pointing down, shows that the screen associated with the current choice card includes additional items that are not shown on display screen 105. Herein, a screen can be larger than the number of lines available on display screen 105 and so the user must scroll the screen display to view the complete screen.

Thus, to view the additional items, the user presses a first screen scroll key, e.g., a next key, on cellular telephone 100. In this embodiment, when the first screen scroll key is pressed, each line of the display is rolled up one line. The resulting display has an icon with a finger pointing up (not shown) if the menu requires only two screen displays. If the menu requires more than two screen displays, the second screen display of the menu would have two icons, one with a finger pointing up, and another with a finger pointing down. To scroll between the various lines in the second menu, the user uses the first screen scroll key, and a second screen scroll key.

If the user displays the last line of a card, e.g., the last line in the second menu, and presses the first screen scroll key nothing happens. In this embodiment, the user must make a choice before the next card is available.

Screen display 202 also includes representations of two soft keys, a home key 204, and an info key 205. In this example, these soft keys are defined only for the card used to generate screen display 202. When the user presses a predetermined key sequence, the home key is highlighted to indicate the selection. In this embodiment, when the home key is selected, the user is returned to screen display 200. In another embodiment, the user could be returned, for example, to a home screen display that is displayed each time the user activates cellular telephone 100 for use on airnet network 150.

The home key is associated with a pointer, that in one embodiment is a resource locator, and the card addressed by the pointer is displayed by the client process when the home key is selected by the user. Specifically, if the pointer is to a card in the current deck, the client process simply displays

14

that card. If the pointer is to other than a card in the current deck, the client process in cellular telephone 100 retrieves the deck containing the card at the location identified by the pointer. The location could be, for example, either a memory in cellular telephone 100, or a memory in computer 121.

Similarly, when the user presses another predetermined key sequence, the info key is highlighted to indicate the selection. In this embodiment, when the info key is selected, a help screen is displayed for the user that describes the possible selections. The particular contents of the help screen are determined by the provider of the service. Specifically, a pointer is associated with the info key and when the info key is depressed by the user, the information stored at the location identified by the pointer is retrieved and interpreted by the client process in cellular telephone 100.

Returning to the menu in FIG. 2C, since the user wants to determine the status of an order, the user pushes the two key on the keypad of cellular telephone 100. In response to the key press, the second choice in the menu is highlighted as shown in FIG. 2C. In response to verification of the key press, e.g., the user presses a predetermined key sequence, cellular telephone 100 transmits a check open order request to computer 121, i.e, the client process transmits a message that includes a resource locator associated with the menu item selected by pressing the two key.

In response to the check open order request, computer 121 transmits yet another card deck to cellular telephone 100. The client process in cellular telephone 100 interprets this deck, that is an entry card, and in turn generates a purchase order number entry screen display 206 (FIG. 2D) on display screen 105. Notice that screen display 206 has a previous soft key 207 and a fax soft key 208. Again, each of these soft keys has an associated pointer and the information stored at the location identified by the pointer is retrieved and interpreted by the client process when the user selects the soft key.

In this example, the user does not select a soft key, but rather the user enters the purchase order number as shown in FIG. 2E using the keypad of cellular telephone 100. The user enters only the various numbers. The client process formats the number and inserts the dashes as shown in FIG. 2E.

After the purchase order is entered, the user presses a predetermined key sequence to indicate to the client process that entry of the purchase order number is complete. Notice that the user is entering data and not simply selecting a menu item. The user is utilizing cellular telephone 100 as if cellular telephone 100 was a computer connected to network 120, but, as explained more completely below, cellular telephone 100 is similar to a standard digital data capable cellular telephone that communicates over data capable cellular telephone network 110. Specifically, cellular telephone 100 is not a combination of a computer module and a wireless communication module as in prior art attempts to create an intelligent telephone.

In addition, the user enters data using only the standard cellular telephone keypad. Thus, cellular telephone 100 eliminates the need for a computer keyboard or for a sophisticated touch screen that recognizes motion of a pointing object. This is important to maintaining the size, weight, and power requirements of cellular telephone 100 similar to those of a voice-only cellular telephone. In one embodiment, to facilitate data entry, as explained more completely below, cellular telephone 100 includes a text prediction process that reduces the number of key strokes required to enter text data. In this embodiment, the text prediction process is turned on or off for each entry card.

US 6,625,447 B1

15

In response to entry of the purchase order number, the client process transmits a request to server computer **121** for the particular purchase order. Specifically, the client process appends the entered data to a resource locator and transmits a message containing the resource locator to server computer **121**. Server computer **121**, in response to the message, retrieves the appropriate purchase order and transmits the purchase order as a card deck to the client process in cellular telephone **100** over airnet network **150**.

The client process interprets the card deck and generates a screen display **209** (FIG. 2F). Initially, fax key **208** is not highlighted in screen display **209**.

Notice that screen display **209** includes multi-display screen card indicator **203** to show the user that the purchase order screen contains more information that can be displayed at one time on display screen **105**.

After the user reviews the purchase order, the user presses the key sequence for fax key **208** and in response, fax key **208** is highlighted as illustrated in FIG. 2F.

In response to selection of fax key **208**, the client process retrieves the card deck at the location identified by the pointer associated with fax key **208**. If the location is on server computer **121**, the client process transmits a message including a resource locator to server computer **121** and in response to the message, server computer **121** transmits back yet another card deck. If the location is on a server computer other than server computer **121**, the client process transmits a message including a resource locator to that server computer and in response to the message, that server computer transmits back yet another card deck. If the location identified by the pointer is within cellular telephone **100**, the client process simply retrieves the deck. In either case, fax form **210** (FIG. 2G), that is an entry card, is displayed on display screen **105** by cellular telephone **100**. This example demonstrates the information accessed by the client process can be located in any number of locations. The resource locator associated with the fax key identifies the appropriate location.

When fax form **210** is displayed, the user enters the facsimile machine telephone number at ABC Designs, as shown in FIG. 2H, using the cellular telephone keypad. In this embodiment, the telephone number is automatically formatted by the client process. After the telephone number is entered, the client process appends the telephone number to a resource locator and transmits the information to server computer **121**.

When server computer **121** receives the information, server computer **121** executes a common gateway interface application (CGI) pointed to by the resource locator. The CGI application grabs the necessary information and transmits the information via e-mail to a fax gateway. The fax gateway, upon receipt of the e-mail, converts the information to a fax and sends the information to the specified telephone number. Thus, cellular telephone **100** requires neither a printer connection nor a print driver, but yet can print using the facsimile machine at ABC Designs.

As illustrated in this example, cellular telephone **100** transmitted a request for a particular purchase order, and scheduled transmission of data responsive to the request to a local machine capable of printing the data. Thus, the processes of this invention, as described more completely below, in cellular telephone **100** in combination with data capable cellular telephone network **110** and server computer **121** permit cellular telephone **100** to effectively utilize an application on server computer **121** on network **120** even though cellular telephone **100** utilizes only a microcontroller

16

found in telephone **100** and does not required a separate computer module as in the prior art.

In addition, the client process using the information transmitted from server computer **121**, i.e, the cards, generates a wide-variety of user interfaces as illustrated in FIGS. 2A to 2H. The particular configuration of the various user interfaces is defined by the cards transmitted in a card deck. Consequently, the user interface is not fixed to one particular format such as an E-mail type format, but rather the format is variable and can be redefined by each card that is interpreted by the client process. Also, in general, the user interface for one application on a server computer is independent from the user interface for another application on that server computer.

Specifically, the application accessed on server computer **121** generates the card deck and so in turn defines each of the various user interfaces. Each user interface permits the user to identify a particular selection. Each particular selection could result in generation of a different user interface with different selections. Thus, the user interfaces are limited only by the applications accessible to the two-way data communication device.

As shown below, a wide variety of applications can be provided on a server computer. Despite the robustness of the client module in interpreting a wide variety of application, typically, the client process is lightweight and thus requires only lightweight resources, e.g., 60 Kbytes of read-only memory (ROM) for the client module, 10 Kbytes of random access memory (RAM), and less than one million instructions per second (MIPS) of processing power. Since the client process needs only these lightweight resources in a two-way data communication device, the client can use existing resources in such a device and therefore does not add to the cost of the two-way data communication device such as data capable cellular telephone **100**.

In another embodiment, the user can configure cellular telephone **100** to access server computer **131** on corporate local area network **130**. In response to the access by the user, computer **131** transmits a home card (not shown) to cellular telephone **100** which in turn generates a home screen display on display screen **105**.

When the user selects personal information on the home screen display or on a subsequent screen display associated with the home card, a message including a resource locator for a personal information deck is transmitted from cellular telephone **100** to computer **131**. In response to the message, computer **131** transmits a card deck that includes a display card and a choice card to cellular telephone **100**. In these examples, the card deck is described as including one of three cards, a display card, a choice card, and an entry card. However, these examples are illustrative only, and are not intended to limit the invention to those particular embodiments of cards. In view of this disclosure, those skilled in the art will be able to form combinations of these types of cards and define other types of cards, if such cards are appropriate for the particular application.

The client process in cellular telephone **100** interprets the display card that includes image and text data and generates screen display **300** on display screen **105** (FIG. 3A). Screen display **300** includes a home key **301**, and an info key **302**. When the user selects home key **301**, the user is returned to the home screen. Info key **302** functions in a manner similar to that described above for info key **205**.

When the user presses a predetermined key, the client process interprets the choice card and a second screen display **304** (FIG. 3B) is driven on display screen **105**.

US 6,625,447 B1

17

Screen display **304** is a menu of the personal information that is stored on server computer **131** for use by the user of cellular telephone **100**. Multi-display screen card indicator **203**, e.g., the hand with a finger pointing down, illustrates to the user that the list has additional items that appear on the next screen display. Screen display **304** also indicates the number of E-mail messages, faxes, and voice messages waiting for the user.

The user scrolls the screen display line by line until screen display **305** is on display screen **105**. Initially, the fourth item in the menu is not highlighted. In this example, the user presses the four key on the keypad of cellular telephone **100** to view the user's schedule. In response to the key press, the client module in cellular telephone **100** transmits a message, including a resource locator associated with the menu item selected by pressing the four key, to server computer **131** using data capable cellular telephone network **110** and corporate local area network **130**.

In response to the message, server computer **131** executes the application identified in the resource locator. Upon completion of the execution, server computer **131** transmits, over corporate local area network **130** and data capable cellular telephone network **110** to cellular telephone **100**, a card deck that includes a choice card that describes the user's schedule for that day.

In this embodiment, when server computer **131** completes the transmission, server computer **131** has completed the response to the message and has transmitted all necessary information to cellular telephone **100**. Therefore, server computer **131** does not retain any state information concerning the transmitted information and so is referred to as a stateless server computer **131**. In this embodiment, the client process can only request a card deck. However, as demonstrated herein, card decks and the two-way interactive data communication system of this invention provide the user with a new level of capability.

When cellular telephone **100** receives the card deck, the client process in cellular telephone **100** interprets the choice card and drives screen display **306** (FIG. 3D) on display screen **105**. Initially, the first item in the menu of screen display **306** is not highlighted. When the user depresses the one key on the keypad of cellular telephone **100**, cellular telephone **100** highlights the first item in the menu. Cellular telephone **100** generates screen display **308** (FIG. 3E) upon the user subsequently depressing a predetermined key. Screen display **308** includes a schedule key **309**, that when selected returns the user to screen display **306** (FIG. 3D). Screen display **308** also includes a more detailed description of the 10:00 a.m. meeting.

While screen display **308** is active, if the user depresses a predetermined key, the user is presented with the options in screen display **310** (FIG. 3F). Initially, item two in screen display **310** is not highlighted.

In this example, the user depresses key two on the keypad of cellular telephone **100** and so cellular telephone **100** sends a message including a resource locator to server computer **131** to send an E-mail message to Bill Smith confirming the meeting at 10:00 a.m. When server computer **131** executes the application addressed by the resource locator, an E-mail message is sent.

In another example, the user of cellular telephone **100** connects to Internet service provider computer **141** on Internet **140** using data capable cellular telephone network **110**. Upon connection of cellular telephone **100**, service provider **141** transmits to cellular telephone **100** a card deck to generate FIGS. 4A to 4C.

18

The client process in cellular telephone **100** interprets the first card in the card deck from computer **141** and generates screen display **400** (FIG. 4A). When the user presses a predetermined key, cellular telephone **100** displays screen display **401** (FIG. 4B). Screen display **401** provides the user with a series of choices that group services alphabetically.

When the user depresses the seven key on the keypad of cellular telephone **100**, cellular telephone **100** displays a list of the services that have letters P, R, or S as the first letter in the service name. In this embodiment, screen displays **401** and **402** are a single card, e.g., a single screen. Each of the various services associated with a key has an index and when a particular choice is made by the user, the choice defines an index. The client process then displays all of the services with the index that corresponds to the index defined by the user's choice.

In screen display **402**, the user is given a series of choices of services that are available to the user under tab seven. Initially, item three in screen display **402** is not highlighted. In this example, the user depresses the three key on the keypad of cellular telephone **100** to select the stock quotes and item three in screen display **402** is highlighted.

In response to this selection, cellular telephone **100** transmits a request for a stock quote, i.e, a message including a resource locator, over cellular telephone network **100** and internet **140** to service provider **141**. In response to the request, service provider **141** executes the application addressed by the resource locator. The application retrieves a card deck that, in turn is transmitted to cellular telephone **100**. The card deck includes a display card and an entry card.

Upon receiving the card deck, the client process in cellular telephone **100** interprets the display card and generates screen display **403** (FIG. 4D). When the user depresses a predetermined key, entry screen display **406** (FIG. 4E) is generated on display screen **105** of cellular telephone **100**.

Initially, the box with letters SUNW in screen display **406** is empty. The letters SUNW are entered in the box by the user to indicate the ticker symbol of the stock for which the user wants information. After the user has entered the stock ticker symbol, the user presses the predetermined key to indicate that the entry is complete.

In response to the entry by the user, the client module appends the stock ticker symbol to the resource locator and transmits the resource locator to service provider computer **141** which, in turn, executes an application addressed by the resource locator to retrieve the latest stock market information for the stock ticker symbol. Service provider **141** uses the retrieved information to generate a card deck that contains the information and then transmits the card deck to cellular telephone **100**.

The client process in cellular telephone **100** interprets the first card in the deck and generates screen display **409** (FIG. 4F). For convenience, the FIGS. 4F to 4I are grouped together and separated by a dotted line. However, at any given time, in this embodiment, display screen **105** can display any four adjacent lines and so the grouping of lines in FIGS. 4F to 4I is for convenience only to demonstrate the level of information that can be retrieved and displayed by the client process. The use of a four line display screen is illustrative only. The client process of this invention can work with any size display screen, even a one line display screen. However, a multi-line display screen is preferred.

In the Figures discussed above, the display screen is a pixel display and so can display images. In another

US 6,625,447 B1

19

20

embodiment, the display screen only displays text and is smaller in size. For such an embodiment, the various entries are abbreviated and only text is displayed, but the general operation is identical to that just described. Also, the various computer networks can be interlinked so that a user with access to one computer network can obtain information on another computer network. Moreover, the embodiments described above are merely illustrative. One important aspect of this invention is that cellular telephone **100** can interact with any type of server application that is configured to communicate with and interact with the client process in cellular telephone **100**. Thus, the user is no longer limited to only a few services offered by a telephone network provider.

