No. 2015-1108

# In the
# United States Court of Appeals
# for the Federal Circuit

---

OPENWAVE SYSTEMS, INC., NKA UNWIRED PLANET, INC.,
*Plaintiff-Appellant,*

v.

APPLE INC., RESEARCH IN MOTION, LTD., RESEARCH IN MOTION CORP.,
*Defendants-Appellees.*

---

Appeal from the United States District Court for the District of Delaware in No.
1:11-cv-00765-RGA, Judge Richard G. Andrews

---

## REPLY BRIEF FOR PLAINTIFF-APPELLANT UNWIRED PLANET, INC. (F/K/A/ OPENWAVE SYSTEMS, INC.)

---

Theodore Stevenson, III
*Principal Attorney*
Daniel L. Geyser
Jared M. Hoggan
Nicholas Mathews
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201
Tel.:  (214) 978-4000
Fax:  (214) 978-4044
*tstevenson@mckoolsmith.com*
*dgeyser@mckoolsmith.com*
*jhoggan@mckoolsmith.com*
*nmathews@mckoolsmith.com*

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................1

ARGUMENT .................................................................................................2

    THE DISTRICT COURT'S "DISAVOWAL" FINDING IS AT
    ODDS WITH CONTROLLING LAW AND INCOMPATIBLE
    WITH THE PATENTS' PLAIN LANGUAGE...................................2

    A.    The Standard For Establishing Disavowal Is "Exacting,"
        And Defendants Improperly Diminish That Controlling
        Standard .....................................................................................2

    B.    The Specification Contemplates That "Intelligent"
        Devices Will Practice The Claims And Benefit From The
        Invention ...................................................................................3

    C.    There Is No Clear And Unambiguous Evidence Of
        Disclaimer, And Defendants' Contrary Position Misreads
        The Specification .......................................................................7

        1.    Defendants cannot restrict the entire invention to
            the features found in non-exclusive embodiments ...........8

        2.    The embodiments do not depict devices with
            "computer modules" because *excess* capacity is
            irrelevant to practicing the invention..............................12

        3.    Defendants do not identify any actual disclaimer,
            and instead read snippets of the specification out of
            context.............................................................................13

        4.    Defendants misunderstand the specification's
            critique of the prior art and its related discussion of
            the invention's benefits...................................................16

        5.    The invention's "significant departure" from the
            prior art was not a "temporary workaround" but a
            "radical shift" to a new paradigm of open
            applications ....................................................................17

# TABLE OF CONTENTS
## (continued)

<u>Page</u>

6.    In stark contrast with its otherwise-exhaustive detail, the specification never defines "computer module" or "microcontroller," and the hazy distinction between those concepts is inconsistent with disclaimer..................................................18

7.    This Court's disavowal case law is context-specific—and wholly consistent with affording the patented claims their "plain and ordinary" meaning......19

D.    There Was No Disclaimer To Avoid The Prior Art—And Defendants' Contrary Suggestion Has No Basis In The Record .....................................................................................23

1.    Defendants cite no evidence from the prosecution history, and their only support is *Defendants' own invalidity contentions* in the ITC ....................................25

2.    The patents distinguished the prior art on independent grounds......................................................27

E.    If Any Disclaimer Is Appropriate, It Should Be Limited To Disclaiming Devices With A Separate Computer Module .....................................................................................29

CONCLUSION ....................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Akamai Techs., Inc. v. Limelight Networks, Inc.*, 629 F.3d 1311 (Fed. Cir. 2010) ............................................................................................... 8

*Alloc, Inc. v. ITC*, 342 F.3d 1361 (Fed. Cir. 2003) ................................. 20

*Boss Control, Inc. v. Bombardier Inc.*, 410 F.3d 1372 (Fed. Cir. 2005) ................ 20

*C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858 (Fed. Cir. 2004) ................... 12

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361 (Fed. Cir. 2012) .................................................... 19, 20, 21

*Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366 (Fed. Cir. 2008) .............................................................................................. 20

*Dealertrack, Inc. v. Huber*, 674 F.3d 1315 (Fed. Cir. 2012) ............................ 2, 16

*Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322 (Fed. Cir. 2009) .............. 22

*GE Lighting Solutions, LLC v. Agilight, Inc.*, 750 F.3d 1304 (Fed. Cir. 2014) .............................................................................................. 22

*Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364 (Fed. Cir. 2014) ................................ 20

*Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367 (Fed. Cir. 2014) ...... 9, 11, 15

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312 (Fed. Cir. 2006) ....... 20, 22

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350 (Fed. Cir. 2006) ............................................................................................. 20

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) ............. 17, 27

*Papst Licensing Digital Camera Patent Litig., In re*, 778 F.3d 1255 (Fed. Cir. 2015) ............................................................................ 11, 17

*Resonate Inc. v. Alteon Websyss., Inc.*, 338 F.3d 1360 (Fed. Cir. 2003) ................. 22

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296 (Fed. Cir. 2011) ................................................................................................... 3

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Sandisk Corp. v. Memorex Prods.*, 415 F.3d 1278 (Fed. Cir. 2005) ................. 3, 30

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001) .................................................................. 13, 22

*Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358 (Fed. Cir. 2014) ........................29

*Superguide Corp. v. DirecTV Enters.*, 358 F.3d 870 (Fed. Cir. 2004)....................20

*Teva Pharm. U.S.A. Inc. v. Sandoz, Inc.*, 135 S. Ct. 831 (2015) .............................18

*Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362 (Fed. Cir. 2012)................................................................................ 2, 3, 12, 22

*United States v. Williams*, 504 U.S. 36 (1992) ......................................................29

*Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007)................................................................................................8

## INTRODUCTION

In its opening brief, Unwired Planet established that Rossman's invention marked a groundbreaking innovation for wireless internet applications. It recognized that prior-art "intelligent" devices were stuck in "closed systems," and it taught how those same devices could overcome that deficiency. Under these patents, new and updated applications were available "for the first time" without any hardware or software changes, a major benefit for *any* device. While "computer modules" were not "*required*" to practice the invention, "computer modules" were not *precluded* from practicing the invention, a result compelled by simple logic. The patents contemplated, directly, that "intelligent" devices (like "any" other wireless device) would use and benefit from this invention.