In FIG. 1, the cellular telephone user must address, i.e., connect to, each computer of interest to access the different services. Consequently, each computer requires the information necessary to communicate with cellular telephone **100**. In another embodiment, not illustrated, cellular telephone **100** contacts a single central computer over data capable cellular telephone network **110**. This computer is connected to each of the other networks illustrated in FIG. 1. Consequently, the user of cellular telephone **100** sends a message including a resource locator to the central computer, the central computer processes the message and retrieves the information addressed by the resource locator from the appropriate network shown in FIG. 1. After the requested information is retrieved, the central computer generates a card deck and transmits the card deck to cellular telephone **100**. In this embodiment, only one computer must be configured to communicate with cellular telephone **100**. However, that same computer must be configured to communicate with all other computer networks that are of interest to the user of cellular telephone **100**.

Hence, according to the principles of this invention, the client process on a two-way data communication device can initiate an interaction with a particular server computer. The server computer transmits (i) information to the client process to generate a user interface, and (ii) a resource locator for each possible selection by the user from the user interface. The resource locators can address applications on the server computer, applications on over server computers, or an application on the server computer that in turn accesses other server computers. Consequently, the user of a two-way data communication device is limited only by the applications provided on the server computers.

Further, the user can be provided new and/or updated capabilities by modifying the applications on the server computers. There is no requirement that the client process be changed for a new or updated application. The client process must only interpret the information received from an application and transmit a message for additional information. These operations are unaffected by a new or updated application. Consequently, as noted above, this invention does not require distribution of application updates or new applications to the end user of the two-way data communication device.

FIG. 5 is an illustration of another embodiment of airnet network **150**. In this embodiment, the messages from a two-way data communication device, e.g., devices **100**, **101**, and **102** are directed to an airnet network translator **500**. Airnet network translator **500** and a particular two-way data communication device, e.g., any one of devices **100**, **101**, and **102** communicate using the protocol for point-to-point communication on the particular network linking airnet network translator **500** and that two-way data communication device. For example, if data capable cellular telephone network **110** is a cellular digital packet data network, either

the transmission control protocol (TCP) or the user datagram protocol (UDP) can be used.

Airnet network translator **500** transfers data between the two-way data communication device and the selected computer network after translator **500** validates the communication path, as explained more completely below, and encrypts the message transferred to the computer network if necessary. In addition, airnet network translator **500** collects transaction and billing information concerning the communication between the two-way data communication device and the designated computer network. Specifically, airnet network translator **500** provides access control for paying services and a logging mechanism for billing. Airnet network translator **500** can also provide a directory service to users.

FIG. 6 is a block diagram of a typical GSM digital cellular telephone. Each of the hardware components in cellular telephone **600** is known to those skilled in the art and so the hardware components are not described in detail herein. The compiled and linked processes of this invention are stored in ROM **601** as a client module **602** and support modules **603**. Upon activation of a predetermined key sequence utilizing the keypad, physical layer processor **610**, that is sometimes referred to herein as a microcontroller, initiates a client process using client module **602** in ROM **601**.

In this embodiment, client module **602** includes a plurality of manager modules, as explained more completely below. The particular manager modules utilized is determined by the characteristics of the particular cellular telephone **100** in which client module **602** is implemented. Client module **602** must include manager modules to interface with modules that control the particular hardware in cellular telephone **100**, a manager module to interface with the particular cellular telephone network protocol used by cellular telephone **100**, and a manager module to interpret the card decks received. Therefore, the particular manager modules described herein are only illustrative of the principles of this invention and are not intended to limit the invention to the specific modules described more completely below.

In this embodiment, the client process controls the operations of a plurality of cellular telephone dependent support processes that are stored in ROM **601** such as a display module, a keypad module, and a network and terminal control module, that were referred to above collectively as support modules **603**. The combination of the client process, display process, keypad process, and network and terminal control process are considered foreground tasks by the microkernel in cellular telephone **600**. Also, herein module and process are used interchangeably, but those skilled in the art will appreciate that the module is the computer software as stored in a memory, preferably, a ROM, of cellular telephone **600** and the corresponding process is the execution of the module by the microcontroller in cellular telephone **600**. Again, note that this invention does not require a separate processor and instead can utilize the processing power that already exists in cellular telephone **600**, because as described above, the client process of this invention is so lightweight.

The user interface for cellular telephone **600** determines the version of the user interface manager module that is stored in ROM **601**. In one embodiment, the parameters used to define the user interface level are the display resolution, the pixel access of the display, and the support of soft keys. One definition of the user interface levels is given in Table 1.

US 6,625,447 B1

21

TABLE 1

USER INTERFACE LEVEL DEFINITIONS

| Level 1 | Text only; 1 or more lines; 12 to 15 characters per line; and no soft keys. |
| Level 2 | Text only; 4 or more lines; 20 to 25 characters per line; and soft keys. |
| Level 3 | Pixel access; 150 by 75 pixels or larger; and soft keys. |

The user interface manager module presents data to the display module which in turn drives display screen **605**; and captures data entered by the user on display screen **605**. In response to this information, the client process prepares a message for transmission by a network manager module.

To more completely explain the operations performed over airnet network **150**, FIG. 7 is a block diagram that illustrates the various components in one embodiment of this invention of cellular telephone **700**. Those skilled in the art will appreciate that cellular telephone **700** includes circuitry and software similar to that illustrated in cellular telephone **600** for voice and data operations supported by cellular telephone **700** in addition to the modules for operation on airnet network **750**. Similarly, server computer **743** includes other software and hardware that is known to those skilled in the art and so is not illustrated in FIG. 7 for clarity.

In this embodiment, client module **702** in digital cellular telephone **700**, that is executing on the microcontroller of telephone **700**, communicates with server computer **743** over cellular digital packet data (CDPD) network **710**. Cellular digital packet data network **710** is used to illustrate one embodiment of this invention on one two-way data communication network. The principles of this invention can be used with a wide variety of two-way data communication networks. For example other two-way data communication networks for cellular telephones that may be used include TDMA, CDMA, and GSM circuit switched data networks; and the AMPS analog cellular network with a modem. Similarly, for two-way pagers, two-way data communication networks include PACT, or other priority two-way paging networks with data transport capability.

Prior to considering the operation of this configuration of airnet network **750** in more detail, another aspect of this invention is required. Specifically, a technique is required for conveying instructions from digital cellular telephone **700** to a server application on server computer **743**, and conversely.

A telephone interaction description language (PIDL) is defined for use by service developers. A terminal interaction language (TIL) is a distillation of the telephone interaction description language and describes the same interaction to digital cellular telephone **700** as the telephone interaction description language describes to computer **743**.

With the exceptions described more completely below, a process in the terminal interaction language is a compressed version of the same process written in the telephone interaction description language. The terminal interaction language allows easy parsing on the two-way data communication device, which in turn makes the client smaller than a client for the telephone interaction description language that is readable by humans, but is not optimized for parsing by a machine.

The compression from the telephone interaction description language to the terminal interaction description lan-

22

guage is done typically at run time because some cards are computed cards and so cannot be precompiled. A wide variety of techniques can be used to convert the telephone interaction description language to terminal interaction language. The important aspect is that, if bandwidth across the cellular telephone network is limited, a compressed form of the telephone interaction description language is used.

Preferably, each data type is compressed to facilitate optimal transfer over the two-way data communication network. For example, the verbs in the telephone interaction description language are compressed using a binary tokenization. Graphics are compressed using run length limited compression and text is compressed using any one of the well-known techniques for text compression. While compression of the telephone interaction description language is not required to implement this invention, compression makes the invention more efficient by utilizing the bandwidth of the network more effectively.

Instructions in the telephone interaction description language and in the terminal interaction language are grouped into a deck and a card. Each deck includes one or more cards. A card includes the information, i.e., a set of telephone interaction description language, required to generate a screen. As indicated above, a screen can be larger than the number of lines in a display screen. Other equivalent terms for a card include a page and an atomic interaction. Thus, a card deck is simply a group of screens. The number of cards in a card deck is selected to facilitate efficient use of the resources in the two-way data communication device and in the airnet network.

For simplicity, in this embodiment, each card is a single operation. Herein, an operation is defined as a related set of actions such that the user does not encounter an unanticipated delay in moving from one action to the next, i.e, the user does not have to wait for client module **702** to retrieve another card deck from computer **743**. Also, a deck may include definitions of soft keys that stay in force while the deck is active, i.e, being executed by the cellular telephone microcontroller.

Computer **743** may contain stored static telephone interaction description language decks. Computer **743** also generates telephone interaction description language decks in response to data from, or choices made by, the user of cellular telephone **700**.

In the embodiment shown in FIG. 7, computer **743** converts a telephone interaction description language deck to a terminal interaction language deck, that in turn is transmitted to cellular telephone **700**. The terminal interaction language is designed so that decks can be stored unaltered in memory **716** of cellular telephone **700** and referenced directly with little or no parsing. While telephone interaction description language decks on computer **743** may contain references to images, a terminal interaction language deck contains the images at the end of the deck. Thus, if a particular two-way data communication device does not support display of images, the images are easily stripped from the terminal interaction language deck before the deck is transmitted to that particular two-way data communication device.

As indicated above, each interaction with the user of cellular telephone **700** is described by a deck or a series of decks. Logically, the user retrieves a terminal interaction language deck stored in a memory **716** of cellular telephone **700** after receipt from computer **743** over CDPD network **710**. The user reviews the information displayed by cards in the deck and makes choices and/or enters requested infor-

US 6,625,447 B1

23

mation and then requests another deck, as described above with respect to FIGS. 2A to 2H, for example.

When the user receives a deck, the first card of information is displayed on display screen **705**. Typically, as shown above, the first card is text, an image, or a combination of an image and text. After the user has reviewed the first card, the user hits a NEXT key to view the next card in the deck. Similarly, a user can return to a previous card in the deck by using a PREV key. Thus, using the NEXT and PREV keys, the user can navigate back and forth through the deck. Within a card, the user uses a scroll key or keys to move the portion of the card displayed up and down. This description of a particular method used to navigate through a deck and within a card is not intended to limit the invention to this particular method. In view of this disclosure, those skilled in the art will be able to use a wide variety of ways to navigate through a deck and within a card.

Cards, in this embodiment, are one of three types, a display card, a choice card, and an entry card. Independent of the type of card, the card can contain text and images. In addition, the invention is not limited to these three particular types of cards. The definition of the three particular types of cards is used to facilitate a description of the invention and to assist the developer's in organizing applications.

A display card gives information to the user to read. The display content can include any one of, or any combination of text, an image, and a soft key. The soft key is in effect only while the display card is active.

A choice card displays a list of choices for the user. The choices are automatically presented in a format specified on the choice card. See Appendix I, which is a part of the present disclosure and is incorporated herein by reference in its entirety. As explained above, the user makes a choice by depressing the key corresponding to the choice.

An entry card is used to obtain input data from the user. An entry card displays one or more entry lines. Typically, each entry line includes a display followed by an entry line. The entry line, in this embodiment, can be for either numeric or text data.

In this embodiment, choice and entry cards prevent the user from moving to the next card until the user has entered the requested information. When the user reaches the last card in a deck and hits the NEXT key, a request for a new deck is initiated. The deck requested is determined by either the deck that the user has completed, or by the choices made by the user. Also, when the deck is completed, the choices and/or data entered by the user typically are transmitted along with the request for the new deck to computer **743**.

Appendix I is one embodiment of a syntax for the telephone interaction description language and the terminal interaction language of this invention. In one embodiment, the telephone interaction description language is described using a subset of the standard generalized markup language. Only a subset of the standard generalized markup language is utilized so that telephone interaction description language parsers also can be written easily using simple tools like lex and yacc.

Returning to operation over airnet network **750**, cellular telephone **700** includes a display module **712**, a keyboard module **711**, a client module **702**, and a UDP interface module **714**. In this embodiment, module **702** is stored in a non-volatile memory (not shown) of telephone **700** and is executed by the microcontroller (not shown) in telephone **700**. Modules **711**, **712**, and **714** operate under the control of client module **702**.

Client module **702** includes instructions that direct the microcontroller in cellular telephone **700** to perform the

24

operations described more completely below with respect to FIGS. **8A** to **8D**. The operations include sending uniform resource locator (URL) requests to HyperText Transfer Protocol (HTTP) server **749**, parsing and displaying a TIL deck or decks returned by HTTP server **749**, and generating new URLs based on the user's key presses. For a description of HTTP server software and platforms that can run the HTTP server software, see, for example, Ian S. Graham, *The HTML Sourcebook*, John Wiley & Sons, Inc., New York, Chapt. 8, (1995), which is incorporated herein by reference.

User datagram protocol (UDP) interface module **714** couples CDPD network **710** to client module **702**, and allows client module **702** to communicate using UDP over CDPD network **710**. The user datagram protocol is well known to those skilled in the art and is documented extensively. UDP interface module **714** supports transmission of simple stand-alone messages between the connection partners.

Display module **712** is a display driver that couples client module **702** to display screen **705** and so allows client module **702** to specify the information presented on display screen **705**. The user interface manager module within client module **702** converts the display information in a card to instructions for display module **704** which in turn provides signals that drive the hardware that controls the operation of display screen **705**. For example, if the TIL deck includes an image, the user interface manager module determines whether the active card calls for display of the image. If the active card directs the user interface manager module to display the image, the user interface manager module passes the image in memory **716** to display module **712**, which in turn displays the image on display screen **705**.

Keyboard module **705** couples keypad **715** to client module **702**, and stores data representing keys pressed by the user on physical keypad **715** in memory **716**. Keyboard module **705** notifies client module **702** when the user has pressed a key.

When client module **702** is notified of a key press, the user interface manager module within client module **702** passes information about the key press to display module **712** that in turn displays the appropriate character on display screen **705**, if an entry card is active. If the user interface manager module determines that a choice card is active, and the key press corresponds to one of the choices, the user interface manager module sends instructions to display module **712** that result in the choice being identified for the user, e.g., highlighted as described above.

In addition to HTTP server **749**, host computer **743** includes a UDP interface module **748**, CGI programs **761** stored in a memory **755** of host computer **743**, and TIL decks **760** stored in memory **755**.

HTTP server **749** uses UDP interface module **748** to send data to and receive data from CDPD network **710**. TIL decks **760** are TIL decks that can be accessed by HTTP server **749**. Static files containing PIDL decks are converted to TIL decks only once on HTTP server **749**. CGI programs **761** are common gateway interface programs that produce PIDL decks that are used by HTTP server **749** to produce TIL decks that in turn are transmitted via UDP interface modules **748** and **714** and cellular telephone network **710** to client module **702**. In this embodiment, the services available over airnet network **750** are applications accessible by HTTP server **749** on Internet **140** for which a service developer has written a PIDL deck, or a CGI script that in turn generates a PIDL deck, and is stored on computer **743**.