In response, Defendants chiefly repeat the same errors from the decision below. They do not identify any explicit textual disclaimer, because none exists. They continue to cast features of the "embodiments" as the entire invention, despite plain language pointing in the opposite direction. They pluck snippets of text out of context, rather than reproduce even a single, complete, unequivocal statement of disclaimer. They suggest the patentee disavowed claim scope to avoid invalidity, but their only support for this contention is—*Defendants' own briefing*. Because Defendants could not identify *anything* in the file wrapper, they instead

invoked their own invalidity theories before the ITC (without raising this issue below).

There was no articulable reason for the patentee to jettison this critical set of devices from the invention. The court's ruling misread the patents, and its decision should be reversed.

## ARGUMENT

## THE DISTRICT COURT'S "DISAVOWAL" FINDING IS AT ODDS WITH CONTROLLING LAW AND INCOMPATIBLE WITH THE PATENTS' PLAIN LANGUAGE

### A.    The Standard For Establishing Disavowal Is "Exacting," And Defendants Improperly Diminish That Controlling Standard

As previously explained (Opening Br. 19-20), the district court erred in finding disavowal under this Court's demanding standard. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012). The patents' text must reveal a "clear," "unambiguous," "deliberate[]," "unmistakable" disclaimer (*Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1322 (Fed. Cir. 2012)), and nothing here approaches that showing.

Defendants refuse to engage this Court's "exacting" standard, and barely even acknowledge it in their brief. Instead, Defendants fault Unwired Planet for advancing a "magic words" test or embracing "rigid formalism." Answering Br. 24. But Unwired Planet never said that disavowal requires a party to repeat a specific phrase or utter some rote incantation. The test requires a clear "expression[]

2

of manifest exclusion." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1306 (Fed. Cir. 2011) (internal quotation marks omitted). Defendants cannot rest on a plausible interpretation, but must show the *only* plausible reading compels disclaimer. If the specification is "subject to more than one reasonable interpretation," it must be construed to preserve the claims' natural scope. *Sandisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005). The "natural scope" here captures Defendants' devices.

Defendants cannot duck this standard simply because these patents "disparage" the prior art. Answering Br. 35. "Mere criticism of a particular embodiment" fails to establish a "clear disavowal." *Thorner*, 669 F.3d at 1366. Indeed, "even a direct criticism" is inadequate. *Ibid.*; *Retractable Techs.*, 653 F.3d at 1306 (rejecting disclaimer even though "the specifications expressly criticize and distinguish prior art devices"; "statements about the difficulties and failures in the prior art, without more, do not act to disclaim claim scope"). Disparagement is a relevant factor in the analysis, but it cannot alone surpass the high threshold. Unless disavowal is inescapable, the patented claims mean what they say. That principle supports reversal.

### B.    The Specification Contemplates That "Intelligent" Devices Will Practice The Claims And Benefit From The Invention

Defendants assert that "the specification *never* states that the invention would benefit devices containing computer modules," and "nothing in the specifi-

cation even hints that the claimed invention had any application" to such devices. Answering Br. 28, 46. This is incorrect. The specification directly teaches that "intelligent" devices can practice the invention and benefit from its use. *E.g.*, Opening Br. 26-28. That textual directive is impossible to square with disclaimer.

Contrary to Defendants' contention, the invention explicitly contemplates that "intelligent" devices would perform the claimed functions. In assessing the prior art, the specification highlights that "intelligent communications devices" are "too inflexible" because "limitations" have "close[d] the traditional routes for delivering [those devices] new applications or updates" (A124 (1:59, 2:23-25)):

> [T]he current crop of intelligent communication devices run only the few applications which were burned into their ROMs at the factory or which are contained in a ROM card plugged into a slot designed for this purpose. This scheme lacks the flexibility needed to run the thousands of applications required to address the fragmented requirements of the market and provides no simple method for updating the applications after the device has been sold.

A124 (2:25-33); *see also* A126 (5:34-46), A128 (9:60-67). "This invention," however, "*eliminates these problems*" (A128 (10:1) (emphasis added)):

> This invention allows *for the first time* two-way communications devices such as cellular telephones, two-way pagers, and telephones to become open application platforms which in turn empowers software developers to deliver value-added applications and services to *any two-way communication device* that incorporates the principles of this invention. This is a radical shift from the current situation where telephones and two-way pagers are closed, proprietary systems.

A125 (3:61-4:2) (emphases added).

4

These statements mean what they plainly say. The invention targets a specific defect in "intelligent" devices and articulates a specific solution for those same devices. This eviscerates Defendants' contention that "nothing" in the specification would benefit "intelligent" phones. On the contrary, the specification singles out those devices and their "closed systems" with "fixed functionality"—and teaches how to "eliminate[]" those problems. A128 (9:65-10:6); A57 (4:9-10). This is incompatible with disclaimer: it is implausible that the patentee would distinctly claim a specific improvement for the very devices it was simultaneously disavowing. Despite Unwired Planet featuring these points in its opening brief (at 2, 13, 16, 24, 26-28), Defendants refuse to grapple with this unambiguous textual evidence. Their refusal is telling.