The architecture in FIG. **7** demonstrates some important aspects of this invention. First, the applications, the PIDL

US 6,625,447 B1

25                                                           26

decks and CGI scripts in this embodiment, are independent of the particular two-way data communication network. For HTTP server 749 to communicate over a different two-way data communication network that does not support UDP, only UDP interface module 748 must be changed. The applications are unaffected by such a change.

Second, the applications on HTTP server 749 are independent of the two-way data communication device with which HTTP server 749 is interacting. An application on HTTP server 749 can communicate with any two-way data communication device that includes the appropriate client and a module to transmit and receive data over the two-way data communication network. These two facts mean that an investment in developing an application is insulated from either advances in two-way data communication devices, or advances in two-way data communication network technology.

FIGS. 8A to 8D are a process flow diagram for one embodiment of this invention. Initially, when the user initiates communication over airnet network 750, client module 702 initializes a work space in memory 716 of cellular telephone 700 and then, in get home URL process 801, stores a URL in the work space. According to the principles of this invention, in one embodiment, each cellular telephone that utilizes the airnet network has a home URL stored in a non-volatile memory that is used to retrieve a home card deck for the cellular telephone. In another embodiment, the cellular telephone obtains the home URL from server 749. Thus, in get home URL process 801, client module 702 obtains the home URL. Herein, a URL is an example of a specific embodiment of a resource locator.

For example, in get home URL process 801, client module 702 obtains a home URL, such as

http://www.libris.com/airnet/home.cgi

and stores the home URL in the work space. The portion of the home URL, http:/www.libris.com, identifies a particular HTTP server, i.e, server 749, on the world-wide web. The portion of the URL, /airnet/home.cgi, specifies a particular common gateway interface program within CGI programs 761. The use of a URL pointing to a server on the world-wide web is illustrative only is not intended to limit the invention to applications on the world-wide web. In general, cellular telephone 700 obtains an identifier, i.e, a resource locator, of a home application on a home server that is executed by the server when the cellular telephone initially becomes active on airnet network 750, and stores the resource locator in the work space.

Next in create HTTP request process 802, client module 702 converts the URL in the work space to a HTTP request. For example, for the above URL, create HTTP request process 802 generates a method field, such as

GET/airnet/home.cgi HTTP/1.0

The GET method is part of HTTP. Thus, the format for the GET method is known to those skilled in the art. Also, this particular form of the method is used because a specific server connection is established by cellular telephone 700 and so identification of the server is unnecessary. Nevertheless, briefly, this command instructs server 749 to execute application home.cgi and execution of application home.cgi in turn results in generation of a home deck and a subsequent transmission of the home deck to cellular telephone 700. HTTP/1.0 specifies the HTTP version used by client module 702 in cellular telephone 700.

In addition to the method field, client module 702 in process 802 could also generate appropriate HTTP request fields to pass information to server 749 about the capabilities

of client module 702. The request fields can include information such as lists of the MIME content-types acceptable to the client; lists of data encoding types acceptable to the client; user authentication and encryption scheme information for the server; the length in bytes of the message being sent to the server; and the Internet mail address of the user accessing the server. This list of information is illustrative only and is not intended to limit the invention to the particular request fields described herein. Any request field defined by HTTP can be utilized by client module 702. However, in this embodiment, the defaults are utilized and so no HTTP request fields are generated.

Typical HTTP methods that can be generated in HTTP request process 802 are a GET method for requesting either a TIL deck from server 749, or execution of a common gateway interface program on server 749; and a GET method request to a common gateway interface program with data, e.g., a query string appended to the URL. In either case, a URL is transmitted to server 749 within the particular message. After create HTTP request process 802 is complete, client process transfers to transmit request process 804.

However, if the transmission control protocol is used instead of UDP, client module 702 would access a TCP module in establish server connection process 803 that replaced UDP module 714. Since, in this embodiment, UDP is used, establish connection process 803 is enclosed by a dashed line in FIG. 8A to indicate that this process is unnecessary when using UDP.

In establish server connection process 803, a virtual connection would be made over CDPD network 710 between TCP interface module 714 and a TCP interface module in HTTP server 749 so that data could be transmitted between cellular telephone 700 and computer 743 using TCP, e.g., buffers to support data exchange are defined. The establishment of a TCP connection is well-known and so is not described further.

In FIG. 8A, a dashed line connects establish server connection process 803 with establish client connection process 860, that is also dashed, that is performed by HTTP server 749. This indicates that both client module 702 and server 749 are required to complete process 803.

When the TCP virtual connection is established, client module 702 transfers processing from establish server connection process 803 to transmit request process 804. Similarly, server 749 transfers to request received check 861, in which server 749 waits until a request is received. Establish client connection process 860 is not needed for UDP and so HTTP server 749 initiates processing in request received check process 861. Process 860 is enclosed within a dashed line box to indicate that the process is used only for TCP.

In transmit request process 804, the HTTP request is sent from the work area in telephone 700 to HTTP server 749. Again, a dashed line connects process 804 of client module 702 to request received check 861 that is performed by HTTP server 749 to indicate that the check is dependent upon information from client module 702. When the transmission of the request is complete, client module 702 transfers to response received check 806.

Upon receipt and storage of the HTTP request, request received check 861 transfers to service request process 862 in which HTTP server 749 initiates service of the received request. In service request process 862, if the HTTP request only seeks transfer of a static deck, HTTP server 749 retrieves the requested static deck from TIL decks 760. Conversely, if the request requires server 749 to obtain data

27

28

from the Internet or to append data to a particular file, server **749** launches the common gateway interface application addressed in the request, and passes the data in the HTTP request to this application for further processing.

For example, if the user of cellular telephone **700** requested a fax as in FIG. 2F, the HTTP request identifies a common gateway interface application in CGI programs **761** that accepts as input data the telephone number and grabs the information to be faxed. The CGI application generates an e-mail transmission to the fax gateway. Similarly, for a stock quote, server **749**, in response to the HTTP request, launches a common gateway interface application that sends out a stock query over Internet **140** to a stock quote service provider using the ticker tape symbol passed as input data by server **749** to the common gateway interface application. When the response to the stock query is received, the common gateway interface application builds a PIDL deck that includes the data in the response to the stock query.

Upon completion of servicing the request, HTTP server **749** converts the PIDL deck to a TIL deck and returns the TIL deck to client module **702** using UDP in transfer response process **863**, that is connected by a dotted line to response received check **806** in client module **702**. As the TIL deck is transferred, client module **702** stores the deck in memory **716**.

After the TIL deck is transferred, HTTP server **749** closes the process for responding to the message from cellular telephone **700**. All the information needed by client module **702** to generate a user interface on display screen **705** and for responding to any selection or data entry presented in the user interface is included in the TIL deck. Consequently, client module **702** only has to interpret the TIL deck and interpret the user input to transmit the next message to HTTP server **749**. The state for the HTTP server is defined in the next message. Consequently, HTTP server **749** is stateless because HTTP server **749** does not retain state information concerning a response to a message after the message is transmitted.

However, in another embodiment (not shown), a server could retain state information concerning each interaction with a client module. For example, if the server transmitted a choice card to the client module, the server would retain state information indicating that a choice was pending from the client module. In this embodiment, when the user makes a choice, e.g., depresses key two to indicate choice two, the choice is transmitted to the server which in turn accesses the URL associated with choice two. If this URL addresses another application, the server executes that application. Thus, in this embodiment, the server retains state information concerning each interaction with a client module. In view of this disclosure, those skilled in the art can implement the principles of this invention utilizing a server that retains state information when such a client/server combination is advantageous.

Returning to the present embodiment, when the TIL deck is received, client module **702** leaves response received check process **806** and transfers to process first card **808**. However, if TCP is used instead of UDP, client module **702** upon leaving check **806** would close the virtual TCP connection in transmission completed process **807**. Upon closing the virtual TCP connection, processing would transfer to process first card **808**. Again, transmission complete process **807** is enclosed within a dashed line box to indicate that process **807** is used only with TCP.

In process first card **808**, client module **702** parses the TIL deck and interprets the first card. Processing transfers from process first card **808** to generate display process **809**.

In generate display process **809**, client module **702** passes the data to be displayed in the first card to display module **712**. Display module **712**, in response to the data, drives the text and images in the data on display screen **705**. Generate display process **809** transfers processing to key press check **820** through node **813**. In FIGS. 8A to 8D, any circular node with the same alphanumeric character and reference numeral is the same node. The circular nodes are used to establish connections between the various processes in the method of FIGS. 8A to 8D without cluttering the figures with a number of connection lines.

Client module **702** waits in key press check **820** for the user to press a key on keypad **715** of cellular telephone **700**. In this embodiment, cellular telephone **700** is assumed to have the capability to support two soft keys, a scroll-up key, a scroll-down key, a previous key, a next key, and keys zero to 9 that are configured in the standard telephone keypad configuration. In view of the following disclosure, if one or more of these keys are not present, one of skill in the art can alter the method for the particular configuration of the cellular telephone keypad, or other two-way data communication device keypad. For example, if the cellular telephone included a home key, the key press processing described more completely below would include a check that detected when the home key was pressed and would in turn transfer to get home URL process **801**.

Briefly, the processes in FIGS. 8B to 8C, identify the key pressed by the user, identify the action required, and then transfer to a process that implements the action required. Specifically, when a key on the keypad is pressed, keypad module **711** stores an identifier for the key in work memory **716** and notifies client module **702** of the key press. Upon receipt of the notification from keypad module **711**, client module **702** reads the storage location in work memory **716** to determine the key pressed and transfers processing from key press check **820** to scroll key check **821**.

In scroll key check **821**, client module **702** determines whether the user pressed either of the scroll keys. If a scroll key was pressed, processing transfers to adjust display process **822** and otherwise to display card check **823**.

In adjust display process **822**, client module **702** determines which of the scroll-up or scroll-down keys was pressed. Client module **702** then sends information to display module **712** so that the current display is either scrolled-up one line or scrolled-down one line. If the scroll key would move the display beyond a boundary of the current card, the scroll key press is ignored in adjust display process **822**.

In response to the information from client module **702**, display module **712** adjusts the screen display on display screen **705**. Client module **702** transfers processing from adjust display process **822** to key press check **820** through node **813**.

If a scroll key was not pressed, processing is passed through scroll key check **821** to display card check **823**. Client module **702** takes action that depends on the particular type of card that is currently being displayed on display screen **705**. If the current card is a display card, client module **702** passes through display card check **823** to soft key check **828**, and otherwise transfers to choice card check **824**.

Assuming for the moment that the current card is not a display card, choice card check **824** determines whether the current card is a choice card. If the current card is a choice card, client module **702** passes through choice card check **824** to choice key check **826**, and otherwise transfers to data key check **826**.

Assuming for the moment that the current card is neither a display card nor a choice card, the current card must be an

US 6,625,447 B1

29                                                      30

entry card, because in this embodiment only three card types are defined. Thus, client module **702** does not check for an entry card. Rather, data key check **826** determines whether a valid data key was pressed. In this embodiment, the data keys are keys zero to nine on the key pad, and the # key. In other embodiments, other combinations of keys could be defined as data keys. If the pressed key was one of the data keys, data key check **826** transfers to process data entry **827** and otherwise transfers to soft key check **828**.

In process data entry **827**, client module **702** knows whether the predictive text entry process is turned-on, because one of the parameters on the entry card specifies whether to use the predictive text entry process, as described in Appendix I, which is incorporated herein by reference in its entirety.

If the predictive text entry process is not turned-on, client module **702** in process data entry **827** enters the pressed key value in a text entry buffer in work memory **716** at the appropriate location. Also, client module **702** sends information to display module **712** so the value of the pressed key is displayed in the appropriate location on display screen **705** by display module **712**.

If the predictive text entry process is turned-on, client module **702** uses the novel predictive text entry process in process data entry **827**, as described more completely below with respect to FIGS. **9**, **10**A to **10**T, and **11**, to determine the letter to select from the set of letters associated with the pressed key. After the predictive text entry process determines the appropriate letter, a value representing the letter is stored at the appropriate location in the text buffer in work memory **716**. Also, client module **702** sends information to display module **712** so that the letter is displayed in the appropriate location on display screen **705**. Upon completion of process data entry **827**, client module **702** transfers processing through node **813** to key press check **820**.

The previous description assumed that the current card was an entry card, but if the current card is a choice card, choice card check **824** transferred to choice key check **826**. In generate display process **804** for the choice card, each of the choices are labeled according to information on the choice card and some or all of the choices are displayed on display screen **705**. Thus, choice key check **826** determines whether the pressed key corresponds to one of the choices. If the pressed key is one of the choices, client module **702**, in one embodiment, sends information to display module **712** to indicate the selected choice. Client module **702** also transfers from choice key check **826** through node **831** to store identifier process **850** (FIG. 8D), that is described more completely below. Conversely, if the pressed key is not one of the choices, choice key check **826** transfers to soft key check **828**.

Soft keys can be specified both for a deck as a whole and per card, i.e., a physical key on the keypad is specified as a soft key as described more completely in Appendix I. Each soft key specification includes an identifier that defines the action to be taken when the soft key is pressed.

When a soft key is specified for a deck, the soft key remains in effect for the entire deck. However, when a soft key is specified for a card, the card soft key specification temporarily overrides the corresponding deck soft key specification, i.e., the deck soft key specification for the same physical key as the card soft key specification, while the card is visible, i.e., displayed on display screen **705**. This override is done independently for the two soft keys. Thus, soft key check **828** transfers processing to first soft key check **829** if the key pressed is one of the two possible physical soft keys. Conversely, soft key check **828** transfers

processing to next key check **840** (FIG. 8C), if neither of the two possible physical soft keys is pressed by the user.

In first soft key check **829**, client module **702** determines whether the pressed key corresponds to the first soft key. If the pressed key is the first soft key, check **829** passes the active identifier for the first soft key to store identifier process **850** through node **831**. Conversely, if the pressed key is not the first soft key, processing transfers from check **829** to second soft key check **830**.

If the pressed key is the second soft key, check **830** passes the active identifier for the second soft key to store identifier process **850** through node **831**. Conversely, if the pressed key is not the second soft key, e.g., a physical key that can be defined as a soft key was pressed but neither the current deck nor the current card defines a soft key for that physical key, processing transfers from check **830** to key press check **820** through node **813**.

When pressing transfers to next key check **840**, client module **702** determines whether the pressed key was the next key. If the next key was pressed, processing transfers to display card check **841** and otherwise to previous key check **846**.

If a display card is the current card, the next key is used to move to another card in a deck, or alternatively to another deck. Thus, display card check **841** transfers processing to last card check **842** when a display card is the current card, and otherwise to entry card check **843**.

Last card check **842** determines whether the current card is the last card in the deck. If the current display card is not the last card in the deck, last card check **842** transfers processing to read next card process **845**, which in turn reads the next card in the deck and transfers through node **812** to generate display process **809**.

If the current display card is the last card in the deck, the deck includes an identifier that specifies the location to transfer to from the last card. This identifier can be a URL to another deck, to a common gateway interface program, or an address for a card within the current deck, for example. Thus, last card check **842** transfers through node **831** to store identifier process **850** when the current display card is the last card in the deck.

If the current card is not a display card but is an entry card, display card check **841** transfers to entry card check **843**. In this embodiment, the next key is the predetermined key used to indicate that all the data for an entry on an entry card has been entered. Thus, if the current card is an entry card, entry card check **843** transfers processing to store data process **844**.