Rather than confront these issues, Defendants instead focus on statements in the specification that "intelligent" devices are "too bulky" and "too expense." Answering Br. 31; *see also id.* at 19 (suggesting the specification's "disparage[ment]" was limited to the device's "size and expense"). It is understandable that Defendants wish to shift the Court's focus away from the specification's discussion of "inflexibility"—since that problem underscores how the invention benefits *all* devices. But Defendants cannot simply brush this issue aside. If "[a] device with a computer module does not need the invention" (Answering Br. 29), Defendants must explain why this particular shortcoming was cured "for the first time" by the pa-

tented claims. A125 (3:61-4:2). The fact is that the specification contemplates, explicitly, resolving this issue for "all" devices, including those with "computer modules." A128 (9:63-10:1). "Intelligent" devices benefit directly by these claims. A60 (9:66-10:6); A57 (4:9-10). Defendants cannot wish away this critical aspect of the invention by pretending it does not exist.[1]

This likewise underscores Defendants' error in insisting, repeatedly, that the "prior art intelligent communicators" already performed every function covered by the patents. Answering Br. 1. In support of this contention, Defendants cite *nothing*. They have no basis for suggesting that the mere presence of a "computer module" already enabled "intelligent" devices to perform every task made possible ("for the first time") by the claimed invention. And the specification itself flatly refutes that suggestion: The invention's genius was rooted in splitting processing functionality between a device and its remote server. *See, e.g.*, A125 (3:50-66), A131 (15:55-63). Because applications under the invention are *server*-based, not *device*-based, they can push updates to any device without reburning applications

---

[1] Defendants thus are correct that the specification "disparage[d]" intelligent devices for "technical[]" deficiencies (Br. 15), but Defendants fail to appreciate that this cuts directly against them. The "technical" deficiency was the inability of "intelligent" devices to operate in an *open* system—the very issue resolved by the patent itself. It is the *opposite* of disavowal for a specification to identify a deficiency in the prior art and explain directly how the invention "overcomes" that deficiency. Defendants never say why the inventor would disclose a way to improve "intelligent" devices only to immediately exclude those devices from the invention.

into ROM (A56 (2:33-36)) or modifying the device's hardware (A57 (4:20-23)). The novel and useful applications arising from that insight were not anticipated by "intelligent" devices designed for closed systems. A128 (9:19-10:1).

Accordingly, even if "intelligent" devices "could run a variety of applications, and could communicate with remote servers to, for example, send and receive email" (Answering Br. 4), those devices still lacked the critical functionality of an "open application platform." A125 (3:61-4:33) (explaining how the invention "*for the first time*" transforms "*any* two-way communication device" into an "open application platform") (emphases added). Defendants err in asserting, without support or explanation, that "intelligent" devices already "used hardware computer modules to communicate with external servers in just this way." Answering Br. 1.

## C.    There Is No Clear And Unambiguous Evidence Of Disclaimer, And Defendants' Contrary Position Misreads The Specification

According to Defendants, the specification unambiguously disclaims any device with a "computer module" from the invention. If this "disavowal" were truly clear and unambiguous, Defendants would simply pull direct language, using complete quotations, from the specification. Instead, however, Defendants improperly truncate the operative text, pluck language out of context, and cobble together isolated snippets (often separated by *columns* of text) in order to manufacture "clear" statements that do not exist.

On its face, the specification does not impose any hardware processing limitations. This invention revolutionized wireless internet applications. It explained how dividing computing functions between a mobile device and a remote server would eliminate the need to do everything on the device itself. While advanced "computer modules" were no longer "*required*" under the invention, *any* device with basic processing abilities could practice the invention and benefit from its operation. These patents do not disavow "computer modules" from their scope; in multiple respects, Defendants' contrary position is irreconcilable with the specification.

### 1.    Defendants cannot restrict the entire invention to the features found in non-exclusive embodiments

According to Defendants, the specification "says that <u>the claimed devices</u> do *not* contain a computer module." Br. 13 (underlining added). Defendants are wrong. There is not a single instance where the specification declares that "the claimed devices" (as a unitary category) lack computer modules, or the "invention" is strictly limited to so-called "microcontrollers."[2] Defendants simply truncate the

---

[2] *Contrast Akamai Techs., Inc. v. Limelight Networks, Inc.*, 629 F.3d 1311, 1326 (Fed. Cir. 2010) ("written description specifically refer[ences]" features "as 'the invention'"), cited at Answering Br. 44-45; *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) (finding limitation where a patent "describes the features of 'the present invention' as a whole"), cited at Answering Br. 44.

text to replace clear references to individual *embodiments* (such as "cellular tele-

phone 100") with their own absolute terms (*all* "claimed devices"). Defendants

cannot fairly characterize these explicit "examples" as exclusive representations of

"this invention." *See, e.g.*, *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367,

1373 (Fed. Cir. 2014) (refusing to restrict "the invention generally" based on terms

"describing a particular numbered component in the figure depicting the preferred

embodiment").

Defendants repeat this error throughout their brief. A representative exam-

ple: "The specification unambiguously recites that the claimed cell phone 'is *not* a

combination of a computer module and a wireless communication module as in

prior art attempts to create an intelligent telephone' [*clause 1*]; rather, it 'utilizes

*only* a microcontroller * * * and does not require[] a separate computer module as

in the prior art [*clause 2*].'" Answering Br. 1-2 (quoting A130 (14:45-49), A131

(15:61-63) (underlining and bracketing added).

The phrase "the claimed cell phone," however, is found nowhere in these

passages, and the text never articulates global requirements for covered devices.

Instead, each clause is textually limited to one "*example*" of the invention's opera-

tion. First, clause 1 explicitly describes a single figure ("Fig. 2E") illustrating "one

application" of the invention. A130 (14:41-49). Defendants simply replace the *ac-*

9

*tual* term ("cellular telephone 100") with words they *wish* the patent used ("the claimed cell phone").[3]

Read in context, clause 2 discloses how, "in this example," the invention "permit[s]", not *requires*, Figure 1's "cellular telephone 100" to perform claimed functions with *minimal* processing power:

> *As illustrated in this example*, cellular telephone 100 transmitted a request for a particular purchase order, and scheduled transmission of data responsive to the request to a local machine capable of printing the data. Thus, the processes of this invention, as described more completely below, in cellular telephone 100 in combination with data capable cellular telephone network 110 and server computer 121 *permit* cellular telephone 100 to effectively utilize an application on server computer 121 on network 120 *even though cellular telephone 100 utilizes only a microcontroller found in telephone 100 and does not require[] a separate computer module as in the prior art*.