Store data process **844** stores the data entered in at an appropriate location in memory that is specified in the current entry card. Typically, the data is combined as an argument with a URL and stored. Upon completion, store data process **844** transfers through node **810** to create HTTP request process **802** (FIG. 8A).

When the next key is pressed, if the current card is neither a display card nor an entry card, the current card is a choice card. However, as indicated above, in this embodiment client module **702** requires that the user make a choice and does not allow use of the next key. Consequently, if the current card is not an entry card, entry card check **843** transfers processing through node **813** to key press check **820**.

The previous discussion assumed that the next key was pressed and so next key check **840** transferred processing to display card check **841**. However, if the next key was not pressed, next key check **840** transfers processing to previous key check **846**. If the previous key was pressed, check **846**

US 6,625,447 B1

31

transfers to first card check **847** and otherwise returns processing to key press check **820**.

First card check **847** determines whether the current card is the first card of a deck. If the current card is not the first card, processing transfers from first card check **847** to read previous card **849**, which in turn reads the previous card and transfers to generate display process **809** through node **813**. Conversely, if the current card is the first card, processing transfers to home deck check **848**.

If the current card is the first card in the home deck, there is not a previous card and so home deck check transfers processing to key press check **820** through node **813** and so the previous key press is ignored. If the current deck is not the home deck, home deck check **848** retrieves the identifier for the previous deck and transfers through node **831** to store identifier process **850**.

Store identifier process **850** is reached through node **831** from several different points. The operations in store identifier process **850** are the same irrespective of the particular process that transfers to process **850**. In each instance, an identifier is passed to store identifier process **850** and process **850** saves the identifier in working memory **716**. The identifier can be, for example, a pointer to another location in the current card, an address of another card in the current deck, a URL to a deck stored in working memory **716**, a URL to a TIL deck in TIL decks **760** on computer **743**, or perhaps, a URL to a common gateway interface program in CGI programs **761** on computer **743**. Thus, process **800** checks the stored identifier to determine the action required.

Specifically, in identifier to current deck check **851**, client module **702** determines whether the identifier is to a card in the current deck. If the identifier points to the current deck, check **851** transfers processing to retrieve data process **852** and otherwise to URL to local deck check **853**.

In retrieve data process **852**, client module **702** retrieves the information stored at the location indicated by the identifier from working memory **716** and processes the information. Retrieve data process **852** transfers through node **812** to generate display **809** (FIG. 8A) that was described above.

URL to local deck check **853** determines whether the identifier is a URL to a deck that is stored in working memory **716**, e.g., cached. If the deck is stored locally, check **853** transfers to retrieve local deck **854** which in turn moves the local deck into the storage location for the current deck. Retrieve local deck **854** transfers processing through node **811** to process first card **808** (FIG. 8A), that was described above.

If the identifier is neither to a location in the current deck, nor to a local deck, the identifier is a URL to an object on computer **743**. Thus, in this case, check **853** returns processing to create HTTP request **802** through node **810**.

Process **800** continues so long as the user continues to enter and process the information provided. In this embodiment, process **800** is terminated, for example, either by the user powering-off cellular telephone **700**, selecting a choice or entry card that discontinues operations of client module **702**, or remaining inactive for a time longer than a time-out period so that client module **702** shuts itself down.

To further illustrate the operations in process **800**, consider the following example which is returned to client module **702** as a TIL deck in response to a HTTP request generated by process **802**. For readability, Table 2 presents the deck in PIDL. In this example, all of the choices are for applications on the same server. However, in another embodiment, each URL could address any desired combination of servers.

32

TABLE 2

EXAMPLE OF PIDL CHOICE DECK

```
<PIDL>
<CHOICE>
<CE URL=http://www.libris.com/airnet/nnn>News
<CE URL=http://www.libris.com/airnet/www>Weather
<CE URL=http://www.libris.com/airnet/sss>Sports
</CHOICE>
</PIDL>
```

In process first card **808**, client module **702** interprets the information in Table 2 and transfers to generate display process **809**. In generate display process **809**, client module **702** sends information to display module **712** so that the user is presented with a list of three choices on display screen **705**, i.e, a user interface for the choice card is generated:

1. News
2. Weather
3. Sports

Generate display process **809** (FIG. 8A) transfers to key press check **820** (FIG. 8B). When the user presses the two key on keypad **715**, key press check **820** transfers through check **821** to display card check **823**.

Since the current card is a choice card, check **823** transfers processing to choice card check **824**, which in turn transfers to choice key check **826**. Since the two key was pressed and that key is a choice key, check **826** transfers processing to store identifier process **850** (FIG. 8D). In process **850**, client module **702** stores the URL corresponding to two, i.e,

URL=http://www.libris.com/airnet/www

in working memory **716**.

Since this URL is to an object on computer **743**, processing transfers through checks **851** and **853** to create HTTP request process **802**, which in turn generates the request. When the HTTP request is transmitted to server **749**, as described above with respect to process **804**, server **749** in service request process **862** retrieves deck www from TIL decks **760**. An example of the deck is given in Table 3. Again for readability, the deck in present herein in PIDL.

TABLE 3

EXAMPLE OF A SECOND PIDL CHOICE DECK

```
<PIDL>
<CHOICE>
<CE URL=http://www.libris.com/airnet/www-1>World
<CE URL=http://www.libris.com/airnet
            /www-2>National
<CE URL=http://www.libris.com/airnet/www-3>State
<CE URL=http://www.libris.com/airnet/www-4>Local
</CHOICE>
</PIDL>
```

The deck in Table 3 is transmitted to cellular telephone **700** and stored in memory **716**, as described above with respect to process **806**. The choice card is processed in process **808** and displayed in process **809**. As a result of process **809**, the user is presented with a list of choices:

1. World
2. National
3. State
4. Local.

When the user makes another selection, the same sequence of processes as described above for the first choice card is executed by client module **702**, and another URL is

US 6,625,447 B1

33

stored that points to a program on server **749** that retrieves the desired weather information and generates a deck with that information. This deck is transferred to cellular telephone **700** and displayed.

As described above, if the current card is an entry card and a key is pressed, client process **702** reaches data key press check **826** (FIG. 8B). If the pressed key is a valid data key, check **826** transfers to process data entry **827**.

In one embodiment, process data entry **827** uses a novel predictive text entry process for text entry. Recall that on a typical telephone keypad, the keys are labeled with both a number and two or three letters. For example, the two key is also labeled abc. This leads to some ambiguity when using the telephone keypad to enter text. Is the user attempting to enter an a, b, or c when the two key is pressed?

In one prior art method, two keystrokes were required to enter each letter of text. The first keystroke identified the first key and the second key stroke identified the specific letter desired on the first key. For example, to enter the letter s, the user would first press the seven key that is labeled with letters p, r, and s. Next, the user would press the three key to select the letter s. While this method may work well for short sequences that consist of only three or four letters, the method does not work well for English text. For example, if the user has already entered th and then presses the three key that is labeled with letters d, e, and f, almost always the desired next letter is the letter e. Therefore, making the user press the two key is an extra and unnecessary step.

Client module **702** of this invention utilizes a novel predictive text entry process to reduce the number of key strokes required to enter text using a telephone keypad, or any similar keypad. Using this process, in most cases a single key stroke suffices to enter a single letter.

While this embodiment of the invention is described in terms of a telephone keypad, the principles of the invention are not limited to only a telephone keypad. In general, the process described more completely below, can be extended to any keypad where a single key is used to enter two or more letters. Further, the process is not limited to only letters, but rather is applicable to any keypad where a single key is used to represent two or more characters. In view of the following disclosure, those skilled in the art can use the principles of the predictive text entry process in a wide variety of applications.

The system for predictive text entry includes a predictive text entry module **901** that in this embodiment is included in client module **702**, keyboard module **711**, and a letter frequency table **902** that is loaded into memory **716**, when client module **702** is activated. Predictive text entry module **901** is used in process data entry **827** when specified by the current entry card. Predictive text entry module **901** performs routine buffer management processes, that are known to one of skill in the art and so are not described further to avoid detracting from the process.

Predictive text entry module **901** stores a letter entry for each letter entered in a text buffer **903** in memory **716**. In this embodiment, letters Q and Z are assigned to the one key and the zero key is used to enter a space, period, and comma, i.e., the zero key provides punctuation. However, these assignments are illustrative only, and are not intended to limit the invention to this particular embodiment.

The first letter entered is placed at the left end of the buffer and each additional letter is placed in the left most unused space in buffer **903**. Thus, the last letter entered in text buffer **903** is the right most character. Letter frequency table **902**, sometimes referred to as a table of predictive letter entries, is a look-up table where each entry in the look-table is

34

addressed by three indices. The first two indices represent the two most recently entered letters in text buffer **903** and the third index represents the key that was pressed. Each predictive letter entry stored in letter frequency table **902** defines which of the letters associated with the pressed key to use given the previous two letters. For example, since the is a commonly occurring string, the entry in table **902** addressed by (t, h, 3) returns e, or more concisely the predictive letter entry **2** is returned to indicate that the second letter of the group of letters d, e, and f associated with the three key is the predicted letter. Of course, letter frequency table **902** could be altered to return more than a single letter.

In this embodiment, letter frequency table **902** was empirically generated using a collection of e-mail. Appendix II is a computer program listing that was used to generate letter frequency table **902** that is illustrated in FIGS. 10A to 10T. Briefly, the computer program implements a process that sequentially steps through the data provided and (i) for each possible single letter determines the most likely letter that follows for each key on the keypad; and (ii) for each possible combination of two letters determines the most likely letter that follows for each key on the keypad. In this embodiment, the most likely letter is the letter having the greatest frequency after the single letter. Similarly, the most likely letter is the letter having the greatest frequency after the combination of two letters. If there is a tie in the frequency, the first letter associated with a key is selected. Of course, other measures of likelihood could be used to generate the entries in table **902**.

Thus, in FIGS. 10A to 10T, the first of the ten columns, i.e., the left most column, is the two letter sequence and the first row, i.e., the top row is the keys on the key pad used to enter text. A combination of an entry in the first column and a key in the top row is used to select the predicted text entry. Thus, using the example of th, this two key sequence appears in the first column of FIG. 10O. When the three key is pressed, the letter in the row with th as the first entry and in the column with three as the first entry, i.e., e, is retrieved. Alternatively, if the four key is pressed, letter i is retrieved from the table.

In this embodiment, table **902** is a buffer of two bit numbers. Each two bit number has a value in the range of zero to three, and the two bit number represents a predicted letter for the pressed key. Thus, for a two key labeled with letters A, B and C, a zero represents A; a one represents B; and a two represents C. In general, the number of bits used is determined by the key that represents the maximum number of characters. In this embodiment, the maximum number of characters represented by a key is three. The number of storage bits required is an integer S where S is the smallest number such that $2^{**}S$ is greater than or equal to the maximum number of characters represented by a key.

In this embodiment, three indices i0, i1, and i2 are used generate a table index that in turn is used to access a particular predictive letter entry in table **902** of two bit numbers. Each letter is represented as a number, i.e., a letter entry, with letter A being zero, letter B being a one, letter C being a two, and so forth with letter Z being twenty-five. A space element is assigned a space element value of twenty-six. Thus, in this embodiment, there are twenty-seven possible characters.

Upon the initial entry to process **1100** (FIG. 11), letter indices i0, i1, and i2 were set to twenty-six in the initial processing of the entry card to indicate that the text buffer is empty. Also, as explained more completely below, as each letter of text is entered, letter indices i0 and i1 are updated and stored in memory **716**.

US 6,625,447 B1

35

However, in another embodiment, an initialize indices process is the first operation in predictive text entry process **1100**. In this embodiment, for the first letter entered, letter indices i0 and i1 are set to twenty six; for the second letter entered, letter index i0 is set to twenty six and letter index i1 is set to the value of the letter in text buffer **903**; and for all letters entered after the first two, the value associated with next to the last letter in text buffer **903** is assigned to letter index i0 and the value associated with the last letter in text buffer **903** is assigned to letter index i1.

Punctuation key check **1101** determines whether the zero key was pressed, i.e., the key selected to represent punctuation.

If the zero key was pressed, processing transfers from check **1101** to process punctuation entry **1102**. Process punctuation entry **1102** sets index i2 to twenty-six, and sends the space element value to display letter process **1108**. Display letter process **1108** transfers the space element value to display module **712** which in turn drives a space in the text entry on display screen **705**. This completes the operation of process data entry for a zero key press and so processing returns to key press check **820**.

If the zero key was not pressed, processing transfers through punctuation key check **1101** in data entry process **1100** to key one-to-nine check **1103**, i.e., to a data entry key check. If the pressed key was any one of keys one to nine, check **1103** transfers to set letter index process **1104** and otherwise to rotate last entry process **1109**.

In set letter index process **1104**, one is subtracted from the numeric value of the pressed key and the resulting value is assigned to index i2. Set index process **1104** transfers to generate table index process **1105**.

Generate table index process **1105** combines indices i0, i1 and i2 to create a table index. In this embodiment, table index TABLE_INDEX is defined as:

TABLE_INDEX=(((i0*27)+i1)* 9)+i2

Upon completion of generate table index process **1105**, generate text entry process **1106**, retrieves the two bit value in the table at the location pointed to by table index TABLE_INDEX and converts the two bit value to a letter represented by the two bit value.

Generate text entry process **1106** transfers to update index process **1107**, which in turn stores the value of letter index i1 as letter index i0; stores the value of the retrieved letter in letter index i1; and stores the predicted letter in text buffer **903**. While this step assumes that letter indices i0, and i1 are stored and accessed each time in process **827**, alteratively, the last two letters in text buffer **903** can be retrieved and assigned to indices i0 and i1, respectively, as described above.

Update index process **1107** transfers to display letter process **1108**. Display letter process **1108** sends information to display module **712** which in turn generates the predicted letter on display screen **705**.

If the pressed key is not one of keys one to nine, i.e, is not a data entry key, processing transfers from check **1103** to rotate last entry **1109**. Recall that data key check **826** determined whether the pressed key was one of the zero to nine keys, or the # key. Thus, since checks **1101** and **1103** determined that keys zero to nine were not pressed, the only key press remaining is the # key, i.e., the rotate entry key, which indicates the user wants a letter different than the one entered last in text buffer **903**. In rotate last entry **1109**, the last character, i.e., the right most character, in text buffer **903** is replaced by the next character in the set of characters

36

assigned to the last key pressed before the # key was pressed. Again, the use of the # key is illustrative only and is not intended to limit the invention to the use of that particular key to rotate an entry.

For example, if the last character in the text buffer **903** was a t and the # key is pressed, process **1109** changes the t to u. If the # key is pressed again, the u is changed to a v. Alternatively, if the last character in text buffer **903** was a u and the # key is pressed, process **1109** changes the u to a v. If the last character in text buffer **903** was a v and the # key is pressed, process **1109** changes the v to a t. If index i1 is stored, as the last character in text buffer **903** is rotated, index i1 is updated.