A131 (15:52-63) (emphases added).

The full text refutes Defendants' attempt to impose some unspecified limit on a device's hardware capabilities. Each passage textually discusses one "example," not the *definitive* claimed device, and each explains how the invention does

---

[3] The full passage: "The user is utilizing cellular telephone 100 as if cellular telephone 100 was a computer connected to network 120, but, as explained more completely below, cellular telephone 100 is similar to a standard digital data capable cellular telephone that communicates over data capable cellular telephone network 110. Specifically, cellular telephone 100 is not a combination of a computer module and a wireless communication module as in prior art attempts to create an intelligent telephone." A130 (14:41-49); *see also* A130 (14:31-41) (providing additional detail for "this example" describing a user entering a "purchase order").

not "*require[]*" a computer module, without stating that advanced processors are forbidden. *See In re Papst Licensing Digital Camera Patent Litig.*, 778 F.3d 1255, 1269 (Fed. Cir. 2015). This is far afield from a specification explicitly limiting features of "the present invention."[4]

It is unsurprising that the specification focused on *minimal* requirements, as that is exactly what the written description had to teach. It *was* necessary to explain how a device with minimal capacity would operate; it was *not* necessary to explain how a device with excess capacity (or other irrelevant features) would *not use* that capacity when practicing the claims. The specification must describe and disclose the invention. Had the patents intended to exclude certain devices, they would have said so expressly. The specification's deliberate use of broad and unqualified lan-

---

[4] Defendants maintain that "the description of cellular telephone 100 [must] pertain[] to the whole invention," because the specification explains that "[t]he same or similar operations can be performed on two-way data communication devices 101, and 102." Br. 25-26 (quoting A129 (11:44-46)). This is perplexing. By its plain terms, the specification simply established that "cellular telephone 100"—one device in Figure 1—would operate similarly to "two-way pager 101" and "telephone 102," two other devices in Figure 1. A129 (11:8-9, 39-52). The relevant comparison was between the "hardware" of those different devices—cellular phones versus pagers and landline phones—not a comparison between "cellular telephone 100" and every device conceivably covered by the invention. The fact that all of Figure 1's different devices might operate similarly does not mean that *all* devices are limited to features found in this single embodiment, a suggestion at odds with controlling precedent. *See, e.g.*, *Hill-Rom Servs.*, 755 F.3d at 1373.

guage—while carefully setting out *sufficient*, not *mandatory*, requirements—undercuts Defendants' theory.

### 2. The embodiments do not depict devices with "computer modules" because *excess* capacity is irrelevant to practicing the invention

It is true that "[t]he patent describes no embodiments that incorporate computer modules." Answering Br. 26. But it is also true, for example, that the patent describes no embodiments that incorporate thumbprint scanners, digital cameras, or fancy logos. Some features (including excess capacity) are not relevant to disclosing the invention or teaching the claimed functions. Any device with a "computer module" could perform the tasks illustrated by Figure 1's "cellular telephone 100." It was unnecessary to include other examples immaterial to practicing the invention.

Contrary to Defendants' contention, it is "not enough that the only embodiments, or all of the embodiments, contain a particular limitation." *Thorner*, 669 F.3d at 1366-67 (rejecting that commonality as a "clear and unmistakable disclaimer"). "[A] patentee's choice of embodiments can shed light on the intended scope of the claim, but a patent claim term is not limited merely because the embodiments in the specification all contain a particular feature." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 865 (Fed. Cir. 2004). These embodiments did not depict "intelligent" devices because excess capacity was irrelevant to teaching

the invention. It is inappropriate to read the features of these non-exclusive embodiments into the claims. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001).

### 3. Defendants do not identify any actual disclaimer, and instead read snippets of the specification out of context

Defendants cannot identify an explicit disclaimer because no such statement exists. Instead, Defendants isolate snippets of the specification, read that language out of context, and insert their own text to fill the gaps. That showing does not meet this Court's "exacting" standard.

For example, according to Defendants, the specification says that the invention "'use[s] existing resources in' a basic cell phone, <u>instead of a computer module</u>, to achieve the desired ends." Answering Br. 40 (quoting A126 (6:27-32)) (underlining added). But the full passage conveys a different message: "The client module of this invention is lightweight, and thus <u>requires only</u> lightweight resources in a two-way data communication device. Consequently, the client module <u>can use</u> existing resources in such a device and therefore does not add to the cost of the two-way data communication device." A126 (6:27-32) (underlining added).

This language, read in context, refutes Defendants' statement on multiple levels. It says nothing about using a "basic" cell phone "instead of a computer module." It says that the invention "*requires only* lightweight resources," and thus

can use a device's "existing resources," without any restriction on a device's hard-
ware capabilities. This is perfectly consistent with using the "existing resources" of
a *computer module*.

The specification does not even say that devices *must* use existing resources.
The language is *permissive*—it specifically says that devices "*can use*" those re-
sources, and there *is* a difference. This text discloses how to practice the invention,
and it explains that the invention is compatible with "*any* two-way communication
device," without "add[ing]" "cost." A125 (3:65) (emphasis added); A136 (25:9-13)
("[a]n application on HTTP server 749 can communicate with *any* two-way data
communication device that includes the appropriate client and a module to transmit
and receive data") (emphasis added). Advanced processors were not "*required*"
under the invention; any device with basic processing abilities (accommodating
"lightweight resources") could practice the claims and benefit from their use.