Text entry in cellular telephone **700** in different languages or contexts can be supported by using different letter frequency tables. For example, for plumbers, the prediction table can be based on text about plumbing procedures. For Frenchmen, the prediction table can be based on French text. Also, multiple letter frequency tables could be stored in cellular telephone **700**, or selectively transmitted to cellular telephone **700**, and a particular letter frequency table would be selected on an entry card.

In addition, an entry in the table can be more that a single letter, and thus save even more key strokes. For example, if the text buffer contains sche then typing a **3** could return dule rather than just d. Further, this novel method of text entry can be utilized with other than a cellular telephone. The method is applicable to any device that has several characters assigned to a single key on a keypad.

In the above embodiment, the English alphabet and a space element were used as the character set. Thus, the number 27 used in defining the table index is just the number N of characters in the set. Similarly, the number 9 used in defining the table index is just the number M of keys in the keypad that represent two or more different characters. Hence, predictive text entry method of this invention is not limited to text and is directly applicable to any keypad where each key represents a plurality of different characters.

In the embodiment of FIGS. **7**, **8**, and **9**, client module **702** and server module **749** communicate over CDPD network **710**. However, this architecture is illustrative only of the principles of the invention and is not intended to limit the invention to the particular architecture described. Client module **702** and server module **749** can use a wide variety of two-way data communication links to exchange resource locators, e.g., URLs, and TIL decks. For example, the communications link could be a switched voice circuit in which the client module and server module communicate using modems. Alternatively, the communications link could be any other packet switched network, so long as there is some way for client module **702** to get requests to server module **749** and for server module **749** to send data back to client module **702**. Further, a special purpose server could be used in place of HTTP server **749**. For example, the principles of this invention can be used over various data transport mechanisms including circuit switched data and packet switched data. These data transport mechanisms are being defined and implemented for most of the cellular network standards including GSM, TDMA, and CDMA.

In the configuration of airnet network **750** (FIG. **7**), client module **702** communicated directly with a server computer **743**. In another embodiment, as illustrated in FIG. **5**, the two-way data communication device first communicates with an airnet network translator **500** that in turn communicates with the appropriate server. In this embodiment, the operation of two-way data communication devices **100**, **101**, and **102** is similar to that described above for cellular

telephone **700**, except the method field in the request generated in process **802** has a different form. For example, using the same information as before, the method field in this embodiment is:

---

GET http://www.libris.com/airnet
/home.cgi?&cost=1    ANTP/1.0

---

The method field includes the full address of the server, the expected cost of the service, and the version of the protocol used for communicating with airnet network translator **500**. The two-way data communication device transmits the HTTP request including the complete URL to airnet network translator **500**.

FIG. **12** is a more detailed block diagram that illustrates the structures in one embodiment of airnet network translator **500**, according to the principles of this invention. In this embodiment, airnet network translator **500** is a computer running under the UNIX operating system with an interface to CDPD network **710**. Such computers are well known to those skilled in the art. Thus, herein only the structures and processes that must be added to such a computer are described.

Airnet network translator **500** supports internet protocol (IP) connections over CDPD network **710** and with each computer network with which translator **500** can interact. In this embodiment, each of the modules in network translator **500** are processes that are executed by the processor in the computer. Control module **1201** is a daemon that listens for transmissions over an IP connection from CDPD network **710**. When control module **1201** accepts a transmission, control module **1201** spawns an ANT request processor **1204**, which in this embodiment is a process, as indicated above. While in FIG. **12**, only one ANT request processor **1204** is shown, there is an ANT request processor spawned for each transmission that control module **1201** accepts and the ANT request processor remains active until the communication is terminated.

FIG. **13** is a process flow diagram that illustrates the operation of ANT request processor **1204**. This process flow diagram considers transmissions that utilize both TCP/IP and UDP/IP. However, the processes that are specific only to TCP/IP are enclosed in dashed-line boxes. Upon being spawned for a TCP/IP, in establish connection process **1300**, ANT request processor **1204** establishes a TCP connection using a TCP module in the server with the client module over CDPD network **710**. After the connection is established processing transfers from process **1300** to request received check **1301**.

If UDP is being used, upon being spawned ANT request processor **1204** initiates processing in request received check **1301**. In check **1301**, ANT request processor **1204** determines whether the request from cellular telephone **700** (FIG. **12**) has been received and stored in memory **1210**. Memory **1210** represents both RAM and non-volatile memory in this embodiment. When the request has been received and stored, processing transfers from check **1301** to retrieve data process **1302**.

In retrieve data process **1302**, ANT request processor **1204** retrieves information concerning the source of the URL, i.e., client module **702** of cellular telephone **700** from customer database **1213**, and the destination specified in the URL, i.e., the designated server, from server database **1212**. Both databases **1212** and **1213** are stored in memory **1210**. A customer record in database **1213** includes, for example, a carrier address, e.g., an IP number, an airnet network

translator account number, billing information, and server subscriptions. A server record in database **1212** includes a server IP address, name, category, and class of service. Class of service refers to the pricing of the service, e.g., basic services, premium services, or pay-per-view services. Other pricing schemes can be supported in other implementations. When the information is retrieved for the server and service specified in the URL, and for the customer, processing transfers to valid request check **1303**.

In valid request check **1303**, ANT request processor **1204** determines, for example, whether client module **702**, i.e., the customer, is authorized to access airnet network translator **500**; whether client module **702** is authorized to access the server specified in the URL; whether the specified server is available through translator **500**; and whether the specified server supports the requested service. Thus, valid request check **1303**, validates the client, the server, and the client/server pair. Also, since an estimated cost is included in the request, the status and credit limits on the customer's account could be checked to determine whether the estimated cost is acceptable. If all of the checks are true, processing transfers to create HTTP request process **1306**. Conversely, if any one of the checks is untrue, valid request check **1303** passes information concerning the error to return error process **1304**.

Return error process **1304** launches a CGI program stored in memory **1210** based on the information received and passes appropriate information to the CGI program. The CGI program builds an appropriate PIDL deck describing the error and converts the PIDL deck to a TIL deck, as described above. When the TIL deck describing the error is complete, return error process **1304** transfers processing to log transaction process **1315** that is described more completely below.

If all the checks in valid request check **1303** are true, create HTTP request **1306** converts the request in memory **1211** to a request specific to the server specified, which in this embodiment is a HTTP request. For example, for the above request, create HTTP request process **1306** generates a method field, such as

GET/airnet/home.cgi?&client=xyz&cost=1 HTTP/1.0

In this embodiment, the method field includes the same information as in the embodiment described above, and in addition, the method field includes a client identification and the estimated cost.

After create HTTP request process **1306** is complete, ANT request processor **1204** accesses TCP module **1203** in establish server connection process **1307** for TCP/IP and transfers to secure transmission check **1308** for UDP/IP. In establish connection process **1307**, a connection is made between the server designated in the client request and the TCP interface module (not shown) so that data can be transmitted between airnet network translator **500** and the server. When the TCP connection to the server is established, ANT request processor **1204** transfers processing from establish server connection process **1307** to secure transmission check **1308**.

In secure transmission check **1308**, ANT request processor **1204** determines whether the HTTP request from the client requested a server that utilizes a protocol that supports encryption. If such a server was requested, processing transfers to negotiate process **1309** and otherwise to transmit request process **1310**.

In negotiate process **1309**, ANT request processor **1204** negotiates an encryption technique with the server. Upon completion of the negotiation, processing transfers from process **1309** to encryption process **1311**. In encryption

39

process **1311**, the HTTP request is encrypted using the negotiated encryption technique, and then processing transfers to transmit request process **1310**.

In transmit request process **1310**, the HTTP request is sent from memory **1210** to the HTTP server. When the transmission is complete, ANT request processor **1204** goes to result received check **1312**.

As described above, upon receipt of the request, the HTTP server services the request. Upon completion of servicing the request, the HTTP server returns either a PIDL deck or a TIL deck to airnet network translator **500**. The deck is stored in memory **1210**. If the server does not convert the PIDL deck to a TIL deck, the translation is done by airnet network translator **500**.

When the deck is received and stored, ANT request processor **1204** transitions from check **1312** to transmission completed process **1313** for TCP/IP and to secure transmission check **1314** for UDP/IP. ANT request processor **1204** closes the TCP circuit with the server in transmission completed process **1313**. Upon closing the server TCP connection, processing transfers to secure transmission check **1314**.

If the server utilized encryption, the deck stored in memory **1210** is encrypted. Thus, secure transmission check **1314** transfers processing to decryption process **1316** if encryption was used and otherwise to log transaction **1315**.

In decryption process **1316**, the encrypted deck is decoded and stored in memory **1210**. Also, after the decoding, if the deck must be converted to a TIL deck, the translation is performed. Decryption process **1316** transfer to log transaction process **1315**.

In log transaction process **1315**, ANT request processor **1204** writes a description of the transaction to transaction log **1211** in memory **1210**. In this embodiment, each transaction record includes a customer identification, a server identification, time required for the transaction, cost of the transaction, and a completion code. In one embodiment, for security purposes, each cellular telephone is assigned to only one customer and only one account.

After the transaction is logged, processing transfers to transmit result **1317**. In transmit result **1317**, ANT request processor **1204** returns the deck to client **702**. After the deck is transmitted, ANT request processor **1204** is terminated.

In one embodiment, if an airnet network translator is fully loaded and another transmission comes in, the translator returns the address of another airnet network translator and refuses the transmission. The cellular telephone transmits the message to the other airnet network translator. In yet another embodiment, all incoming transmissions are directed to a router. A plurality of airnet network translators are connected to the router. The router monitors the status of each translator. Each incoming transmission is routed to the least busy translator, which in turn responds to the transmission and performs the necessary operations for continuing communications with the client module.

In the above description of client module **702**, module **702** interacted with components within the cellular telephone to perform the various operations specified by the user. To insulate client module **702** from the exigencies of various cellular telephones to the extent possible, a general architecture for client module **702** is described more completely below. This general architecture is designed to have specific manager modules that interact with the modules described above within the cellular telephone and to provide standard information to the remaining manager modules within client module **702**. The manager modules with client module **702** form an interpreter that interprets TIL decks to generate a

40

user interface; interprets data input by the user; and interprets the TIL decks so that the data input by the user is combined with an appropriate resource locator and either a message is sent to an appropriate server, or another local TIL deck is interpreted by client module **702**. While this embodiment is for a cellular telephone, the manager modules are generic and so are applicable to any client module in a two-way data communication device.

This approach limits the modifications that must be made to client module **702** to implement the principles of this invention in a wide variety of two-way data communication devices over a wide variety of two-way data communication networks. Also, in the above embodiment, client module **702** supported communications and interactions over the cellular telephone network. However, client module **702** can also support local services on cellular telephone **700**. Typical local services includes local messages, an address book, and preconfigured e-mail replies, or any combination of such services.

In this embodiment, client module **702** includes a plurality of manager modules including a navigation manager module **1401**, a network manager module **1402**, a TIL manager module **1403**, an archive manager module **1404**, a local manager module **1405**, an event manager module **1406**, a timer manager module **1407**, a user interface manager module **1408**, a memory manager module **1409**, and a device dependent module **1410**.

Navigation manager module **1401** handles card and deck navigation as well as managing any caches. Navigation manager module **1401** owns and manages a history list and as well as a pushed card list. In addition, navigation manager module **1401** functions as the main line of client module **702**; does all event distribution; and supports local services.

For local services, like local message store, there are two basic approaches that can be used. First, local services are implemented in a CGI-like manner. Each local service has an entry point which is called with an argument list. A TIL deck is returned via the event manager. From that point on, the TIL deck is processed in the standard manner. This approach limits local services to the same constraints as remote services. A less restrictive approach is to allow the local service to field events instead of the standard event loop. The local service would construct TIL cards on-the-fly and feed them to user interface manager **1406**. Note that the local service would need to cooperate with the standard event loop with regard to the history, the pushed card list, and any other state that is normally managed by the event loop. Table 4 is a listing of processes for the architecture for navigation manager module **1401**.

TABLE 4

| ARCHITECTURE FOR NAVIGATION MANAGER MODULE 1401 |
| --- |
| ProcessEvents (void); |
| PushLocation (void * location, Boolean forStack); |
| void * PopLocation (Boolean forStack); |
| void * CurrentLocation(); |
| struct LOCAL_SERVICE { |
|     char name[50]; |
|     FUNC HandleEvent(Event * pevent); |
|     FUNC StartLocalService (void); |
|     FUNC StopLocalService (void); |
|     }; |
| static LOCAL_SERVICE localServices[]={ . . . }; |
| STATUS HandleEvent(Event * pevent); |
| STATUS StartLocalService (); |
| STATUS StopLocalService (); |

Routine ProcessEvents is the main entry point for event processing in client module **702**. Typical events include key

US 6,625,447 B1

41

presses on the keypad, choice selection for a choice card, text entry for an entry card, network events, and history events. Routine ProcessEvents can be called at any time to process an event or events. Routine ProcessEvents does not return until all events on a queue generated by event manager module **1406** are processed. If a local service is running, events are distributed to the local service before being processed by routine ProcessEvents.

The remaining routines in Table 4 are called internally to navigation manager module **1401** and by local services. Routine PushLocation pushes a location on the history list and issues a request for that location. The forStack flag indicates a stack push of local cards.

Routine *PopLocation pops a location on the history stack and issues a request for the top location of the history stack. In routine *PopLocation the forStack flag indicates that all cards since the last stack push should be popped.

Routine *CurrentLocation returns the current location the current URL being displayed.

As shown in Table 4, each local service provides a number of functions. If a local service is running, function HandleEvent, the local service's event handler, is called before any processing by navigation manager module **1401**. If the event is handled by the local service, the event is not processed any further.

Function StartLocalService is the local services start function. Function StartLocalService is called before any events are distributed to the local function. Similarly, function StopLocalService is the stop function for the particular local service. Function StopLocalService is called when no more events are distributed to the local service.

Network manager module **1402** insulates the rest of client module **702** from the specific networking protocol used over the cellular telephone network. Network manager module **1402** delivers requests to the server specified in the URL via the cellular telephone network interface; segments responses from the server for lower latency; delivers responses from local services to navigation module **1401** via event module **1406**; handles request/response cycle (e.g. cancellation, retry strategy) with the server over the cellular telephone network; can receive asynchronous messages from the server; performs memory management of TIL decks; performs caching of TIL decks; handles all negotiations concerning protocols and server scaling with the server; handles any encryption for information exchanged between cellular telephone **700** and the server.

In some cellular telephone, the maximum message size is fixed. However, for UDP and TCP messages, a more direct interface is used that bypasses this limitation of message passing. It is important to avoid copying network data from memory buffer to memory buffer as such copying increases the memory "high water mark" as well as decreases performance. Since different cellular telephones have different interfaces for delivering network data, network manager module **1402** manages the network data. In this way, network data is only copied from the network buffer for long-term storage.

When a message or reply arrives, network manager module **1402** uses event manager module **1406** to report that fact. However, access to the data by other manager modules in client module **702** is through a protocol that allows storage of data in a variety of fashions on different telephones. Any transparent, short-term caching of TIL data is handled by network manager module **1402**. Table 5 is one architecture for network manager module **1402**.