Defendants also assert that the patents *categorically* exclude computer mod-
ules: "the invention is 'unlike prior art approaches that attempted to combine a
computer module and a wireless communication module in a single package.'"
Answering Br. 7 (quoting A129 (11:4-8)). This is what the specification actually
says: "unlike prior art approaches that attempted to combine a computer module
and a wireless communication module in a single package, this embodiment of the
invention preferably utilizes the memory and processing power that currently ex-

ists in the cellular telephone 100, two-way pager 101, telephone 102 or other wireless or landline two-way data communication devices." A129 (11:4-10) (underlining added).

The actual language—without truncation—confirms that the specification discusses only "this embodiment," recommends only how the invention "preferably" works, and confirms its application to Figure 1's "example" devices (referencing their explicit labels, *e.g.*, "cellular telephone 100") and "*other*" devices—without *any* limitation on hardware-processing capabilities. Indeed, the very next sentence highlights an important way that the invention benefits *all* devices, as "*updating user applications* is removed from cellular telephone 100, two-way pager 101, and telephone 102." A129 (11:14-16) (emphasis added); *compare* Answering Br. 8 (omitting this key language after quoting an earlier snippet from the same sentence); *see also* A128 (9:63-10:1) (explaining how the invention improves "prior art attempts at intelligent communication devices" plagued by "closed systems and fixed functionality"). This language does not exclude "computer modules" at all, let alone "unmistakably."[5]

---

[5] Defendants are again incorrect (Answering Br. 26) that the specification's socalled "boilerplate language"—reaffirming that all "embodiments" are "illustrative only"—is irrelevant. That language is consistent with Unwired Planet's reading of the invention, and courts routinely credit similar language in evaluating purported disclaimers. *See, e.g.*, *Hill-Rom Servs.*, 755 F.3d at 1373 (crediting the specifica-

[Footnote continued on next page]

### 4.    Defendants misunderstand the specification's critique of the prior art and its related discussion of the invention's benefits

Defendants misunderstand the specification's statement that the invention does not add weight or cost to existing devices: "The specification's statements that heavy and expensive computer modules are 'not required' in the context of this specification *means that they are not used at all*." Answering Br. 31 (emphasis added). This fails as a matter of language and logic: the fact that something is "not required" does not mean that it is "not used"; it means that the feature is *unnecessary*: A device is not *limited* to minimal processing capabilities because it *requires* only minimal processing capabilities.

Under an ordinary reading, the specification explains that the invention operates without *introducing* the same problems that infected the prior art. *E.g.*, A128 (10:64-67) ("The inclusion of the processes of this invention in such cellular telephones therefore has very little effect on the cost, size, and power consumption of the cellular telephone."). It does not mean that the invention—fashioned explicitly to benefit "any" device, including "intelligent" devices (*e.g.*, A124 (2:10-33), A125 (3:61-4:21), A128 (9:60-10:1))—automatically excludes devices with "ex-

---

[Footnote continued from previous page]

tion's statement that "the figures" "merely 'illustrate embodiments of the invention'"); *Dealertrack*, 674 F.3d at 1322.

cess" capacity. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003).

**5.    The invention's "significant departure" from the prior art was not a "temporary workaround" but a "radical shift" to a new paradigm of open applications**

Defendants label the invention a "temporary workaround solution." Answering Br. 42. But that concept is not in the specification. The invention was designed to change the way all devices (including "intelligent" devices) would operate. It described in detail how the invention would "allow[] for the first time" "*any* two-way communication device that incorporates the principles of this invention" to "become open application platforms." A125 (3:61-67). The specification did not identify the invention as "temporary" or "limited" to a subset of devices; "*any*" means what it says, and the specification encompassed "intelligent devices" suffering from "closed, proprietary systems" (A125 (3:67-4:2)). *See also* A124 (2:10-33) (explaining how the invention benefits "the current crop of intelligent communication devices"). This "radical shift" marked a "significant departure from prior art systems," and there is no indication it was meant as temporary. A126 (5:34-35), A128 (9:31).[6]

---

[6] Defendants also misstate the marginal extrinsic evidence, none of which factored into the district court's decision. *See In re Papst Licensing*, 778 F.3d at 1261 ("we review the district court's claim constructions de novo, because intrinsic evidence

[Footnote continued on next page]

**6.    In stark contrast with its otherwise-exhaustive detail, the specification never defines "computer module" or "microcontroller," and the hazy distinction between those concepts is inconsistent with disclaimer**

Like the district court, Defendants cannot explain why the specification would place dispositive weight on an artificial distinction it never attempted to define. Opening Br. 36-37. As previously explained, this specification was precise and meticulous. It describes in exhaustive detail every component of the invention. It is difficult to presume that the same specification would draw a dispositive line between "computer modules" and "microcontrollers" without providing any hint where that threshold was crossed.

In response, Defendants insist that this issue is not "justiciable," because everyone agrees that *their* devices contain "computer modules," however that cate-

---

[Footnote continued from previous page]

fully determines the proper constructions") (citing *Teva Pharm. U.S.A. Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 840-42 (2015)). For example, according to Defendants, "OpenWave acknowledged in its 2008 Form 10-K that its 'business depends upon the mass adoption of mobile phones for delivery of data services,' but '*[c]ompeting products, such as * * * smart phones' were taking the market instead.*" Answering Br. 9 (quoting A5866) (emphasis added). But this document never said that. In a section discussing "Risk Factors" (A5865), OpenWave merely acknowledged that "[c]ompeting products," including "smart phones," "currently exist for mobile data delivery," and "[i]f mobile phones are not widely adopted for delivery of data services our customers may choose not to widely deploy, maintain or market offerings based on our products, which would adversely affect our business and operating results." A5866. This warns of potential risks; it does not "acknowledge" that competing products "were taking the market instead."

gory is defined. Answering Br. 16, 51-52. This misses the point entirely: the issue here—which most certainly *is* "justiciable"—is whether *any such distinction exists*. It may be possible to classify devices at each end of the spectrum. But that hardly supports the odd notion that the patentee used this amorphous line, which no one could define below, to mark the outer boundary of this critical invention.