42

TABLE 5

SPECIFICATION FOR NETWORK MANAGER MODULE 1402

```
typedef short TID;
void NM__Init (void);
void NM__Terminate (void);
TID NM__SendRequest (void *requestData, int length,
        Boolean ignoreCache);
NM__CancelRequest (TID TRANSACTIONId);
NM__DataType (TID TRANSACTIONId);
NM__GetData (TID TRANSACTIONId, void *data, int
        *length, Boolean *complete);
void *NM__HoldData (TID TRANSACTIONId);
NM__ReleaseData (TID TRANSACTIONId);
TID NM__StartData(int data Type, char *requestData,
        int length);
STATUS NM__EndData (TID TRANSACTIONId);
STATUS NM__SetDataLength (TID TRANSACTIONId, int
        length);
STATUS NM__GrowDataLength (TID TRANSACTIONId, Int
        grow);
int NM__GetDataLength (TID TRANSACTIONId);
void *NM__GetDataPointer (TID TRANSACTIONId);
STATUS NM__DeliverData (TID TRANSACTICNId);
```

Network manager module **1402** identifies each network data transaction by a 16-bit transaction identification code TID. Network manager module **1402** increments transaction identification code TID by one for each new transaction. Transaction identification code TID rolls over after 0xffff.

Routine NM__Init initializes network manager module **1402** and so is called before any other calls in network manager module **1402**. Routine NM__Terminate closes processing of network manager module **1402** and so is called after all other calls in network manager module **1402**.

Network manager module **1402** uses routine TID NM__SendRequest as the standard process of sending a request to the server. Pointer *requestData in the call to routine TID MN__SendRequest is defined by the server protocol. Similarly, the state, e.g., the Boolean value, of variable ignoreCache is used to indicate whether any cached replies should be ignored. After sending the request, this routine returns a server transaction identification code TRANSACTIONId. A local service can also send a request to the server.

When the user instructs client module **702** to cancel a request, network manager module **1402** calls a routine NM__CancelRequest with cellular telephone transaction identification code TID and server transaction identification code TRANSACTIONId. Routine NM__CancelRequest issues a command to the server to cancel the specified request.

When data are received from the network, the data can be either a response to a request sent by routine TID MN__SendRequest, or by a local service. Thus, in response to receiving data from the server, network manager module **1402** generates an event that includes server transaction identification code TRANSACTIONId and the type of data DATAType. For replies to requests sent by routine TID MN__SendRequest, server transaction identification code TRANSACTIONId is the same as the one returned by the matching call to routine TID MN__SendRequest and data type DATAType indicates that the data is a response. For local service originated messages, server transaction ID is new, and data type DATAType depends on whether the data is an e-mail, pushed TIL, or another type.

After the network event is received by event manager module **1406**, and navigation manager module **1401** distributes control of the event to network manager module **1402**, network manager module **1402** users the server transaction

US 6,625,447 B1

43                                           44

identification code TRANSACTIONId and the remaining
routines in Table 5 to process the data.

Routine NM_DataType is used to return the particular
data type dataTYPE, e.g, reply, MIME, server push, etc.
Routine NM_GetData sets a pointer to the data identified by
server transaction identification code TRANSACTIONId,
retrieves the length of the data, and determines whether all
the data has been received. The interface provided by this
routine allows the first part of a data stream, e.g. the first card
of a TIL deck, to be processed by client module **702** before
the rest of the deck is received.

Routine NM_HoldData is called before calling routine
NM_GetData to hold the data and thus insure that the data
remains valid during processing by client module **702**. If the
data is not held, the data can be deleted or moved with the
internal buffers of network manager module **1402**. If the data
is held, routine NM_ReleaseData is called after network
data has been processed to release the data.

Routines TID NM_StartData, NM_EndData,
NM_SetDataLength, NM_GrowDataLength,
NM_GetDataLength, NM_GetDataPointer, and
NM_DeliverData are used internally by network manager
module **1402**, and by local services to deliver data. By
allowing local services to use these routines, the same
buffers can be used to store both network and locally
generated data thereby reducing the amount of memory
required to support client module **702**.

Routine TID NM_StartData creates a new data transac-
tion and triggers a data delivery event. Routine
NM_EndData is called when all data for the given server
transaction identification code TRANSACTIONId has been
transmitted. Routine NM_SetDataLength sets the data seg-
ment to a given length and may cause the location of the data
to change. Routine NM_GrowDataLength grows the data
segment by a given length and also may cause the location
of the data to change. Routine NM_GetDataLength returns
the length of the data segment. Routine
NM_GetDataPointer returns a pointer to the data. This
routine is preferably called before writing into the data
buffer. Also, this routine is preferably called whenever the
data's location may have changed. Routine
NM_DeliverData can be called when at least one card has
been stored to reduce latency while the other cards are being
generated.

TIL manager module **1403** insulates the rest of client
module **702** from changes to the TIL specification. The
interface provided by TIL manager module **1403** has the
following characteristics: removes the need for parsing by
the rest of client module **702**; uses cursors to avoid gener-
ating data structures on-the-fly; does not need an entire deck
to operate; and handles TIL versioning.

Each TIL deck contains a major and a minor version
number. The minor version number is incremented when
TIL changes in a way that does not break existing TIL
manager modules. The major version number is incremented
for non-compatible versions of TIL.

Each TIL deck has the same hierarchy. One embodiment
of this hierarchy is presented in Table 6. In Table 6,
indentation is used to represent the relationships of the
various hierarchical levels.

TABLE 6

|  |
|---|
| TIL DECK HIERARCHY |
| deck |
| options |
| softkeys |
| options |
| card |

TABLE 6-continued

|  |
|---|
| TIL DECK HIERARCHY |
| options |
| softkeys |
| options |
| formatted text |
| formatted lines |
| entries |
| options |
| formatted line |

The interface presented in Table 7 for TIL manager module
**1403** is designed with the assumption that TIL is a direct
tokenization of PIDL as described in Appendix I. However,
the interface does not have any dependencies on that tokeni-
zation and can support other PIDL encoding techniques.
Given the above assumption, the opaque pointers described
below are actual pointers into the TIL deck itself. A rudi-
mentary object typing scheme based on where in the deck
the opaque pointer points can be used to implement the
generic functions described below. If this object typing is not
feasible due to details of TIL encoding, the generic functions
can be replaced with specific functions.

TABLE 7

|  |
|---|
| ARCHITECTURE FOR TIL MANAGER MODULE 1403 |
| typedef char *opaque; |
| typedef opaque Deck; |
| typedef opaque Card; |
| typedef opaque Entry; |
| typedef opaque Entry; |
| typedef opaque Option; |
| typedef opaque SoftKey; |
| typedef opaque Object; |
| /* Generic functions */ |
| FirstOption(Object obj, Option *o); |
| /* obj is a card, softkey, entry, or deck */ |
| GetSoftkey(Object obj, Option *o); |
| /* obj is a card or deck */ |
| GetText(Object obj, Option *o); |
| /* obj is a card or entry */ |
| /* Deck functions */ |
| SetDeck(Deck d, int length); |
| /* tells module which deck to use */ |
| DeckGetcard(Card *c, int num); |
| -or- |
| DeckGetCard(Deck d, Card *c, int num); |
| /* Card functions */ |
| int CardType(Card c); |
| CardFirstEntry(Card c, Entry *e); |
| CardLookupSoftkey(Card c, int num, Softkey *s); |
| CardIsLast(Card c); |
| /* Option cursor functions */ |
| OptionNext(Option *o); |
| char *OptionKey(option o); |
| char *OptionValue(Option o) |
| /* Entry cursor functions */ |
| /* Text (and image) cursor functions */ |
| TextNextToken(Text *t, int *type, int *subtype, |
| int *length, char *data); |

Archive manager module **1404** stores and retrieves long-
lived information. This information includes: data related to
the server's location and/or required to support server scal-
ing; data related to encryption; TIL caching (transparent to
user); TIL storage (specified by user); and message storage
and retrieval (see local manager module). Archive manager
module **1404** should support a variety of nonvolatile
memory schemes that are provided by the two-way data
communication devices.

Local manager module **1405** is an interface to local device
resources, such as local messages, address book entries, and

US 6,625,447 B1

45

preconfigured e-mail replies. Local manager module **1405** should also define an abstract interface to navigation manager module **1401** for use by archive manager module **1404**.

Table 8 is an architecture for an interface within local manager module **1405** to access to an address book stored on cellular telephone **700**. The name of a routine in Table 8 is descriptive of the operations performed by the routine.

TABLE 8

ARCHITECTURE FOR ADDRESS BOOK ACCESS

```
int NumAddresses();
char *AddressName(int num);
char *AddressGetEMail(int num);
    // returns *e-mail address
char *AddressGetPhone(int num);
    // returns phone number
char * AddressGetFax(int num);
    // returns fax number
SetAddress(int num, char *name, char *email,
           char *phone, char *fax);
DeleteAddress(int num);
InsertAddress(int before);
```

Table 9 is an architecture for an interface within local manager module **1405** to access predetermined replies stored on cellular telephone **700**. The name of a routine in Table 9 is descriptive of the operations performed by the routine.

TABLE 9

ARCHITECTURE FOR PREDETERMINED REPLY ACCESS

```
int NumReplies();
char * GetReply(int num);
DeleteReply(int num);
SetReply(int num, char *text);
InsertReply(int before);
```

Table 10 is an architecture for an interface within local manager module **1405** to access messages stored locally on cellular telephone **700**. The name of a routine in Table 10 is descriptive of the operations performed by the routine.

TABLE 10

ARCHITECTURE FOR LOCALLY STORED MESSAGE ACCESS

```
int NumMessages();
void *FirstMessage();
void *NextMessage();
int MessageType (void *msg);
    // e.g. e-mail, TIL, etc.
void *MessageContent(void *msg);
void *SaveMessage(int type, void *content, int
                  contentLength);
DeleteMessage(void *msg);
```

Event manager module **1406** handles the distribution of events. In this embodiment, events include low-level events like key presses and higher level navigation and user interface events. There are typically only a small number of events at any one time. The main event loop in the two-way data communication device dependent module keeps calling EM__GetNextEvent( ) until no events are left in the queue. Note that processing one event can cause another event to be pushed onto the queue. The main event loop is not restarted until another event is pushed onto the queue due to a user key press or a network event.

In this embodiment, the event types include:

1) keypad events, i.e., pressing of a key;

2) choice events relating to a current choice card, e.g., the user selecting choice three;

46

3) text entry events relating to a current entry card, e.g., the user keying in "Hello";

4) network events, e.g., response arrived, request arrived, transaction terminated, network status; and

5) history events, e.g., pop, pop to marker.

Table 11 is an architecture for event manager module **1406**. As in the other tables herein, the name of a routine in Table 11 is descriptive of the operations performed by the routine and in addition a brief description is given in the comment field.

TABLE 11

ARCHITECTURE FOR EVENT MANAGER MODULE 1406

```
struct Event {
    int  type;
    void *data;
            /* e.g. keycode, choice num, entry
            text, status code, other data */
}
EM__QueueEvent(int type, void * data);
        /* Adds event at end of queue*/
EM__GetNextEvent(Event * event);
        /*Pops next event*/
EM__PeekNextEvent(Event event);
        /*Peeks at next event*/
```

Timer manager module **1407** allows timer events to support timeouts, animation, and other time-domain features. Timeouts are delivered via event manager module **1406**.

Table 12 is an architecture for timer manager module **1407**. As in the other tables herein, the name of a routine in Table 12 is descriptive of the operations performed by the routine.

TABLE 12

ARCHITECTURE FOR TIMER MANAGER MODULE 1407

```
TimerInit();
int TimerSet(int milliseconds, int code, void
             *clientData);
        /*Returns a timer identification timerId to
        be used for cancellations*/
TimerCancel (int timerId);
TimerCancelAll()
```

User interface manager module **1408** handles interactions with the keypad and the display. Each of the three types of user interfaces defined in Table 1 above requires a different version of user interface manager module **1408**. For most cellular telephones, only one card at a time is used. However, some cellular telephones can display multiple cards at once and so would require a different version of user interface manager module **1408** from the version that handled display of only one card at a time.

In this embodiment, user interface manager module provides a user interface for the three types of cards display, choice, and entry; provides hooks for custom user interfaces for the address list and e-mail reply entry; only cares about the user interface aspects of cards and provides no navigation, argument, or option processing; handles all text and graphic layout including word wrapping; handles scrolling of text; operates from PIDL data structures; generates keyboard events, some of which may be generated by soft keys; and generates high-level events, e.g. next card, choice entry **3**, text entry "IBM".

Table 13 is an architecture for processing cards by user interface manager module **1408**. As in the other tables

US 6,625,447 B1

47

herein, the name of a routine in Table 13 is descriptive of the operations performed by the routine.

TABLE 13

ARCHITECTURE FOR CARD PROCESSING
BY UI MANAGER MODULE 1408

```
void UI_StartCard(Card c);
    /* called to begin display and processing of
        a given card*/
void UI_EndCard(Card c);
    /*called when a card is no longer to be
        displayed*/
Boolean UI_HandleEvent(Event *pevent) ;
    /*returns true if the event is handled, false
        if not*/
```

Table 14 is an architecture for the user interface implementation by user interface manager module **1408**. As in the other tables herein, the name of a routine in Table 14 is descriptive of the operations performed by the routine.

TABLE 14

ARCHITECTURE FOR UI IMPLEMENTATION
BY UI MANAGER MODULE 1408

```
UI_LayoutCard(Card c, Boolean draw, Proc
                                    callback)
    /* relies on global data; needs to be able
    to:   draw as it goes; and note the
    special function of the currentLine
    (e.g. none, choice, softkey)*/
int numLines, firstVisible, lastVisible,
                                    currentLine;
char currentEntry[80];
int currentChoice;
void *currentSoftkey;
Card currentCard; and
    . . . other info as needed for in-line
        scrolling
```

The callback routine is notified of the special function of each line as the line is laid out. Thus, routine UI_LayoutCard can be used to scroll to a particular choice. If the current line is too wide to display all at once, horizontal scrolling is used to display the complete line, one display width at a time.

Memory manager module **1409** is optional, and is used in two-way data communication devices that do not support dynamic memory allocation. In these devices, initial memory allocation and releases must go through memory manager module **1409**. Also, by allocating memory in advance via memory manager module **1409**, client module **702** does not run out of memory due to some other process on the device using up memory.

Microfiche Appendix A is a computer source code listing in the C++ computer language of one embodiment of a client module within a cellular telephone, and one embodiment of an airnet network translator that was used with an Internet server to communicate with client module. The Internet server was a UNIX computer running the Mosaic HTTP server. The source code was used to generate executable code by compiling the source code on a computer running the Sun Microsystems Operating System Solaris 2.4 using Sun Microsystems compiler SunPro C and C#, and the Sun Microsystems SDK make utility. All of these products are available from Sun Microsystems of Mountain View, Calif.

This application is related to copending and commonly filed U.S. patent application Ser. No. **08/570,384**, entitled, "A PREDICTIVE DATA ENTRY METHOD FOR A KEYPAD" of Alain Rossmann, which issued as U.S. Pat. No. 5,911,485 and which is incorporated herein by reference in its entirety.