Contrary to Defendants' contention, the district court did not find this undefined distinction "'obvious to a POSITA.'" Answering Br. 53 (quoting A9-A10). The district court said that "this issue may be obvious to a POSITA, *but it is not obvious to me*" (emphasis added). The clear implication from that (truncated) statement is exactly the *opposite* of what Defendants suggest: the district court could not explain or identify the distinction, and was unable to draw the line at any discernible point. Its remark that a POSITA may theoretically have that ability—but obviously had not demonstrated that ability below—does not support Defendants' case, but it assuredly does support Unwired Planet's.

### 7.  This Court's disavowal case law is context-specific—and wholly consistent with affording the patented claims their "plain and ordinary" meaning

Defendants insist that their limited showing is sufficient under this Court's case law. But as Defendants themselves recognize, "disavowal" cases are case-specific and "context-dependent" (Answering Br. 35); they often turn on fact-bound considerations, limiting the ability of any one decision (such as *Chicago Bd.*

*Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361 (Fed. Cir. 2012)) to directly control another.

In any event, Defendants' entire set of authority is distinguishable. Some of Defendants' cases turned partially (or more) on *prosecution-history* disclaimer, unlike here (with no mention of disclaimer in the file wrapper). *Compare Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1369-70 (Fed. Cir. 2014); *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1376 (Fed. Cir. 2008); *Superguide Corp. v. DirecTV Enters.*, 358 F.3d 870, 892 (Fed. Cir. 2004); *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1371 (Fed. Cir. 2003). Other cases found disclaimer "clear" or "inescapable" under the patent's plain text, unlike these patents' broad and inclusive language. *Compare Boss Control, Inc. v. Bombardier Inc.*, 410 F.3d 1372, 1379 (Fed. Cir. 2005); *Alloc*, 342 F.3d at 1370. Still others found disclaimer where the purported disparagement focused directly on an *actual element of the claim*, explaining that the patented operation would not function as intended—unlike here, where a device's hardware capabilities are *irrelevant* to the claimed operation (*i.e.*, any device can easily practice every claimed function, and the use of a "computer module" only affects indirect marketplace considerations). *Compare Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1320 (Fed. Cir. 2006); *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1354 (Fed. Cir. 2006).

And, of course, Unwired Planet previously explained why *Chicago Board* is perfectly consistent with resisting disclaimer here. Opening Br. 34 n.4 (distinguishing *Chicago Board* on multiple grounds (text, purpose, clarity, and context), many of which Defendants ignore). *Chicago Board* is further distinguishable on two additional grounds. The first is that *Chicago Board* did not obviously apply this Court's exacting standard: rather than searching for expressions of "clear and unmistakable" intent, *Chicago Board* found disavowal because "repeated derogatory statements * * * *reasonably* may be viewed as disavowal." 677 F.3d at 1372 (emphasis added). The question is not whether language "reasonably" supports disclaimer, but whether that language *compels* it. Second, *Chicago Board* identified specific problems with the prior art that would *frustrate* the invention's operation. *Ibid.* Here, by contrast, there is no reason that using a computer module would interfere with the patents' operation: any device with minimal capacity can leverage the power of a remote server and practice every claimed function exactly as intended. While not every device will take full advantage of the claimed invention— because devices with excess capacity may remain "bulky" or "expensive"—there is no reason to exclude those devices from the claimed scope, especially when they use the invention.

Contrary to Defendants' contention (Answering Br. 15, 48-49), it indeed matters under these cases that "intelligent" devices were disparaged as "*commer-*

21

*cially* deficient," not "*technically* deficient." This invention performs equally well on any device: the invention might not eliminate all marketplace deficiencies in "intelligent" devices, but the invention operates exactly as intended on those devices. *See, e.g.*, *Thorner*, 669 F.3d at 1366 ("even where a particular structure makes it 'particularly difficult' to obtain certain benefits of the claimed invention, this does not rise to the level of disavowal of the structure"); *Resonate Inc. v. Alteon Websyss., Inc.*, 338 F.3d 1360, 1367 (Fed. Cir. 2003) (the "invention claimed" need not "address" every "problem[]" identified in the prior art). This differs from the traditional disavowal setting, where the *invention itself* cannot perform properly with the disclaimed elements. *Compare GE Lighting Solutions, LLC v. Agilight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (describing past situations where "the specification indicated that for 'successful manufacture' a particular step was 'require[d]'"); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1332-33 (Fed. Cir. 2009) ("'this invention requires malleable, rather than resilient, wires'"); *Honeywell Int'l*, 452 F.3d at 1320 (explaining why disclaimed "carbon fibers" were "[un]suitable"); *SciMed Life Sys.*, 242 F.3d at 1343 (focusing on elements intrinsic to the claims). Here, by contrast, "any device" with minimal processing power can practice and benefit from the invention. There is no reason to disavow devices with computer modules when they invoke the claimed functions.

\*     \*     \*

Defendants cannot freely substitute the specification's careful phrasing for their preferred version of what they wish the patents said. Under the actual language, Defendants' position is unsustainable: the fact that it is *sufficient* to use a microcontroller does not mean it is *necessary* to use a microcontroller. The language sets a floor, not a ceiling: the invention can "*require[] only*" minimal processing without *excluding* "intelligent" devices. A128 (9:9-18) (emphasis added).

If the specification supported disavowal under this Court's "exacting" standard, Defendants would not resort to plucking language out of context and distorting the specification's plain text. Their position is unsupportable, and it should be rejected.