48

Various embodiments of a novel interactive two-way data communication system, a two-way data communication device, an airnet network architecture, and a predictive text entry system have been described herein. These embodiments are illustrative only of the principles of the invention and are not intended to limit the invention to the specific embodiments described. In view of this disclosure, those skilled in the art will be able to use the principles of this invention in a wide variety of applications to obtain the advantages of this invention, as described above.

APPENDIX I

A DESCRIPTION OF PIDL AND TIL

Unpublished © 1995 Libris, Inc.

The main structure of PIDL is described by an abstract syntax. This appendix describes the elements of the language and their semantics. In the syntax description of each element, an element is defined in an enhanced BNF.

| | |
|---|---|
| a :: = b | the element a is defined as b |
| a :: = b | the element a is defined as b or c |
| :: = c | |
| b c | the element b followed by element c, the intervening space is just for clarity |
| a\|b\|c | element a or element b or element c |
| {a} | the element a is optional |
| {a}* | the element a may appear zero or more times in a row |
| {a}+ | the element a may appear one or more times in a row |
| abc | the characters abc literally |
| o1 (a) | an option list with zero or more options of the element a, see Options below |

In general, the element blank-space can optionally appear between any two other elements. To keep the diagram clear, it has been omitted except where required. Where a blank-space is illegal or treated specially, it is noted.

The PIDL ELEMENTS

| | |
|---|---|
| deck | ::= deck-header {softkey}* {card} + deck-footer |
| deck-header | ::= <PIDL  o1(deck-options) > |
| deck-options | ::= o-args \| o-cost \| o-tt1 |
| deck-footer | ::= </PIDL> |

A deck consists of one or more cards. There must be at least one card. A deck may also have a number of softkeys defined that stay in force for the whole deck. See soft keys below for the syntax and full description.

| | |
|---|---|
| o-cost | ::= cost= value |
| o-tt1 | ::= tt1= integer |

Additional arguments to be passed on the next deck request are given in o-args. See Arguments below for syntax and full description.

The cost of retrieving this page (exclusive of telephone system charges) is represented in o-cost. If no o-cost is given, the deck cost is included with the user's standard service contract.

A0212

US 6,625,447 B1

49

Decks can be cached by the cellular telephone for a period of time. The o-ttl entry indicates the number of seconds that the deck can be cached from time of reception. If no o-ttl entry is given, the deck can only be cached for short periods of time, for example, to implement a back function similar to that of most Web browsers. If the value of o-ttl is zero, the deck must not be cached.

| card | ::= display-card \| choice card \| entry-card |
|------|---|

A card is one of three types of card in this embodiment. These are described in the sections below.

| card-options | ::= o-name \| o-next \| o-prev |
|------|---|
| o-name | ::= name= identifier |
| o-next | ::= next= destination |
| o-prev | ::= prev= destination |

All cards can have these options. The optional o-name option gives a name to the card. If a card has a name, the card can be referred to by a destination.

The o-next and o-prev give destinations for the NEXT and PREV keys. If omitted, the defaults are the next and previous sequential card in the deck. If o-prev is omitted from the first card, the PREV key returns to the deck last visited. If o-next is omitted from the last card, the NEXT key returns to the first card of the current deck. However, this default behavior is only a fail-safe: the last card in a deck should always have either an o-next option, or be a choice card where each choice entry indicates a new destination.

DISPLAY CARD

| display-card | ::= display-header display-content display-footer |
|------|---|
| display-header | ::= <DISPLAY option-list > |
| display-options | ::= card-options |
| display-content | ::= { softkey }* formatted text |
| display-footer | ::= </DISPLAY> |

Display cards give information for the user to read. See Formatted Text below for a full description of the format of information that can be displayed. Softkeys can be described for this card only, see Softkeys below.

CHOICE CARD

| choice-card | ::= choice-header display-content { entries } choice-footer |
|------|---|
| choice-header | ::= <CHOICE o1{choice-options} > |
| choice-options | ::= card-options \| o-method \| o-key \| o-default |
| o-method | ::= method= method-type |
| method-type | ::= number \| list \| alpha \| group |
| entries | ::= { choice-entry }+ |
| | ::= { group-entry { choice-entry }+ }+ |
| choice-footer | ::= </CHOICE> |

Choices let user pick one from a list. The initial display content is shown to the user, followed by the choices.

50

Each choice can have one line of formatted text (which may be wrapped or scrolled by the phone if too long).

How the choices are displayed and chosen is based on the o-method option. Note that this option is a hint only, and can be disregarded by the phone. The number method is the default and indicates that the choices are numbered sequentially from one and are chosen by pressing the appropriate digit on the keypad. If there are more than nine options, the phone may choose some other method of selection. The list method indicates that the list should be unnumbered and that the user should scroll through the list and hit some designated enter key to choose an entry. The alpha method is like list, only it is an indication that the text of the entries should be used to aid selection if at all possible. In this case, the entries are assumed to be alphabetically sorted. The group method is described in more detail below.

The o-key option indicates, if present, the key of an argument to be added to the argument list. See Arguments below for more information. The value of the argument comes from the choice entry; see below. The o-default option indicates the default value if the user just hit ENTER. See o-default under Entry Card below for more information.

| choice-entry | ::= <CE o1(entry-options) > formatted-line |
|------|---|
| entry-options | ::= action-option \| o-value |

Each choice has text displayed to the user. If the action-options are given, the indicated action is performed if the choice is made. If the o-value option is present, it supplies the value to the argument identified with the o-key option in the choice header. If no o-value is given, the text of the entry is used (without any formatting) as the argument value.

| group-entry | ::= <GE o1(group-options) > |
|------|---|
| group-options | ::= label= value |

If the group method is used, the choices are divided into a number of groups. Each group is headed by a group-entry, which, via the label option, gives a short name to the group. The phone can then give the user a hierarchial interface for choosing among a large number of choices. The text of the label should be limited to eight characters and may be truncated by the phone.

ENTRY CARD

| entry-card | ::= entry-header display-content entry-footer |
|------|---|
| entry-header | ::= <ENTRY o1(entry-options) > |
| entry-options | ::= card-options \| o-format \| o-key \| o-default |
| entry-footer | ::= </ENTRY> |

Entries let the user enter a value. The display content is shown to the user, followed by an entry line. The user's entry is controlled by the format. The o-key option

US 6,625,447 B1

| 51 | 52 |
|---|---|

indicates the argument that is being set by this entry. The value of the argument are the user's entry.

| o-format | ::= format= value { ; format-hint} |
|---|---|
| format-hint | ::= value |

This option specifies the format for user input entries. The string consists of format control characters and static text which is displayed in the input area. Most of the format control characters control what data is expected to be keyed in by the user. They are displayed as blanks until the user types into them.

The format codes are:

| A | entry of any alphabetic character |
|---|---|
| 9 | entry of any numeric character |
| X | entry of any alphabetic or numeric character |
| *f | allow entry of any number of characters; the next character, f, is one of A, 9 or X and specifies what kind of characters can be entered. |
| \c | display the next character, c, in the entry field; allows display of the formatting characters in the entry field. |

Format hints indicate what kind of value is expected. If a format hint is not understood, it is ignored. Currently defined format hints are:

| text | text is expected to be text, use special input techniques; generally follows ^A or *X |
|---|---|
| mail-reply | like text, but expected text is for an e-mail message or page; may affect input algorithm |
| address-list | entry is a list of e-mail addresses |

| o-default | ::= default= value |
|---|---|

The o-default option supplies a value that is used if the user simply hits NEXT. If no default value is given, then the user must supply a value.

FORMATTED TEXT

| formatted-text | ::= { { flow-image } { line-format } text-line )* |
|---|---|
| formatted-line | ::= text-line |
| text-line | ::= { text | image | text-format | alignment-format }* |

Formatted text is what is shown to the user in most cards. Formatted lines are used for choice entries.

| text-format | ::= <B> | <I> | <BL> |
|---|---|
| | ::= </B> | <I> | <BL> |

The format codes control Bold, Italic and Blinking. The slash versions cancel the formatting. Unlike HTML, these needn't be strictly nested and over application and over cancellation are tolerated. Formatted-text and formatted-line elements start in plain mode (no bold, italic, or blinking).

| alignment-format | ::= <CENTER> | <BOLD> | <TAB> |
|---|---|

The alignment codes specify how parts of a line are to be laid out. The text following the alignment code is either centered or right justified on the same line as the other text. The text or image following the code is considered to be all text up to the next alignment code or line break. All lines start implicitly aligned left. Note that these do not include an implicit line break so that one can have both left and right justified text on a single line. If there is too much text and not enough room on the line then, if in wrap mode, the non-fitting text is moved to the next line and aligned the same way. If in line mode, the line may end up running together with two spaces between the left, center, and right justified segments.

The tab code is used to create aligned columns. Rather than tab to specific character positions, the tab code separates the text for each column. The width of the column is determined by the maximal width of the text (or images) in each line. The extent of the columns is from the first line with tab codes through the last contiguous line with tab codes. Some lines may have fewer tab codes than others, in which case they are assumed to have no text for the extra columns.

| line-format | ::= <WRAP> | <LINE> |
|---|---|
| | ::= <BR> |

Multiple lines of text are separated by the <BR> code. If a line is too long to fit on the screen and, if in wrap mode, the line is word wrapped onto multiple lines. If in line mode, the line is left as one line and is scrolled horizontally. Formatted-text and formatted-line elements start in wrap mode and may be changed with either the <WRAP> or <LINE> codes. These codes are an implicit line break.

IMAGES

| image | ::= <IMAGE o1(image-options) > |
|---|---|
| | ::= <INLINE o1(image-options) > inline-data </INLINE> |
| flow-image | ::= <IMAGE o1(flow-image-options) > |
| | ::= <INLINE o1(flow-image-options) > inline-data </INLINE> |

**A0214**

**53**

**54**

-continued

| image-options | ::= o-source |
| flow-image-options | ::= image-options \| o-flow |
| inline-data | ::= ASCII85 encoding of image data |

Images are treated as large words and, by default, are simply displayed as part of the text. Flow-Images have a flow option that causes them to be treated differently. The image data is stored in a separate data stream as identified by the source option.

Inline images are treated identically, only the data is part of the current data stream. ASCII85 is a standard way of encoding binary data in printable ASCII, whereby each four bytes of data is encoded in five characters. Note that TIL only uses inline images, and uses a different encoding.

| o-source | ::= src= location |

This option specifies the location of the source for images.

| o-flow | ::= flow= { left \| right } |

This option controls the alignment of flow-images. The option specifies that the image is flush left or flush right with the screen. Subsequent lines of text flow in the remaining right or left hand space.

SOFTKEYS

| softkey | ::= <SOFTKEY  ol(softkey-options) > |
| softkey-options | ::= o-label \| o-button \| action-options |

Softkeys supply definitions for two buttons known as SOFT-L and SOFT-R. They do not show up in the normal text and graphics area displayed to the user, but on a separate line for soft key labels. (Note: in some implementations, where screen real estate is scarce, this label line may get used for normal text and graphics display when there are no softkeys defined on the current card).

When the softkey is pressed, the indicated action takes place.

| o-button | ::= button= side |
| side | ::= left \| right |
| o-label | ::= label= value |

The button option specifies which physical key the soft-key applies to. The label option is the text that is displayed on screen for that key. The phone may truncate the label. It is suggested that labels be fewer than eight characters.

Softkeys can be specified both for the deck as a whole and per card. When specified for the deck (after the deck-header, but before the first card) they remain in effect for the entire deck. When specified for a card (at the beginning of the formatted-text for the card), they temporarily override any deck softkeys while the card

is visible. Note that the override is done independently for the two keys (a card can override one softkey, but not the other). To override a deck softkey with no softkey (in effect, to remove a softkey for the duration of a card) use a softkey with no label and no action.

SYNTAX: OPTIONS

Many of the syntactic elements of PIDL have option lists associated with them. Options refine the operation of the elements they are part of. Unless otherwise noted, options do not nest, even when the same option is given in two nested elements. Options that are not defined for an element are ignored, even if valid for an enclosing element.

| ol(valid-option) | ::= { blank-space valid-option }* |
| | {blank-spaces } |
| option-list | ::= ol(option) |
| option | ::= key = value |
| key | ::= identifier |
| value | ::= plain-text |
| | ::= " { text } " |

An option list contains zero or more options. Each option is separated by blank-space (required!) and optionally followed by blank-space. In the syntax diagrams, option lists are shown as: ol(valid-option) where valid-option is replaced with an element that defines the possible options in this context. ol is a generic syntactic description of option-lists.

Each option is a key and a value. They may be given in any order within the list of options. The key is always an alpha-numeric name that is case insensitive. The value, if it is composed of only alphanumeric characters, may appear directly after the equals sign. Otherwise, the value must be quoted. In quotes, blank-space is treated literally and is considered part of the value.

In the syntax diagrams, the possible values for various options are specified without quotes. However, quotes are always acceptable around an option value.

Unlike almost all other syntactic elements, blank space is not permitted between the key and the equals sign or between the equals sign and the value.

Many options have a more restricted set of possible values than represented by the above syntax. See the individual options for details.

DESTINATIONS

| destination | ::= location { ; animation } |
| | ::= card-loc { ; animation } |
| | ::= stack-operation { ; animation } |
| location | ::= full-loc \| partial-loc |
| | \| relative-loc |
| full-loc | ::= : service-id / deck-path |
| | ::= : service-host / deck-path |
| partial-loc | ::= : service-host / deck-path |
| relative-loc | ::= { ../ }* deck-path |
| card-loc | ::= # identifier |
| deck-path | ::= plain-text { / plain-text }* |
| service-id | ::= % plain-text |
| service-host | ::= plain-text |

Destinations are used in some options to indicate the next, or previous deck or card to show. A deck is specified either with a full location (service-id and deck-path), just a deck-path (in which case the service is the same

US 6,625,447 B1

as the current deck's service), or a relative deck-path. In the later case; the last component of the current deck-path is removed, (and one additional component for each ../ in the relative deck-path), and the deck-path appended.

A particular card can be a destination and is specified by a card-loc element.

| stack-operation | ::= + card-loc |
| | ::= – |

In addition to the normal history list of where a user has been that is kept by a phone, the phone also keeps a short stack of locations. Using a plus sign form causes the current location (deck and card, and location in the history list, and animation used) to be pushed on the stack before going to the new card. Using the minus sign form causes a return to the location on the top of the stack, and the history list to be pruned back to the saved point. If no animation is given, the inverse animation is used. The stack is popped.

| animation | ::= slideN \| slideS |
| | ::= slideW \| slideE |
| | ::= slideSW \| slideNE |
| | ::= slideSE \| slideNW |
| | ::= flipV |
| | ::= flipH |
| | ::= fade |
| | ::= none |

The optional animation argument indicates what form of screen animation, if available, is to be used when going to the destination. The animation is remembered in the destination in the history and destination stack. If the user moves to a destination via a 'go' or 'next' operation, then the animation is performed. If the user moves to a destination via a 'prev' or 'pop' operation, the reverse animation associated with the current location is performed.

## ACTIONS

Choice entries and soft keys can specify actions to be performed when the user selects the choice or softkey.
action-options ::=o-args |o-call |o-page

| o-go | :: = go = destination |
| o-call | :: = call = value |

The go operation indicates that the destination should be moved.