### D.    There Was No Disclaimer To Avoid The Prior Art—And Defendants' Contrary Suggestion Has No Basis In The Record

In an argument not developed below, Defendants assert that the patentee disavowed computer modules "in order to secure the patents." Answering Br. 19. According to Defendants, "[i]f the claims were broad enough to cover 'intelligent communicators' or other devices containing computer modules, they would not have issued." *Id.* at 35. Disclaimer, in short, "was a necessary prerequisite to patentability." *Id.* at 39.

Defendants cannot substantiate this theory. Defendants' entire support consists of *their own briefing and expert reports* from the ITC, none of which is even in the appellate record. *See* Answering Br. 38 (citing Defendants' own ITC materials). There is not one whit of tangible evidence that the patentee disclaimed "computer modules" at all, much less to avoid invalidity. Defendants fail to identify a single statement from the prosecution history. There is nothing in the file wrapper: they cannot identify a single example where Unwired Planet narrowed a claim in response to an examiner's objection, or any instance where Unwired Planet explained (or even *hinted*) that its focus was designed to overcome prior art. Defendants refuse to acknowledge that their expert's views were squarely refuted by Unwired Planet in the ITC litigation. Defendants do not even attempt to explain how these claims are *actually* invalid under one construction but not another, or whether "disavowal" would in fact eliminate Defendants' invalidity concerns. Indeed, Defendants overlook that one of only three patents-in-suit—the '037 patent—*is not even referenced* in the 200+ pages of material that Defendants block-cite to "prove" invalidity.

The specification distinguishes the prior art based on the invention's "radical shift" in dividing computing functions between devices and remote servers. That distinction has nothing to do with "computer modules." There was no need to dis-

claim any device to avoid the prior art, and Defendants' contrary theory is mistaken.

### 1. Defendants cite no evidence from the prosecution history, and their only support is *Defendants' own invalidity contentions* in the ITC

Contrary to Defendants' contention, Unwired Planet did not silently disavow "computer modules" in order to secure the patents. Defendants fail to cite *any* traditional source that typically supports this kind of argument. Defendants do not identify any direct statements from the patents themselves. They do not cite anything from the prosecution history: they have no evidence of any changes made in response to an official office action. They have a sum total of *zero* statements from the applicant, his attorney, or the patent examiner offering any hint of a disavowal to avoid prior art. Defendants cannot identify anything—not a single document, quotation, interview, brief, memorandum, lawsuit, rejection, etc.—remotely suggesting that invalidity was a true concern, much less that any (hypothetical) concern would be resolved by excluding "computer modules" from the invention's expansive sweep.

Instead, as their sole authority, Defendants are left citing their own invalidity arguments from the ITC. Answering Br. 38. That material, developed for litigation, cannot substantiate the raw claim that "computer modules" were disavowed in order to obtain the patent. Defendants again overlook that their expert testimony was

refuted by Unwired Planet. And Defendants again overlook that the undifferentiated 200+ pages of testimony and briefing (none of which is in the appellate record) does not even address *one of the three patents-in-suit*: the entire span of material is limited to the '409 and '447 patents, without any analysis of the '037 patent. Defendants' theory thus cannot even stand on its own terms: it is untrue that "[t]he prior art intelligent communicators *perform each limitation of the claims and would anticipate the patents-in-suit* if the patents did not disclaim devices with computer modules." Answering Br. 39 (emphasis added). Defendants' own evidence supplies no foundation for "the claims" of an *entire patent*. Even crediting, without analysis, Defendants' own litigation material, Defendants still cannot explain why the patentee would have disavowed computer modules for the '037 patent.[7]

Nor is it appropriate to credit Defendants' assertions without accompanying analysis. Parties cannot typically refer the Court to 200+ pages of material without any effort to explain or develop the arguments supported by that material. If De-

---

[7] Defendants' argument further suffers from a non-sequitur: A party cannot "avoid" invalidity via disclaimer where the patent would supposedly be invalid *even without disclaimer*. Defendants refuse to admit that Unwired Planet could *avoid* invalidity by disclaiming computer modules—they simply maintain that "serious invalidity concerns" could be "averted *or mitigated*" by a disclaimer. Answering Br. 38 (emphasis added). Until Defendants directly concede that their invalidity defenses *necessarily* fail if "computer modules" are disavowed, there would be no reason for a patentee to disavow anything.

fendants wished to establish a looming invalidity defense as a basis for disavowal, it was Defendants' obligation to substantiate that issue below. A broad citation to chunks of expert testimony and briefing is an inadequate substitute for crafting a concrete theory with actual evidence and argument.

If Unwired Planet (or the patent examiner) felt that disclaimer was necessary to avoid prior art, one would expect to find *some* explicit indication to that effect—and one would expect the PTO to resist claim language drawn as broadly and categorically as these claims. This is especially true where the specification repeatedly highlights ways that the invention confronts and cures problems infecting "intelligent" devices—a clear sign that those purportedly "disclaimed" devices were still covered by the claims. *See* Part B, *supra*. If invalidity were a genuine issue, the PTO would not tolerate the internal contradiction.

Parties do not randomly disclaim claim scope in such a strange and haphazard fashion. Defendants' new theory is at odds with common experience and common sense. In a world in which disclaimer must be "clear and unmistakable," this argument falls short of the mark. *Omega Eng'g*, 334 F.3d at 1326.

### 2. The patents distinguished the prior art on independent grounds

According to Defendants, the only distinction between the claimed invention and the prior art is that the invention "does not include a computer module"—"[t]he patents do not distinguish any of the prior art intelligent communicators on

any other basis." Answering Br. 8, 39. This again is wrong. As described above, the patents explicitly state how dividing processing power between devices and their remote servers marked "a significant departure from prior art systems." A126 (5:34-35); A128 (9:31-67) (explaining how the invention's "radical shift" eliminates the "closed, proprietary systems" that hampered "prior art attempts at intelligent communication devices"). This alone distinguishes the prior art, and it has nothing to do with "computer modules."