## ARGUMENT PROCESSING

Each time a deck is requested, arguments may be passed along with the request.

These arguments may be used by the service end to compute a deck specific for the user rather than just return a pre-written deck.

Arguments are built-up as the user traverses the deck. Each argument is a key-value pair. While arguments superficially look like options, these two entities are quite distinct: Options are a part of PIDL and affect the operation of the phone. Arguments are information

gathered by the phone and returned to the service. Neither PIDL nor the phone understands the arguments beyond their basic syntactic structure.

Arguments come from three places: Choice cards, Entry cards, and the args option. Each of these specifies a key-value pair that is added to a buffer of arguments to be sent. In the case of the args option, multiple arguments may be specified. When an argument key-value pair is added to the argument buffer, if the key is already present in the buffer, its value is replaced.

| o-args | :: = args = arg-list |
| argument-list | :: = arg-key-value { { & \| ; } key-value }* |
| arg-key-value | :: = arg-key = arg-value |
| arg-key | :: = identifier |
| arg-value | :: = plain-text |
| o-key | :: = key = arg-key |
| o-value | :: = value = arg-value |

Note:
The entire o-args element is actually the value of an option. If it has more than one arg-key-value it will need to be in quotes. Since the ampersand (&) and semi-colon (;) are used as key-value pair separators, these characters cannot be part of argument values.

These options are used in choice and entry cards to specify the key and value for the arguments those cards set.

## BASIC ELEMENTS

| alpha | :: = any alphabetic character |
| numeric | :: = any digit |
| alpha-numeric | :: = alpha \| numeric |
| hex | :: = numeric \| any letter A through F, either case |
| blank-space | :: = { space \| tab \| new-line }+ |
| space | :: = the space character |
| tab | :: = the tab character |
| new-line | :: = the carriage return character |
| | :: = the line feed character |
| | :: = the sequence carriage return, line feed |
| word | :: = { alpha-numeric }+ |
| identifier | :: = alpha { alpha-numeric }* |
| integer | :: = { + \| – }{ numeric }+ |
| text | :: = any 7-bit ASCII character except <, >, ", or & |
| | :: = &gt; \| &lt; \| &quot; \| &amp; \|   |
| | :: = any ISO-Latin-1 named entity |
| | :: = &# hex hex; |

In text, runs of blank-space are treated as single spaces and my be used as point for word wrapping.
plain-text

| safe | :: = { alpha \| numeric \| safe }* |
| | :: = $ \| – \| _ \| @ \| . \| & \| \| ! \| * \| , |

## TIL ENCODING

Except where noted, TIL is identical to PIDL in structure. To translate PIDL to TIL several steps are conceptually needed (these may be done in one pass by a translator):
1. Escape characters with the high bit set.
2. Compress or remove all blank space where possible.

US 6,625,447 B1

57

3. Tokenize comment elements with a single byte with the high bit set.

4. Inline images.

Fundamentally, TIL is just PIDL with certain common character sequences replaced by single bytes with the high-bit set. The first two steps above support this. Additionally, images are further compacted by including them inline in a dense format.

The tokenizing follows the encoding given in the table below. Note that for purposes of element separation, the tokens that represent option key identifiers (with the equal sign) can be considered to include all preceding blank space. Similarly, the tokens that represent option values can be considered to include all following blank space.

| <PIDL> | 90 | args = | C0 | alpha | E0 |
|---|---|---|---|---|---|
| </PIDL> | 91 | button = | C1 | center | E1 |
| <DISPLAY> | 92 | call = | C2 | fade | E2 |
| </DISPLAY> | 93 | cost = | C3 | flipH | E3 |
| <CHOICE> | 94 | default = | C4 | flipV | E4 |
| </CHOICE> | 95 | flow = | C5 | group | E5 |
| <ENTRY> | 96 | format = | C6 | inline | E6 |
| </ENTRY> | 97 | go = | C7 | left | E7 |
| <CE | A0 | key = | C8 | list | E8 |
| <GE | A1 | label = | C9 | none | E9 |
| <IMAGE | A2 | method = | CA | number | EA |
| <INLINE | A3 | name = | CB | right | EB |
| <SOFTKEY | A4 | next = | CC | slideE | EC |
| <B> | B0 | page = | CD | slideN | ED |
| </B> | B1 | prev = | CE | slideNE | EE |
| <I> | B2 | src = | CF | slideNW | EF |
| </I> | B3 | ttl = | D0 | slideS | F0 |
| <BL> | B4 | value = | D1 | slideSE | F1 |
| </BL> | B5 | | | slideSW | F2 |
| <CENTER> | B6 | | | slideW | F3 |
| <RIGHT> | B7 | | | | |
| <WRAP> | B8 | | | | |
| <LINE> | B9 | | | | |
| <BR> | BA | | | | |

APPENDIX II

A COMPUTER PROGRAM TO GENERATE A LETTER FREQUENCY TABLE FOR USE IN THE PREDICTIVE DATA ENTRY PROCESS

Unpublished © 1995 Libris, Inc.

```
/* This program opens a text file selected by the
user, generates the frequency table for that file,
and then writes the frequency table to another
file also selected by the user.
*/
#include <stdio.h>
#include <string.h>
#include <console.h>
#include <assert.h>
typedef unsigned char byte;
typedef byte triplet [3];
typedef byte tristorage [27] [27] [27];
IncrementTrigram(triplet t, tristorage trigrams)
{
    byte * pb;
    assert (t[0] < 27);
    assert (t[1] < 27);
    assert (t[2] < 27);
    pb = & trigrams [t [0]] [t [1]] [t [2]];
    if (*pb < 255) *pb = *pb + 1;
    return *pb;
}
```

58

```
                          -continued
StoreTrigramValue(triplet t, tristorage trigrams, byte
value)
{
    assert(t[0] < 27);
    assert(t[1] < 27);
    assert(t[2] < 27);
    trigrams[t[0]] [t[1]] [t[2]] = value;
}
byte FetchTrigramvalue(triplet t, tristorage trigrams)
{
    assert(t[0] < 27);
    assert(t[1] < 27);
    assert(t[2] < 27);
    return trigrams [t [0]] [t [1]] [t [2]];
}
byte DumpTrigram(triplet t, tristorage trigrams)
{
    byte value;
    assert(t[0] < 27);
    assert(t[1] < 27);
    assert(t[2] < 27);
    value = FetchTrigramValue(t, trigrams);
    if (value != 0)
    {
        printf("%c%c%c = ", t[0] + 'a', t[1] + 'a', t[2] +
'a');

        if (value == 255) printf("***");
        else printf("%3d", value)
    }
return value;
    }
    int IdFromChar(short c)
    }
        c = tolower(c)
        if (c < 'a' || c > 'z') return 26;
        return c - 'a';
}
Addchar (tristorage trigram, triplet t, byte b)
{
    byte value;
    unsigned short r;
    assert (b <= 26)
    if (b == 26) {t[0] = t[1] t[2] = 26; return; }
    t[0] = t[1];
    t[1] = t[2];
    t[2] = b;
    value = FetchTrigramValue(t, trigrams);
    if (value == 255) return;
#if 0
    if (value > 64) }
        r = Random();
        if (value > 192 && r & O × E000) return;
        else if (value > 128 && r & O × C000) return;
        else if (value >64 && r & O × 8000) return;
    }
#endif
    StoreTrigramValue(t, trigrams, value + 1);
}
DumpTrigrams (tristorage trigrams)
{
    int i, j, k;
    int x;
    triplet t;
    X = O;
    for (i = 0; i < 26; ++i)
        for (j = 0; j < 26; ++j)
            for (k = 0; k < 26; ++k)
                {
                    byte value;
                    t[0] = i;
                    t[1] = j;
                    t[2] = k;
                    value = DumpTrigram(t, trigrams);
                    if (value == 0) continue;
                    if (++x == 6) }
                        printf(" "); x = 0;
                    }
                    else
                        printf("");
```

**A0217**

**59**

-continued

```
        }
}
OSErr BuildTrigram(short refNum, tristorage trigrams)
{
    OSErr err;
    triplet t;
    t[0] = t[1] = t[2] = 26;
    while (true)
    }
        long count = 80;
        char buf [80]
        int i;
        err = FSRead(refNum, &count, buf);
        if (count == 0) return err;
        for (i = 0; i < count; ++i) }
            AddChar(trigrams, t, IdFromChar(buf [i]));
        }
        if (err) return err;
    }
    return 0;
}
Handle openTrigrams (void)
{
    OSErr err;
    OSType type;
    StandardFileReply reply
    short refNum;
    short id;
    Handle h;
    Str63 name;
    tristorage *trigrams;
    type = TEXT';
    StandardGetFile(nil, 1, &type, &reply);
    if (!reply.sfGood) return nil;
    err = FSpOpenDF(&reply.sfFile, fsCurPerm, &refNum);
    if (err) return nil;
    memcpy(name, reply.sfFile.name, sizeof(name));
    h = NewHandle (sizeof (tristorage));
    HLock(h);
    trigrams = (tristorage *) (*h)
    memset (*trigrams, 0, sizeof (tristorage))
    BuildTrigram(refNum, *trigrams);
    FSClose(refNum);
    DumpTrigram(*trigrams);
    HUnlock(h);
    type = 'rsrc'
    StandardGetFile(nil, 1, &type, &reply);
    if (!reply.sfGood) return nil;
    refNum = FSpOpenResFile(&reply.sfFile, fsCurPerm);
    if (refNum == -1) return;
    UseResFile (refNum);
    id = UniqueIID('smrt');
    //id = 128;
    AddResource(h, 'smrt', id, name);
    UpdateResFile(refNum);
    FSClose (refNum);
    return h;
}
main()
{
    OSErr err;
    Handle h;
    cshow(stdout)
    TEInit ();
    InitDialogs (OL);
    InitCursor();
    h = openTrigrams();
```

I claim:

**1**. A method for a two-way communication device having a display and an input interface to interact with a data network, the method comprising:

sending a request to a server across a wireless link for access to a resource on said data network, using a resource locator identifying said resource;

receiving over said wireless link a response from said server, said response resulting from said server access-

**60**

ing and transforming said resource to be more compatible with at least one of the two-way communication device and the wireless link, said response including a set of linked pages; and

displaying a display screen on said display based on at least one of the pages; and

allowing a user of the two-way communication device to move among said pages using a user input interface without sending an additional request.

**2**. The method of claim **1**, wherein said pages include a page specifying an image to be displayed on said display.

**3**. The method of claim **1**, wherein said pages include a page specifying a data input to be received from a user through said input interface.

**4**. The method of claim **3**, wherein said data input is received through a phone keypad.

**5**. The method of claim **4**, wherein said data input is received in conjunction with a predictive data entry process.

**6**. The method of claim **5**, wherein said predictive data entry process uses a character frequency table stored in said memory.

**7**. The method of claim **1**, wherein said pages include a page specifying selectable choices to be presented on said display for selection.

**8**. The method of claim **7**, wherein said selectable choices are selected using a cursor associated with said input interface.

**9**. The method of claim **1**, wherein said displaying a display screen on said display comprises

displaying on said display a first user interface defined in a first page of said set of pages; and wherein the method further comprises

allowing a user to move among said pages using said input interface.

**10**. The method of claim **9**, wherein, upon receiving said pages, said two-way communication device stores said pages in a memory.

**11**. The method of claim **9**, wherein said pages are associated by links within the pages.

**12**. The method of claim **9**, wherein said input interface comprises a plurality of soft keys displayed on said display.

**13**. A wireless two-way communication device for communicating across a wireless network, said wireless two-way communication device comprising:

a display to display information;

a wireless network interface to communicate across said wireless network; and

a client module running on a processor, said client module to send a request for access to a resource on a data network using a resource locator identifying said resource, said client module receiving a response from said server, said response including a plurality of linked pages, said client module displaying information on said display according to at least one of the pages, said client module allowing a user of the wireless two-way communication device to move among said pages using a user input interface without sending an additional request.

**14**. The wireless two-way communication device of claim **13**, wherein said pages include a first page specifying an image to be displayed on said display.

**15**. The wireless two-way communication device of claim **14**, wherein said pages include a second page specifying data input to be received from a user through a user input interface.

**16**. The wireless two-way communication device of claim **15** wherein said user input interface comprises a phone keypad.

US 6,625,447 B1

61

**17**. The wireless two-way communication device of claim **16** wherein said data input is received in conjunction with a predictive data entry process.

**18**. The wireless two-way communication device of claim **17** wherein said predictive data entry process uses a character frequency table stored in said memory.

**19**. The wireless two-way communication device of claim **15**, wherein said pages include a third page specifying selectable choices to be presented on said display for selection.

**20**. The wireless two-way communication device of claim **19** wherein said selectable choices are selected using a cursor associated with a user input interface.

**21**. The wireless two-way communication device of claim **15** wherein said input interface comprises a plurality of soft keys displayed on said display.

**22**. The wireless two-way communication device of claim **13**, wherein, upon receiving said pages, said two-way communication device stores said pages in a memory and displays information from a page selected from said pages on said display.

**23**. The wireless two-way communication device of claim **13**, wherein said pages include links relating said pages.

**24**. A wireless two-way communication device for communicating across a wireless network, said wireless two-way communication device comprising:

a display to display information;

a wireless network interface to communicate data across said wireless network; and

a client module running on a processor, to send a request for access to a resource on a data network using a resource locator identifying said resource, said client

62

module further to receive a response from a server, said response being a version of said resource transformed by said server and including a plurality of linked pages, said client module further to display information on said display according to a first page of the plurality of pages, said client module allowing a user of the two-way communication device to move among said pages using a user input interface without sending an additional request.

**25**. The wireless two-way communication device of claim **24**, wherein said pages further include a second page specifying an image to be displayed on said display.

**26**. The wireless two-way communication device of claim **24**, wherein, upon receiving said pages, said two-way communication device stores said pages in a memory.

**27**. The wireless two-way communication device of claim **24**, wherein said pages further include a second page, and wherein said first page is associated with said second page by a link in said first page.

**28**. The wireless two-way communication device of claim **24**, wherein said pages further include a second page specifying a data input to be received from a user through said user input interface.

**29**. The wireless two-way communication device of claim **24**, wherein said pages further include a second page specifying selectable choices to be presented on said display for selection.

**30**. The wireless two-way communication device of claim **29** wherein said selectable choices are selected using a cursor associated with said user input interface.

*    *    *    *    *

# CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 8,875 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

/s/ *Daniel L. Geyser*
Daniel L. Geyser
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201
Tel.:  (214) 978-4014
Fax:  (214) 978-4044
*dgeyser@mckoolsmith.com*

*Counsel for Plaintiff-Appellant*
*Unwired Planet, Inc. (f/k/a/ Openwave Systems, Inc.)*

February 27, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2015, an electronic copy of the forego-ing Opening Brief was filed with the Clerk of Court for the U.S. Court of Appeals for the Federal Circuit, using the appellate CM/ECF system. I further certify that all parties in the case are represented by lead counsel who are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Daniel L. Geyser*
Daniel L. Geyser
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201
Tel.:  (214) 978-4014
Fax:  (214) 978-4044
*dgeyser@mckoolsmith.com*

February 27, 2015