Besides, Defendants' premise is wrong, as the invention most certainly *can* "include a computer module." The specification says that "computer modules" were not "*required*," but that hardly says computer modules were *forbidden*. Any device with basic processing abilities could practice the invention and benefit from its operation. *See, e.g.*, A133 (20:55-57) ("[a]gain, note that this invention does not require a separate processor and instead *can* utilize"—not *must* utilize—"the processing power that already exists in cellular telephone 600") (emphasis added). Defendants' contrary view tracks the same logical error that produced the decision below. It lacks support and should be rejected.[8]

---

[8] Contrary to Defendants' contention (Answering Br. 39), Defendants' theory indeed pitches this case as an unusual example of a wholly gratuitous disclaimer. If "intelligent" devices were not disclaimed to avoid prior art (they were not), there was no articulable reason to exclude them from the invention. The specification explains in direct language how an "intelligent" device could employ the patented

[Footnote continued on next page]

### E.    If Any Disclaimer Is Appropriate, It Should Be Limited To Disclaiming Devices With A Separate Computer Module

As previously explained (Opening Br. 38-39), at most, the patents would disclaim only a *separate* computer module, not a single processor functioning both as a "microcontroller" and a "computer module" (whatever those undefined, insoluble terms mean).

Defendants suggest this theory was waived below and is unreviewable on appeal. Answering Br. 53. Yet the correct test asks whether an issue, disjunctively, was "pressed" *or* "passed upon" below (*e.g.*, *United States v. Williams*, 504 U.S. 36, 41 (1992)), and it most surely was passed upon here: the district court squarely raised and resolved the issue in its opinion (A7), and its ruling is sufficient grounds for challenging the issue on appeal. *See Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1364 n.2 (Fed. Cir. 2014).[9]

Defendants' theory (Answering Br. 53-54) also fails on the merits. Leaving aside everything else, the specification's plain language is at least susceptible to a

---

[Footnote continued from previous page]

technology and "for the first time" operate as an "open application platform[]." A125 (3:61-67). Those devices can benefit from this invention even if *other* marketability concerns remain. There is no reason to presume that the patentee would artificially restrict the patents' scope in this fashion.

[9] Moreover, Defendants' assertion of waiver below—a single sentence with no citation (A7876)—is thin for establishing a dispositive defense at this stage. Unwired Planet's alternative theory was a fair response to Defendants' *Markman* opposition, which likely explains why the district court did not rest on waiver here.

construction that says a *separate* computer module is not required. That is consistent with the specification's teachings that the invention is operable using existing capacity on ordinary devices. *See, e.g.*, A63 (15:7-16:2), A65 (20:56-60). Under this Court's "exacting" standard, if it is not necessary to read a patent to disavow claim scope, it is necessary *not* to read the patent that way. *Sandisk Corp.*, 415 F.3d at 1287. If the Court believes that anything was disavowed, this alternative construction is more measured; the district court's finding was excessive, and it warrants reversal.[10]

---

[10] Defendants accuse Unwired Planet of "'wasting'" judicial and party resources by "'shopping around for another forum'" after dismissing its ITC action. Answering Br. 20. This reflects an unfair rendition of the record. Unwired Planet abandoned the ITC proceeding to *preserve* time and effort. It was pointless to continue in that forum without taking an immediate appeal from the ITC's flawed claim construction, and an immediate appeal was unavailable in that forum. In returning to district court—which was not "shopping" for a *new* forum, but reinstating a *preexisting* case (Opening Br. 10-11)—Unwired Planet again attempted to minimize the strain on judicial and party resources. Rather than demanding robust discovery or extensive motions practice, Unwired Planet endorsed a streamlined procedure that would present the (potentially dispositive) claim-construction issue as efficiently as possible. Opening Br. 10-13. Defendants may have preferred that Unwired Planet press ahead with pointless proceedings in the ITC—or, more to the point, may have preferred that Unwired Planet abandon its appellate rights. But these proceedings reflect a reasonable effort to accommodate the legitimate interests of all sides. Defendants' contrary suggestion is mistaken.

## CONCLUSION

In light of the district court's incorrect finding of specification disclaimer, the judgment of non-infringement should be reversed, and the case should be re-manded for further proceedings.

Respectfully submitted.

/s/ *Theodore Stevenson, III*
Theodore Stevenson, III
   *Principal Attorney*
Daniel L. Geyser
Jared M. Hoggan
Nicholas Mathews
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
Tel.: (214) 978-4000
Fax: (214) 978-4044
*tstevenson@mckoolsmith.com*
*dgeyser@mckoolsmith.com*
*jhoggan@mckoolsmith.com*
*nmathews@mckoolsmith.com*

*Counsel for Plaintiff-Appellant Unwired Planet, Inc. (f/k/a/ Openwave Systems, Inc.)*

July 1, 2015

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 7,000 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

/s/ *Daniel L. Geyser*
Daniel L. Geyser
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
Tel.: (214) 978-4014
Fax: (214) 978-4044
*dgeyser@mckoolsmith.com*

*Counsel for Plaintiff-Appellant*
*Unwired Planet, Inc. (f/k/a/ Openwave Systems, Inc.)*

July 1, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2015, an electronic copy of the foregoing Reply Brief was filed with the Clerk of Court for the U.S. Court of Appeals for the Federal Circuit, using the appellate CM/ECF system. I further certify that all parties in the case are represented by lead counsel who are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Daniel L. Geyser*
Daniel L. Geyser
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201
Tel.:  (214) 978-4014
Fax:  (214) 978-4044
*dgeyser@mckoolsmith.com*

July 1, 2015